**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

NATIONAL DAY LABORER ORGANIZING
NETWORK; CENTER FOR CONSTITUTIONAL
RIGHTS; and IMMIGRATION JUSTICE
CLINIC OF THE BENJAMIN N. CARDOZO
SCHOOL OF LAW,

                    Plaintiffs.

        v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW;
FEDERAL BUREAU OF INVESTIGATION;
and OFFICE OF LEGAL COUNSEL,

                    Defendants.

-------------------------------------------------------------X

Civil Action No.:

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**



## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552, *et seq.*, for declaratory, injunctive, and other appropriate relief to compel the release

of agency records improperly withheld from Plaintiffs, National Day Laborer Organizing

Network ("NDLON"), Center for Constitutional Rights ("CCR"), and Immigration

Justice Clinic of the Benjamin N. Cardozo School of Law ("the Immigration Justice

Clinic" or "the Clinic") (collectively "Plaintiffs"), by Defendants, U.S. Immigration and

Customs Enforcement Agency ("ICE"), U.S. Department of Homeland Security

("DHS"), Executive Office for Immigration Review ("EOIR"), Federal Bureau of

Investigation ("FBI"), and Office of Legal Counsel ("OLC") (collectively "Defendants").

2.      Plaintiffs seek the release of records on a matter of significant public concern: documents related to ICE's immigration enforcement program "Secure Communities."

3.      Secure Communities subjects people interacting with the criminal justice system to an automatic and indiscriminate civil immigration investigation. Through Secure Communities, ICE identifies large numbers of people for deportation by cross-checking fingerprints submitted through criminal FBI fingerprint queries against error-prone civil immigration databases. According to ICE, Secure Communities will also involve a dramatic expansion of the existing immigration detention and removal system.

4.      The program is in its pilot phase and currently operating in at least 145 jurisdictions. ICE expects to extend it to every jail in the country by 2013.[1]

5.      Despite the immense scale of Secure Communities, ICE has released little information about it to the public. The limited information available is vague and conflicting. Significant details are unknown, including: the methods by which Secure Communities operates; the implementation process for Secure Communities in local jurisdictions; whether local jurisdictions can decide not to participate; whether any congressional or agency oversight mechanisms exist; the policies and procedures ICE has in place to pursue its mandate of prioritizing the identification of "dangerous criminal aliens"; and details about Secure Communities' expansion and "transformation" of the immigration detention and removal system. ICE has failed to clarify the fiscal impact of Secure Communities on federal, state, and local governments, or the program's impact on community relations with local law enforcement agencies. Nor has ICE identified

---

[1] *See* Press Release, Immigration and Customs Enforcement, Secure Communities Activated in More Virginia Communities (Apr. 13, 2010), http://www.ice.gov/pi/nr/1004/100413fairfax.htm.

mechanisms for addressing racial profiling or the misidentification of United States citizens and other individuals not subject to removal.

6.     In light of ICE's intention to expand Secure Communities, Plaintiffs seek information necessary to facilitate meaningful public discourse and increase government transparency. Community members, as well as state and local government officials, urgently need the information sought by Plaintiffs to make appropriate decisions about implementing the program and conducting oversight.

7.     NDLON, CCR, and the Clinic submitted FOIA requests ("Plaintiffs' Requests") to Defendants on February 3, 2010, seeking records related to Secure Communities. Plaintiffs sought records related to policies, procedures, and objectives; data and statistical information; individuals subject to Secure Communities queries or ICE detainers; fiscal impact; agency communications; program assessment; and complaint mechanisms and oversight.

8.     Despite the urgent public need for information about Secure Communities as ICE continues to expand the program,[2] Defendants have failed to respond to Plaintiffs' Requests within the statutory timeframe.

9.     To vindicate the public's right to information about practices and policies relating to the ongoing implementation and expansion of Secure Communities, Plaintiffs seek declaratory, injunctive, and other appropriate relief to compel Defendants to immediately process Plaintiffs' Requests and release records that have been unlawfully withheld.

_____

[2] ICE has expanded Secure Communities to at least 27 new jurisdictions since the February 3, 2010 requests. *See id.*

3

## JURISDICTION AND VENUE

10.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 522(a)(6)(C)(i). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

11.     Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a).

## PARTIES

12.     Plaintiff NDLON is a non-profit organization founded in 2001 whose mission is to improve the lives of immigrant day laborers in the United States through nationwide advocacy and organizing efforts in coordination with thirty-eight member organizations in fifteen states. Toward this end, NDLON seeks to strengthen, connect, and expand the work of its member organizations in order to become more effective and strategic in building leadership and advancing low-wage worker and immigrant rights. The office and principal place of business of NDLON is located in Los Angeles County, California.

13.     Plaintiff CCR is a New York-based legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights, including materials on immigration enforcement. CCR publishes regular newsletters, know-your-rights handbooks, and other informational materials for public dissemination. These materials are also available through CCR's Development, Communications, and Education and Outreach Departments. CCR operates a website, www.ccrjustice.org, that addresses the issues on which CCR works. The website includes material on topical civil and human rights issues and material concerning CCR's work. In addition, CCR maintains a comprehensive

Secure Communities website, www.ccrjustice.org/secure-communities, which will serve as a resource to community members and a mechanism to disseminate information disclosed pursuant to FOIA. All of this material is free to the public. The office and principal place of business of CCR is located in New York County, New York.

