# Exhibit A



February 3, 2010

Freedom of Information Act Request
U.S. Immigration and Customs Enforcement
800 North Capitol St., NW, Room 585
Washington, DC 20536-5009
Attn: Catrina Pavlik-Keenan, FOIA Director

National Records Center (NRC)
Freedom of Information Act division
P.O. Box 648010
Lee's Summit, MO 64064-5570

Re: **Freedom of Information Act Request**

To Whom It May Concern:

        This is a request under the Freedom of Information Act, 5 U.S.C. Sec. 552 ("FOIA"), on behalf of the National Day Laborer Organizing Network ("NDLON"), the Center for Constitutional Rights ("CCR"), and the Immigration Justice Clinic of the Benjamin N. Cardozo School of Law ("the Clinic") (collectively "the Requesters") for information regarding the U.S. Immigration and Customs Enforcement agency ("ICE") program Secure Communities ("Secure Communities"). We ask that you please direct this request to all appropriate offices and departments within the agency, including, but not limited to, the Office of Public Affairs, the Office of Detention Policy and Planning, the Office of Detention Oversight, and the Office of State/Local Coordination.

**Purpose of Request**

        The purpose of this request is to obtain information for the public about the Secure Communities program and its impact on the relationship between local law enforcement and immigration enforcement in local communities. This information will enable the public to monitor the impact of the program. ICE announced the Secure Communities program in March 2008 as a program to facilitate the automatic sharing of fingerprints between federal immigration authorities and local and state enforcement agencies.[1] Secure Communities' purported objective is to "target" individuals who have committed crimes and "prioritize" removal of the most dangerous criminals. ICE has since implemented Secure Communities in over 95 jurisdictions

---

[1] The program introduces automatic interoperability between FBI and immigration databases.

and plans to expand it nationwide by 2013.[2] In spite of this unprecedented large-scale cooperation between federal immigration authorities and state and local agencies, ICE has promulgated no regulations and released minimal information about the program's operation.

The sometimes contradictory materials that ICE has released leave significant gaps in the public's understanding of the program's purpose, procedures, and potential impact on local communities.[3] Information unavailable to the public includes, but is not limited to, ICE's policies, procedures, and training materials related to Secure Communities and the subsequent detention and removal of individuals identified by Secure Communities, agreements between ICE and state or local entities, and the projected fiscal impact of Secure Communities. No information clarifies whether ICE takes action to protect citizens from erroneous detention and removal, to identify and protect vulnerable groups, or prevent racial profiling in local communities. The minimal data released from jurisdictions where Secure Communities has been implemented indicates that ICE has not effectively prioritized the most dangerous criminals. It is also unclear the extent to which individuals indentified by the Secure Communities process are experiencing due process violations and other abuses when they are swept through ICE's costly, dangerous, and inefficient detention and removal system.

### A. Definitions

1) **Secure Communities Jurisdiction(s)**. In this request, the term "Secure Communities Jurisdiction(s)" is defined as all jurisdictions where Secure Communities has been implemented.

2) **Potential Secure Communities Jurisdiction(s)**. In this request, the term "Potential Secure Communities Jurisdiction(s)" is defined as all jurisdictions where ICE is negotiating the implementation of Secure Communities or is in the process of finalizing an agreement.

3) **Designated Jurisdiction(s)**. In this request, the term "Designated Jurisdiction(s)" refers to the following jurisdictions:
   - Florida, all jurisdictions
   - Washington, D.C.
   - Harris County, TX
   - San Diego County, CA
   - Los Angeles County, CA
   - Maricopa County, AZ
   - Philadelphia County, PA
   - Wake County, NC

4) **Secure Communities Query**. In this request, the term "Secure Communities Query" is defined as a Criminal Answer Required ("CAR"), Criminal Print Identification ("CPI") File Maintenance Query, or any other mechanism by which a Law Enforcement Agency

---

[2] David Sherfinski, *ICE plans expansion of immigration database program*, WASHINGTON EXAMINER, Jan. 28, 2010, *available at* http://www.washingtonexaminer.com/local/ICE-plans-expansion-of-immigration-database-program-82809177.html#ixzz0ePOriSz2.

[3] *See* Secure Communities Standard Operating Procedures, §§ 2.1.1 – 2.1.4, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.

submits a fingerprint query to be run through the Secure Communities' system to be checked against FBI and any DHS databases.[4]

5) **Secure Communities Match**. In this request, the term "Secure Communities Match" is defined as an interoperability hit following a Criminal Answer Required ("CAR") or Criminal Print Identification ("CPI") File Maintenance Query including, but not limited to, any instance in which a Secure Communities Query matches an individual to a record in any DHS database.

6) **Immigration Detainer**. In this request the term "Immigration Detainer" refers to the Form I-247, Immigration Detainer - Notice of Action (attached at Tab B) or any other similar request by ICE to detain an individual in state or local custody upon their release.

7) **ICE Field Offices**. In this request the term "ICE Field Offices" refers to all ICE Field Offices, including, but not limited to, ICE Sub-Field Offices, and any other ICE office involved in immigration enforcement.[5]

8) **Law Enforcement Agency**. In this request the term "Law Enforcement Agency" includes, but is not limited to, any state, city, county, or local police agency, department of corrections, sheriff's office, jail, or other holding facility.

9) **Vulnerable Groups**. In this request the term Vulnerable Groups includes, but is not limited to, such groups as minor children, the elderly, pregnant or breastfeeding woman, individuals with chronic or acute medical or mental health conditions, victims of human trafficking or other crimes, individuals with T, U, or S visas or pending visa applications, individuals who express a fear of persecution if removed, and individuals with dependent minor children in the United States.

10) **Record(s)**. In this request the term "Record(s)" includes, but is not limited to, all Records or communications preserved in electronic or written form, such as correspondences, emails, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, technical manuals, technical specifications, training manuals, studies, or any other Record of any kind.

**B. Acronyms**[6]

| | |
|---|---|
| Department of Justice | DOJ |
| Federal Bureau of Investigation | FBI |
| Criminal Justice Information Services | CJIS |
| Integrated Automated Fingerprint Identification System | IAFIS |
| Department of Homeland Security | DHS |
| Immigration and Customs Enforcement | ICE |
| United States Visitor and Immigrant Status Indicator Technology | US-VISIT |
| Automated Biometric Identification System | IDENT |
| State Identification Bureau | SIB |

---

[4] Secure Communities Standard Operating Procedures, §§ 2.1.1 – 2.1.4, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.

[5] Jacqueline Stevens, *America's Secret ICE Castles*, THE NATION, Dec. 16, 2009, *available at* http://www.thenation.com/doc/20100104/stevens; List of Immigration and Customs Enforcement Subfield Offices, attached at Tab C.

[6] *See also* Appendix B, attached at Tab D.

| Memorandum of Agreement | MOA |
|---|---|
| Local Law Enforcement Agency | Local LEA |
| National Fingerprint File | NFF |
| Criminal Ten-Print Submission (Answer Required) | CAR transaction |
| National Crime Information Center | NCIC |
| Automatic Immigration Alien Query | IAQ |
| ICE Law Enforcement Support Center | LESC |
| Immigration Alien Response | IAR |
| IDENT Data response | IDR |

## C.  Request for Information

### 1) Policies, Procedures and Objectives

Any and all Records, received, maintained, or created by any government agency or subdivision, related to the policies, procedures or objectives of Secure Communities, including documents created prior to March 28, 2008. Such Records include but are not limited to:

a. **Overview Documents**: policies, operating procedures, rules, internal policy guidance, training materials and legal opinions or memoranda referencing Secure Communities or discussing the mandate, goals, objectives, function responsibility, purpose, implementation, deployment strategy of Secure Communities and any  procedures for state or local jurisdictions to opt-out of  Secure Communities.

b. **State and Local Agreements**: agreements, including Memoranda of Agreement, Memoranda of Understanding, and drafts of agreements between ICE and any partner, including State Identification Bureaus ("SIBs"), local Law Enforcement Agencies ("local LEAs") or other state or local agencies related to Secure Communities.

c. **Secure Community's Inquiry & Response Procedures**: any and all Records related to policies and procedures governing the initiation of Secure Communities Queries in Secure Communities Jurisdictions and policies and procedures governing ICE's responses to Secure Communities Queries, including, but not limited to:

   i. Any Record containing guidance or procedures governing when local LEAs may generate a Secure Communities Query, including any Records providing for mandatory Secure Communities Queries or discretionary Secure Communities Queries.

   ii. Any Record related to any past, current, or future practice of automatic generation of a Secure Communities Query ("automated IAQ processing") when "unknown" or "other than the United States" is entered as an individual's place of birth.[7]

   iii. Any Records that contain lists or otherwise identify any databases checked as a result of a Secure Communities Query, including, but not limited to, all national, state and local databases.

---

[7] Secure Communities Standard Operating Procedures, § 2.2.7, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.

      iv.    Any Records containing standard notices or computer screen shots generated in response to a Secure Communities Query.

d.   **Detainer Procedures**: any and all Records containing guidance, procedures, or standards governing the issuance or lifting of Form I-247, Immigration Detainer - Notice of Action ("Immigration Detainer"), by the Law Enforcement Support Center ("LESC"), the Criminal Alien Program ("CAP"), or ICE Field Offices on individuals who are subject to a Secure Communities Query, including any Records related to the Secure Communities "risk-based approach"[8] or the "Secure Communities' levels and offense categories" by National Crime Information Center ("NCIC") Code.[9]

e.   **State Training or Explanatory Materials**: any and all Records containing training, briefing, guidance, procedures, rules, or other informational materials developed for local LEAs, SIBs, or other state or local entities.

f.   **Relationship Between Secure Communities and Other ICE Enforcement Programs**: any and all Records indicating the interface or relationship between Secure Communities and other ICE programs, including but not limited to the Criminal Alien Program ("CAP"), 287(g) arrangements, and other ICE Agreements of Cooperation in Communities to Enhance Safety and Security ("ICE ACCESS").

g.   **Racial Profiling Policy**:

      i.    Any and all Records related to ICE monitoring or plans to monitor Secure Communities Jurisdictions for racial or ethnic profiling or other due process violations;[10]
      ii.   Any and all Records related to local LEAs' racial profiling or anti-racial profiling policies or procedures from Secure Communities Jurisdictions or Proposed Secure Communities Jurisdictions;
     iii.   Any and all Records evaluating, reviewing, compiling or otherwise discussing compliance with racial profiling or anti-racial profiling policies and procedures, including, but not limited to, Section 1.0 of the Secure Communities Standard Operating Procedures.

h.   **Vulnerable Groups**: Any and all Records containing policy or procedures concerning the treatment of Vulnerable Groups targeted by Secure Communities, including, but not limited to, the issuance of Immigration Detainers, parole, or other exercise of prosecutorial discretion.

