UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

NATIONAL DAY LABORER
ORGANIZING NETWORK, *et al.*,

          **Plaintiffs,**

   - against -

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT AGENCY, *et
al.*,

          **Defendants.**

------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 3488 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

      Plaintiffs brought this action for the purpose of obtaining records, pursuant to the Freedom of Information Act ("FOIA"), from four government agencies (collectively, "Defendants"). Specifically, the requests pertain to Secure Communities, a collaborative program established by the United States Immigration and Customs Enforcement Agency ("ICE") and the Department of Justice ("DOJ") that enlists states and localities in the enforcement of federal immigration law.[1] A dispute has now arisen regarding the format in which the

---

[1]     Secure Communities now operates in thirty-eight states, and is expected to operate nationwide by 2013. The Secure Communities program must be activated at the state level through a signed agreement with ICE known as the Secure Communities Memorandum of Agreement ("MOA"). It is unclear whether participation in Secure Communities is mandatory for localities once their state has

Defendants have produced records to Plaintiffs, and will be required to produce records to Plaintiffs in the future.

## II. BACKGROUND

In February 2010, Plaintiffs submitted identical twenty-one page FOIA requests to each of the four defendant agencies.[2] Defendants claim that these requests would require production of millions of pages of responsive documents. Because the Plaintiffs received no substantive response to their requests, on April 27, 2010, they brought this suit to compel production of responsive records. After negotiating with the Government, Plaintiffs agreed to create a five-page Rapid Production List ("RPL") identifying specific records that would be sought and hopefully produced on an expedited basis. The Government believes that even responses to the RPL will involve thousands of pages of records.

After further negotiations, the parties reached an agreement on July 7, 2010, regarding production responsive to the RPL. In substance, the Defendants agreed to produce "the bulk of responsive, non-exempt materials by Friday, July

signed an MOA. A question exists as to whether local jurisdictions can "opt-out" of the program and prevent ICE from using their police records to identify persons subject to deportation. The primary purpose of Plaintiffs' FOIA request is to answer this question.

[2]    In addition to ICE, the agencies include the Department of Homeland Security, the Federal Bureau of Investigation, and the Office of Legal Counsel.

30.["3] The agreement also provided that if the Defendants identified responsive, non-exempt materials that could not be produced by that date, they would provide Plaintiffs with a description of such materials by July 26, and would propose an alternative date for their production.  Defendants failed to produce any records by the agreed-upon July 30 date, but nearly two thousand pages of records were produced on August 3, August 13, September 8, and October 22, 2010.[4]  These productions did not satisfy the July 7 agreement.

On October 22, 2010, Plaintiffs moved for a preliminary injunction to compel production for five categories of the RPL documents that had not been produced.  Specifically, Plaintiffs asked the Court to order (1) that Opt-Out records – defined in the RPL as "National policy memoranda, legal memoranda or communications relating to the ability of states or localities to opt-out or limit their participation in [the program]" – be produced within five days; (2) that Defendants provide a *Vaughn* index within ten days;[5] and (3) that an expedited briefing

---

[3]     7/9/10 Letter from Assistant United States Attorney ("AUSA") Christopher Connolly to Bridget Kessler, Plaintiffs' Counsel.

[4]     Three of these productions were from ICE.  The August 13 production was from the FBI.

[5]     The term "*Vaughn* index" arises from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), which held that a government agency must describe how it searched for records, as well as its rationale for any claimed FOIA exemptions, in order to satisfy its statutory obligations under FOIA.

schedule be set for contested exemptions.  The motion was resolved at a

conference held on December 9, 2010, with an order requiring Defendants to

provide the Opt-Out Records by January 17, 2011.[6]

On December 22, 2010, Plaintiffs sent the Government a Proposed

Protocol Governing the Production of Records ("Proposed Protocol").  This

proposal, annexed hereto as Exhibit A, sets forth a requested format for the

production of electronic records and a separate requested format for the production

of paper records.  As Plaintiffs note, the Proposed Protocol is based, in part, on the

format demands routinely made by two government entities – the Securities and

Exchange Commission and the Department of Justice Criminal Division.

