**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

NATIONAL DAY LABORER ORGANIZING
  NETWORK, et al.,

        Plaintiffs,

  -v -

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

        Defendants.

------------------------------------------------------------------- x

Civil Action No. 10-CV-3488

**DECLARATION OF CATRINA PAVLIK-KEENAN**

    Catrina Pavlik-Keenan, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Director of the Freedom of Information Act Office at United States Immigration and Customs Enforcement ("ICE") (the "ICE FOIA Office"). I have been the Director of the ICE FOIA Office since that office was created on December 18, 2006. Prior to holding this position, I worked for approximately four years in the FOIA office at the Transportation Security Administration — first as a Supervisory FOIA Analyst, then as Deputy Director for two years, and finally as Director. In total, I have 18 years of experience processing FOIA requests.

2. The ICE FOIA Office is responsible for the receipt, processing, and response to all Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE.

3. As the Director of the ICE FOIA Office, I am the individual primarily responsible for the oversight of how ICE processes FOIA and Privacy Act requests. I manage and supervise a staff of ICE FOIA Paralegal Specialists, who report to me regarding the processing of FOIA

and Privacy Act requests received by ICE. In connection with my official duties, I am familiar with ICE's procedures for responding to requests for information pursuant to the FOIA and the Privacy Act. I am familiar with ICE's processing of the FOIA request that plaintiffs in the above-captioned action—the National Day Laborer Organizing Network, Center for Constitutional Rights, and Immigration Justice Clinic of the Benjamin N. Cardozo School of Law—submitted on February 3, 2010. The ICE FOIA Office assigned FOIA case number 2010FOIA2674 to this request.

4. I make this declaration in support of ICE's motion for a stay pending appeal in the above-captioned action. The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

## II.   ICE'S CAPABILITY TO RESPOND TO THE COURT'S FEBRUARY 7, 2011 ORDER

5. ICE does not have the technical ability to fully comply with the Court's order.

6. The regular practice of the ICE FOIA Office is to use Redax software and Adobe Professional 9.0 for the review and redaction of documents. Redax and Adobe Professional 9.0 do not have the technical capability to comply with the Court's formatting and metadata requirements.

7. Due to the extreme time constraints imposed by the Court's December 9, 2010 order, the ICE FOIA Office was forced to request permission to utilize an e-discovery application that was property of the ICE Office of the Principal Legal Advisor (OPLA).

8. OPLA acquired the Clearwell e-discovery application through a three-year long procurement and development process. At the time of the Court's December 9, 2010 order, the application was untested and had not been approved for use by the ICE Office of the

Chief Information Officer (OCIO).  OPLA was in the beginning stages of establishing protocols for the use of the software and had originally anticipated a pilot phase of testing to begin in February or March 2011.

9. The Clearwell application was not acquired for FOIA purposes.  The Clearwell application was acquired to meet e-discovery demands in civil litigation cases against the agency.  During the lengthy procurement process, OPLA did not take FOIA needs into consideration in determining the relevant capabilities OPLA would require.  Further, in determining the amount of storage that would be purchased from the vendor, OPLA considered only the volume of current civil litigation and estimates of future civil litigation.  FOIA litigations and FOIA requests were not considered in this process.

10. OCIO and the Department of Homeland Security Privacy Office granted OPLA a waiver of normal operating procedures to deploy the Clearwell application for pilot deployment of the application specifically to meet the January 17, 2011 deadline imposed for the production of records responsive to the Plaintiffs' request for "opt-out" records.

11. During the processing of the records for the January 17, 2011 deadline, using the Clearwell application, ICE encountered numerous technical difficulties.   These difficulties resulted in an enormous expenditure of manpower and financial resources over the course of a three week period beginning on December 20, 2010 through January 17, 2011.  OPLA estimates that it was forced to expend more than $270,000.00 in upgrades, including the acquisition of a new $32,000.00 server, during this period in order to have access to and run the application.  Further, OCIO was forced to suspend many of the agency's security protocols in order to allow the Clearwell application, which is a web-based application, to run properly.