14.     Plaintiff Immigration Justice Clinic was founded in 2008 to provide quality *pro bono* legal representation to indigent immigrants facing deportation as well as community-based organizations in public policy and litigation projects. In its first two years of existence, the Clinic has already established itself as a leader in the dissemination of critically important information about immigration enforcement operations to the public. In February 2009, the Clinic issued a press release and disseminated previously unavailable secret memoranda and data obtained through FOIA litigation that was related to ICE home raid operations, resulting in widespread national media coverage. In July 2009, the Clinic published the first public study of ICE's home raid operations, also drawing on data from FOIA litigation. The report played a critical role in informing the public of widespread constitutional violations and other abuses, again attracting significant national media attention, and ultimately leading to significant policy changes by ICE. These materials are freely available to the public on the Clinic's website. The Clinic's office and principal place of business is located in New York County, New York.

15.     Defendant DHS is a Department of the Executive Branch of the United States. Defendant ICE is a component of DHS. Both DHS and ICE are "agencies" within the meaning of 5 U.S.C. § 552(f)(1).

16.     Defendants EOIR, FBI, and OLC are components of the Department of Justice

("DOJ"), a Department of the Executive Branch of the United States, and each is an

"agency" within the meaning of 5 U.S.C. § 552(f)(1).

## STATEMENT OF FACTS

17.     All statements made herein are made upon information and belief except where

the basis of knowledge is specifically stated.

**I.     ICE Is Rapidly Implementing Secure Communities Nationwide Without
        Sufficient Transparency, Oversight, or Public Engagement**

18.     ICE has withheld from the public even the most basic information about Secure

Communities' implementation and effects, including, but not limited to: 1) the

mechanisms Secure Communities uses to avoid errors within its automated identification

process; 2) ICE's policies and procedures relating to the targeting of individuals for

detention and removal; 3) details about Secure Communities' dramatic expansion of the

immigration detention and removal system; 4) the implications of Secure Communities

for local communities, crime victims, and individual civil liberties; and, 5) the method by

which ICE negotiates agreements to implement the program in states and localities.

**A.  Secure Communities Employs an Unreliable Automated Identification
        Process Lacking in Transparency and Accountability**

19.     The central component of Secure Communities appears to be an electronic

database interoperability system whereby ICE maintains a technological presence in local

jails and prisons throughout the country.

20.     Local law enforcement officials routinely perform fingerprint screenings after

arrests and submit the fingerprints to the FBI's Integrated Automated Fingerprint

Identification System ("IAFIS"), a criminal records database maintained by the FBI

Criminal Justice Information Services Division ("CJIS"). The Secure Communities
database system redirects these fingerprints to error-prone civil immigration databases.

    21.    Secure Communities relies on two central DHS databases of immigration
information—the U.S. Visitor and Immigrant Status Indicator Technology Program
("US-VISIT") and the Automated Biometric Identification System ("IDENT"). Both US-
VISIT and IDENT have been riddled with errors and inaccuracies since their
introduction. The DOJ Office of the Inspector General issued a report that concluded that
immigration databases "continue[] to face significant data accuracy problems . . . caused
by data entry errors, incompatibilities between the systems, and the lack of a system for
correcting data inaccuracies."[3]

    22.    In the first year of Secure Communities, ICE subjected nearly one million
individuals, including U.S. citizens and green card holders, to this clandestine
immigration investigation.[4]

    23.    Database inaccuracies are particularly concerning in the case of U.S. citizens.
False "matches" under Secure Communities are likely in the context of derivative
citizens, foreign-born individuals who become U.S. citizens by operation of law when
one of their parents naturalizes. Because derivative citizens gain citizenship
automatically, without the intervention of any government agency, they are likely to
appear as potentially removable non-citizens in a DHS database. This likelihood is

---

[3] Dep't of Justice, Office of Inspector General, Evaluation and Inspectors Division, No. I-
2003-004, The Immigration and Naturalization Service's Removal of Aliens Issued Final
Orders, at v. (Feb. 2003), *available at* www.justice.gov/oig/reports/INS/e0304/final.pdf.
[4] *See* Press Release, Immigration and Customs Enforcement, New ICE Initiative
Launched in 3 Georgia Counties (Nov. 17, 2009), http://www.ice.gov/pi/nr/0911
/091117atlanta.htm.

compounded by the fact that many derivative citizens are not aware of their citizenship status.

24.    Since 2008, Secure Communities has identified more than 5,800 United States citizens as database "matches."[5]

25.    FOIA disclosure is an essential step towards understanding and correcting the fundamental failings of the identification mechanisms on which Secure Communities relies.