---

[8] Secure Communities Fact Sheet, U.S. Department of Homeland Security, Immigration and Customs Enforcement, September 1, 2009, *available at* www.ICE.gov/secure_communities, attached at Tab E.
[9] Secure Communities Standard Operating Procedures, Appendix A, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.
[10] Secure Communities Standard Operating Procedures, Introduction, § 1.0, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A (stating that "[u]se of IDENT/IAFIS for the purpose of racial and/or ethnic profiling or other activity in violation of the Fourth Amendment of the United States Constitution is not permitted and may result in the suspension of the local jurisdiction engaged in the improper activity").

**2)  Data & Statistical Information**

Any and all Records, <u>excluding Records from individual Alien files</u>, containing data or statistics prepared, compiled, or maintained by ICE or any agency or subdivision thereof related to or pertaining to Secure Communities or to Secure Communities Jurisdictions beginning the last full fiscal year prior to the implementation of Secure Communities in each jurisdiction through the present (except as otherwise specified).  Such Records should include, but not be limited to:

a. **Criminal Answer Required ("CAR") and Criminal Print Identification ("CPI") File Maintenance Messages**:  Records that contain data or statistical information on CARs and CPI File Maintenance Messages originating in each Secure Communities Jurisdiction and cumulatively (including Records that contain data or statistical information on of any and all fingerprints transmitted through interoperability), from the implementation of Secure Communities through the present, or any sub-period thereof.  Any Records that contain statistics or data drawn from such CARs and CPIs, including any analysis or breakdown thereof.

b. **Automatic Immigration Alien Queries ("IAQs")**: Records that contain data or statistical information on IAQs triggered by inquiries from each Secure Communities Jurisdiction (including Records that contain data or statistical information on any and all matches or hits in IDENT), from the implementation of Secure Communities through the present, or any sub-period thereof.  Any Records that contain data drawn from such IAQs, including any analysis or breakdown thereof.

c. **Immigrant Alien Responses ("IARs") and IDENT Data Responses ("IDRs")**: Records that contain data or statistical information on IARs and IDRs triggered by Secure Communities Queries from each Secure Communities Jurisdiction, from the implementation of Secure Communities through the present, or any sub-period thereof. Any Records that contain data drawn from such IARs and IDRs, including any analysis or breakdown thereof.

d. **Form I-247, Immigration Detainers (Immigration Detainers)**:
    i. **Pre-Secure Communities**: Records that contain data or statistical information on the number of Immigration Detainers lodged dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
    ii. **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Immigration Detainers lodged through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
    iii. **Post-Secure Communities**: Records that contain data or statistical information on the number of Immigration Detainers lodged in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    iv. **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Immigration Detainers lodged through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    v. **Secure Communities Detainers:** Records that contain data or statistical information on the number of Immigration Detainers lodged on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    vi. Any Records that contain data drawn from any such Immigration Detainer forms, including any analysis or breakdown thereof.

e. **Form I-213, Record of Deportable/Inadmissible Alien**:

    i. **Pre-Secure Communities**: Records that contain data or statistical information on the number of Forms I-213 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii. **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-213 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    iii. **Post-Secure Communities**: Records that contain data or statistical information on the number of Forms I-213 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    iv. **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-213 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    v. **Secure Communities I-213s:** Records that contain data or statistical information on the number of Forms I-213 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    vi. Any Records that contain data drawn from any such I-213 forms, including any analysis or breakdown thereof.

f. **Form I-286, Notice of Custody Determinations**:

    i. **Pre-Secure Communities**: Records that contain data or statistical information on the number of Forms I-286 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii. **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number Forms I-286 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    iii. **Post-Secure Communities**: Records that contain data or statistical information on the number of Forms I-286 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    iv. **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-286 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    v. **Secure Communities I-286:** Records that contain data or statistical information on the number of Forms I-286 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    vi. Any Records that contain data drawn from any such I-286 forms, including any analysis or breakdown thereof.

g. **Form I-862, Notice to Appears (NTA)**:

    i. **Pre-Secure Communities**: Records that contain data or statistical information on the number of Forms I-862 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii. **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-862 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    iii. **Post-Secure Communities**: Records that contain data or statistical information on the number of Forms I-862 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    iv. **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-862 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    v. **Secure Communities I-862:** Records that contain data or statistical information on the number of Forms I-862 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

vi. Any Records that contain data drawn from any such I-862 forms including any analysis or breakdown thereof.

h. **Criminal Records in Secure Communities Jurisdictions:**
   i. **Pre-Secure Communities**: Records that contain data or statistical information on criminal history or records and/or pending charges of individuals identified through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
   ii. **Post-Secure Communities:** Records that contain data or statistical information on criminal history or records and/or pending charges of individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, since the implementation of Secure Communities;
   iii. Any Records that contain any analysis or breakdown of the aforementioned data and statistical information on criminal history, records, or pending charges.

i. **Offense Level Determinations**:
   Any records that contain data or statistical information disaggregated by any categorization of criminal history or other risk-based assessment including, but not limited to, the "Secure Communities' levels and offense categories"[11] for the following periods:
   i. **Pre-Secure Communities**: Dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively; and
   ii. **Post-Secure Communities:** Since the implementation of Secure Communities.

   This request includes any such record pertaining to whether or not detainers were lodged, whether or not Notices to Appear were issued, and whether or not individuals were ordered removed and/or actually removed.

j. **Removals**:
   Any records that contain data or statistical information on removals of individuals in Secure Communities jurisdictions, including:

   i. **Pre-Secure Communities**: Any removal resulting from apprehensions through the CAP dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
   ii. **Post-Secure Communities:** Any removal of individuals who are subject to a Secure Communities Query since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;
   iii. **Post-Secure Communities through CAP**: Any removal resulting from apprehensions through the CAP following the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively.

---

[11] *See* Secure Communities Standard Operating Procedures, Appendix A, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.

k. **United States Citizens**:
   Any records that contain data or statistical information or any discussion or information whatsoever pertaining to United States Citizens:
   i. Identified through Secure Communities Matches;
   ii. Subjected to Immigration Detainers after being subject to a Secure Communities Query;
   iii. Detained by ICE after being subject to a Secure Communities Query;
   iv. Removed by ICE after being subject to a Secure Communities Query.

l. **Demographic Data**
   Any records that contain data or statistical information on race, ethnicity, sex, age, or place of birth of:
   i. Subjects of Detainers
      1. **Pre-Secure Communities**: Individuals subject to detainers dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
      2. **Post-Secure Communities**: Individuals subject to detainers after being subject to a Secure Communities Query since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;
   ii. Subjects of Secure Communities Queries;
   iii. Subjects of Secure Communities Matches.

m. **Vulnerable Groups**
   Any and all Records containing data or statistical information on Vulnerable Groups for:
   iv. **Pre-Secure Communities**: Individuals subject to detainers dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;
   v. **Post-Secure Communities**: Individuals subject to Secure Communities Queries since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;

3) <u>**Individual Records**</u>

The following Records pertaining to individuals subject to Secure Communities Queries or ICE detainers in Designated Jurisdictions from October 2007 through the present:

i. Criminal Answer Required (CAR) and Criminal Print Identification (CPI) File Maintenance Messages;

ii. Automatic Immigration Alien Queries (IAQs);

iii. Immigrant Alien Responses (IAR) and IDENT Data Responses (IDR);

iv.    Form I-247, Immigration Detainer – Notice of Action (Immigration Detainer);

v.    Form I-213, Record of Deportable/Inadmissible Alien;

vi.    Form I-215c, Record of Sworn Statement in Affidavit Form;

vii.    Form I-200, Warrant for Arrest of Alien;

viii.    Stipulated Request for Final Order of Removal and Waiver of Hearing;[12]

ix.    Written Notice of Reinstatement of Removal;[13]

x.    Administrative Voluntary Departure;

xi.    Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent)

xii.    Form I-205, Warrant of Removal

xiii.    Form I-286, Notice of Custody Determination;

xiv.    Form I-862, Notice to Appear (NTA);

xv.    Initial Notice if Hearing in Removal Proceedings;

xvi.    Immigration Judge Bond Redetermination Order, EOIR Form 1;

xvii.    Notice of Entry of Appearance as Attorney or Representative before the Immigration Court, Form EOIR-28 or USCIS Form G-28;

xviii.    Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals, Form EOIR-27

xix.    Immigration Judge Orders: ordering individual removed, terminating proceedings, or granting relief;

xx.    Any other Records that contain any of the following information:

    i.    **Demographic Information:**
        1. The criminal history of, and the current charges against, the individual;
        2. The individual's age, race, gender, nationality, place of birth or status as a member of a Vulnerable Group.

---

[12] *See* Stipulated Request for Final Order of Removal and Waiver of Hearing, http://www.scribd.com/doc/22093836/EOIR-Stipulated-Request-for-Removal-Order-and-Waiver-of-Hearing
[13] *See* 8 C.F.R. § 1241.8(b)

ii. **Immigration Detainers**:
1. Whether the Immigration Detainer was lodged on individuals who are subject to a Secure Communities Query;
2. Whether the Immigration Detainer was issued by the LESC, the CAP, a local ICE field office, a 287(g) officer, or some other entity;
3. How the determination to lodge an Immigration Detainer was made, including reference to any policy guidelines or "risk-based" assessment, such as guidance based on criminal history or factors such as age, gender, medical or mental health conditions, or dependent minor children;
4. For any individual identified following a Secure Communities Query for whom an Immigration Detainer was not lodged or was subsequently lifted and the reasons for that determination, including reference to any policy guidelines or "risk-based" assessment.

iii. **ICE Custody Determinations**:
1. Any notice or communication from the local or state facility with custody of the individual subject to an ICE detainer to ICE indicating when the individual is to be released from criminal custody or when ICE can and/or must assume custody;
2. The date and time the individual subject to the detainer was taken into ICE custody;
3. Whether and when the individual posted bond, if any;
4. What factors ICE considered in deciding whether or not to issue bond, how much bond to issue, whether to release someone on their own recognizance, whether to put someone on supervised release or intensive supervised release, whether to grant someone parole or prosecutorial discretion, or any other custody determination, including, for example, any worksheet or checklists utilized for any of the above determinations and reference to any policy guidelines or "risk-based" assessment, including, but not limited to, determinations based on:
    I. Any categorization of criminal history or other risk-based assessment including, but not limited to, the "Secure Communities' levels and offense categories";[14]
    II. Age or gender;
    III. Medical or mental health conditions;
    IV. Eligibility for T, U, S visas, or VAWA adjustment;
    V. Eligibility for asylum, withholding or protection under the Convention Against Torture;
    VI. Eligibility for other forms of relief from removal;
    VII. Length of permanent residence in the United States and community ties; or
    VIII. The existence of minor children dependent on the individual or other family members in the United States;

---

[14] *See* Secure Communities Standard Operating Procedures, Appendix A, *available at* http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, attached at Tab A.