In advance of a court conference scheduled for January 12, 2011,

Defendants produced five PDF files totaling less than three thousand pages.  Upon

receipt of these files, Plaintiffs again sought assistance from the Court, asserting

that the form in which these records were produced was unusable.[7]  Plaintiffs

made three specific complaints: (1) the data was produced in an unsearchable PDF

format; (2) electronic records were stripped of all metadata; and (3) paper and

electronic records were indiscriminately merged together in one PDF file.

---

[6]      *See* December 17, 2010 Order [docket # 25].

[7]      *See* 1/6/11 Letter from Norman Cerullo, Plaintiffs' Counsel, to the
Court.

Plaintiffs asked the Court to "so order" the Proposed Protocol.[8]  In response, the Government submitted a letter defending its form of production.[9]  An oral argument on this issue was held on January 12, 2011.[10]

Before turning to a discussion of the issues raised by this dispute, it is important to describe what the parties did and did not do in an effort to negotiate an agreed upon form of production.  As far as I can tell from the record submitted by the parties, the equivalent of a Rule 26(f) conference, at which the parties are required to discuss form of production, was not held and no agreement regarding form of production was ever reached.  Nor was a dispute regarding form of production brought to the Court for resolution.  The Proposed Protocol was first provided to Defendants on December 22, 2010, and also was the first time Plaintiffs made a written demand for load files and metadata fields.[11]  Prior to December 22, the only written specification of form of production was a July 23 email from Bridget Kessler, Plaintiffs' counsel, to AUSA Connolly, Defendants'

---

[8]    *See* Proposed Protocol, Exhibit C to 1/6/11 Letter.

[9]    *See* 1/11/11 Letter from AUSAs Joseph N. Cordaro and Christopher Connolly, Defendants' Counsel, to the Court.

[10]    *See* 1/12/11 Transcript of Proceedings ("Tr.").

[11]    The parties dispute whether this was the first written demand for production in single page format with respect to text documents and native format production with respect to spreadsheets.

counsel.  Given its importance and brevity, I quote the full text of this email:

> We would appreciate if you could let us know as soon as
> possible how ICE plans to produce the Rapid Production
> List to plaintiffs.  To facilitate review of the documents
> between several offices, please (1) produce the responsive
> records on a CD and, if possible, as an attachment to an
> email; (2) save each document on the CD as a separate file;
> (3) provide excel documents in excel file format and not as
> PDF screen shots; and (4) produce all documents with
> consecutively numbered bate [sic] stamps. . . . Thank you
> for your help and if you have any questions or concerns,
> please feel free to call me.

It is undisputed that Defendants' counsel did not respond to the email by raising any

questions or concerns.  Defendants do not deny that the records that have been

produced, including but not limited to spreadsheets, are in an unsearchable PDF

format with no metadata.

## III.  APPLICABLE LAW

### A.    FOIA and the Federal Rules of Civil Procedure

FOIA provides that "[i]n making any record available to a person under

this paragraph, an agency shall provide the record in any form or format requested by

the person if the record is readily reproducible by the agency in that form or format."[12]

While Congress has recognized the need for "Government agencies [to] use new

technology to enhance public access to agency records and information," there is

---

[12]     5 U.S.C. § 552(a)(3)(B) (effective Oct. 1, 1997).

surprisingly little case law defining this standard.[13]   The leading case, *Sample v. Bureau of Prisons*, provides the following guidance:

> Under any reading of the statute, however, "readily reproducible" simply refers to an agency's technical capability to create the records in a particular format. No case construing the language focuses on the characteristics of the requester. *See, e.g., TPS, Inc. v. U.S. Dep't of Defense,* 330 F.3d 1191, 1195 (9th Cir. 2003) (interpreting "readily reproducible" as referring to technical capability); *see also, e.g., Carlson v. U.S. Postal Serv.,* 2005 WL 756573, at *7 (N.D. Cal. 2005) (holding that "readily reproducible" in a requested format means "readily accessible" by the agency in that format); *Landmark Legal Found. v. EPA,* 272 F. Supp. 2d 59, 63 (D.D.C. 2003) (construing "readily reproducible" as the ability to duplicate).[14]

Rule 34 of the Federal Rules of Civil Procedure also addresses the form of production of records, albeit in the context of discovery.  The Rule is divided into a series of steps that are intended to facilitate production in a useful format.  *First,* the requesting party may specify the form of production of

---

[13]     Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 2(a)(6), 110 Stat. 3050 (1996).