12. The Clearwell application is an e-discovery platform that has limitations that make it unsuitable for use in FOIA.  For example, a critical aspect of the FOIA process is the ability for the agency to create a "highlighted" or "red-redacted" copy of the production.  This is to ensure that the agency can present a document to the Court for in camera review should the Court seek to review the material claimed exempt by the agency.  The Clearwell application is unable to accommodate this requirement.  While the agency still has the ability to offer an unredacted version of the document to the Court for its review, because FOIA requires non-exempt information to be segregated from exempt information on a line-by-line basis, it is cumbersome and difficult to compare a "clean" copy to a redacted version.  For the same reasons, ICE retains a "highlighted" copy for its records in order to respond to administrative appeals.  Additionally, the Clearwell application treats all parent documents and attachments as a single document.  Therefore, FOIA processors are unable to extract pages or documents from a single "document" as defined by Clearwell.  As a result, ICE was forced to Bates number and mark dozens of pages as "Non-responsive" due to documents that were out of date range or documents that were non-responsive due to the subject matter.  There are further practical limitations that also make the application unsuitable for FOIA use.

13. Beyond the practical limitations that also make the application unsuitable for FOIA use, ICE purchased a limited amount of storage space within the Clearwell application.  At the present time, while this litigation occupies only approximately two to three percent of the current storage, only a very limited amount of potentially responsive documents have been introduced into the system.  If the application were to be employed to process the balance of this FOIA request, given the fact there are over one million potentially responsive records,

the storage needs of this single FOIA request could occupy the entire storage capacity purchased by ICE. If ICE FOIA were required to purchase sufficient storage capacity to accommodate all FOIA requests, such a procurement would cost hundreds of thousands, if not millions of dollars.

14. Following the conclusion of the January 17, 2011 production, OCIO decided that given the tremendous technical difficulties and huge expenditure of manpower (within both OPLA and OCIO) associated with operating the Clearwell software in responding to plaintiffs' FOIA request, the agency should abandon the Clearwell application and discontinue its use. The agency is currently evaluating the events that occurred in December 2010 and January 2011 to see if the application can be salvaged. It is unknown at this time whether 1) the pilot phase that currently enables OPLA to operate the application on behalf of ICE FOIA for this litigation will be extended; or 2) the Clearwell application will be in further use in the future.

15. In order for ICE FOIA to continue using the Clearwell application beyond the immediate needs of this litigation, ICE FOIA will be required to pay an as-yet undetermined amount for the continued use of the application. ICE will also be required to submit new documentation to cover the expanded use to satisfy federal Privacy Act requirements. This process would be expected to take a minimum of three to six months to complete. The monetary investment would be in the hundreds of thousands of dollars. ICE FOIA currently does not have sufficient financial resources to meet this demand.

16. ICE has examined the Court's February 7, 2011 order directing production of twenty (20) fields of metadata and other format requirements.

17. Upon examination, ICE has determined that it is technically impossible for ICE to comply with all the aspects of the Court's order.

18. While ICE does currently have the ability to address some of the formatting requirements, ICE nonetheless cannot comply with certain aspects of the Court's order.

19. ICE has the capability to produce a so-called "load file" containing selected metadata fields. ICE does not have access to Concordance 8X or Opticon 3X, the two e-discovery platforms referenced in plaintiffs' proposed Protocol, and which the Court incorporated into its order. ICE has been advised by the software vendor that ICE's software, as it currently exists, cannot produce a "load file" that is compatible with Concordance 8X and/or Opticon 3X.

20. Further, the load file containing all twenty fields required by the Court's Order is an executable file that contains information that would be subject to FOIA exemptions. ICE is unable to apply redactions to the .dat load file. As such, it would be impossible for ICE to produce information in .dat format with all twenty required metadata fields without releasing exempt information, which could include personal privacy information belonging to agency employees and third parties exempt under FOIA exemptions 6 and 7(C), law enforcement sensitive information exempt under FOIA exemption 7, and internal agency information of a sensitive nature exempt under FOIA exemption 2.