**B. ICE Has Not Disclosed Policies and Procedures Relating to Case Processing or Detainer Issuance**

26.    In the next stage of the Secure Communities process, the ICE Law Enforcement Support Center ("LESC") is notified of any fingerprint matches in the immigration databases. The LESC "processes" the matches to determine whether the individual may be removable. Information about this process is not publicly available.[6]

27.    ICE then determines whether to issue an immigration detainer to the local authorities with custody of the subject.[7] Once ICE issues a detainer, the individual may be held by the local or state jurisdiction for up to forty-eight hours after they would

---

[5] *See id.*; Julia Preston, *U.S. Identifies 111,000 Immigrants with Criminal Records,* N.Y. Times, Nov. 13, 2009, at A13 ("According to ICE figures, about 5,880 people identified through the program turned out to be United States citizens."); Diane Solis, *Secure Communities Databases Net Arrests of About 22,000 Illegal Immigrants*, Dallas Morning News, Nov. 13, 2009, http://carrolltonblog.dallasnews.com/archives/2009/11 /secure-communities-databases-n.html ("Of the 12 percent [of individuals Secure Communities identified as foreign born], about 5,900 people were U.S. citizens, which raises questions about database flaws.").

[6] *See* Dep't of Homeland Security, Immigration and Customs Enforcement, Secure Communities Standard Operating Procedures 4 (Sept. 30, 2009) [hereinafter ICE Standard Operating Procedures], *available at* http://www.ice.gov/doclib/foia /secure_communities/securecommunitiesops93009.pdf.

[7] ICE Standard Operating Procedures, *supra* note 6, at 4-5.

otherwise have been released, in order to facilitate transfer to ICE custody. 8 C.F.R. §
287.7(d) (2010).

28.     ICE has not disclosed how it makes the determination about whether to issue a
detainer; any measures in place to prevent errors and abuses; or whether it considers
relevant factors such as an individual's age, health, pregnancy, or whether the individual
is a crime victim.

29.     ICE states that Secure Communities will prioritize the removal of "the most
dangerous criminal aliens."[8] ICE purports to classify offenses into three categories of
seriousness and prioritize the most serious category of offenses.[9]

30.     The few statistics ICE has released about the Secure Communities' pilot phase,
however, indicate that ICE is not following a prioritization scheme. As of November
2009, only ten percent of the individuals identified through Secure Communities had
been charged with or convicted of the most serious category of crimes, while ninety
percent of detainers have been issued for people who do not fall into the highest priority
category.[10]

31.     In addition to failing to release information about the procedures it follows in
processing individual cases and targeting individuals for detention, ICE has also failed to
explain statements about the drastic changes to the existing ICE enforcement scheme that
Secure Communities will require.

---

[8] Immigration and Customs Enforcement, Secure Communities Fact Sheet 1 (Sept. 1,
2009), http://www.ice.gov/doclib/pi /news/factsheets/secure_communities.pdf.
[9] ICE Standard Operating Procedures, *supra* note 6, at 5.
[10] Press Release, Immigration and Customs Enforcement, Secretary Napolitano and ICE
Assistant Secretary Morton Announce That the Secure Communities Program Identified
More Than 111,000 Criminal Aliens in Its First Year (Nov. 12, 2009),
http://www.ice.gov/pi/nr/0911/091112washington.htm.

9

### C. ICE Has Not Disclosed Details About Its Plan to Expand the Immigration Detention and Removal System as an Element of Secure Communities

32.     ICE states that another element of Secure Communities is the expansion of the flawed immigration detention and removal system.

33.     When ICE lodges a civil immigration detainer against an individual who has been identified through the Secure Communities process, that person is generally transferred to ICE custody and enters ICE's detention and removal system.

34.     ICE acknowledges that Secure Communities will "dramatically increase" the number of individuals entering the detention and removal system, and ICE claims the program will "boost its capabilities to arrest, process, detain, and ultimately remove aliens from the United States."[11] ICE's predictions about increased detention rates are confirmed by the experience of at least one jurisdiction participating in the pilot phase.[12]

35.     The current detention and removal system is already plagued with well-documented and pervasive problems. Studies of individual detention facilities and of the immigration detention system as a whole conducted by government experts, journalists, and other observers have resulted in extensive criticism for, *inter alia*, unacceptable health and safety conditions, insufficient access to communications and legal services, extensive due process violations, and a lack of uniform and binding standards and guidelines.[13]

---

[11] Secure Communities Fact Sheet, *supra* note 8, at 2.

[12] *See, e.g.*, Susan Carroll & Bradley Olson, *Cost Sidelines Parker Promise to Use ICE Initiative at City Jail*, Houston Chronicle, Feb. 24, 2010, *available at* http://www.chron.com/disp/story.mpl/metropolitan/6884140.html (citing Houston Assistant Police Chief Dan Perales' statement that ICE filed detainers on more suspects in the first two months after implementation of Secure Communities than it had in the previous year).

[13] *See e.g.*, Dora Schriro, Immigration and Customs Enforcement, Immigration Detention Overview and Recommendations (Oct. 6, 2009), *available at* http://www.ice.gov/doclib

36.    The expansion of ICE detention and removal will lead to an increased risk of

errors, due process violations, and increased costs throughout the detention and removal

process. However, ICE has not publicly addressed how it will manage the high volume of

individuals that the new initiative will sweep into an already overcrowded system,[14]

adding to the backlogs of already overburdened immigration courts.[15]

37.    FOIA disclosure about ICE's plans to manage the dramatic increase in the

volume of the detained population in ICE custody will allow the public to coordinate

oversight and hold ICE accountable.