     5.   Whether the individual's criminal case(s) were resolved at the time ICE assumed custody.

iv. **Immigration Charging Document**:
1. When a Notice to Appear is not issued after ICE assumes custody, whether the non-issuance is due to:
   I. The existence of a prior deportation, exclusion, or removal order;
   II. The existence of a stipulated order of removal;
   III. The issuance of a Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order, pursuant to the expedited removal statute;
   IV. The issuance of a Final Administrative Order of Removal;
   V. The issuance of a Form I-860, Notice and Order of Expedited Removal, pursuant to the expedited removal statute;
   VI. ICE's determination that the individual is a United States citizen;
   VII. ICE's determination that the individual is not removable;
   VIII. ICE's exercise of prosecutorial discretion; or
   IX. Any other factor.
2. The date and time that ICE:
   I. Executed the Notice to Appear;
   II. Served the Notice to Appear on the individual;
   III. Filed the Notice to Appear with the Executive Office for Immigration Review.

v. **Immigration Bonds**:
1. Whether and when the individual requested a bond hearing;
2. Whether and when a bond hearing was held;
3. Whether and when an individual requested a redetermination of custody decision;
4. Whether and when a custody redetermination hearing was scheduled;
5. Whether and when a custody redetermination hearing was held;
6. Whether and when the individual requested a *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999), hearing;
7. Whether and when a *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999), hearing was held;
8. The amount of the bond set by the Immigration Judge, if any;
9. Whether the individual appealed the bond determination;
10. Whether and when the individual posted bond, if any.

vi. **Removal Proceedings**:
1. If resolved, the final outcome of the individual's removal case;
2. If pending, the current status of the individual's removal case;
3. The date the individual's removal case was resolved;
4. Whether the individual was represented by counsel in the removal proceeding at any time.

      vii. **Detention**:
1. When the individual was first detained by ICE;
2. If released, the date the individual was released from custody (or removed);
3. Each location and facility where the individual was detained and the dates of detention at each such facility.

4) **Fiscal Impact of Secure Communities**

a. **Fiscal Impact on State and Local Secure Communities Jurisdictions and Potential Secure Communities Jurisdictions**: Any and all Records related to the fiscal impact or the actual, estimated, or projected cost on state and local Secure Communities Jurisdictions and Proposed Secure Communities Jurisdictions arising from or related to Secure Communities or to individuals subject to Immigration Detainers following a Secure Communities Query, including, but not limited to, costs, reimbursements, monetary agreements, and monetary incentives, including increased costs of detention.

b. **Intergovernmental Service Agreements**: Any and all Records related to proposed, contemplated, existing, or prior Intergovernmental Service Agreements for detention facilities with Secure Communities Jurisdictions and Proposed Secure Communities Jurisdictions.

c. **Contracts with Private Entities:** Any and all Records related to proposed, contemplated, existing, or prior contracts or communications with private companies or other private entities related to the development or implementation of Secure Communities.

d. **Federal Costs of Secure Communities**: Any and all Records related to actual, estimated, or projected costs of the Secure Communities program to the federal government, including, but not limited to, Department of Homeland Security appropriations, and costs of increased detention and removal operations to ICE, EOIR, and United States Attorneys' Offices, and to the federal courts.

5) **Communications**

a. **Any and all Records containing communications related to Secure Communities by, to, or between any of the following**:

      i. **ICE**: ICE or any agent, officer, employee, or subdivision thereof;

      ii. **DHS**: DHS or any agent, officer, employee, or subdivision thereof;

      iii. **DOJ:** DOJ or any agent, officer, employee, or subdivision thereof, including, but not limited to EOIR, FBI, and FBI CJIS**;**

    iv. **State and Local Jurisdictions**:  Secure Communities Jurisdictions, Proposed Secure Communities Jurisdictions, and any other state and local jurisdictions, including, but not limited to, any local or state LEAs, SIBs and Attorney Generals' offices;

    v. **The White House**:  The White House, the President of the United States, his staff and advisors;

    vi. **United States Congress:** United States Congress, including, but not limited to, letters or emails to Senators or Representatives or staff members thereof, congressional committees, congressional briefings documents, congressional testimony, any other information provided to a member or employee of Congress, and any documents used in preparation of the aforementioned materials. Including but not limited to:

        1. Congressional inquiries regarding Secretary Napolitano's statements regarding Secure Communities in the week following the Criminal Alien Program presentation (November 2009);
        2. Information regarding ICE Assistant Secretary John T. Morton's meeting with the Congressional Hispanic Caucus on October 21, 2009;
        3. Briefings for Congress on 287(g) announcement on July 15, 2009;
        4. Briefing for Senate staff in September 2009 on fugitive operations and other issues related to Secure Communities; and,
        5. Briefing for Department of Justice Civil Rights Division in 2009.

    vii. **Non-Governmental Organizations (NGOs):** including emails, letters, or other documents distributed to NGOs or any documents used in preparation of such materials or in preparation for meetings with NGOs.

**b. Public Statements**

    i. **Press Releases:** Any and all Records related to or containing press releases or public internet postings that mention the phrase "Secure Communities" and any and all Records used in the preparation thereof;

    ii. **Statements to Reporters or Media Outlets:** Any and all Records related to or containing statements by ICE or any official, officer, or employee thereof to a reporter or media outlet, including any opinion pieces or letters to the editor drafted for newspapers or internet media outlets and any Records used in the preparation thereof.

**c. Speeches:**  Any and all Records related to speeches, statements, and presentations by ICE or any official, officer, or employee thereof, mentioning Secure Communities and any Records or drafts used in the preparation thereof.

**d. Secure Communities Public Relations Approach:**
Any and all Records related ICE's Secure Communities messaging, media, or communications approach.  Including but not limited to:

    i.    Any and all Records related to the development of the program's title, media approach, website, and public relations approach;

    ii.    Any and all Records related to any media, communications, or consulting firm that assisted in the development or implementation of ICE's Secure Communities messaging, media, or communications approach, including any contract or agreement with such firm.

**6)  Secure Communities Program Assessment Records**

a.  Any and all Records developed or used by ICE or DHS to evaluate, review, or monitor effectiveness or outcomes of Secure Communities**.**

b.  Any records containing assessments of the Secure Communities program, whether related to national assessments, assessments of specific Secure Communities Jurisdictions, related to any time period, or any interface or relation with any other ICE programs, divisions or initiatives.

c.  Secure Communities Stakeholder's Questionnaire:

    i.    Any and all Records related to the Form 70-008, ICE Secure Communities Stakeholder's ID Assessment Questionnaire (Stakeholder Questionnaire), OMB No. 1653-NEW, including earlier versions of the questionnaire, memoranda, communications, data gathered, or analysis of such data or questionnaire responses;[15]

    ii.    Any and all Records containing comments to the Stakeholder Questionnaire;

    iii.    Any Records containing follow-up communications related to the Stakeholder Questionnaire or other efforts to solicit community input;

    iv.    Any Records containing implementation, analysis, rejection, or other processing of the Stakeholder Questionnaire.

**7)  Secure Communities Complaint Mechanisms and Oversight**

a.  Any and all Records related to a complaint mechanism or redress procedure for an individual, such as a United States citizen, erroneously subject to an Immigration Detainer following a Secure Communities Query or other Secure Communities related complaints.

---

[15] Immigration and Customs Enforcement Secure Communities StakeholdersID Assessment Questionnaire

b. Any and all Records relating to oversight, monitoring, evaluation and supervision of federal, state, and local actors involved in Secure Communities, including, but not limited to, local LEAs, SIBs, and ICE Field Offices.

c. Any and all Records related to complaints or grievances filed by community members, detained individuals, non-governmental organizations, Congressional representatives, ICE or DHS working groups, state or local entities or employees, federal entities or employees, including those filed with ICE, DHS, SIBs, DHS' Office of Civil Rights and Civil Liberties, the DHS Office of the Inspector General, ICE Office of Professional Responsibility, the United States Attorney General or the Department of Justice, state or local authorities or civil rights bureaus, or the United States Congress or any member or committee thereof.

If you deny any part of this request, please cite each specific reason or exemption to FOIA that you believe justifies your refusal to release the information, and notify us of appeal procedures available to us under the law. The Requesters expect release of all segregable portions of otherwise exempt material. 5 U.S.C. § 552(b). The Requesters reserve the right to appeal a decision to withhold information or a denial of fee waivers. 5 U.S.C. § 552(a)(6)(A)(i).

### D. The Requesters

*The National Day Laborer Organizing Network ("NDLON")* is a non-profit organization founded in 2001 whose mission is to improve the lives of day laborers in the United States. Toward this end, NDLON seeks to strengthen, connect and expand the work of its member organizations in order to become more effective and strategic in building leadership, advancing low-wage worker and immigrant rights, and developing successful models for organizing immigrant contingent/temporary workers. [16]

*The Center for Constitutional Rights ("CCR")* is a not-for-profit, public interest, legal, and public education organization that engages in litigation, public advocacy, and the production of publications in the fields of civil and international human rights. CCR's diverse docket includes litigation and advocacy around immigration detention, post-9/11 detention policies, policing, and racial and ethnic profiling. CCR is a member of immigrant rights networks nationally and provides legal support to immigrant rights movements. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. CCR has published reports on various aspects of detention and the criminal justice system in the United States. These and other materials are available through CCR's Development, Communications, and Education & Outreach Departments. CCR operates a website, www.ccrjustice.org, which addresses the issues on which the Center works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public. In addition, CCR regularly issues press releases and operates a listserv of over 50,000 members and issues "action alerts" that notify supporters and the general public about developments and operations pertaining to

---

[16] NDLON has routinely been granted fee waivers in the past. *See e.g.,* Freedom of Information Act to Customs and Border Protection, March 18, 2009, Case Number 2009F7375.

CCR's work. CCR staff members often serve as sources for journalist and media outlets on immigration, policing and detention policies.

   ***The Immigration Justice Clinic of the Benjamin N. Cardozo School of Law ("the Clinic")*** was founded in 2008 to provide quality *pro bono* legal representation to indigent immigrants facing deportation. Under the supervision of experienced practitioners, law students in the Clinic represent individuals facing deportation and community-based organizations in public advocacy, media, and litigation projects. In just over one year of existence, the Clinic has already established itself as a leader in the dissemination of critically important information about immigration enforcement operations to the public. In February 2009, the Clinic issued a press release and released previously unavailable secret memoranda and data related to ICE home raid operations to the press, resulting in widespread national media coverage. In July 2009, the Clinic published the first public study of ICE's home raid operations, playing a critical role in informing the public of widespread constitutional violations and other abuses, again attracting significant national media attention.[17]

## E. **Fee Waiver**

   The Requesters are entitled to a waiver of all costs because the information sought "is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the [Requesters'] commercial interest." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge if the information is in the public interest, and disclosure is not in the commercial interest of institution). The Requesters have a proven track-record of compiling and disseminating information to the public about government functions and activities. The Requesters have undertaken this work in the public interest and not for any private commercial interest. Similarly, the primary purpose of this FOIA request is to obtain information to further the public's understanding of federal immigration enforcement actions and policies. Access to this information is a prerequisite for members of the local community organizations to meaningfully evaluate immigration enforcement actions and their potential detrimental effects.