[14]     466 F.3d 1086 (D.C. Cir. 2006) (holding that Bureau of Prisons had the obligation to produce records electronically when requested to do so).  *Accord TPS,* 330 F.3d at 1195 ("[A] FOIA request *must be processed in a requested format* if 'the capability exists to respond to the request' [in that format]." (citing 32 C.F.R. § 286.4(g)(2) (emphasis added)).

electronically stored information ("ESI").[15] *Second*, the responding party may object to the specified form; if it does so, it must state the form that it intends to use.[16] If the requesting party disagrees with the counter-proposal, the parties must attempt to resolve the disagreement. If they cannot, the requesting party may make a motion to compel production in the requested form. *Third*, if the requesting party has not specified a form of production, the responding party must state the form that it intends to use.[17] The responding party may select the form in which the material "is ordinarily maintained," or in a "reasonably usable form."[18] The Advisory Committee Note to Rule 34 states that the responding party's "option to produce [ESI] in a reasonably usable form does not mean that [it] is free to convert [ESI] from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently."[19] Finally, the Advisory Committee Note also states that if

---

[15]     *See* Fed. R. Civ. P. 34(b)(1)(C).

[16]     *See* Fed. R. Civ. P. 34(b)(2)(D).

[17]     *See id.*

[18]     Fed. R. Civ. P. 34(b)(2)(E)(ii). *See also* The Sedona Principles: Best Practices Recommendations and Principles for Addressing Electronic Document Production (2d ed. 2007) ("Sedona Principles 2d"), Principle 12 ("[P]roduction should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form . . . .").

[19]     Fed. R. Civ. P. 34(b), 2006 Advisory Committee Note.

the ESI is kept in an electronically-searchable form, it "should not be produced in a form that removes or significantly degrades this feature."[20]

## B.   Case Law

### 1.   Metadata and Load Files

In *Aguilar v. Immigration and Customs Enforcement Division of the United States Department of Homeland Security,* Magistrate Judge Frank Maas, of this District, provided a guidebook that explained the various types of metadata and the relationship between a record and its metadata.[21]  In that opinion, Judge Maas noted that in the second edition of the Sedona Principles, the Conference abandoned an earlier presumption against the production of metadata in recognition of "'the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party . . . .'"[22]  By now, it is well accepted, if not indisputable, that metadata is generally considered to be an integral part of an electronic record.[23]

---

[20]    *Id.*

[21]    255 F.R.D. 350 (S.D.N.Y. 2008).

[22]    *Id.* at 356 (quoting Sedona Principles 2d Principle 12).

[23]    *See, e.g., Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 652 (D. Kan. 2005) (holding that "metadata is an inherent part of an electronic document, and its removal ordinarily requires an affirmative act by the producing

The *Aguilar* decision also explained the term load file, quoting from

The Sedona Conference Glossary.  The 2010 version of the Glossary now defines

the term as follows:

> A file that relates to a set of scanned images of electronically processed files, and indicates where individual pages or files belong together as documents, to include attachments, and where each document begins and ends.  A load file may also contain data relevant to the individual documents, such as selected metadata, coded data, and extracted texts.  Load files should be obtained and provided in prearranged or standardized formats to ensure transfer of accurate and usable images and data.[24]

Once again, it is by now well accepted that when a collection of static images are

produced, load files must also be produced in order to make the production

searchable and therefore reasonably usable.[25]

---

party that alters the electronic document").  *See generally* W. Lawrence Wescott, *The Increasing Importance of Metadata in Electronic Discovery*, 14 Rich J.L. & Tech. 10 (2008).

[24]     The Sedona Conference® Glossary: E-Discovery & Digital Information Management (3d ed. Sept. 2010), at 31.  *See also* Sedona Principles 2d Principle 12, cmt 12(b) ("In an effort to replicate the usefulness of native files while retaining the advantage of static productions, image format productions are typically accompanied by 'load files,' which are ancillary files that may contain textual content and relevant system metadata.").

[25]     The question arises as to the expense of creating load files.  While I cannot predict the exact cost of creating such files in every case, the fact is that a large collection of static TIFF images is not reasonably usable without load files.  A party can always avoid the expense by producing the records in native format.