21. An examination of the information that is being processed for the February 25, 2011 production reveals that those documents contain information subject to all the cited FOIA exemptions. At least some of the documents that must be produced by February 25, 2011 contain at least one metadata field that both (a) is required to be produced under the court's order and (b) contains no exempt information.

22. ICE does have the capability to produce a load file with selected metadata fields that would eliminate fields that contain exempt information.  For instance, if ICE is processing a document that contains exempt material in the fields "Author, Custodian, To:, From:, CC:, BCC:, and Full Text", ICE would produce a load file that eliminates those seven fields of metadata, but contains the remaining thirteen fields.  This type of load file would need to be configured manually for each individual document.  For the February 25, 2011 production alone, ICE has identified more than five hundred (500) documents.  ICE estimates that this process would take between 150 and 175 man hours to complete.  If ICE had to apply this process to the remainder of Plaintiffs' FOIA request, ICE would need to repeat this process for potentially up to one million additional records.

23. In the alternative, in order for ICE to apply the necessary redactions to a number of fields of metadata required by the Court (for example: To, From, CC:, BCC:, full text), ICE would be required to alter the load file into a searchable .pdf file.  It appears highly unlikely that this alternative would comply with all of the Court's formatting requirements.

24. In order to consider this alternative, after processing the records according to ICE's normal procedures, ICE would then produce an electronic version of the load file.  The load file will then be printed as a hard copy and scanned to .pdf format.  The newly created PDF will be reloaded into ICE's redaction software to enable the file to be reviewed for appropriate redactions. The file would need to be redacted and reproduced and exported again.  ICE notes that the "full text" requirement as a metadata field would result in the agency redacting the same text twice for the same document.

25. Moreover since ICE has never to date accessed, processed, and produced metadata in response to a FOIA request, there may be additional obstacles that ICE would need to

overcome and additional steps ICE would need to take to meet metadata production requirements. One obstacle ICE has already identified would be how to match up the PDF of the load file with the original document. Since the load file will be identified by the document identification number and the Order calls for single page TIFF files named by Bates number, ICE has no ready way to link the load file with the corresponding TIFF files.

26. ICE estimates that the production and processing of the load files would add an additional 500 man hours to the handle the production and processing of the load files for the February 25, 2011 production alone. If ICE had to apply this process to the remainder of Plaintiffs' FOIA request, ICE would need to repeat this process for potentially up to one million additional records.

27. The Court's Order also requires that all parent-child relationships be reflected. In accordance with the Court's January 12, 2011 order, ICE endeavored to provide its January 17, 2011 production in accordance with the Plaintiffs' demands, in particular, that parent-child relationships be reflected.

28. In doing so, ICE initially turned over its production with most files named by the document identification number assigned to the documents by the software ICE employed for the production. The parent-child relationships were reflected, for example, as follows: If document A is the parent document, it was assigned a number. For the sake of illustration, I will name Document A, document 565. If Document A has four attachments, the attachments will be reflected in the name of the attachments: Document 565.1, Document 565.2, Document 565.3, and Document 565.4. The documents were also sequentially Bates numbered on the document itself.

29. In response to these efforts, Plaintiffs complained that they were unable to match up the name of the document to the corresponding Vaughn entry without opening the actual document.

30. As a result, ICE had to rename all of the documents in the production by their Bates number, but in doing so, the names of the documents no longer reflected the parent-child relationships.  To rectify this situation, each set of parent document and all attachments were recombined into a single PDF and named by the corresponding Bates range. However, since the Order demands single page TIFFs named by Bates number, ICE can neither rely on the Document number method of reflecting parent child relationships nor the combination of the parent documents and attachments into a single document.  This leaves ICE with no method to identify parent-child relationships within the documents.

**JURAT CLAUSE**

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this <u>20th</u> day of February, 2011

Catrina Pavlik-Keenan
Freedom of Information Act Officer
Freedom of Information Act Office
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security