### D.  ICE Has Not Disclosed Basic Information About the Impact of Secure Communities on Local Communities and Civil Liberties

38.    Through Secure Communities, ICE intends to have a technological presence in

every jail in the country by 2013. Still, ICE has failed to address publicly concerns

regarding the program's long-term impact on communities, or to propose mechanisms

that prevent it from hindering local law enforcement and eroding community relations.

---

/091005_ice_detention_report-final.pdf; Dep't of Homeland Sec., Office of Inspector
Gen., OIG-10-13, Immigrations and Customs Enforcement Policies and Procedures
Related to Detainee Transfers (Nov. 2009), *available at* http://www.dhs.gov/xoig/assets
/mgmtrpts/OIG_10-13_Nov09.pdf; The Constitution Project, Recommendations for
Reforming our Immigration Detention System and Promoting Access to Counsel in
Immigration Proceedings (Oct. 2009), *available at* http://www.constitutionproject.org
/manage/file/359.pdf; Human Rights Comm., U.N. Special Rapporteur on the Human
Rights of Migrants, Mission to the United States of America, U.N. Doc.
A/HRC/7/12/Add.2 (Mar. 5, 2008) *available at* http://texascivilrightsreview.org/tcrr/docs
/bustamante08a.pdf; Amnesty International, Jailed Without Justice: Immigration
Detention in the USA (May 2009), *available at* http://www.amnestyusa.org/uploads
/JailedWithoutJustice.pdf; American Bar Association, Ensuring Fairness and Due Process
in Immigration Proceedings (Dec. 2008), *available at* http://www.abanet.org/poladv
/transition/2008dec_immigration.pdf.
[14] *See* Schriro, *supra* note 13, at 13.
[15] Transactional Records Access Clearinghouse, Backlogs in Immigration Courts Expand,
Wait Times Grow (Jun. 18, 2009), http://trac.syr.edu/immigration/reports/208/.

39.    Secure Communities increases the already significant financial strain on states and localities by imposing additional costs for detaining individuals subject to civil immigration detainers, sometimes throughout the pendency of criminal proceedings and often after they would otherwise have been released on bail, on their own recognizance, or at the conclusion of their criminal proceedings.[16] Once an immigration detainer is in place, the person will not be released on bail in any pending criminal proceedings, even if the criminal court determines the individual is not a flight risk or a danger to the community. Local jurisdictions absorb significant costs incurred for detaining individuals on immigration detainers and are not reimbursed by ICE.

40.    ICE has not provided any financial resources to alleviate this strain or guidance on how to balance other financial burdens.

41.    Local communities are concerned that incorporating immigration enforcement into local jails undermines law enforcement-community relationships because individuals will be afraid to report crimes, especially in domestic incidents.[17] Secure Communities may also incentivize law enforcement officers to subject members of immigrant communities to pre-textual discretionary arrests, knowing that regardless of the legality

---

[16] 8 C.F.R. 287.7(d) (2010).

[17] *See, e.g.,* Susan Carroll & James Pinkerton, *HPD Fighting Lack of Trust on Some Calls*, Houston Chronicle, Feb. 22, 2010, *available at* http://www.chron.com/disp/ story.mpl/metropolitan/6878331.html (detailing how an immigrant witness' decision not report a crime for fear of immigration consequences led to his brother's murder, and stating that "[the Houston Police Department's] relationship with local immigrant communities has suffered" due to the city's consideration of 287(g) and implementation of Secure Communities); Ben Sanders, *Houston's Illegal Immigrants Get One More Reason Not To Talk to Cops*, Reason, Feb. 23, 2010, http://reason.com/blog/2010/02/23 /houstons-illegal-immigrants-ge (stating that "[s]ince Houston partnered with [ICE] in the Secure Communities program to run automated immigration checks on all detainees, members of Houston's immigrant communities have been increasingly reluctant to speak with the police").

or outcome of the arrest, Secure Communities will automatically subject the individual to a civil immigration investigation.[18]

42.     Despite Secure Communities' potential to impact negatively public safety and civil liberties, ICE has not released any information regarding training or guidance for local partners, or other mechanisms to protect public safety and local communities.

43.     It is difficult to assess the extent of problems posed by Secure Communities to date, because ICE has not made available data or statistics regarding the error rate of Secure Communities identifications, policies regarding redress procedures or oversight, evaluations of the program's effectiveness, or even the vast majority of agreements that it ostensibly has negotiated with states and localities.