   The public has an interest in knowing about the manner in which the federal government involves state and local entities in the enforcement of federal immigration law. Secure Communities is a new program of which the public has limited information. There is almost no data in the public domain about the implementation of Secure Communities or whether and how ICE adheres to its congressionally sanctioned objectives to target and prioritize "dangerous criminal aliens."[18] The information that is available is vague and seems to indicate that ICE is not executing its enforcement priorities.[19] The Records sought in this request will inform the

---

[17] *See* Constitution On ICE: A Report on Immigration Home Raid Operations, Cardozo Immigration Justice Clinic, *available at* http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/immigrationlaw-741/IJC_ICE-Home-Raid-Report%20Updated.pdf

[18] U.S. Congress, FY2010 Conference Summary: Homeland Security Appropriations, October 7, 2009 (providing funding to "improve and modernize efforts to identify aliens convicted of a crime, sentenced to imprisonment, and who may be deportable.")

[19] *See* U.S. Immigration and Customs Enforcement, News Release, *Secretary Napolitano and ICE Assistant Secretary Morton Announce That the Secure Communities Initiative Identified More Than 110,000 Criminal Aliens*

public of the scope and effect of the Secure Communities program on community policing and safety, racial profiling, and Constitutional or due process violations in immigration detention. The public has a strong interest in knowing when and how an individual arrested by local police might be subject to federal immigration database checks and swept into the immigration detention and removal system. Moreover, local communities need the requested information about how Secure Communities functions in order to determine whether their interests will be served by the introduction of the program.

As stated above, the Requesters have no commercial interest in this matter. The Requesters will make any information that they receive as a result of this FOIA request available to the public, including the press, at no cost. Disclosure in this case therefore meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters.'").

In the alternative, the Requesters seek all applicable reductions in fees pursuant to 6 C.F.R. § 5.11(d). The Requesters agree to pay for the first 100 pages of duplication. *See* 6 C.F.R. § 5.11(d). The Requesters agrees to pay search, duplication, and review fees up to $200.00. If the fees will amount to more than $200.00, the Requesters request a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). If no fee waiver is granted and the fees exceed $200.00, please contact the Requesters' undersigned counsel to obtain consent to incur additional fees.

## F.  Expedited Processing

Expedited processing of this request is required because there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need" is established when there exists an "urgency to inform the public concerning actual or alleged Federal Government activity," when the requester is a "person primarily engaged in disseminating information," 28 C.F.R. § 16.5(d)(1)(iv), and also when there exists "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence, 28 C.F.R. § 16.5(d)(1)(ii).

There is an urgent need to inform the public of the Secure Communities program. 28 C.F.R. § 16.5(d)(1)(iv). The Fiscal Year 2010 appropriations bill for DHS allocates $200 billion to Secure Communities. To date, the program has been implemented in over 95 jurisdictions in eleven states. By 2013, ICE intends to operate the program in all 3,100 county and local jails across the country. In spite of this widespread fiscal and community impact, ICE has promulgated no regulations or agency guidelines regarding the operation of the program. ICE has not released the memorandums of agreement that it has entered into with local entities or disclosed precisely how Secure Communities will be implemented on a local level. As ICE continues to introduce Secure Communities in jurisdictions across the country, the public has an urgent need to understand the scope of the program.

---

*in its First Year*, Nov. 12, 2009 (citing that 110,000 "criminal aliens" have been identified, but indicating that some of these "criminal" aliens had only been *charged* but not *convicted* of crimes);

Given the vast implications of the program and the public uncertainty surrounding its implementation, Secure Communities is a "matter of widespread and exceptional media interest."[20] Correspondingly, the media has raised serious questions about the Secure Communities program related to the "government's integrity which affect public confidence," including concerns that Secure Communities will serve as a dragnet instead of a mechanism to target dangerous criminal individuals, and will hinder community policing and lead to racial profiling.[21]

## G. Certification

The Requesters certify that the above information is true and correct to the best of the Requesters' knowledge. *See* 6 C.F.R. § 5.5(d)(3).

If you have any questions regarding the processing of this request, you may contact Bridget Kessler at (212) 790-0213 or Peter Markowitz at (212) 790-0340. Thank you for your kind consideration.

Please furnish all applicable Records to:

Bridget Kessler
Clinical Teaching Fellow
Cardozo School of Law
Immigration Justice Clinic
55 Fifth Avenue
New York, NY 10003

Sincerely,

Bridget Kessler
Clinical Teaching Fellow
Cardozo School of Law
Immigration Justice Clinic
55 Fifth Avenue
New York, NY 10003
Phone: (212) 790-0213

---

[20] Julia Preston New York Times, *U.S. Identifies 111,000 Immigrants With Criminal Records*, Nov. 13, 2009; New York Times, Editorial, *Wrong Paths to Immigration Reform*, Oct. 12, 2009; Jose M. Serrano, New York State senator, Letter to Editor, New York Times, *Threat to Immigrants*, Oct. 16, 2009; The Real Cost of Prisons Weblog, *Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens*, Jan. 19, 2009; N.C. Aizenman, Washington Post, *D.C. to help U.S. identify illegal immigrants in jail Federal program checks fingerprints of local crime suspects*, Nov. 13, 2009; *More Questions Than Answers About the Secure Communities Program*, Mar. 2009; *See* Michelle Waslin, Ph.D., *The Secure Communities Program: Unanswered Questions and Continuing Concerns*, 11, Nov. 2009;

[21] *See* Michelle Waslin, Ph.D., *The Secure Communities Program: Unanswered Questions and Continuing Concerns*, 11, Nov. 2009 (noting the concern that Secure Communities raises questions about local police authorities' ability to build strong, trusting relationship with their communities).

Sunita Patel
Staff Attorney
Center for Constitutional Rights
666 Broadway, 6th Floor
New York, NY 10012
Phone: (212)614-6439


On behalf of the Requesters

Exhibit B



U.S. Department of Justice

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

March 2, 2010

MS. BRIDGET KESSLER
CARDOZO SCHOOL OF LAW
IMMIGRATION JUSTICE CLINIC
55 FIFTH AVENUE
NEW YORK, NY 10003

FOIPA Request No.:  1143784- 000
Subject:  SECURE COMMUNITIES PROGRAM

Dear Ms. Kessler:

☒  This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request to the FBI received by this office February 4, 2010. The FOIPA number listed above has been assigned to your request.

☐  For an accurate search of our records, please provide the complete name, alias, date and place of  birth for the subject of your request.  Any other specific data you could  provide such as prior addresses, or employment information would also be helpful.  If your subject is deceased, please  include date and proof of death.

☐  To make sure information about you is not released to someone else, we require your notarized  signature or, in place of a notarized signature, a declaration pursuant 28 U.S.C. § 1746.  For your convenience, the reverse side of this letter contains a form which may be used for this purpose.

☐  If you want the FBI's Criminal Justice Information System (CJIS) to perform a search for your arrest  record, please follow the enclosed instructions in Attorney General Order 556-73.  You must submit fingerprint impressions so a comparison can be made with the records kept by CJIS.  This is to make sure your information is not released to an unauthorized person.

☒  We are searching the indices to our Central Records System for the information you requested, and will inform you of the results as soon as possible.

☐  Processing delays have been caused by the large number of requests received by the FBI.  We will process your request(s) as soon as possible.

Your request has been assigned the number indicated above.  Please use this number in all correspondence with us.  Your request for expedited processing has been granted.  Your request for a fee waiver is being considered and you will be advised as to its status at a later date.  Your patience is appreciated.

Very truly yours,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

Exhibit C



Department of Homeland Security
800 North Capitol Street NW #585
Washington, DC 20536-5009



**U.S. Immigration
and Customs
Enforcement**

February 23, 2010

Ms. Bridgette J. Kessler
Clinical Teaching Fellow
Cardoza School of Law
55 Fifth Avenue
New York, NY  10003

RE:  **FOIA Case Number 2010FOIA2674**

Dear Ms. Kessler:

This letter responds to your request for a waiver of fees in the processing of your Freedom of
Information Act (FOIA) request dated Feb 3, 2010.  You have requested any and all records,
received, maintained, or created by any government agency or subdivision related to the policies,
procedures or objectives of Secure Communities, including documents created prior to March 28,
2008 Immigration and Customs Enforcement (ICE) evaluates fee waiver requests under the legal
standard set forth above and the fee waiver policy guidance issued by the Department of Justice
on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of
Information Act regulations[1]. These regulations set forth six factors to examine in determining
whether the applicable legal standard for fee waiver has been met.  I have considered the
following factors in my evaluation of your request for a fee waiver: (1) whether the subject of the
requested records concerns "the operations or activities of the government"; (2) whether the
disclosure is "likely to contribute" to an understanding of government operations or activities; (3)
whether disclosure of the requested information will contribute to the understanding of the public
at large, as opposed to the individual understanding of the requestor of a narrow segment of
interested persons; (4) whether the contribution to public understanding of government
operations or activities will be "significant"; (5) whether the requester has a commercial interest
that would be furthered by the requested disclosure; and (6) whether the magnitude of any
identified commercial interest to the requestor is sufficiently large in comparison with the public
interest in disclosure that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have
determined to deny your request for a fee waiver.

---

[1] 6 CFR § 5.11(k).

Immigration and Customs Enforcement (ICE) evaluates requests for expedited processing based upon the legal standards set forth in the Electronic Freedom of Information Act Amendments of 1996 as incorporated into the Department of Homeland Security's Freedom of Information Act regulations[2]. These regulations establish two factors to examine in determining whether the applicable legal standard for expedited processing has been met. We have considered the following factors in our evaluation of your request for expedited processing: (1) whether the lack of an expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; and (2) if there is an urgency to inform the public about an actual or alleged federal government activity, if the request is made by a person primarily engaged in disseminating information.

Upon review of your request and a careful consideration of the factors listed above, I have determined to deny your request for expedited processing.

The undersigned is the person responsible for this determination. You may appeal this finding by writing to the Associate General Counsel (General Law), Department of Homeland Security, FOIA Appeals, Washington, DC 20528, within 60 days from the date of this determination. It should contain any information and state, to the extent possible, the reasons why you believe the initial determination should be reversed and the envelope in which the appeal is mailed in should be prominently marked "FOIA Appeal." The Privacy Office's determination will be administratively final.

If you have any questions pertaining to your request, please contact the FOIA Office at (202) 732-0300.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

---

[2] 6 CFR § 5.5(d).



**To:** Ms. Kessler          **From:** Schniene

**Fax:** 212-790-0256      **Pages:** 2

**Phone:**                        **Date:** 3-9-10

**Re:** 2010-FOIA 2674    **CC:**

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

Please contact the ICE FOIA Office at 202-732-0300 If there are problems with this transmission.