## 2.   FOIA and Metadata

No federal court has yet recognized that metadata is part of a public record as defined in FOIA.  However, this precise issue has been addressed by several state courts, which have uniformly held, in the context of state freedom of information laws, that metadata is indeed a part of public records and must be disclosed pursuant to a request for public records.[26]  In his January 6, 2011 letter, Plaintiffs' counsel does cite one FOIA case recognizing that production in a medium which detrimentally affects the access to the information sought is inappropriate because it could improperly "reduce the quantum of information made available."[27]

---

[26]     *See Irwin v. Onondaga Cnty. Res. Recovery Agency,*, 895 N.Y.S.2d 262, 319 (4th Dep't 2010) (finding that petitioner's request for "all computer records that are associated with published [photographs]" included a demand for the metadata associated with those images, and that the metadata should have been disclosed pursuant to New York's Freedom of Information Law); *O'Neill v. City of Shoreline*, 240 P.3d 1149, 1152 (Wash. 2010) (holding, in a manner of first impression, that metadata associated with an email sent to a public official constituted a public record subject to disclosure under Washington's Public Records Act); *Lake v. City of Phoenix*, 218 P.3d 1004, 1007-08 (Ariz. 2009) ("[T]he metadata in an electronic document is part of the underlying document; it does not stand on its own.  When a public officer uses a computer to make a public record, the metadata forms part of the document as much as the words on the page.").

[27]     1/6/11 Letter (quoting *Dismukes v. Department of Interior*, 603 F. Supp. 760, 762 (D.D.C. 1984) (holding that production of microfiche instead of computer tape could violate FOIA if production of microfiche "affects [the] access to the information [sought]")).  *Accord Armstrong v. Executive Office of the*

## IV. DISCUSSION

### A.    August - October 2010 and January 2011 Productions

The Government defends the format of the productions to date based on its claim that Plaintiffs failed to make a timely request for metadata.  Placing heavy reliance on *Aguilar*, Defendants quote the following language: "[I]f a party wants metadata, it should 'Ask for it.  Up front.  Otherwise, if [the party] asks[s] too late or ha[s] already received the document in another form, [it] may be out of luck.'"[28]  Given Plaintiffs' July 23 email and Defendants' tardy productions, I cannot accept this lame excuse for failing to produce the records in a *usable format*.

*First*, the language of Plaintiffs' July 23 email, while less than crystal clear, was sufficient to put Defendants on notice of certain requests regarding form of production.  Defendants were asked to "(2) save each document on the CD as a separate file; (3) provide excel documents in excel file format and not as PDF screen shots; and (4) produce all documents with consecutively numbered bate

---

*President*, 1 F.3d 1274, 1280 (D.C. Cir. 1993) (providing paper print-outs of electronic documents violated the Federal Records Act because "essential transmittal information relevant to a fuller understanding of the context and import of the electronic communication will simply vanish").

[28]    1/11/11 Letter (quoting *Aguilar*, 255 F.R.D. at 357 (quoting Levitt & Farrell, *Taming the Metadata Beast*, N.Y.L.J. May 16, 2008, at 4)).

[sic] stamps." These requests explicitly placed Defendants on notice that

spreadsheets were sought in native format — not as a PDF screen shot — and that

each text record should be produced as a separate file (*i.e.*, in single file format). In

addition, the request for consecutively numbered Bates stamping also put

Defendants on notice of the need for single file format. *Second*, and of equal if not

greater importance, Plaintiffs asked the Government to "let us know as soon as

possible how ICE plans to produce the Rapid Production List." Had the

Government done as it was asked, any ambiguity as to the nature of the requested

format would have been resolved. Finally, Plaintiffs wrote "if you have any

questions or concerns, please feel free to call me." This invitation was ignored.

Defendants violated the explicit requests of the July 23 email by producing all of

the records in non-searchable PDF format, merging all records without indicating

any separate files, merging paper with electronic records, and failing to produce

emails with attachments. They also violated the Federal Rules of Civil Procedure

(the "Rules") by failing to produce the records in a reasonably usable form, and by

producing the records in a form that makes it difficult or burdensome for the

requesting party to use the information efficiently.