---

[18] *See* Orange County Board of Commissioners, Recommendations from the Human Relations Commission Concerning the "Secure Communities" Program in Orange County 6 (Jan. 21, 2010), *available at* http://www.co.orange.nc.us/OCCLERKS /1001213b.pdf (expressing concern that "the consequences of someone being arrested through racial profiling can now include deportation and the separation of families," and recommending that local law enforcement agencies ensure "thorough training" to prevent racial profiling); Alex Kingsbury, *Immigration Checks on Criminals Could Increase Deportations*, U.S. News & World Report, Apr. 20, 2010 (citing a letter from a coalition of immigrants' rights organizations to House Speaker Nancy Pelosi stating that Secure Communities "creates an incentive for police to arrest people on pre-textual or minor crimes so that their immigration status can be checked" and that it "will likely lead to unlawful racial and ethnic profiling," and reporting that "federal authorities are currently investigating several claims that [ICE programs similar to Secure Communities] have led to instances of racial profiling"); Nat'l Immigr. Forum, Secure Communities Fact Sheet, *available at* http://www.immigrationforum.org/images/uploads/Secure_Communities.pdf (stating that "[a]lthough individuals are checked once they are in jail, it matters how they got into the jail in the first place. Police officers with a motive to deport undocumented immigrants—or who have a prejudice towards Latinos or other persons of color—will find a pretext to arrest a person, bring them into the jail, and check their fingerprints against the DHS databases in the hopes of turning them over to ICE").

### E. ICE Has Not Revealed the Process by Which It Negotiates Participation in Secure Communities With States and Localities

44.     As of February 2010, Secure Communities was operating in 118 jurisdictions[19] in sixteen states.[20] ICE is currently coordinating with states and local jurisdictions to expand Secure Communities to every state by 2011 and to every jail and prison throughout the country by 2013.[21]

45.     The Secure Communities Standard Operating Procedures states that ICE signs Memoranda of Agreement with State Identification Bureaus.[22] ICE has not, however, clarified how these agreements are negotiated on the state or local level or who has the authority to enter into an agreement on behalf of a State Identification Bureau or other state or local entity. Further, in spite of the significant impact of Secure Communities, no information is available as to whether other state or local actors have the opportunity to participate in negotiations surrounding the adoption and implementation of the program, or whether a local correctional facility, agency, or jurisdiction may decline to participate in Secure Communities.

46.     Just since the submission of Plaintiffs' Requests in February 2010, twenty-two previously undisclosed agreements became publicly available, some months after they

---

[19] Although ICE has indicated that "high-risk" jurisdictions are its priority, no information is available regarding how these "high-risk" jurisdictions are identified. Secure Communities Fact Sheet, *supra* note 8.
[20] Dep't of Homeland Sec., Immigration and Customs Enforcement, Strategy to Accelerate and Expand Secure Communities (Mar. 4, 2010), http://www.ice.gov /secure_communities/deployment/.
[21] Press Release, Immigration and Customs Enforcement, Secretary Napolitano and ICE Assistant Secretary Morton Announce That the Secure Communities Initiative Identified More Than 111,000 Criminal Aliens in Its First Year (Nov. 12, 2009), http:// www.dhs.gov/ynews/releases/pr_1258044387591.shtm.
[22] ICE Standard Operating Procedures, *supra* note 6, at 3.

were signed.[23] The rate at which new agreements are being signed underscores the

urgency of Plaintiffs' Requests and the public's need for meaningful information about

Secure Communities.

47.     The public needs information about the mechanisms for the program's

implementation in order to hold local officials accountable for their decisions to

participate in federal civil immigration enforcement. Past negative experiences with ICE

programs involving local law enforcement and corrections agencies reinforce the great

need for comprehensive public information about Secure Communities.

## II.    Secure Communities Constitutes A Substantial Expansion of Smaller-Scale Jail-Based Enforcement Programs Denounced as Flawed and Secretive

48.     The Criminal Alien Program ("CAP") and 287(g) are smaller-scale ICE jail-

based screening programs preceding, and similar, in some ways, to Secure Communities.

The government's own investigations revealed that ICE consistently attempted to conceal

fundamental flaws of these Secure Communities precursors by failing to affirmatively

collect and disclose critical data and by providing misleading information.[24]

49.     CAP involves personnel at participating jails notifying federal immigration

enforcement agents about foreign-born inmates. Federal immigration agents then may

---

[23] Dep't of Homeland Sec., Immigration and Customs Enforcement, FOIA Reading Room (last modified Apr. 15, 2010), http://www.ice.gov/foia/readingroom.htm.
[24] *See e.g.*, U.S. Gov't Accountability Office, GAO-09-109, Immigration Enforcement: Better Controls Needed over Program Authorizing State and Local Enforcement of Federal Immigration Laws 23-24 (Jan. 2009), *available at* http://www.gao.gov/products/ GAO-09-109 (concluding that ICE has failed to institute sufficient oversight, data collection practices, or clear objectives in implementing the 287(g) program); Dep't of Homeland Sec., OIG-10-13, *supra* note 13, at 35-37 (documenting ICE's systematic failure to manage 287(g) in accordance with prioritization objectives, issue accurate information about the program, or address serious civil liberties concerns).

choose to conduct interviews with these individuals in an attempt to ascertain

immigration status and target individuals for detention and removal.[25]

50.    The 287(g) program cross-designates corrections and law enforcement officers

in participating states and local jurisdictions to enforce federal immigration law.[26]

Through 287(g), local law enforcement officers are deputized to conduct the jail-house

interviews generally performed by federal immigration agents as part of CAP.

51.    Like Secure Communities, CAP and 287(g) purport to target individuals held in

state and local jails for detention and removal.[27] Neither CAP nor 287(g), however,

operate nationwide,[28] while DHS envisions implementation of Secure Communities in

every jail and prison in the country.