Exhibit D

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

March 5, 2010

Ms. Bridget Kessler
Clinical Teaching Fellow
Cardozo School of Law
Immigration Justice Clinic
55 Fifth Avenue
New York, NY 10003

Re: **DHS/OS/PRIV 10-0385**

Dear Ms. Kessler:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated February 3, 2010 and received in this office on February 12, 2010, seeking information on behalf of the National Day Laborer Organizing Network ("NDLON"), the Center for Constitutional Rights ("CCR"), and the Immigration Justice Clinic of the Benjamin N. Cardozo School of Law ("the Clinic") (collectively "the Requesters") for information regarding the U.S. Immigration and Customs Enforcement agency ("ICE") program Secure Communities ("Secure Communities") including, but not limited to the following:

(1) **Policies, Procedures and Objectives**: Any and all Records, received, maintained, or created by any government agency or subdivision, related to the policies, procedures or objectives of Secure Communities, including documents created prior to March 28, 2008. Such records include but are not limited to:

    a. **Overview Documents**: policies, operating procedures, rules, internal policy guidance, training materials and legal opinions or memoranda referencing Secure Communities or discussing the mandate, goals, objectives, function responsibility, purpose, implementation, deployment strategy of Secure Communities and any procedures for state or local jurisdictions to opt-out of Secure Communities.

    b. **State and Local Agreements**: agreements, including Memoranda of Agreement, Memoranda of Understanding, and drafts of agreements between ICE and any partner, including State Identification Bureaus ("SIBs"), local Law Enforcement Agencies ("local LEAs") or other state or local agencies related to Secure Communities.

    c. **Secure Community's Inquiry & Response Procedures**: any and all Records related to policies and procedures governing the initiation of Secure Communities Queries in Secure Communities Jurisdictions and policies and procedures governing ICE's responses to Secure Communities Queries, including, but not limited to:

        i. Any Record containing guidance or procedures governing when local LEAs may generate a Secure Communities Query, including any Records providing for mandatory Secure Communities Queries or discretionary Secure Communities Queries.

    ii.  Any Record related to any past, current, or future practice of automatic generation of a Secure Communities Query ("automated IAQ processing") when "unknown" or "other than the United States" is entered as an individual's place of birth.

    iii.  Any Records that contain lists or otherwise identify any databases checked as a result of a Secure Communities Query, including, but not limited to, all national, state and local databases.

    iv.  Any Records containing standard notices or computer screen shots generated in response to a Secure Communities Query.

**d.** **Detainer Procedures**: any and all Records containing guidance, procedures, or standards governing the issuance or lifting of Form I-247, Immigration Detainer-Notice of Action ("Immigration Detainer"), by the Law Enforcement Support Center ("LESC"), the Criminal Alien Program ("CAP"), or ICE Field Offices on individuals who are subject to a Secure Communities Query, including any Records related to the Secure Communities "risk-based approach" or the "Secure Communities' levels and offense categories" by National Crime Information Center ("NCIC") Code.

**e.** **State Training or Explanatory Materials**: any and all Records containing training, briefing, guidance, procedures, rules, or other informational materials developed for local LEAs, SIBs, or other state or local entities.

**f.** **Relationship Between Secure Communities and Other ICE Enforcement Programs**: any and all Records indicating the interface or relationship between Secure Communities and other ICE programs, including but not limited to the Criminal Alien Program ("CAP"), 287(g) arrangements, and other ICE Agreements of Cooperation in Communities to Enhance Safety and Security ("ICE ACCESS").

**g.** **Racial Profiling Policy**:

    i.  Any and all Records related to ICE monitoring or plans to monitor Secure Communities Jurisdictions for racial or ethnic profiling or other due process violations;

    ii.  Any and all Records related to local LEAs' racial profiling or anti-racial profiling policies or procedures from Secure Communities Jurisdictions or Proposed Secure Communities Jurisdictions;

    iii.  Any and all Records evaluating, reviewing, compiling or otherwise discussing compliance with racial profiling, or anti-racial profiling policies and procedures, including, but not limited to, Section 1.0 of the Secure Communities Standard Operating Procedures.

**h.** **Vulnerable Groups**: Any and all Records containing policy or procedures concerning the treatment of Vulnerable Groups targeted by Secure Communities, including, but not limited to, the issuance of Immigration Detainers, parole, or other exercise of prosecutorial discretion.

## 2) Data & Statistical Information

Any and all Records, <u>excluding Records from individual Alien files</u>, containing data or statistics prepared, compiled, or maintained by ICE or any agency or subdivision thereof related to or pertaining to Secure Communities or to Secure Communities Jurisdictions beginning the last full fiscal year prior to the implementation of Secure Communities in each jurisdiction through the present (except as otherwise specified). Such Records should include, but not limited to:

a.  **Criminal Answer Required ("CAR") and Criminal Print Identification ("CPI") File Maintenance Messages**: Records that contain data or statistical information on CARs and CPI File Maintenance Messages originating in each Secure Communities Jurisdiction and cumulatively (including Records that contain data or statistical information on of any and all fingerprints transmitted through interoperability), from the implementation of Secure Communities through the present, or any sub-period thereof. Any Records that contain statistics or data drawn from such CARs and CPIs, including any analysis or breakdown thereof.

b.  **Automatic Immigration Alien Queries ("IAQs")**: Records that contain data or statistical information on IAQs triggered by inquiries from each Secure Communities Jurisdiction (including Records that contain data or statistical information on any and all matches or hits in IDENT), from the implementation of Secure Communities through the present, or any sub-period thereof. Any Records that contain data drawn from such IAQs, including any analysis or breakdown thereof.

c.  **Immigrant Alien Responses ("IARs") and IDENT Data Responses ("IDRs")**: Records that contain data or statistical information on IARs and IDRs triggered by Secure Communities Queries from each Secure Communities Jurisdiction, from the implementation of Secure Communities through the present, or any sub-period thereof. Any Records that contain data drawn from such IARs and IDRs, including any analysis or breakdown thereof.

d.  **Form I-247, Immigration Detainers (Immigration Detainers)**:

   i.  Pre-Secure Communities: Records that contain data or statistical information on the number of Immigration Detainers lodged dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   ii.  **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Immigration Detainers lodged through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   iii.  **Post-Secure Communities**: Records that contain data or statistical information on the number of Immigration Detainers lodged in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   iv.  **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Immigration Detainers lodged through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   v.  **Secure Communities Detainers**: Records that contain data or statistical information on the number of Immigration Detainers lodged on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   vi.  Any Records that contain data drawn from any such Immigration Detainer forms, including any analysis or breakdown thereof.

e.  **Form I-213, Record of Deportable/Inadmissible Alien**:

   i.   **Pre-Secure Communities**: Records that contain data or statistical information on the number of Forms I-213 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   ii.  **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-213 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   iii. **Post Secure Communities**: Records that contain data or statistical information on the number of Forms I-213 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   iv.  **Post-Secure Communities through CAP:** Records that contain data or statistical information on the number of Forms I-213 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   v.   **Secure Communities I-213s**: Records that contain data or statistical information on the number of Forms I-213 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   vi.  Any Records that contain data drawn from any such I-213 forms, including any analysis or breakdown thereof.

f.  **Form I-286, Notice of Custody Determinations**:

   i.   **Pre-Secure Communities**: Records that contain data or statistical information on the number of Forms I-286 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   ii.  **Pre-Secure Communities through CAP:** Records that contain data or statistical information on the number Forms I-286 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

   iii. **Post-Secure Communities**: Records that contain data or statistical information on the number of Forms I-286 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

   iv.  **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-286 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;



    v.  **Secure Communities I-286**: Records that contain data or statistical information on the number of Forms I-286 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    vi.  Any Records that contain data drawn from any such I-286 forms, including any analysis or breakdown thereof.

g.  **Form I-862, Notice to Appears (NTA)**:

    i.  **Pre-Secure Communities**:  Records that contain data or statistical information on the number of Forms I-862 issued dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii.  **Pre-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-862 issued through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    iii.  **Post-Secure Communities:** Records that contain data or statistical information on the number of Forms I-862 issued in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    iv.  **Post-Secure Communities through CAP**: Records that contain data or statistical information on the number of Forms I-862 issued through the Criminal Alien Program in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    v.  **Secure Communities I-862**: Records that contain data or statistical information on the number of Forms I-862 issued on individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, from the implementation of Secure Communities through the present, or any sub-period thereof;

    vi.  Any Records that contain data drawn from any such I-862 forms including any analysis or breakdown thereof.

h.  **Criminal Records in Secure Communities Jurisdictions**:

    i.  **Pre-Secure Communities**: Records that contain data or statistical information on criminal history or records and/or pending charges of individuals indentified through the Criminal Alien Program dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii.  **Post-Secure Communities**: Records that contain data or statistical information on criminal history or records and/or pending charges of individuals who are subject to a Secure Communities Query in each Secure Communities Jurisdiction and cumulatively, since the implementation of Secure Communities;

    iii.  Any Records that contain any analysis or breakdown of the aforementioned data and statistical information on criminal history, records, or pending charges.

i.   **Offense Level Determinations**:

Any records that contain data or statistical information disaggregated by any categorization of criminal history or other risk-based assessment including, but not limited to, the "Secure Communities' levels and offense categories" for the following periods:

    i.   **Pre-Secure Communities**: Dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively; and

    ii.  **Post-Secure Communities**: Since the implementation of Secure Communities.