      The Government argues that metadata is substantive information that

must be explicitly requested and then reviewed by an agency for possible

exemptions.[29]  Because there is no controlling FOIA precedent recognizing that

metadata is an integral part of the electronic record that must be produced when an

electronic record is requested, the Government asserts that it complied with its

FOIA obligations, even if it did not comply with the Rules.[30]  To that end, the

Government argues that if the requirements of FOIA and the requirements of the

Rules conflict, FOIA must trump the Rules.[31]

However, there is no need to decide this question because FOIA does

not conflict with the Rules.  FOIA is silent with respect to form of production,

requiring only that the record be provided in "any form or format requested by the

person if the record is readily reproducible by the agency in that form or format."

There is no doubt in my mind that this language refers only to technical ability or,

at most, reasonable accessibility.  Defendants do not argue that they are *unable* to

produce the records in the requested form — namely native format for spreadsheets

and single file format for text records — but that reviewing all of the metadata

---

[29]     *See* Tr. at 9, 11.

[30]     *See id.* at 13, 23-24.  Specifically, the Government argues that FOIA
places the burden on the requesting party to ask for metadata, rather than on the
producing party to object to requests regarding the form of production.  Moreover,
the Government argues that its compliance with its FOIA obligations must be
assessed by the adequacy of its *search* for responsive documents, rather than on the
quantity and quality of its production.  *See id.* at 26.

[31]     *See id.* at 24.

would greatly increase the burden of search and production. To that extent, they have unwittingly argued that a request to produce *all* metadata would push the request into the second tier of Rule 26(b)(2)(B) because such records are not reasonably accessible based on undue burden and cost.[32]

Nonetheless, the Government argues that FOIA is not synonymous with discovery in a civil litigation. It is a statute requiring the production of records to the public, upon request, subject to certain exemptions. While rhetorically nuanced, this argument is unavailing. Regardless of whether FOIA requests are subject to the same rules governing discovery requests, Rule 34 surely should inform highly experienced litigators as to what is expected of them when making a document production in the twenty-first century.[33] As noted earlier,

---

[32]   In short, Defendants do not argue that Plaintiffs are not entitled to the metadata or that it is privileged. Rather, they stress that the review and production of that data will easily double the time and expense of responding to the FOIA request. *See* Tr. at 11, 14-15.

[33]   It is well-established that FOIA was not intended to supplant or supplement the discovery rules; as far as I can tell, however, courts have not addressed the reverse question of whether the discovery rules govern FOIA productions. Nonetheless, because the fundamental goal underlying both the statutory provisions and the Federal Rules is the same — *i.e.*, to facilitate the exchange of information in an expeditious and just manner — common sense dictates that parties incorporate the spirit, if not the letter, of the discovery rules in the course of FOIA litigation. Thus, attorneys should meet and confer throughout the process, and make every effort to agree as to the form in which responsive documents will ultimately be produced. In this context I note that Rule 26(f) specifically requires the parties to discuss "any issues about disclosure or discovery

Defendants' productions to date have failed to comply with Rule 34 *or* with FOIA.

The next issue to address is the appropriate remedy.  Because no metadata was specifically requested, and because this is an issue of first impression, I will not require Defendants to re-produce all of the records with metadata.  However, Defendants must re-produce all spreadsheets in native format; produce all text records in static image single file format together with their attachments.[34]  All records must be Bates stamped, which should also assist in the production of single file format.

That said, I now hold, consistent with the state court decisions cited earlier, that certain metadata is an integral or intrinsic part of an electronic record.[35] As a result, such metadata is "readily reproducible" in the FOIA context.   The only remaining issue is which of the many types of metadata are an intrinsic part of

---

of electronically stored information, including the form or forms in which it should be produced."

[34]    Generally, when a court orders a "do-over" it gives serious consideration to cost shifting or cost sharing.  *See generally Covad Comm'cs Co. v. Revonet, Inc.*, 254 F.R.D. 147 (D.D.C. 2008) (requiring parties to share costs of re-producing previously produced hard copies in electronic format as both parties were at fault).  However, in this case, I conclude that Defendants failed to comply with Plaintiffs' request in the July 23 email and the explicit invitation to confer with Plaintiffs regarding any questions or concerns.  Moreover, Defendants produced records in a format that was not reasonably usable.  As a result, I decline to require Plaintiffs to bear any of the costs of a re-production.