---

[25] Immigration Policy Center, The Criminal Alien Program: Immigration Enforcement in Travis County, Texas 4-5 (Feb. 2010), *available at* http://www.immigrationpolicy.org /sites/default/files/docs/Criminal_Alien_Program_021710.pdf.

[26] *See* Dep't of Homeland Sec., Immigration and Customs Enforcement, Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act: The ICE 287(g) Program, http://www.ice.gov/pi/news/factsheets/section287_g.htm (last visited Apr. 23, 2010).

[27] Dep't of Homeland Sec., Immigration and Customs Enforcement, Criminal Alien Program, http://www.ice.gov/partners/dro/cap.htm (last visited Apr. 23, 2010).

[28] CAP currently operates in approximately ten percent of the 3,100 local jails and prisons across the country. Trevor Gardner II & Aarti Kohli, Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity, UC Berkeley Law School, The C.A.P. Effect: Racial Profiling in the ICE Criminal Alien Program 2 n. 6 (Sept. 2009) (citing ICE, "ICE Access: State/Local Coordination," www.ice.gov/partners/dro/iceaccess.htm (as viewed on July 24, 2009)), *available at* http://www.law.berkeley.edu/files /policybrief_irving_FINAL.pdf. Although 287(g) was authorized by statute in 1996, it was not implemented in any local jurisdiction until 2001, and was implemented in only three jurisdictions prior to 2007. Migration Policy Institute, A Program in Flux: New Priorities and Implementation Challenges for 287(g) 6 (citing ICE data), *available at* http://www.migrationpolicy.org/pubs/287g-March2010.pdf. Currently, 287(g) operates in jails through "Jail Enforcement Operations" agreements with approximately forty counties and municipalities and five state corrections agencies. ICE, Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act (Aug. 18, 2008), http://www.ice.gov/partners/287g/Section287_g.htm.

52.    The eventual release of some information has been instrumental in the ability of major law enforcement organizations, experts, and the public to evaluate the wisdom and effectiveness of local involvement in immigration enforcement. Public scrutiny has confirmed widely-held concerns about the programs, including their ineffectiveness, disregard for core civil liberties, adverse affect on public trust and confidence in law enforcement, and unduly high costs to local communities. According to Montgomery County, Maryland Police Chief J. Thomas Manger, "[i]mmigration enforcement by local police would negatively affect and undermine the level of trust and cooperation between local police and immigrant communities," and "would be a burden that most major police agencies would not be able to bear."[29] Other jurisdictions have similarly concluded that the costs of participating in local enforcement programs far outweigh the benefits.[30] In Salt Lake City, Utah, Mayor Ralph Becker and Police Chief Chris Burbank opted not to participate in 287(g), citing concerns that it would "add a tremendous burden on our

---

[29] *Examining 287(g): The Role of State and Local Law Enforcement in Immigration Law: Hearing Before the House Comm. on Homeland Security*, 11th Cong. 3-5 (2009) (statement of Chief J. Thomas Manger, Montgomery County Police Dep't, Chairman, Legislative Comm. for the Major Cities Chiefs Ass'n), *available at* http://hsc.house.gov/SiteDocuments/20090304140934-99719.pdf; *see also* Letter from Mariaelena Hincapie, Executive Dir., Nat'l Immigr. L. Ctr., to President Barack Obama (Aug. 25, 2009) (calling for the repeal of 287(g) in light of, *inter alia*, the GAO report, DOJ civil rights investigation, and OIG audit, on behalf of more than 500 organizations), *available at* http://www.nilc.org/immlawpolicy/LocalLaw/287g-Letter-2009-08-25.pdf; Immigration Policy Center, *supra*, note 25, at 1 ("find[ing] strong evidence to support claims that Irving police engaged in racial profiling of Hispanics" in carrying out its CAP initiative).

[30] *See* Police Foundation, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties (Apr. 2009) (concluding after a comprehensive review that the costs of local participation in 287(g) outweigh the benefits); Editorial, *Too Broken to Fix*, NY Times, at A28 (Apr. 9, 2010) (calling for the abandonment of 287(g)'s local, jail-based model of immigration enforcement).

police, who are not trained to enforce federal policy" and "deter victims and witnesses from reporting violent and other serious crimes."[31]

53.     Secure Communities raises many of the same concerns. Because Secure Communities uses the same jail-based screening methods as CAP and 287(g), it too risks sweeping U.S. citizens and non-criminal immigrants into detention, increasing illegal racial profiling by law enforcement officers, undermining local law enforcement-community relations, and resulting in the misallocation of local resources. Accordingly, agencies weighing the costs and benefits of participating in Secure Communities need immediate access to meaningful information and analysis that addresses these dangers. The present FOIA action is an essential means for securing the disclosure of precisely this information and its dissemination to the public.

54.     Increased scrutiny has led to grave doubts among the public, the law enforcement community, and government oversight agencies about the utility of precursor programs to Secure Communities like CAP and 287(g).[32] Nevertheless, Secure Communities seems to adopt and expand the flawed principles and procedures behind these programs, with even less transparency and oversight.