This request includes any such records pertaining to whether or not detainers were lodged, whether or not Notices to Appear were issued, and whether or not individuals were ordered removed and/or actually removed.

j.   **Removals**:
Any records that contain data or statistical information on removals of individuals in Secure Communities jurisdictions, including:

    i.   **Pre-Secure Communities**: Any removal resulting from apprehensions through the CAP dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

    ii.  **Post-Secure Communities**: Any removal of individuals who are subject to a Secure Communities Query since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;

    iii. **Post-Secure Communities through CAP**: Any removal resulting from apprehensions through the CAP following the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively.

k.   **United States Citizens**:
Any records that contain data or statistical information or any discussion or information whatsoever pertaining to United States Citizens:

    i.   Identified through Secure Communities Matches;

    ii.  Subjected to Immigration Detainers after being subject to a Secure Communities Query;

    iii. Detained by ICE after being subject to a Secure Communities Query;

    iv.  Removed by ICE after being subject to a Secure Communities Query.

l.   **Demographic Data**

Any records that contain data or statistical information on race, ethnicity, sex, age, or place of birth of:

    i.   Subjects of Detainers

      1.   **Pre-Secure Communities**:  Individuals subject to detainers dating back through the last full fiscal year prior to the implementation of Secure



Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

2. **Post-Secure Communities**: Individuals subject to detainers after being subject to a Secure Communities Query since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;

ii. Subjects of Secure Communities Queries;

iii. Subjects of Secure Communities Matches.

m. **Vulnerable Groups**

Any and all Records containing data or statistical information on Vulnerable Groups for:

iv. **Pre-Secure Communities**: Individuals subject to detainers dating back through the last full fiscal year prior to the implementation of Secure Communities, or any sub-period thereof, in each Secure Communities Jurisdiction and cumulatively;

v. **Post-Secure Communities**: Individuals subject to Secure Communities Queries since the implementation of Secure Communities, in each Secure Communities Jurisdiction and cumulatively;

3) **Individual Records**

The following Records pertaining to individuals subject to Secure Communities Queries or ICE detainers in Designated Jurisdictions from October 2007 through the present:

i. Criminal Answer Required (CAR) and Criminal Print Identification (CPI) File Maintenance Messages;

ii. Automatic Immigration Alien Queries (IAQs);

iii. Immigrant Alien Responses (IAR) and IDENT Data Responses (IDR);

iv. Form I-247, Immigration Detainer – Notice of Action (Immigration Detainer);

v. Form I-213, Record of Deportable/Inadmissible Alien;

vi. Form I-215c, Record of Sworn Statement in Affidavit Form;

vii. Form I-200, Warrant for Arrest of Alien;

viii. Stipulated Request for Final Order of Removal and Waiver of Hearing;

ix. Written Notice of Reinstatement of Removal;

x. Administrative Voluntary Departure;

xi. Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent)

xii. Form I-205, Warrant of Removal

xiii. Form I-286, Notice of Custody Determination;

xiv. Form I-862, Notice to Appear (NTA);

xv. Initial Notice of Hearing in Removal Proceedings;

xvi. Immigration Judge Bond Redetermination Order, EOIR Form 1;


      xvii.   Notice of Entry of Appearance as Attorney or Representative before the Immigration Court, Form EOIR-28 or USCIS Form G-28;

     xviii.   Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals, Form EOIR-27

      xix.   Immigration Judge Orders: ordering individual removed, terminating proceedings, or granting relief;

      xx.   Any other Records that contain any of the following information:

         i.   **Demographic Information**:

             1. The criminal history of, and the current charges against, the individual;

             2. The individual's age, race, gender, nationality, place of birth or status as a member of a Vulnerable Group.

ii. **Immigration Detainers**:

1. Whether the Immigration Detainer was lodged on individuals who are subject to a Secure Communities Query;

2. Whether the Immigration Detainer was issued by the LESC, the CAP, a local ICE field office, a 287(g) officer, or some other entity;

3. How the determination to lodge an Immigration Detainer was made, including reference to any policy guidelines or "risk-based" assessment, such as guidance based on criminal history or factors such as age, gender, medical or mental health conditions, or dependent minor children;

4. For any individual identified following a Secure Communities Query for whom an Immigration Detainer was not lodged or was subsequently lifted and the reasons for that determination, including reference to any policy guidelines or "risk-based" assessment.

iii. **ICE Custody Determinations:**

1. Any notice or communication from the local or state facility with custody of the individual subject to an ICE detainer to ICE indicating when the individual is to be released from criminal custody or when ICE can and/or must assume custody;

2. The date and time the individual subject to the detainer was taken into ICE custody;

3. Whether and when the individual posted bond, if any;

4. What factors ICE considered in deciding whether or not to issue bond, how much bond to issue, whether to release someone on their own recognizance, whether to put someone on supervised release or intensive supervised release, whether to grant someone parole or prosecutorial discretion, or any other custody determination, including, for example, any worksheet or checklists utilized for any of the above determinations and reference to any policy guidelines or "risk-based" assessment, including, but not limited to, determinations based on:

    I.        Any categorization of criminal history or other risk-based assessment including, but not limited to, the "Secure Communities' levels and offense categories",

    II.       Age or gender;

    III.     Medical or mental health conditions;

    IV.     Eligibility for T, U, S visas, or VAWA adjustment;

    V.       Eligibility for asylum, withholding or protection under the Convention Against Torture;

    VI.     Eligibility for other forms of relief from removal;

    VII.    Length of permanent residence in the United States and community ties; or

    VIII.   The existence of minor children dependent on the individual or other family members in the United States;

5.  Whether the individual's criminal case(s) were resolved at the time ICE assumed custody.

iv.  **Immigration Charging Document**:

1.  When a Notice to Appear is not issued after ICE assumes custody, whether the non-issuance is due to:

    I.        The existence of a prior deportation, exclusion, or removal order;

    II.       The existence of a stipulated order of removal;

    III.     The issuance of a Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order, pursuant to the expedited removal statute;

    IV.     The issuance of a Final Administrative Order of Removal;

    V.       The issuance of a Form I-860, Notice and Order of Expedited Removal, pursuant to the expedited removal statute;

    VI.     ICE's determination that the individual is a United States citizen;

    VII.    ICE's determination that the individual is not removable;

    VIII.   ICE's exercise of prosecutorial discretion; or

    IX.     Any other factor.

2.  The date and time that ICE:

    I. Executed the Notice to Appear

    II.       Served the Notice to Appear on the individual;

    III.     Filed the Notice to Appear with the Executive Office for Immigration Review.

v.  **Immigration Bonds**:

1. Whether and when the individual requested a bond hearing;

2. Whether and when a bond hearing was held;

3. Whether and when an individual requested a redetermination of custody decision;

4. Whether and when a custody redetermination hearing was scheduled;

5. Whether and when a custody redetermination hearing was held;

6. Whether and when the individual requested a *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999), hearing;

7. Whether and when a *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999), hearing was held;

8. The amount of the bond set by the Immigration Judge, if any;

9. Whether the individual appealed the bond determination;

10. Whether and when the individual posted bond, if any.

vi.  **Removal Proceedings**:

1. If resolved, the final outcome of the individual's removal case;

2. If pending, the current status of the individual's removal case;

3. The date the individual's removal case was resolved;

4. Whether the individual was represented by counsel in the removal proceeding at any time.

vii.  **Detention**:

1. When the individual was first detained by ICE;

2. If released, the date the individual was released from custody (or removed);

3. Each location and facility where the individual was detained and the dates of detention at each such facility.

4)  **Fiscal Impact of Secure Communities**:

a.  **Fiscal Impact on State and Local Secure Communities Jurisdictions and Potential Secure Communities Jurisdictions**: Any and all Records related to the fiscal impact or the actual, estimated, or projected cost on state and local Secure Communities Jurisdictions and Proposed Secure Communities Jurisdictions arising from or related to Secure Communities or to individuals subject to Immigration Detainers following a Secure Communities Query, including, but not limited to, costs, reimbursements, monetary agreements, and monetary incentives, including increased costs of detention.

(b)  **Intergovernmental Service Agreements**: Any and all Records related to proposed, contemplated, existing, or prior Intergovernmental Service Agreements for detention facilities with Secure Communities Jurisdictions and Proposed Secure Communities Jurisdictions.

(c)  **Contracts with Private Entities**: Any and all Records related to proposed, contemplated, existing, or prior contracts or communications with private companies or other private entities related to the development or implementation of Secure Communities.

(d)  **Federal Costs of Secure Communities**: Any and all Records related to actual, estimated, or projected costs of the Secure Communities program to the federal government, including, but not limited to, Department of Homeland Security appropriations, and costs of increased detention and removal operations to ICE, EOIR, and United States Attorneys' Offices, and to the federal courts.

5)  **Communications**

a. Any and all Records containing communications related to Secure Communities by, to, or between any of the following:

i.  **ICE**: ICE or any agent, officer, employee, or subdivision thereof;

ii. **DHS**: DHS or any agent, officer, employee, or subdivision thereof;

iii. **DOJ**: DOJ or any agent, officer, employee, or subdivision thereof, including, but not limited to EOIR, FBI, and FBI CJIS;

iv. **State and Local Jurisdictions**: Secure Communities Jurisdictions, Proposed Secure Communities Jurisdictions, and any other state and local jurisdictions, including, but not limited to, any local or state LEAs, SIBs and Attorney Generals' offices;

v. **The White House**: The White House, the President of the United States, his staff and advisors;

vi. **United States Congress**: United States Congress, including, but not limited to, letters or emails to Senators or Representatives or staff members thereof, congressional committees, congressional briefings documents, congressional testimony, any other information provided to a member or employee of Congress, and any documents used in preparation of the aforementioned materials. Including but not limited to:

1. Congressional inquiries regarding Secretary Napolitano's statements regarding Secure Communities in the week following the Criminal Alien Program presentation (November 2009);
2. Information regarding ICE Assistant Secretary John T. Morton's meeting with the Congressional Hispanic Caucus on October 21, 2009;
3. Briefings for Congress on 287(g) announcement on July 15, 2009;
4. Briefing for Senate staff in September 2009 on fugitive operations and other issues related to Secure Communities; and,
5. Briefing for Department of Justice Civil Rights Division in 2009.

vii. **Non-Governmental Organizations (NGOs)**: including emails, letters, or other documents distributed to NGOs or any documents used in preparation of such materials or in preparation for meetings with NGOs.

b. **Public Statements**

i. **Press Releases**: Any and all Records related to or containing press releases or public internet postings that mention the phrase "Secure Communities" and any and all Records used in the preparation thereof;

ii. **Statements to Reporters or Media Outlets**: Any and all Records related to or containing statements by ICE or any official, officer, or employee thereof to a reporter or media outlet, including any opinion pieces or letters to the editor drafted for newspapers or internet media outlets and any Records used in the preparation thereof.

c. **Speeches**: Any and all Records related to speeches, statements, and presentations by ICE or any official, officer, or employee thereof, mentioning Secure Communities and any Records or drafts used in the preparation thereof.

d. **Secure Communities Public Relations Approach**:

Any and all Records related ICE's Secure Communities messaging, media, or communications approach. Including but not limited to:

i. Any and all Records related to the development of the program's title, media approach, website, and public relations approach;

     ii. Any and all Records related to any media, communications, or consulting firm that assisted in the development or implementation of ICE's Secure Communities messaging, media, or communications approach, including any contract or agreement with such firm.

6) **Secure Communities Program Assessment Records**

  a. Any and all Records developed or used by ICE or DHS to evaluate, review, or monitor effectiveness or outcomes of Secure Communities.

  b. Any records containing assessments of the Secure Communities program, whether related to national assessments, assessments of specific Secure Communities Jurisdictions, related to any time period, or any interface or relation with any other ICE programs, divisions or initiatives.

  c. Secure Communities Stakeholder's Questionnaire:

     i. Any and all Records related to the Form 70-008, ICE Secure Communities Stakeholder's ID Assessment Questionnaire (Stakeholder Questionnaire), OMB No. 1653-NEW, including earlier versions of the questionnaire, memoranda, communications, data gathered, or analysis of such data or questionnaire responses;

     ii. Any and all Records containing comments to the Stakeholder Questionnaire;

     iii. Any Records containing follow-up communications related to the Stakeholder Questionnaire or other efforts to solicit community input;

     iv. Any Records containing implementation, analysis, rejection, or other processing of the Stakeholder Questionnaire.