[35]    *See supra* note 26.

-16-

an electronic record.  Unfortunately, there is no ready answer to this question.  The answer depends, in part, on the type of electronic record at issue (*i.e.*, text record, email, or spreadsheet) and on how the agency maintains its records.  Some agencies may maintain only a printed or imaged document as the final or official version of a record.  Others retain all records in native format, which includes all of the metadata.  Electronic records may have migrated from one system to another, maintaining some metadata but not all.   The best way I can answer the question is that metadata *maintained* by the agency *as a part of an electronic record* is *presumptively* producible under FOIA, unless the agency demonstrates that such metadata is not "readily reproducible."

**B.    Future Productions**

The Government argues that the Proposed Protocol should not be required for the January 17 production of the Opt-out Records because it was received *after* the Government had completed the great bulk of its search.[36]  While it surely had not reviewed all of the documents as of December 22, there is no reason to question the Government's claim that it began to search in earnest on December 10, following a court conference on December 9 which set a production deadline of January 17, and that it had completed the bulk of its collection efforts

---

[36]    *See* Tr. at 30-31.

-17-

by December 22.[37]  The Government notes that the form of production issue was

not raised at the December 9 conference or at any time prior to December 22.

Given this time line, the January 17 production must be made in the same format

that I have now required for the earlier productions.

I turn now to all future productions.  While native format is often the

best form of production, it is easy to see why it would not be feasible where a

significant amount of information must be redacted.[38]  Plaintiffs suggest that ESI

be produced in TIFF image format but with corresponding load files, Bates

stamping, and the preservation of "parent-child" relationships (*i.e.* the association

between an attachment and its parent record).  Plaintiffs also request twenty-four

specific fields of metadata, which presumably will be the content of the load files.

Finally, Plaintiffs request that spreadsheets be produced in both native format and

TIFF format.  Hard copy records are requested in single page TIFF image format

with corresponding load files to provide ease of review.

The Government has not made a counterproposal in response to

Plaintiffs' Proposed Protocol.  Nonetheless, the Court will not impose any greater

---

[37]     *See id.* at 27-28.

[38]     In order to ensure that the receiving party cannot use the metadeta to
circumvent any applied exemptions, the producing party would have to manually
redact each field of information before converting the document into a TIFF or
PDF.

-18-

burden on the Defendants than is absolutely necessary to conduct an efficient

review. The Federal Judicial Center recently sponsored an E-Discovery Seminar

for Federal Judges. At the session on Form of Production, held on September 28,

2010, the presenters suggested that the following fourteen fields of metadata were

likely to be necessary in any production of ESI produced in a digital image format:

Bates_Begin; Bates_End; Attach_Begin; Attach_End; Sent_Date; Sent_Time; To;

From; CC; BCC: Subject/Title; Text; Custodian; and Native_File.[39] Not

surprisingly, all of these fields were also requested by Plaintiffs. I find that any

further production of ESI must contain these metadata fields.[40]

        Plaintiffs also request the following metadata fields: Record Type;

Master_Date; Received_Date and Time; Create_Date and Time; Last_Modified

Date and Time; Parent Folder, Author, Original Source; File Extension; File Name;

and File Size. Although the parties have not briefed or argued the need for each

requested field, at this juncture I see no need for Parent Folder; File Size, File

Name; File Extension; Record Type; or Master_Date. However, in order for the

---

[39]    *See* Form of Production PowerPoint slides prepared by Magistrate
Judges James C. Francis and Frank Maas and Maura R. Grossman.

[40]    While not necessary to the holding in this case, I believe that these are
the minimum fields of metadata that should accompany *any* production of a
collection of text-based ESI. Requests for additional fields should be considered
by courts on a case-by-case basis.

static images to be reasonably usable in this litigation, the remaining fields —

Received_Date and Time; Create_Date and Time; Last_Modified Date and Time;

and Author — must be added to the list.