---

[31] Sheena McFarland, *Minutemen Protest SLC Opting Out of Immigration Enforcement*, Salt Lake Trib. (Apr. 9, 2009), *available at* http://www.sltrib.com/news/ci_12548933.
[32] The recent passage of the Arizona immigration criminalization law raises similar concerns about the negative impact that state and local enforcement of immigration law will have on public safety and civil liberties. *See* Randal. C. Archibald, *Arizona's Effort to Bolster Local Immigration Authority Divides Law Enforcement*, N.Y. Times, Apr. 22, 2010, at A16 (reporting that "a national police group condemned [the law] as likely to lead to racial and ethnic profiling and to threaten public safety if immigrants did not report crime or did not cooperate with the authorities out of fear of being deported").

III.    **The Need to Evaluate the Costs and Benefits of Secure Communities Demands Immediate Disclosure of the Records Requested by Plaintiffs**

55.    ICE's strategy of implementing Secure Communities in the absence of meaningful disclosure to, or input from, the public and local entities flies in the face of the President's directive that agency initiatives be carried out in a transparent and responsive manner,[33] formal recommendations from executive review bodies that ICE release accurate information and track essential data regarding its enforcement initiatives,[34] and the insistence of leading police chiefs that they and their colleagues "should be consulted and brought in at the beginning of any process to develop a national initiative to involve local police agencies in the enforcement of federal immigration laws."[35]

56.    Comprehensive information regarding Secure Communities is essential for taxpayers, voters, and other members of the public to make informed decisions regarding the costs and benefits of the initiative.

57.    Law enforcement officials and community members have the right to information about the consequences of Secure Communities on local policing, public safety, and civil liberties.

58.    Secure Communities is much too far-reaching and significant a government operation to be introduced without meaningful public disclosure and scrutiny.

---

[33] *See* President Barack Obama, Memorandum for the Heads of Executive Departments and Agencies on Transparency and Open Government, 74 Fed. Reg. 15, 4685 (Jan. 26, 2009).

[34] *See* U.S. Gov't Accountability Office, *supra* note 24, at 23-24; Dep't of Justice, Office of Inspector General, OIG 10-63, The Performance of 287(g) Agreements (Mar. 2010), *available at* www.justice.gov/oig/reports/INS/e0304/final.pdf.

[35] Major City Chiefs, Immigration Committee, Recommendations for Enforcement of Immigration Laws by Local Police Agencies 9 (June 2006).

59.   Accordingly, Plaintiffs' Requests and the present action are necessary in order to vindicate the public's right to be informed of its government's operations, and to correct Defendants' refusal to implement Secure Communities in an open, transparent, and responsive manner.

**IV.   Plaintiffs' FOIA Requests to Defendants**

60.   On February 3, 2010, Plaintiffs' sent Requests pursuant to FOIA, 5 U.S.C. § 552, *et seq.*, to Defendants via overnight mail.

61.   Plaintiffs' Requests seek records related to or containing: Policies, Procedures or Objectives of Secure Communities (including overview documents, state and local agreements, Secure Communities inquiry and response procedures, state training or explanatory materials developed by ICE, documents describing the relationship between Secure Communities and other ICE enforcement programs, and racial profiling policy and oversight documents); Data or Statistical Information (including the number of immigration detainers and removals both before and since the implementation of Secure Communities, the number of United States citizens erroneously identified through Secure Communities, and demographic information for individuals identified through Secure Communities); Immigration and Demographic Information and Records of individuals subject to Secure Communities queries or ICE detainers; Evidence of the Fiscal Impact of Secure Communities (including documentation analyzing the cost of Secure Communities to State and Local Jurisdictions or the Federal Government, Intergovernmental Service Agreements, and contracts with private entities); Communications Records (including public statements and speeches related to Secure Communities and the Secure Communities public relations strategy); Program

20

Assessments of Secure Communities; and Secure Communities Complaint Mechanisms or Oversight Documents.

62.   Plaintiffs' Requests sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(i)(I), citing a "compelling need" for the information because ICE is actively negotiating and planning for a nationwide expansion of Secure Communities, as stated in paragraphs 44-47.

63.   Plaintiffs' Requests also sought a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A) and 8 C.F.R. § 5.11(k).

**V.     Agency Responses**

64.   No Defendant timely responded to the substance of Plaintiffs' Requests.

65.   Plaintiffs confirmed delivery of their Request to ICE on February 4, 2010, but ICE did not acknowledge receiving Plaintiffs' Request until February 19, 2003. ICE denied Plaintiffs' fee waiver and expedite requests in a letter dated February 23, 2010 and received by Plaintiffs on March 9, 2010. Plaintiffs appealed this denial on March 15, 2010, and ICE has not issued a decision on the appeal. ICE has issued no substantive response to the request.

66.   Plaintiffs have constructively exhausted administrative remedies against ICE.

67.   Plaintiffs confirmed delivery of their Request to DHS on February 4, 2010, but DHS did not acknowledge receiving Plaintiffs' Request until February 12, 2010. DHS denied Plaintiffs' fee waiver and expedite requests in a letter dated March 5, 2010 and received by Plaintiffs on March 9, 2010. Plaintiffs appealed this denial on March 15, 2010 and DHS has not issued a decision on the appeal. DHS has issued no substantive response to the request.