7) **Secure Communities Complaint Mechanisms and Oversight**

  a. Any and all Records related to a complaint mechanism or redress procedure for an individual, such as a United States citizen, erroneously subject to an Immigration Detainer following a Secure Communities Query or other Secure Communities related complaints.

  b. Any and all Records relating to oversight, monitoring, evaluation and supervision of federal, state, and local actors involved in Secure Communities, including, but not limited to, local LEAs, SIBs, and ICE Field Offices.

  c. Any and all Records related to complaints or grievances filed by community members, detained individuals, non-governmental organizations, Congressional representatives, ICE or DHS working groups, state or local entities or employees, federal entities or employees, including those filed with ICE, DHS, SIBs, DHS' Office of Civil Rights and Civil Liberties, the DHS Office of the Inspector General, ICE Office of Professional Responsibility, the United States Attorney General or the Department of Justice, state or local authorities or civil rights bureaus, or the United States Congress or any member or committee thereof.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, the Department processes FOIA requests according to their order of receipt. Although DHS' goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As the subject matter of your request is of substantial interest to two or more components of this Department or of substantial interest to another agency, we will need to consult with those entities before we issue a final response. Due to these unusual circumstances, DHS will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B).

As it relates to your request for expedited treatment, your request is denied. Under the DHS FOIA regulation, expedited processing of a FOIA request is warranted if the request involves "circumstances in

which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(d)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(l)(ii). Although you may be "primarily engaged in disseminating information," your request for expedited processing is denied because the request did not meet the criteria for either category. Clearly, the lack of expedited treatment in this case will not pose an imminent threat to the life or physical safety of an individual, nor have you detailed with the requisite specificity why you feel there is an urgency to inform the public about the Secure Communities Program. The urgency to inform the public about actual or alleged government activity would need to exceed the public's right to know about government activity generally. Your letter was conclusory in nature and did not present sufficient facts to justify a grant of expedited processing under the applicable standards.

As it relates to your fee waiver request, this portion of the request is also denied. The DHS FOIA Regulations, 6 CFR § 5.11(k)(2), set forth six factors to examine in determining whether the applicable legal standard for a fee waiver has been met: (1) Whether the subject of the requested records concerns "the operations or activities of the government;" (2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities; (3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons; (4) Whether the contribution to public understanding of government operations or activities will be "significant;" (5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and (6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

As a requester, you bear the burden under the FOIA of showing that the fee waiver requirements have been met. Based on my review of your February 3, 2010 request and for the reasons stated herein, I have determined that your fee waiver request is deficient because it did not adequately address factors 3-4 above. Since your request for a fee waiver has failed to satisfy each of the required factors, I am denying your fee waiver request.

Provisions of the Act allow us to recover part of the cost of complying with your request. We shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to non-commercial requestors. As a non-commercial requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free, as are the first two hours of search time, after which you will pay the per quarter-hour rate ($4.00, $7.00, $10.25) of the searcher. You stated in your request that you are willing to pay assessable fees up to $200.00. You will be contacted before any further fees are accrued.

You have the right to appeal the determination to deny expedited processing and a waiver of fees of your request. Should you wish to do so, you must **send your appeal and a copy of this letter within 60 days of receipt of this letter** to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in Subpart A, Section 5.9, of the DHS Regulations. Your envelope and letter should be marked "Freedom of Information Act Appeal." Copies of the DHS regulations are available online at: http://www.dhs.gov/xlibrary/assets/FOIA_FedReg_Notice.pdf; Internet, accessed February 23, 2010.

We have queried the appropriate components of DHS for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you need to contact this office again concerning your request, please refer to **DHS/OS/PRIV 10-0385.** This office can be reached at 866-431-0486.

Sincerely,

Sabrina Burroughs
Disclosure & FOIA Operations Manager

Exhibit E



 **U.S. Department of Justice**

Office of Legal Counsel



---

*Washington, D.C. 20530*

April 16, 2010

Bridget Kessler
Cardozo School of Law
Immigration Justice Clinic
55 Firth Avenue
New York, NY 10003

Dear Ms. Kessler:

This is to acknowledge receipt of your Freedom of Information Act request dated February 3, 2010, in which you requested records relating to the U.S. Immigration and Customs Enforcement agency program Security Communities.

In your letter you requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a]n urgency to inform the public about an actual or alleged federal government activity if made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(l)(ii) (2009). Based on the information you have provided, I have determined that your request for expedited processing under this standard should be denied because the primary activity of your organization does not appear to be information dissemination, which is required for a requester to qualify for expedited processing under this standard.

You have also requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(l)(iv) (2009). Pursuant to Department policy, we directed your request to the Direct of Public Affairs, who makes the decision whether to grant or deny expedited processing under this standard. *See id.* § 16.5(d)(2). The Director of Public Affairs has determined that the standard is not met because he does not believe the subject of your request pertains to a matter of "widespread and exceptional media interest." Accordingly, your request for expedited processing has been denied.

We have not yet made a decision on your request for a fee waiver. We will do so after we determine whether or not fees will be assessed for this request.

If you have any questions or wish to discuss the processing of your request, you may contact Bette Farris on 202-514-2038.

If you are not satisfied with the denial of your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, N.W., Washington, DC 20530, within sixty days of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Paul P. Colborn
Special Counsel
Office of Legal Counsel

Exhibit F



**National Day Laborer Organizing Network**
**Red Nacional de Jornaleros**

675 S. Park View St., Ste B
Los Angeles, CA 90057

www.ndlon.org

Tel. (213) 380-2783
Fax (213) 353-1344

**centerforconstitutionalrights**    **CARDOZO**
BENJAMIN N. CARDOZO SCHOOL OF LAW · YESHIVA UNIVERSITY

March 15, 2010

Associate General Counsel (General Law)
U.S. Department of Homeland Security
FOIA Appeals
Washington, DC 20528

Re:    **Freedom of Information Act Appeal of the Department of Homeland Security's**
**Denial of Fee Waiver and Expedited Processing in FOIA Case**
**DHS/OS/PRIV 10-0385**

To Whom It May Concern:

This is a Freedom of Information Act ("FOIA") appeal of the determination of the
Department of Homeland Security ("DHS") to deny a fee waiver and expedited processing in
connection with our FOIA request, with the reference number DHS/OS/PRIV 10-0385. 6 C.F.R
§ 5.9(a). The request seeks information on behalf of the National Day Laborer Organizing
Network ("NDLON"), the Center for Constitutional Rights ("CCR"), and the Immigration
Justice Clinic of the Benjamin N. Cardozo School of Law ("the Immigration Justice Clinic")
regarding the recently implemented DHS Immigration and Customs Enforcement ("ICE") Secure
Communities Program. DHS denied our requests for a fee waiver and expedited processing in a
letter dated March 5, 2010 (attached).

The requested information relates to a matter of significant public concern—the new,
expansive and little-understood ICE immigration enforcement program called Secure
Communities. The Secure Communities program enlists states and localities in the enforcement
of federal immigration laws by requiring local authorities to conduct automatic searches of
immigration databases. It was launched in March 2008 and has since been implemented in over
100 jurisdictions nationwide. ICE is set to expand the program to every jail in the country by
2013. The rapid deployment of Secure Communities means that by 2013, all individuals—
including United States Citizens—who come in contact with local law enforcement officials may
be subject to federal immigration database checks and, ultimately, deportation.

The request seeks critical information that will inform the public about the scope and
impact of the Secure Communities program. The requested records pertain to policies,
procedures and objectives, data and statistical information, and other information related to
Secure Communities. The information will provide answers to important questions, such as, how

1

and when immigration database checks will be run by local authorities, whether sufficient protections are in place to assure that United States Citizens and lawful immigrants are not erroneously deported and that other abuses do not take place, whether the databases relied upon are accurate, and how ICE implements enforcement priorities. The information will also permit the public to assess whether the ICE detention and removal system has the capacity to absorb the large influx of individuals identified by Secure Communities, and whether Secure Communities has unintended negative consequences on local communities, such as increased rates of racial profiling and damage to community policing efforts. In short, the Requesters seek information to educate the public on a wide-scale immigration enforcement initiative that is on the verge of being put into operation in every community across the nation.

A fee waiver in this case is warranted. The FOIA statute requires agencies to grant a fee waiver or reduction if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). DHS has promulgated regulations setting forth various factors to be considered in determining whether the statutory criteria are met. 6 C.F.R § 5.11(k)(2). As set forth below, when applied to the facts of this case, all of the regulatory factors militate in favor of granting a fee waiver:

(1) *The subject of the request*: As acknowledged by your office in the March 5, 2010 response, the subject of the request here "concerns 'the operations or activities of the government.'" 6 C.F.R § 5.11(k)(2)(i). The subject of the requested records concerns the "identifiable operations or activities of the federal government," to wit: the Immigration of Customs Enforcement agency's current and ongoing nationwide implementation of Secure Communities—a database-driven program to enforce federal immigration laws. *Id.*

(2) *The informative value of the information to be disclosed*: As acknowledged by your office in the March 5, 2010 response, the information requested will shed light on the manner in which ICE has implemented Secure Communities around the country and how ICE plans to operate the program in the future. The requesters have pledged to make any information obtained as the result of this FOIA request available to the public, including the press, at no fee. Accordingly, the information sought in the instant FOIA is very "'likely to contribute' to an understanding of government operations or activities." 6 C.F.R § 5.11(k)(2)(ii).

(3) *The contribution to an understanding of the subject by the public likely to result from disclosure*: Requesters are exceptionally well-positioned to ensure that the information obtained will "contribute to 'public understanding.'" 6 C.F.R § 5.11(k)(2)(iii). As a nationwide organization with local community-based partners throughout the country, the National Day Laborer Organizing Network has a unique capacity to disseminate information to diverse communities. Most recently, in cooperation with other organizations, NDLON sponsored a series of informational webinars about Secure Communities. These webinars were attended by over 600 concerned participants across the country. The Center for Constitutional Rights is also in an excellent position to

disseminate information about ICE enforcement programs. CCR publishes various newsletters, handbooks and other materials for public dissemination. In addition, CCR regularly issues press releases to supporters on a listserv of over 50,000 members and to the general public about matters such as immigration, policing and detention policies. Similarly, the Immigration Justice Clinic of the Cardozo School of Law has established itself as an expert in compiling, analyzing and disseminating information about immigration enforcement operations. In February, 2009, the Clinic published the first public study of ICE home raid operations, attracting significant media attention and informing the American public about widespread constitutional violations and other abuses.