In addition, spreadsheets must be produced in native format but need

not be produced in TIFF format, unless Plaintiffs can demonstrate why it is also

necessary to produce the spreadsheets in TIFF format.  Conversely, the

Government may produce the spreadsheets in a TIFF format with load files, if it

can demonstrate why native production of spreadsheets would inevitably reveal

exempt information.  All of the other format requirements in the Proposed Protocol

with respect to both ESI and hard copy are hereby ordered.[41]

One final note.  It is no longer acceptable for any party, including the

Government, to produce a large collection of static images of ESI without

---

[41]    To be clear, my order requiring the use of this Proposed Protocol is
limited to this case.  I am certainly not suggesting that this is required to be a
standard production protocol in all cases.  The production of individual static
images on a small scale, where no automated review platform is likely to be used,
may be perfectly reasonable depending on the scope and nature of the litigation.
While Rule 34 requires that records be produced in a reasonably usable format —
which at a minimum requires searchability — any further production specifications
are subject to negotiation by the parties on a case by case basis.  If no agreement is
reached, the court must determine the appropriate form of production, taking into
account the principles of proportionality and considering both the needs of the
requesting party and the burden imposed on the producing party.

accompanying load files.[42]  A party always has the option to produce ESI in native

format, which will reduce costs.  But if a party chooses to produce TIFF images, it

must assume that the receiving party will review those images on some sort of

review platform — such as a Concordance database — which requires load files in

order to be reasonably useable.  Whether or not metadata has been specifically

requested — which it should be — production of a collection of static images

without any means of permitting the use of electronic search tools is an

inappropriate downgrading of the ESI.  That is why the Government's previous

production — namely, static images stripped of all metadata and lumped together

without any indication of where a record begins and ends — was not an acceptable

form of production.  The Government would not tolerate such a production when it

is a receiving party, and it should not be permitted to make such a production when

it is a producing party.

## V.    CONCLUSION

Once again, this Court is required to rule on an e-discovery issue that

could have been avoided had the parties had the good sense to "meet and confer,"

"cooperate" and generally make every effort to "communicate" as to the form in

---

[42]    *See SEC v. Collins & Aikman Corp.,* 256 F.R.D. 403, 413 (S.D.N.Y. 2009) (holding that government agencies "must abide by the Federal Rules of Civil Procedure," and are subject as are all parties to the requirements of Rule 34).

which ESI would be produced.  The quoted words are found in opinion after

opinion and yet lawyers fail to take the necessary steps to fulfill their obligations to

each other and to the court.  While certainly not rising to the level of a breach of an

ethical obligation, such conduct certainly shows that all lawyers — even highly

respected private lawyers, Government lawyers, and professors of law — need to

make greater efforts to comply with the expectations that courts now demand of

counsel with respect to expensive and time-consuming document production.

Lawyers are all too ready to point the finger at the courts and the Rules for

increasing the expense of litigation, but that expense could be greatly diminished if

lawyers met their own obligations to ensure that document production is handled

as expeditiously and inexpensively as possible.  This can only be achieved through

cooperation and communication.


                                                    SO ORDERED:


                                                    Shira A. Scheindlin
                                                    U.S.D.J.

Dated:        New York, New York
              February 3, 2011

## - Appearances -

**For Plaintiffs:**

Bridget Kessler, Esq.
Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Ave., Rm 1154
New York, New York 10003
(212) 790-0213

Norman Cerullo, Esq.
Anthony J. Diana, Esq.
Mayer Brown LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

**For Defendants:**

Joseph N. Cordaro
Christopher Connolly
Assistant U. S. Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10004
(212) 637-2745/2761

# EXHIBIT A

## PROTOCOL GOVERNING THE PRODUCTION OF RECORDS

### I.    Production Formats of Electronic Records

Defendants agree that all responsive electronically stored information ("ESI") shall be produced in the following formats:

A. **TIFFs.** All images shall be delivered as single page Group IV TIFF image files. Image file names should not contain spaces.

B. **Unique IDs.** Each image should have a unique file name and should be named with the Bates number assigned to it.

C. **Text Files.** Extracted full text in the format of multipage .txt files shall be provided. The total number of text files delivered should match the total number of TIFF files delivered. Each text file should match the respective TIFF filename. Text from redacted pages will be produced in OCR format rather than extracted text.

D. **Parent-Child Relationships.** Parent-child relationships (the association between an attachment and its parent record) should be preserved.