68.    Plaintiffs have constructively exhausted administrative remedies against DHS.

69.    Plaintiffs confirmed delivery of their Request to EOIR on February 4, 2010, but EOIR did not acknowledge receiving Plaintiffs' Request until February 19, 2010. Plaintiffs have received no further information from EOIR.

70.    Plaintiffs have constructively exhausted administrative remedies against EOIR.

71.    Plaintiffs confirmed delivery of their Request to the FBI, and the FBI acknowledged receiving Plaintiff's Request, on February 4, 2010. The FBI granted Plaintiffs expedited processing in a letter dated March 2, 2010. The FBI denied Plaintiffs' fee waiver request in a letter dated March 9, 2010. Plaintiffs appealed the fee waiver denial on March 15, 2010. Plaintiffs confirmed delivery of the appeal to the FBI on March 16, 2010. The FBI acknowledged receipt of the fee waiver appeal in a letter dated April 2, 2010. The FBI has not issued a decision on this appeal. The FBI has issued no substantive response to the request.

72.    Plaintiffs have constructively exhausted administrative remedies against the FBI.

73.    Plaintiffs confirmed delivery of their Request to OLC on February 4, 2010. OLC acknowledged receiving Plaintiffs' Request in a letter dated April 16, 2010. OLC also denied Plaintiffs' expedite request in the letter dated April 16, 2010. Plaintiffs appealed the denial of expedited processing on April 21, 2010, and OLC has not issued a decision on the appeal. OLC has issued no substantive response to the request.

74.    Plaintiffs have constructively exhausted administrative remedies against OLC.

75.   The statutory time limit for the agencies' compliance pursuant to FOIA, 5 U.S.C. § 552(a)(6)(A), is twenty days from the date on which the Defendants received Plaintiffs' Requests.

76.   The failure of Defendants to respond substantively to Plaintiffs' Requests within the statutorily prescribed period results in constructive exhaustion of Plaintiffs' administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C).

77.   Requests for expedited processing do not need to be administratively exhausted. 5 U.S.C. § 552(a)(6)(E)(iii); *Elec. Privacy Info. Ctr. v. Dep't of Defense*, 355 F. Supp. 2d 98, 100 n.1 (D.D.C. 2004).

78.   Plaintiffs have, however, exhausted administrative remedies for the denials of fee waiver and expedite requests by filing timely administrative appeals. 5 U.S.C. § 552 (a)(6)(E)(iii); 5 U.S.C. 552(a)(4)(A)(viii). The agencies' failure to respond to these appeals in a timely manner under 5 U.S.C. § 522(a)(6)(ii) results in constructive exhaustion of Plaintiffs' administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C).

79.   Plaintiffs have a statutory right to the records they seek and there is no legal basis for Defendants' failure to disclose them in full.

80.   Defendants' withholding of records is unlawful both in refusing to release documents and in causing unreasonable delay in the time it takes Plaintiffs to receive documents.

## FIRST CLAIM FOR RELIEF

### Violation of FOIA for Failure to Disclose and
### Release Records Responsive to Plaintiffs' Requests

81.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs
1 through 80 as if repeated and incorporated herein.

82.     By failing to disclose and release the requested records, Defendants have
violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. §
552.

## SECOND CLAIM FOR RELIEF

### Defendants Improperly Denied Plaintiffs' Requests for Expedited Processing

83.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs
1 through 82 as if repeated and incorporated herein.

84.     Defendants have violated Plaintiffs' rights to expedited processing under 5
U.S.C. § 552(a)(6)(E) and Defendants' own regulations, 6 C.F.R. § 5.5(d) (DHS); and 28
C.F.R. § 16.5 (DOJ).

## THIRD CLAIM FOR RELIEF

### Defendants Improperly Denied Plaintiffs' Requests for a Fee Waiver

85.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs
1 through 84 as if repeated and incorporated herein.

86.     Defendants have violated Plaintiffs' rights to a fee waiver under 5 U.S.C. §
552(a)(4)(A)(iii) and Defendants' own regulations 6 C.F.R. § 5.11(k) (DHS) and 28
C.F.R. § 16.11(k) (DOJ).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Order Defendants immediately to make a full, adequate, and expedited search for the

requested records;

2) Order Defendants to engage in expedited processing in this action;

3) Enjoin Defendants from assessing fees or costs for the processing of the FOIA

Request;

4) Order Defendants, upon completion of expedited processing, to disclose the requested

records in their entirety and make copies available to Plaintiffs no later than ten days after

the Court's order;

5) Award Plaintiffs their costs and reasonable attorney's fees incurred in this action as

provided by 5 U.S.C. § 552(a)(4)(E); and

6) Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Date:  April 27, 2010
          New York, New York

Peter L. Markowitz, Esq., PM-9052
Bridget P. Kessler, Esq.
Morgan Russell, Law Student Intern
IMMIGRATION JUSTICE CLINIC
Benjamin N. Cardozo School of Law
55 Fifth Avenue, Room 1109
New York, NY 10003
(212) 790-0340
pmarkowi@yu.edu

Sunita Patel, Esq., SP-1443
Gitanjali S. Gutierrez, Esq., GG-1234
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

(212) 614-6439
spatel@ccrjustice.org

Attorneys for Plaintiffs