(4) *The significance of the contribution to public understanding*: While there is widespread public interest in Secure Communities, there is virtually no information about it in the public domain. The little information available, including Standard Operating Procedures, a model (unsigned) Memorandum of Agreement, and limited data, is vague, incomplete and sometimes contradictory. Accordingly, obtaining clear documentation about Secure Communities, including policies and procedures, plans for future deployment, and specific information would "significantly" contribute to the public's understanding of Secure Communities and how it fits within ICE's broader immigration enforcement agenda. 6 C.F.R § 5.11(k)(2)(iv).

(5) *The existence and magnitude of a commercial interest*: As acknowledged by your office in the March 5, 2010 response, the Requesters have absolutely no commercial interest that would be furthered by the requested disclosure. 6 C.F.R § 5.11(k)(3)(i).

(6) *The primary interest in disclosure*: As impliedly acknowledged by your office in the March 5, 2010 response, this factor is not relevant since the Requesters have no commercial interest that would be furthered by the requested disclosure. 6 C.F.R § 5.11(k)(3)(i).

Since all factors militate in favor of finding that "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester," 5 U.S.C. § 552(a)(4)(A)(iii), a full fee waiver should be granted. If no fee waiver is granted, we request all applicable fee reductions.

In this case, expedited processing also is warranted. Expedited processing should be granted if there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need is established when the requester is a "person primarily engaged in disseminating information," and there is "an urgency to inform the public about an actual or alleged federal government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1).

(1) *Requesters' engagement in disseminating information*. As explained in the February 3, 2010 request, reiterated in subparagraph (3) above and acknowledged in DHS' March 5, 2010 response, Requesters NDLON, CCR, and the Clinic are "primarily engaged in

disseminating information" to the public, and have unique expertise in the subject matter of the requested information. 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1).

(2) *The urgency to inform the public:* There exists "an urgency to inform the public about an actual or alleged federal government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1). The need to inform the public about the new government program Secure Communities is urgent for a variety of reasons. First and foremost, there are many local communities where Secure Communities has yet to be implemented. These communities must understand how the program works and its potential cost and impact in order to make informed decisions about whether to participate. Second, individuals in communities where Secure Communities has been implemented have an urgent interest in knowing about the impact of the program on their communities thus far in order to determine whether it serves local interests to continue to participate in the program. Finally, U.S. taxpayers have an interest in understanding how ICE plans to spend substantial funds appropriated by Congress for Secure Communities, and detention and deportation operations in general.

Since there is "an urgency to inform the public about an actual or alleged federal government activity" by entities "primarily engaged in the dissemination of information," 8 C.F.R. § 5.5(d)(1), expedited process should be granted.

For the aforementioned reasons, Requesters are entitled to expedited processing and a fee waiver in the processing of their FOIA request. Thank you for your kind consideration.

Sincerely,

Bridget Kessler
Clinical Teaching Fellow
Cardozo School of Law
Immigration Justice Clinic
55 Fifth Avenue
New York, NY 10003
Phone: (212) 790-0213

On behalf of the Requesters

4

# EXHIBIT G





National Day Laborer Organizing Network
**Red Nacional de Jornaleros**

675 S. Park View St., Ste B
Los Angeles, CA 90057      www.ndlon.org      Tel. (213) 380-2783
Fax (213) 353-1344

centerforconstitutionalrights



CARDOZO
BENJAMIN N. CARDOZO SCHOOL OF LAW • YESHIVA UNIVERSITY

March 15, 2010

Associate General Counsel (General Law)
U.S. Department of Homeland Security
FOIA Appeals
Washington, DC 20528

Re:    **Freedom of Information Act Appeal** of the Immigration and Customs Enforcement
Agency's Denial of Fee Waiver and Expedited Processing on FOIA Request Case
**2010FOIA2674**

To Whom It May Concern:

This is a Freedom of Information Act ("FOIA") appeal of the determination of the
Immigration and Customs Enforcement Agency ("ICE") to deny a fee waiver and expedited
processing in connection with the FOIA request, 2010FOIA2674 ("the request"). The request
seeks information on behalf of the National Day Laborer Organizing Network ("NDLON"), the
Center for Constitutional Rights ("CCR"), and the Immigration Justice Clinic of the Benjamin N.
Cardozo School of Law ("the Immigration Justice Clinic") regarding the recently implemented
Immigration and Customs Enforcement ("ICE") Secure Communities Program. ICE denied our
requests for a fee waiver and expedited processing in a letter dated February 23, 2010, received
by fax on March 9, 2010 (attached).

The requested information relates to a matter of significant public concern—the new,
expansive and little-understood ICE immigration enforcement program Secure Communities.
The Secure Communities program enlists states and localities in the enforcement of federal
immigration laws by requiring local authorities to conduct automatic searches of immigration
databases. It was launched in March 2008 and has since been implemented in over 100
jurisdictions nationwide. ICE is set to expand the program to every jail in the country by 2013.
The rapid deployment of Secure Communities means that, by 2013, all individuals—including
United States Citizens—who come in contact with local law enforcement may be subject to
federal immigration database checks and, ultimately, deportation.

The request seeks critical information that will inform the public about the scope and
impact of the Secure Communities program. In particular, the requested records pertain to
policies, procedures and objectives, data and statistical information and other information related
to Secure Communities. The information will provide the public with answers to important

1

questions, such as, how and when immigration database checks will be run by local authorities, whether sufficient protections are in place to assure that United States Citizens and lawful immigrants are not erroneously deported and that other abuses do not take place, whether the databases relied upon are accurate, and how ICE implements enforcement priorities. The information will also permit the public to assess whether the ICE detention and removal system has the capacity to absorb the large influx of individuals identified by Secure Communities, and whether Secure Communities has unintended negative consequences on local communities, such as increased rates of racial profiling and damage to community policing efforts. In short, the Requesters seek information to educate the public on a wide-scale immigration enforcement initiative that is on the verge of being put into operation in every community across the nation.

A fee waiver in this case is warranted. The FOIA statute requires agencies to grant a fee waiver or reduction if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). DHS has promulgated regulations setting forth various factors to be considered in determining whether the statutory criteria are met. 6 C.F.R § 5.11(k)(2). As set forth below, when applied to the facts of this case, all of the regulatory factors militate in favor of granting a fee waiver:

(1) *The subject of the request*: The subject of the instant request clearly "concerns 'the operations or activities of the government.'" 6 C.F.R § 5.11(k)(2)(i). The subject of the requested records concerns the "identifiable operations or activities of the federal government," to wit: the Immigration of Customs Enforcement agency's current and ongoing nationwide implementation of Secure Communities—a database-driven program to enforce federal immigration laws. *Id.*

(2) *The informative value of the information to be disclosed*: The information requested will shed light on the manner in which ICE has implemented Secure Communities around the country and how ICE plans to operate the program in the future. The requesters have pledged to make any information obtained as the result of this FOIA request available to the public, including the press, at no fee. Accordingly, the information sought in the instant FOIA is very "'likely to contribute' to an understanding of government operations or activities." 6 C.F.R § 5.11(k)(2)(ii).

(3) *The contribution to an understanding of the subject by the public likely to result from disclosure*: Requesters are exceptionally well-positioned to ensure that the information obtained will "contribute to 'public understanding.'" 6 C.F.R § 5.11(k)(2)(iii). As a nationwide organization with local community-based partners throughout the country, the National Day Laborer Organizing Network has a unique capacity to disseminate information to diverse communities. Most recently, in cooperation with other organizations, NDLON sponsored a series of informational webinars about Secure Communities. These webinars were attended by over 600 concerned participants across the country. The Center for Constitutional Rights is also in an excellent position to disseminate information about ICE enforcement programs. CCR publishes various newsletters, handbooks and other materials for public dissemination. In addition, CCR

regularly issues press releases to the general public and to supporters on a listserv of over 50,000 members about matters such as immigration, policing and detention policies. Similarly, the Immigration Justice Clinic of the Cardozo School of Law has established itself as an expert in compiling, analyzing and disseminating information about immigration enforcement operations. In February, 2009, the Immigration Justice Clinic published the first public study of ICE home raid operations, attracting significant media attention and informing the American public about widespread constitutional violations and other abuses.

(4) *The significance of the contribution to public understanding*: While there is widespread public interest in Secure Communities, there is virtually no information about it in the public domain. The little information available, including Standard Operating Procedures, a model (unsigned) Memorandum of Agreement, and limited data, is vague, incomplete and sometimes contradictory. Accordingly, obtaining clear documentation about Secure Communities, including policies and procedures, plans for future deployment, and specific information would "significantly" contribute to the public's understanding of Secure Communities and how it fits within ICE's broader immigration enforcement agenda.   6 C.F.R § 5.11(k)(2)(iv).

(5) *The existence and magnitude of a commercial interest*: The Requesters have absolutely no commercial interest that would be furthered by the requested disclosure. 6 C.F.R § 5.11(k)(3)(i).

(6) *The primary interest in disclosure*: This factor is not relevant since the Requesters have no commercial interest that would be furthered by the requested disclosure.  6 C.F.R § 5.11(k)(3)(i).

Since all factors militate in favor of finding that "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester," 5 U.S.C. § 552(a)(4)(A)(iii), a full fee waiver should be granted.  If no fee waiver is granted, we request all applicable fee reductions.

In this case, expedited processing also is warranted. Expedited processing should be granted if there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need is established when the requester is a "person primarily engaged in disseminating information," and there is "an urgency to inform the public about an actual or alleged federal government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1).

(1) *Requesters' engagement in disseminating information.* As explained in the February 3, 2010 request and reiterated in subparagraph (3) above, Requesters NDLON, CCR, and the Clinic are "primarily engaged in disseminating information" to the public, and have unique expertise in the subject matter of the requested information. 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1).

(2) *The urgency to inform the public:* There exists a "compelling need" or "an urgency to inform the public about an actual or alleged federal government activity." 5 U.S.C. §

3

552(a)(6)(E)(i)(I); 8 C.F.R. § 5.5(d)(1).The need to inform the public about the new government program Secure Communities is urgent for a variety of reasons. First and foremost, there are many local communities where Secure Communities has yet to be implemented. These communities must understand how the program works and its potential cost and impact in order to make informed decisions about whether to participate. Second, individuals in communities where Secure Communities has been implemented have an urgent interest in knowing about the impact of the program on their communities thus far in order to determine whether it serves local interests to continue to participate in the program. Finally, U.S. taxpayers have an interest in understanding how ICE plans to spend substantial funds appropriated by Congress for Secure Communities, and detention and deportation operations in general.

Since there is "an urgency to inform the public about an actual or alleged federal government activity" by entities "primarily engaged in the dissemination of information," 8 C.F.R. § 5.5(d)(1), expedited processing should be granted.

For the aforementioned reasons, Requesters are entitled to expedited processing and a fee waiver in the processing of their FOIA request. Thank you for your kind consideration.


Sincerely,

Bridget Kessler
Clinical Teaching Fellow
Cardozo School of Law
Immigration Justice Clinic
55 Fifth Avenue
New York, NY 10003
Phone: (212) 790-0213



On behalf of the Requesters

4