E. **Database Load Files/Cross-Reference Files.** Records should be provided in a format compatible with Concordance 8x and Opticon 3x in the following format:

Example Concordance Delimited File

þBegDocþ_þEndDoc þ_ þBegAttach þ _ þ EndAttach þ _ þ DocPages þ _ þ RecordType þ _ þ MasterDate þ _ þ SentOn_Date þ _ þ SentOne_Time þ _ þ Recvd_Time þ

þ ABC001 þ _ þ ABC002 þ _ þ ABC001 þ _ þ ABC005 þ _ þ 2 þ _ þ Email þ _ þ þ _ þ 01/01/2008 þ _ þ 13 05 GMT þ _ þ 13:08 GMT þ

þ ABC003 þ _ þ ABC005 þ _ þ ABC001 þ _ þ ABC005 þ _ þ 3 þ _ þ Attachment þ _ þ þ _ þ þ _ þ þ _ þ

Example Opticon Delimited File

There should be one row in each load file per TIFF image. Files that are the first page of a record should contain a "Y" in the file where appropriate.

*Format*: ProductionNumber,VolumeLabel,ImagePath,DocBreak, FolderBreak,BoxBreak,PageCount

*Example:* Record MS000001 – MS000003 and MS000004 – MS000005 on DVD volume MS001 would be:

MS000001,MS001,D:\IMAGES\001\MS000001.TIF,Y,,,3
MS000002,MS001,D:\IMAGES\001\MS000002.TIF,,,,
MS000003,MS001,D:\IMAGES\001\MS000003.TIF,,,,
MS000004,MS001,D:\IMAGES\001\MS000004.TIF,Y,,,2
MS000005,MS001,D:\IMAGES\001\MS000005.TIF,,,,

F. **Metadata.** For records that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Word, Microsoft PowerPoint, Adobe PDF), Defendants will provide all metadata fields set forth in the below metadata fields. Defendants must produce all files attached to each email they produce, but only if such files are actually attached to that email in the ordinary course of business. To the extent a Defendant produces email attachments that were originally created using common, off-the-shelf software, a Defendant will produce the metadata for those attached electronic records in accordance with this section.

Metadata Fields

- Custodian
- Beginning Bates Number
- Ending Bates Number
- Beginning Attachment Number
- Ending Attachment Number
- Record Type
- Master_Date
- SentOn_Date and Time
- Received_Date and Time
- Create_Date and Time
- Last_Modified Date and Time
- Parent Folder
- Author
- To
- From
- CC
- BCC
- Subject/Title
- OriginalSource
- Native Path
- File Extension
- File Name
- File Size
- Full Text

G. **Spreadsheets.** For spreadsheets that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Excel), Defendants will produce the spreadsheets in native format and, in addition, in TIFF format.

## II.   **Production Format of Hard Copy Records**

Defendants agree that all responsive hard copy records shall be produced in the following formats:

A.  **TIFFs**.  All images shall be delivered as single page Group IV TIFF image files.  Image file names should not contain spaces.

B.  **Unique IDs**.  Each image should have a unique file name and should be named with the Bates number assigned to it.

C.  **OCR**.  High-quality multipage OCR text should be provided.  Each text file should match the respective TIFF filename.

D.  **Database Load File/Cross-Reference Files**.  Records should be provided in a format compatible with Concordance 8x and Opticon 3x in the formats identified in Section I.E above.

E.  **Unitizing of Records**.  In scanning hard copy records, distinct records should not be merged into a single record, and single records should not be split into multiple records (*i.e.*, hard copy records should be logically unitized).

F.  **Parent-Child Relationships**.  Parent-child relationships (the association between an attachment and its parent record) should be preserved.

G.  **Objective Coding Fields**.  The following objective coding fields should be provided:

- Beginning Bates Number
- Ending Bates Number
- Beginning Attachment Number
- Ending Attachment Number
- Source/Custodian

H.  **Objective Coding Format**.  The objective coding fields should be provided in the following format:

- Fields should be Pipe (]) delimited.
- String values within the file should be enclosed with Carats (^).
- Multiple entries in a field should have a semi-colon (;) delimiter.
- The first line should contain metadata headers and below the first line there should be exactly only one line for each record.
- Each field row must contain the same amount of fields as the header row.