UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

NATIONAL DAY LABORER
ORGANIZING NETWORK, CENTER FOR
CONSTITUTIONAL RIGHTS, and
IMMIGRATION JUSTICE CLINIC OF
THE BENJAMIN N. CARDOZO SCHOOL
OF LAW,

                Plaintiffs,

     - against -

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW,
FEDERAL BUREAU OF
INVESTIGATION, and OFFICE OF
LEGAL COUNSEL,

             Defendants.
------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 3488 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  7/11/11

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

The National Day Laborer Organizing Network ("NDLON"), the

Center for Constitutional Rights ("CCR"), and the Immigration Justice Clinic of

the Benjamin N. Cardozo School of Law ("Clinic") (collectively, "Plaintiffs")

bring this action for the purpose of obtaining records, pursuant to the Freedom of

Information Act ("FOIA"),[1] from the United States Immigration and Customs

Enforcement Agency ("ICE"), United States Department of Homeland Security

("DHS"), Executive Office for Immigration Review ("EOIR"), Federal Bureau of

Investigation ("FBI"), and Office of Legal Counsel ("OLC") (collectively,

"Defendants").  Specifically, plaintiffs have sought information regarding Secure

Communities, a federal immigration enforcement program launched in 2008.  It

has long been the practice for local law enforcement agencies to send the

fingerprints of individuals arrested and booked into custody to the FBI to be

checked against the national criminal history database.[2]  Under the Secure

Communities program, those fingerprints are also now sent to DHS to be checked

against immigration records.[3]

A portion of the requested records, which has become increasingly

central to the instant litigation, relates to the issue of whether and how localities

may "opt-out" of participation in Secure Communities.[4]  Plaintiffs and defendants

---

[1]      5 U.S.C. § 552 *et seq*.

[2]      *See Secure Communities*, ICE,
http://www.ice.gov/secure_communities/.

[3]      *See id*.

[4]      *See* Memorandum of Law in Opposition to Defendants' Motion for
Partial Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial
Summary Judgment ("Pl. Mem.") at 1-2.

now submit cross-motions for partial summary judgment on the application of

certain FOIA exemptions to "opt-out" records produced on January 17, 2011.  For

the reasons below, plaintiffs' motion is granted in part and denied in part, and

defendants' motion is granted in part and denied in part.

## II.   BACKGROUND

### A.   The FOIA Requests

In February 2010, plaintiffs submitted identical twenty-one page

FOIA requests to each of the five defendant agencies.[5]  Plaintiffs sought a broad

range of information about Secure Communities, including

> records related to or containing: [p]olicies, [p]rocedures or
> [o]bjectives of Secure Communities (including overview
> documents, state and local agreements, Secure
> Communities inquiry and response procedures, state
> training or explanatory materials developed by ICE,
> documents describing the relationship between Secure
> Communities and other ICE enforcement programs, and
> racial profiling policy and oversight documents); [d]ata or
> [s]tatistical [i]nformation (including the number of
> immigration detainers and removals both before and since
> the implementation of Secure Communities, the number of
> United States citizens erroneously identified through

---

[5]      OLC identified no documents responsive to plaintiffs' request for
"opt-out" records.  *See* Defendants' Memorandum of Law in Support of
Defendants' Motion for Partial Summary Judgment on Exemptions Applied to
Opt-Out Records ("Def. Mem.") at 1 n.1.  As a result, while there are five
government agencies named as defendants in this litigation, this Opinion only
addresses the four agencies that claimed exemptions in their productions of "opt-
out" records.

Secure Communities, and demographic information for individuals identified through Secure Communities); [i]mmigration and [d]emographic [i]nformation and [r]ecords of [i]ndividuals subject to Secure Communities queries or ICE detainers; [e]vidence of the [f]iscal [i]mpact of Secure Communities (including documentation analyzing the cost of Secure Communities to [s]tate and [l]ocal [j]urisdictions or the [f]ederal [g]overnment, [i]ntergovernmental [s]ervice [a]greements, and contracts with private entities); [c]ommunications [r]ecords (including public statements and speeches related to Secure Communities and the Secure Communities public relations strategy); [p]rogram [a]ssessments of Secure Communities; and Secure Communities [c]omplaint [m]echanisms or [o]versight [d]ocuments.[6]

Defendants have claimed that these requests have "the potential to implicate more than one million records within ICE" alone.[7]  Because plaintiffs received no substantive response to their requests, on April 27, 2010, they brought this suit to compel production of responsive records.  As a result of subsequent negotiation, defendants produced at least two thousand pages of records between August 2010 and October 2010.[8]

**B.    The "Opt-out" Controversy**

---

[6]    Complaint [Docket No. 1] at 20-21.

[7]    11/12/10 Declaration of Catrina Pavlik-Keenan, ICE Freedom of Information Officer, Ex. A to Declaration of Christopher Connolly, in support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Opp. Mem. to Injunction") [Docket No. 15] ¶ 14.

[8]    *See* Opp. Mem. to Injunction [Docket No. 14] at 6.

Secure Communities is activated at the state level through Memoranda of Agreement ("MOA"), signed between ICE and state law enforcement agencies.[9] Initially, federal government officials suggested that the program was voluntary, in that states or localities could choose not to participate.[10]  As a result, a number of states and localities took steps to remove themselves from the program's planned deployment.[11]

However, while the instant litigation was pending, the federal government appeared to reverse course.  On October 6, 2010, Janet Napolitano, the Secretary of DHS, stated during a press conference that "DHS 'does not view [Secure Communities] as an opt-in, opt-out program.'"[12]  Since that time, the federal government has consistently asserted that there is no way for localities to

---

[9]     *See* ICE Secure Communities Standard Operating Procedure ("SOP"), http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf, at 3.

[10]     *See* Pl. Mem. at 6 (citing Secure Communities MOA Template, ICE, available at http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesmoatempla te.pdf; Secure Communities Frequently Asked Questions, ICE (January 27, 2010), identified as ICE FOIA 10-2674.001976-83).

[11]     *See id*.

[12]     *Id.* (quoting Shankar Vedantam, *U.S. Deportations Reach Record High*, WASHINGTON POST, Oct. 7, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/06/AR2010100607232.html).

opt out of the program,[13] and that the program will be mandatory by 2013.[14]

Plaintiffs allege that although the federal government only began to take this

position publicly in October 2010, it had previously taken the position in non-

public negotiations with local officials, citing various laws and regulations in

support, as early as March 2010.[15]  Plaintiffs allege that the federal government has

intentionally concealed its plans for the implementation of Secure Communities,

leaving the public in the dark as to the legal basis for mandatory participation in

the program and the technological capacity of the federal agencies to enable states

or localities to opt out.[16]  As a result, the public understanding of and debate over

---

[13]      *See* Pl. Mem. at 6-7 (citing, *inter alia*, Shankar Vedantam, *Local Jurisdictions Find They Can't Opt Out of Federal Immigration Enforcement Program*, WASHINGTON POST, Sept. 30, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/06AR2010100607232.html).

[14]      *See id.* at 7 (citing Gene Davis, *Unsure on Secure Communities? Opposition Heats Up to Policy that Would Crack Down on Illegal Immigration*, THE DENVER DAILY NEWS, Sept. 7, 2010, http://thedenverdailynews.com/article.php?aID=9849).

[15]      *See id.* (citing various attachments to 2/11/11 Declaration of James Horton, law student intern in plaintiff Immigration Justice Clinic of Benjamin N. Cardozo School of Law, in support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment ("Horton Decl.")).

[16]      *See id.*

the program has been stifled.[17]

Considering the public confusion, and the rapid rate at which MOAs were being signed with the states, plaintiffs shifted their focus in this litigation to prioritize the release of documents that would help to answer whether or not "opt-out" was possible and by what means.  On October 28, 2011, plaintiffs moved for a preliminary injunction to require defendants to

> promptly search for, process and produce 'Opt-Out Records,' which are records that pertain to the existence or [nonexistence] of a procedure for states or localities to decline or limit participation in Secure Communities or, regardless of the existence of such procedures, pertain to the technological capacity of Immigration and Customs Enforcement agency and the Federal Bureau of Information to honor requests to opt-out, opt-in or limit participation in Secure Communities.[18]

On December 17, 2010, this Court issued an Order directing defendants to produce to plaintiffs by January 17, 2011,

> records relating to the ability of states or localities to decline or limit participation in Secure Communities, including documents, memoranda, manuals, and communications referencing the technological capacity of ICE and the FBI to honor requests to opt-out, opt-in or limit participation in Secure Communities.[19]

---

[17]   *See id.* at 8.

[18]   Notice of Motion for Preliminary Injunction [Docket No. 10] at 1-2.

[19]   *See* 12/17/10 Order [Docket No. 25] at 2; Def. Mem. at 1.

On January 17, 2011, defendants produced over fourteen thousand pages of "opt-out" records.[20]  Defendants have withheld all or part of certain records pursuant to FOIA's statutory exemptions.  Specifically, ICE withheld records pursuant to Exemptions High 2,[21] 5, 6, 7(C), and 7(E); DHS withheld records pursuant to Exemptions High 2, 5, and 6; FBI withheld records pursuant to Exemptions High 2, 6, 7(C) and 7(E); and EOIR withheld records pursuant to Exemption 6.[22] Defendants now move for partial summary judgment on the propriety of their withholdings pursuant to the above exemptions within the opt-out production.

Plaintiffs have cross-moved for partial summary judgment.  They challenge defendants' claims of Exemptions 5, 6, and 7(C) with respect to a set of

---

[20]     *See* Def. Mem. at 2.

[21]     The terms "Low 2" and "High 2" were used for many years to describe two different categories of information withheld pursuant to 5 U.S.C. § 552(b)(2), under the reasoning of *Crooker v. Bureau of Alcohol, Tobacco, and Firearms*, 670 F.2d 1051 (D.C. Cir. 1981).  The Supreme Court recently overruled *Crooker* in its decision in *Milner v. Department of the Navy*, 131 S.Ct. 1259 (2011), issued after the parties completed briefing the instant motion.  A fuller discussion of *Milner* and its application to this case follows below.

[22]     *See* Def. Mem. at 3; 1/28/11 Third Declaration of David Hardy, Section Chief of the Record/Information Dissemination Section of the FBI ("Hardy Decl"); 1/28/11 Declaration of Catrina Pavlik-Keenan ("Pavlik Decl."); 1/14/11 Declaration of Donna Lewis, Attorney Advisor in Office of General Counsel at DHS ("Lewis Decl."); 1/14/11 Declaration of Crystal Rene Souza, Supervisory FOIA Specialist for the Office of General Counsel at EOIR ("Souza Decl.").

documents enumerated in Exhibits A-D and F of the Declaration of James Horton.[23]  Plaintiffs allege that defendants have submitted inadequate *Vaughn* indexes that do not justify the claimed exemptions, and suggest that "patterns of inappropriate withholdings are apparent throughout the production."[24]  They further allege that defendants have performed blanket redactions and failed to appropriately separate non-exempt material from exempt material.[25]  Accordingly, plaintiffs asked the Court to conduct *in camera* review of a select number of documents – which I agreed to do – and to order the release of enumerated redacted materials.[26]

For the reasons stated below, each party's motion is denied in part and granted in part.  Defendants are ordered to release certain documents and to submit

---

[23]     *See* Pl. Mem. at 3.  Plaintiffs also draw the Court's attention to thirty-six redacted documents that were produced by ICE but not included in ICE's *Vaughn* index.  *See* Horton Decl. at 2; Ex. G to Horton Decl.  It is not clear what relief plaintiffs seek with respect to these documents, nor do defendants provide any excuse or explanation for the missing *Vaughn* entries in their reply memorandum.  Thus, at this point, I order only that defendants include the enumerated documents in the revised *Vaughn* indexes that they will be required to submit as a result of this Opinion.  Plaintiffs will have an opportunity to raise any challenges, following submission of the revised *Vaughn* indexes.

[24]     Pl. Mem. at 2.

[25]     *See id.* at 24-25.

[26]     *See id.* at 3; 5/26/11 Order [Docket No. 94].

revised *Vaughn* indexes justifying certain other redactions.[27]

## III.   APPLICABLE LAW

### A.   FOIA and Summary Judgment

FOIA cases are generally and most appropriately resolved on motions for summary judgment.[28]   Summary judgment in the FOIA context, as in any other, is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[29] "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'   A fact is material if it 'might affect the outcome of the suit  under the governing law.'"[30]   "In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[31]   "Inferences and burdens of proof on

---

[27]    The parties separately cross-moved for partial summary judgment on the cut-off dates used by the agencies in their searches, but have informed the Court that they anticipate settling that issue.

[28]    *See Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009); *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 369 (11th Cir. 1993).

[29]    Fed. R. Civ. P. 56(c).

[30]    *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[31]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

cross-motions for summary judgment are the same as those for a unilateral

summary judgment motion.  'That is, each cross-movant must present sufficient

evidence to satisfy its burden of proof on all material facts.'"[32]

However, unique to the FOIA context, "[a]ffidavits submitted by an

agency are accorded a presumption of good faith," and so long as such affidavits

"supply[] facts indicating that the agency has conducted a thorough search and

giv[e] reasonably detailed explanations why any withheld documents fall within an

exemption," they will sustain the agency's burden and summary judgment may be

awarded without discovery being conducted.[33]  Nonetheless, "[t]he agency's

decision that the information is exempt from disclosure receives no deference."[34]

Accordingly, a court is required to conduct a *de novo* review of the record,

deciding "'whether the agency has sustained its burden of demonstrating that the

documents requested are not agency records or are exempt from disclosure under

---

[32]     *Ferrigno v. U.S. Dep't of Homeland Sec.*, No. 09 Civ. 5878, 2011 WL
1345168, at *3 (S.D.N.Y. Mar. 29, 2011) (citing *Straube v. Florida Union Free
Sch. Dist.*, 801 F.Supp. 1164, 1174 (S.D.N.Y. 1992) and quoting *United States
Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136, 2000 WL 1473607, at *3
(S.D.N.Y. Sept. 29, 2000)).

[33]     *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.
1994) (quotation marks and citations omitted).

[34]     *Bloomberg, L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601
F.3d 143, 147 (2d Cir. 2010).

the FOIA.'"[35]

In addition to affidavits, agencies generally submit *Vaughn* indexes to sustain their burden.  A *Vaughn* index is an itemized listing of the non-disclosed records, describing each record and portion withheld, and providing a detailed justification for the agency's withholding, specifying the FOIA exemption that it has applied.[36]  The purpose of a *Vaughn* index is to "(a) [] permit [the opposing party] to contest the affidavit in [an] adversarial fashion," and to "(b) [] permit a reviewing court to engage in effective *de novo* review of the [government's] redactions."[37]

At the heart of FOIA is "a policy strongly favoring public disclosure of information in the possession of federal agencies."[38]  However, FOIA provides

---

[35]     *In Defense of Animals v. National Inst. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (quoting *Assassination Archives & Research Ctr. v. Central Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003)).  *See also* 5 U.S.C. § 552(a)(4)(B); *Carney*, 19 F.3d at 812 ("In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.").

[36]     *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973) ("*Vaughn I*").

[37]     *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 293 (2d Cir. 1999).

[38]     *Id.* at 286.

12

nine categories of information that are exempt from disclosure.[39]  The "exemptions
are 'explicitly made exclusive,' and must be 'narrowly construed.'"[40] Four of those
exemptions are relevant to the instant matter – Exemptions 2, 5, 6, and 7.  Under
Exemption 7, defendants cite both subsection (C) and subsection (E).

### 1.      FOIA Exemptions 2 and 7(E)

Exemption 7(E) protects "records or information compiled for law
enforcement purposes," that, if disclosed, "would disclose techniques and
procedures for law enforcement investigations or prosecutions, or would disclose
guidelines for law enforcement investigations or prosecutions if such disclosure
could reasonably be expected to risk circumvention of the law."[41]  Exemption 2
protects from disclosure information that is "related solely to the internal personnel
rules and practices of an agency."[42]  For many years, following the D.C. Circuit's
ruling in *Crooker v. Bureau of Alcohol, Tobacco, and Firearms*,[43] courts held that
Exemption 2 protected two categories of information: (1) materials concerning

---

[39]      *See id.* at 287.

[40]      *Milner*, 131 S.Ct. at 1262 (quoting *Environmental Prot. Agency v.
Mink*, 410 U.S. 73, 79 (1973) and *Federal Bureau of Investigation v. Abramson*,
456 U.S. 615, 630 (1982)).

[41]      5 U.S.C. § 552(b)(7)(E).

[42]      *Id.* § 552(b)(2).

[43]      670 F.2d 1051.

human resources and employee relations (known as "Low 2"),[44] and (2) "predominantly internal" information that, if disclosed, would "significantly risk[] circumvention of agency regulations or statutes"[45] (known as "High 2").

In its recent decision in *Milner v. Department of the Navy*,[46] the Supreme Court explicitly overruled *Crooker* and its progeny.  In *Milner*, the Court, after considering the statutory language and the legislative history of FOIA, held that "Exemption 2, consistent with the plain meaning of the term 'personnel rules and practices,' encompasses only records relating to issues of employee relations and human resources."[47]  As a result, after *Milner*, High 2 has ceased to exist and "Low 2 is all of 2."[48]  In its reasoning, the Court gave significant weight to Congress's amendment of Exemption 7(E) in 1986, noting that "the *Crooker* construction of Exemption 2 renders Exemption (b)(7)(E) superfluous and so deprives that amendment of any effect."[49]  The Court added, "[w]e cannot think of

---

[44]     *Milner,* 131 S.Ct. at 1262-63 (discussing the development of the *Crooker* doctrine)*.*

[45]     *Crooker,* 670 F.2d at 1074.

[46]     131 S.Ct. 1259.

[47]     *Milner,* 131 S.Ct. at 1271.

[48]     *Id.* at 1265.

[49]     *Id.* at 1268.

14

any document eligible for withholding under Exemption 7(E) that the High 2 reading does not capture."[50]   In fact, prior to *Milner*, agencies frequently cited Exemption 2 in conjunction with Exemption 7(E), due to the conceptual overlap between the two under the *Crooker* doctrine.

### 2.    FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency."[51]   The exemption incorporates "all normal civil discovery privileges,"[52] including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege.[53]   "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance."[54]   "Whether its immunity from discovery is absolute or qualified, a [privileged] document cannot be said to be subject to

---

[50]      *Id.*

[51]      5 U.S.C. § 552(b)(5).

[52]      *Hopkins v. United States Dep't of Housing and Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

[53]      *See National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149-55 (1975); *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999).

[54]      *Federal Trade Commission v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *Sears, Roebuck*, 421 U.S. at 148-49).

'routine' disclosure," and thus, is protected under Exemption 5.[55] "Once a

document is deemed exempt from disclosure pursuant to Exemption 5, there is no

need for the court to consider the public interest in disclosure."[56]

The deliberative process privilege protects from disclosure

"'documents reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmental decisions and policies are

formulated.'"[57]  The privilege is intended "'to enhance the quality of agency

decisions, by protecting open and frank discussion among those who make them

---

[55]    *Id.* at 27.  *Accord Stonehill v. Internal Revenue Service*, 558 F.3d 534,
538-39 (D.C. Cir. 2009) ("Different considerations determine the outcome of
efforts to obtain disclosure: relevance, need, and applicable privileges – bound by
the district court's exercise of discretion – in the discovery regime, statutory
exceptions reflecting a congressional balancing of interests in FOIA.") (citations
omitted); *Lahr v. National Transp. Safety Bd.*, 569 F.3d 964, 982 n.15 (9th Cir.
2009) ("[A]ny equitable discretion retained by the district court was limited to
determining whether the withheld documents fell within the scope of the claimed
privilege.  Once the court concluded that they did fall within the privilege, and thus
fell within one of FOIA's exemptions, the district court had no discretion to order
the documents released pursuant to equitable principles.").

[56]    *Sierra Club v. United States Dep't of Interior*, 384 F. Supp. 2d 1, 29
(D.D.C. 2004).

[57]    *National Council of La Raza v. Department of Justice ("NCLR")*, 411
F.3d 350, 356 (2d Cir. 2005) (quoting *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70,
76 (2d Cir. 2002)).

within the Government.'"[58]

In order to qualify for the privilege, a document must be
"predecisional" and "deliberative."[59]  A document is predecisional if it was
"'prepared in order to assist an agency decisionmaker in arriving at his
decision.'"[60]  The agency claiming privilege "must be able to demonstrate that . . .
the document for which . . . privilege is claimed related to a specific decision
facing the agency."[61]  A document is deliberative if it is "'actually . . . related to the
process by which policies are formulated.'"[62]  Factors used to determine whether a
document is deliberative include "whether the document (i) formed an essential
link in a specified consultative process, (ii) reflects the personal opinions of the

---

[58]     *Tigue*, 312 F.3d at 76 (quoting *Department of the Interior v. Klamath
Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)).

[59]     *NCLR*, 411 F.3d at 356.

[60]     *Id.* (quoting *Grand Cent. P'ship*, 166 F.3d at 482).  Such materials
include "recommendations, draft documents, proposals, suggestions, and other
subjective documents [that] reflect the personal opinions of the writer rather than
the policy of the agency."  *Grand Cent. P'ship*, 166 F.3d at 482.

[61]     *Tigue*, 312 F.3d at 80 (citing *Sears, Roebuck*, 421 U.S. at 151 n.18).
*But see Rein v. United States Patent and Trademark Office*, 553 F.3d 353, 373-74
(4th Cir. 2009) ("[a]gencies were not required to identify the specific policy
judgment at issue in each document for which the deliberative process privilege is
claimed").

[62]     *NCLR*, 411 F.3d at 356 (quoting *Grand Cent. P'ship*, 166 F.3d at
482).

writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."[63]  The privilege does not extend to "'purely factual' material"[64] or documents later adopted or incorporated into a final agency opinion.[65]  "The privilege also does not extend to materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy."[66]

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services."[67]  Advice from an attorney to his or her client is also protected by the

---

[63]   *Grand Cent. P'ship*, 166 F.3d at 482 (quotation marks and citation omitted).  *Accord Tigue*, 312 F.3d at 80.

[64]   *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Hopkins*, 929 F.2d at 85).  *Accord Mink,* 410 U.S. at 88 (requiring disclosure of "purely factual material contained in deliberative memoranda" which is "severable from its context").

[65]   *See NCLR*, 411 F.3d at 356 (citing *Sears, Roebuck*, 421 U.S. at 161); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

[66]   *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991) (citing *Mobil Oil Corp. v. Department of Energy*, 102 F.R.D. 1, 5 (N.D.N.Y. 1983)).

[67]   *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("*Tax Analysts I*").

privilege.[68]  "In the governmental context, the client may be the agency and the attorney may be an agency lawyer."[69]  The attorney-client privilege under Exemption 5 "is narrowly construed and is limited to those situations in which its purpose will be served."[70]  "The agency bears the burden of showing that the information exchanged was confidential.  That is, the agency must show that it supplied information to its lawyers 'with the expectation of secrecy and was not known by or disclosed to any third party.'"[71]

The attorney work product doctrine applies "to memoranda prepared by an attorney in contemplation of litigation which sets forth the attorney's theory of the case and [her] litigation strategy."[72]  The doctrine

> protects 'the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible

---

[68]  *See In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).

[69]  *Tax Analysts I*, 117 F.3d at 618.

[70]  *Coastal States*, 617 F.2d at 862.

[71]  *Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004) (quoting *Mead Data Cent., Inc. v. Department of the Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977)).

[72]  *Sears, Roebuck*, 421 U.S. at 154.

ways' prepared in anticipation of litigation.[73]

The doctrine is "limited in scope and does not protect every written document generated by an attorney."[74]  "[A]n attorney's mental impressions do not become protected work product simply because they were expressed *concurrently with* some form of litigation."[75]  Additionally, "'[d]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected as attorney work product."[76]

### 3.    FOIA Exemptions 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[77]  The purpose of Exemption 6 is to "'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of

---

[73]    *A. Michael's Piano, Inc. v. Federal Trade Comm'n*, 18 F.3d 138, 146 (2d Cir. 1994) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).

[74]    *New York Times Co. v. United States Dep't of Defense*, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007).

[75]    *FPL Group, Inc. v. Internal Revenue Serv.*, 698 F. Supp. 2d 66, 85-86 (D.D.C. 2010).

[76]    *New York Times Co.*, 499 F. Supp. 2d at 517 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).

[77]    5 U.S.C. § 552(b)(6).

20

personal information.'"[78]   The Supreme Court has interpreted Exemption 6 broadly to encompass "any detailed Government records on an individual which can be identified as applying to that individual."[79]

If disclosure would compromise "substantial privacy interests," it need not be disclosed.[80]   If no substantial privacy interest is established, however, the court must weigh the "potential harm to privacy interests" against "the public interest in disclosure of the requested information."[81]   The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government."[82]   "The requesting party bears the burden of establishing that disclosure of personal information

---

[78]     *Wood v. Federal Bureau of Investigation,* 432 F.3d 78, 86 (2d Cir. 2005) (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)).

[79]     *Washington Post*, 456 U.S. at 602.

[80]     *Aguirre v. Securities and Exch. Comm'n*, 551 F. Supp. 2d 33, 53 (D.D.C. 2008).

[81]     *Id*.

[82]     *United States Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (emphasis removed).

21

would serve a public interest cognizable under FOIA."[83]  However, information that "merely identifies the names of government officials who authored documents and received documents" does not generally fall within Exemption 6.[84]

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[85]  Exemption 7(C) requires balancing of privacy interests and the public interest as well.[86]  However, the privacy interests of Exemption 7(C) have been construed more broadly than those of Exemption 6.  "First, whereas Exemption 6 requires that the invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C) . . . Second, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion."[87]

---

[83]    *Associated Press v. United States Dep't of Justice*, 549 F.3d 62, 66 (2d Cir. 2008) (citing *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

[84]    *Aguirre*, 551 F. Supp. 2d at 53.

[85]    5 U.S.C. § 552(b)(7)(C).

[86]    *See McCutcheon v. United States Dep't of Health and Human Servs.*, 30 F.3d 183, 185 (D.C. Cir. 1994).

[87]    *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. §§ 552(b)(6), (b)(7)(C)).

## IV.   DISCUSSION

Plaintiffs have opted not to challenge defendants' claimed assertions of Exemptions 2 and 7(E), though they have done so "[s]olely in the interest of efficiency" and without "conced[ing] that [d]efendants' *Vaughn* indexes and declarations satisfy the burden to justify these redactions."[88]  Regardless of plaintiffs' reasons, they have waived any argument that the exemptions were improperly asserted, to the extent that such exemptions survive *Milner*. Accordingly, I grant summary judgment to defendants on their assertions of Exemption 7(E) throughout the production.[89]  I also grant summary judgment to defendants on their assertions of Exemption 2, where such reference is to what was formerly known as Low 2.  Any documents over which defendants asserted the now non-existent Exemption High 2, without citing Exemption 7(E) concurrently, will be addressed at a later date.[90]

---

[88]      Pl. Mem. at 2.

[89]      *Cf. Vento v. Internal Revenue Serv.*, 714 F. Supp. 2d 137, 147 (D.D.C. 2010) ("if plaintiffs concede the applicability of an exemption, the document is exempt").

[90]      Because the *Milner* decision was issued after the parties completed briefing the instant motion, it is not surprising that many of defendants' assertions of Exemption 2 fall under what was known as "High 2" under *Crooker*.  The parties are in the midst of briefing the impact of *Milner* on defendants' assertions of Exemption High 2 in the January 17, 2010  production, and in earlier productions in this case.

Plaintiffs challenge defendants' invocations of Exemptions 5, 6, and 7(C) to justify the redactions of several hundred documents, in full or in part. Plaintiffs have organized their challenges into five categories and listed them in five corresponding tables.[91] The Court exercised its discretion to conduct *in camera* review of a portion of the contested documents, in the interests of judicial economy and in consideration of the strong public interest in disclosure, as well as plaintiffs' suggestion of possible bad faith on the part of the agencies.[92] In summary, I reviewed the following:[93] (1) ten documents identified by plaintiffs as

---

[91]     Although plaintiffs list a total of three hundred and ninety-four challenges, several documents are cross-listed, so the actual number of documents challenged is fewer.

[92]     *See Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1298-99 (D.C. Cir. 1980) (overruled on other grounds in *Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir.1983)) (establishing factors weighing in favor of *in camera* inspection: (a) judicial economy, (b) the conclusory nature of the agency affidavits, (c) bad faith on the part of the agency, (d) disputes concerning the contents of the documents, (e) whether the agency requests an *in camera* inspection, and (f) the strong public interest in disclosure); *Donovan v. Federal Bureau of Investigation*, 806 F.2d 55, 59 (2d Cir. 1986) (abrogated on other grounds by *United States Dep't of Justice v. Landano*, 508 U.S. 165 (1993)) ("It is clear that Congress intended that the propriety or necessity of an *in camera* inspection is a matter to be left to the discretion of the district court."); *Phillips*, 385 F. Supp. 2d at 301 (in which the court reviewed *in camera* the contested documents as a matter of judicial economy). *See also* Plaintiffs' 4/27/11 Letter to the Court ("Pl. 4/27/11 Letter") (with attachments); Plaintiffs' 6/2/11 Letter to the Court ("Pl. 6/2/11 Letter") (with attachments).

[93]     Because plaintiffs cross-listed a number of documents, I inadvertently ordered duplicative production of certain documents for *in camera* review.  As a

24

"Exemption 5 Priority Policy Document[s];"[94] (2) twenty documents identified by plaintiffs as "Exemption 5 Priority Legal Documents;"[95] (3) ten documents randomly selected by the Court from among the one hundred and eighty-six documents identified by plaintiffs as "Exemption 5 Deliberative Process

---

result, although I intended to review fifty-five documents, I only reviewed forty-nine documents.  Of those forty-nine, twenty-two were slightly different versions of the same two memoranda.

[94]    *See* Ex. A to Horton Decl., listing documents: [#1] ICE F0IA 10-2674.0003457-.0003460; [#2] ICE FOIA 10-2674.0008844-.0008845; [#3] ICE FOIA 10-2674.0010776-.0010778; [#4] ICE FOIA 10-2674.0013116-.0013117; [#5] ICE FOIA 10-2674.0013894-.0013896; [#6] ICE FOIA 10-2674.0012488-.0012493; [#7] ICE FOIA 10-2674.0011411-.0011421; [#8] ICE FOIA 10-2674.0003140-.0003143; [#9] ICE FOIA 10·2674.0002912-.0002976; [#10] DHS000196-DHS000317.  In subsequent references to these documents, the number will be preceded with "PP" for "Priority Policy" documents.

[95]    *See* Ex. B to Horton Decl., listing documents: [#1] ICE FOIA 10-2674.00107941-.0010800; [#2] ICE FOIA 10-2674.0003008-.0003022; [#3] ICE FOIA 10-2674.0009132-.0009145; [#4] ICE FOIA 10-74.0002534-.0002547; [#5] ICE FOIA 10-2674.0002522-.0002533; [#6] ICE FOIA 10-74.0002548-.0002555; [#7] ICE FOIA 10-2674.0010839-.0010849; [#8] ICE FOIA 10-2674.0002509-.0002521; [#9] ICE FOIA 10-2674.0003740-.0003748; [#10] ICE FOIA 10-2674.0002686-.0002693; [#11] ICE FOIA 10-2674.0002666-.0002675; [#12] ICE FOIA 102674.0013854-.0013860; [#13] ICE FOIA 10-2674.0012494-.0012503; [#14] ICE FOIA 10-2674.0002713-.0002721; [#15] ICE FOIA 10-2674.0002676-.0002685; [#16] ICE FOIA 10-2674.001136-.00011365; [#17] ICE FOIA 10-2674.0003754-.0003759; [#18] ICE FOIA 10-2674.0003162-.0003169; [#19] ICE FOIA 10-2674.0013894-.0013896; [#20] ICE FOIA 10-2674.0003023-.0003026.  In subsequent references to these documents, the number will be preceded with "PL" for "Priority Legal" documents.

Challenges;"[96] (4) ten documents randomly selected by the Court from among the

ninety-one documents identified by plaintiffs as "Exemption 5 Attorney Client

Challenges;"[97] and (5) five documents randomly selected by the Court from among

the eighty-seven documents identified by plaintiffs as "Reasonably Segregable

Challenges."[98]

      My review of these documents did not reveal systemic bad faith on

the part of defendants, although, as the standard of review is *de novo*, I hold below

---

[96]    *See* Ex. C to Horton Decl., listing, among other documents: [#1] FBI-SC-1413-1415; [#2] DHS000118-DHS000119; [#3] DHS000196-DHS000317; [#4] ICE FOIA 10-2674.0003393-.0003395; [#5] ICE FOIA 10-2674.0003396-.0003403; [#12] ICE FOIA 10-2674.0003461-.0003463; [#15] ICE FOIA 10-2674.0003544-.0003547; [#47] ICE FOIA 10-2674.0012235-.0012255; [#60] ICE FOIA 10-2674.0013008-.0013009; [#81] ICE FOIA 10-2674.0003237-.0003239. In subsequent references to these documents, the number will be preceded with "DPC" for "Deliberative Process Challenges."

[97]    *See* Ex. D to Horton Decl., listing, among other documents: [#1] ICE FOIA 10-2674.0003386-.0003389; [#5] ICE FOIA 10-2674.0003496-.0003498; [#8] ICE FOIA 10-2674.0003582-.0003583; [#25] ICE FOIA 10-2674.0010639-.0010641; [#30] ICE FOIA 10-2674.0010815; [#39] ICE FOIA 10-2674.0010839; [#49] ICE FOIA 10-2674.0011149-.0011151; [#50] ICE FOIA 10-2674.0003211-.0003219; [#60] ICE FOIA 10-2674.0002534-.0002547; [#79] ICE FOIA 10-2674.0003149-.0003153. In subsequent references to these documents, the number will be preceded with "ACC" for "Attorney Client Challenges."

[98]    *See* Ex. F to Horton Decl, listing, among other documents: [#14] ICE FOIA 10-2674.0003740-.0003748; [#15] ICE FOIA 10-2674.0003754-.0003759; [#16] ICE FOIA 10-2674.0008861-.0008867; [#20] ICE FOIA 10-2674.0010589-.0010592; [#36] ICE FOIA 10-2674.0010833. In subsequent references to these documents, the number will be preceded with "RSC" for "Reasonably Segregated Challenges."

that a significant number of the withheld documents must be released.  I am

troubled, however, by defendants' somewhat haphazard redactions and assertions

of exemptions.  For instance, hundreds of withheld pages are simply slightly

different versions of two memoranda – one dated October 2, 2010 and entitled

"Secure Communities – Mandatory in 2013," and the other contained within an

email dated October 1, 2010 and entitled "SC language: Predecisional Draft for

Review and Comment."  The numerous versions of these two documents have

been redacted to different degrees and with citations to different privileges under

Exemption 5.  Furthermore, they have been described in a variety of ways in the

*Vaughn* index.  With respect to the October 2 memorandum, defendants sometimes

cite attorney-client privilege, sometimes attorney work-product, sometimes

deliberative process, and sometimes some combination thereof.[99]  The

---

[99]     The following pages all consist of the same October 2, 2010
memorandum entitled "Secure Communities – Mandatory in 2013," as to which
various privileges are asserted and which are redacted to varying degrees: [Portion
of PL #2] ICE FOIA 10-2674.0003013-.0003022 (attorney-client); [Portion of PL
#3] ICE FOIA 10-2674.0009137-9145 (deliberative process and attorney-client
privilege); [Portion of PL #4] ICE FOIA 10-2674.0002538-2547 (deliberative
process and attorney work product); [Portion of PL #5] ICE FOIA 10-
2674.0002524-2533 (deliberative process and attorney work product); [PL #6] ICE
FOIA 10-2674.0002548-.0002555 (attorney-client); [Portion of PL #7] ICE FOIA
10-2674.0000010842-.00010849 ("(b)(5)"); [Portion of PL #8] ICE FOIA 10-
2674.0002514-.0002521 (attorney-client); [Portion of PL #9] ICE FOIA 10-
2674.0003741-.0003748 (attorney-client); [Portion of PL #10] ICE FOIA 10-
2674.0002686-.0002693 (attorney-client); [PL #11] ICE FOIA 10-2674.0002666-
.0002674 (attorney-client); [PL #12] ICE FOIA 10-2674.0013854-.00013860

27

memorandum has also been redacted inconsistently, as has the October 1 email memorandum.[100]

Some of these differences undoubtedly result from needing several reviewers to process the thousands of pages involved in the January 17 production, and the slight differences of judgment that might result. In that regard, these inconsistencies, as well as the sometimes perfunctory *Vaughn* descriptions to which plaintiffs object, are partially the product of the extremely broad FOIA request that instigated this contentious litigation. When millions of pages are at stake, some specificity will inevitably be lost. Nonetheless, such discrepancies do not inspire confidence that there is a consistent logic to the assertions of privilege.

--------

(deliberative process and attorney-client); [PL #13] ICE FOIA 10-2674.0012494-
.0012503 (deliberative process and attorney-client); [PL #14] ICE FOIA 10-
2674.0002713-.0002721 (attorney-client); [PL #15] ICE FOIA 10-2674.0002676-
.0002685 (attorney-client); [PL #16] ICE FOIA 10-2674.00011360-.00011365
(deliberative process and attorney-client); [PL #17] ICE FOIA 10-2674.0003754-
.0003759 (attorney-client); [Portion of PL #18] ICE FOIA 10-2674.0003164-
.0003169 (attorney-client); [ACC #30] ICE FOIA 10-2674.0010815 ((b)(5)).

[100]   *Compare, e.g.,* [Portion of PL #2] ICE FOIA 10-2674.0003009-
.0003012 *with* [Portion of PL #3] ICE FOIA 10-2674.0009133-.0009136. The
former is entirely redacted except for the first paragraph, the latter is largely
unredacted except for the second and third paragraphs. The same memorandum
has also been produced as: [PP #5, also PL #19] ICE FOIA 10-2674.0013894-
.0013896; [PP #6] ICE FOIA 10-2674.0012488-.0012493; [Portion of PL #4] ICE
FOIA 10-2674.0002534-.0002537; [Portion of PL #8] ICE FOIA 10-
2674.0002510-.0002513; and [PL #20] ICE FOIA 10-2674.0003023-.0003026. In
certain versions, Beth Gibson's name is redacted, while in others it is not, among
other inconsistent redactions.

In view of the voluminous production at issue, and the numerous challenges by plaintiffs, I begin by addressing a few common concerns regarding the exemptions, laying down principles that will mandate the release of additional documents, or portions thereof, and the production of revised *Vaughn* indexes as to the documents that defendants believe they still have a basis to withhold.  I then make particular rulings as to the documents that I have reviewed *in camera*.

## A.    Exemption 5

### 1.    Deliberative Process Privilege

It is apparent that many of the documents that defendants seek to withhold under the deliberative process privilege do not contain agency deliberations about what Secure Communities policies should be, but rather about what message should be delivered to the public about what Secure Communities policies are.  Such "messaging" is no more than an explanation of an existing policy, which is not protected by the deliberative process privilege.[101] Deliberations about how to present an already decided policy to the public, or documents designed to explain that policy to – or obscure it from – the public, including in draft form, are at the heart of what should be released under FOIA. After all, what FOIA requesters are frequently seeking is evidence of discrepancies

---

[101]    *See Resolution Trust Corp.*, 137 F.R.D. at 641.

between what their government is saying versus what it is doing, or what it is saying in public versus what it is saying behind closed doors.  This is the type of concern that FOIA seeks to vindicate, and discussions about proper "messaging" will often be quite revealing.

            Of course, that plaintiffs are interested in a given document is not sufficient to overcome the privilege, and a court is not permitted to perform equitable balancing under Exemption 5.  Plaintiffs have a tendency in their brief to emphasize the "critical" nature of the documents, but no matter how "critical," if privileged, they are properly exempt.  Where I order the release of documents, it is because I find that they are not privileged, or that the privilege has been waived.

            It is a relevant factor that some of these documents are labeled or referred to as "drafts" or "deliberative."  However, that something is labeled a draft, or reflects discussions among agency personnel, is not enough to render it privileged.  A draft may be protected by the privilege, to the extent that it "reflects the personal opinions of the writer rather than the policy of the agency."[102] Nevertheless, a draft is only privileged if it contains discussions that reflect the policy-making process.[103]  It is not privileged if it reflects the personal opinions of

---

[102]    *Tigue*, 312 F.3d at 80.

[103]    *See New York Times Co.*, 499 F. Supp. 2d at 515 ("[t]he mere fact that a document is a draft is not a sufficient reason to automatically exempt it from

a writer with respect to how to explain an *existing* agency policy or decision.

The majority of redacted material in the draft documents I reviewed *in camera* would not inaccurately reflect agency positions if released, and would not reflect only personal opinions about what agency policies should be. Rather, agency personnel are debating, both implicitly and explicitly, how frank to be with the public about what the agencies' policies *are*. These are not the sorts of deliberative discussions that the privilege is intended to protect; these are the sorts of discussions that FOIA is intended to *reveal*. The concern of the privilege is to prevent the chilling of internal agency discussions that are necessary to the operation of good government;[104] it is not concerned with chilling agency efforts to obfuscate, which are anathema to the operation of democratic government. Whether or not this constitutes "secret law," as plaintiffs allege, it defies both the letter and the spirit of FOIA. As the Supreme Court has stated succinctly, "[t]he point is not to protect Government secrecy pure and simple."[105]

---

disclosure") (quotation marks, ellipses, and citation omitted). *See also Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F. 2d 254, 257-58 (D.C. Cir. 1982) ("Even if a document is a draft of what will become a final document, the court must ascertain whether the document is deliberative in nature.") (quotation marks and citation omitted).

[104]   *See Wolfe v. Department of Health and Human Servs.*, 839 F.2d 768, 775 (D.C. Cir. 1988).

[105]   *Klamath*, 532 U.S. at 9.

31

There is ample evidence that ICE and DHS have gone out of their way
to mislead the public about Secure Communities.  In particular, these agencies
have failed to acknowledge a shift in policy when it is patently obvious – from
public documents and statements – that there has been one.[106]  "The most basic
requirement of the [deliberative process] privilege is that a document be *antecedent*
to the adoption of an agency policy.  A post-decisional document, draft or no, by

---

[106]        *Compare, e.g.*, ICE, *Secure Communities: Setting the Record Straight*,
at 6 (describing how a jurisdiction may object to being activated and the ensuing
process to come to a resolution, "which may include adjusting the jurisdiction's
activation date [] or removing the jurisdiction from the deployment plan,") *and*
9/7/10 Letter from Sec. Napolitano to U.S. Representative Zoe Lofgren, Ex. N to
Declaration of Bridget Kessler, Plaintiffs' Counsel ("Kessler Decl."), in support of
Plaintiffs' Motion for a Preliminary Injunction Compelling Defendants to Produce
Certain "Opt-Out" Records Responsive to Plaintiffs' Freedom of Information
Request [Docket No. 22] (stating "[i]f a local law enforcement agency chooses not
to be activated in the Secure Communities deployment plan, it will be the
responsibility of that agency to notify its local ICE field office of suspected
criminal aliens") *with* Vendantam, *supra*, n.15 *and* 4/28/11 Letter from ICE
Assistant Secretary John Morton to Rep. Lofgren, Ex. E to Pl. 6/2/11 Letter
(stating "state and local jurisdictions cannot prohibit the information sharing
between the Departments of Justice and Homeland Security upon which the Secure
Communities program rests").  *See also* 4/28/11 Letter from Rep. Lofgren to DHS
Acting Inspector General Charles K. Edwards and ICE Assistant Director Timothy
Moynihan, Ex. E to Pl. 6/2/11 Letter (alleging that DHS and ICE "personnel and
contract staff may have made false and misleading statements to local
governments, the public and Members of Congress in connection with the
deployment of the Secure Communities program" and citing examples of
contradictory agency statements).

definition cannot be 'predecisional.'"[107]  However, when the agencies fail to

acknowledge that a new policy has been created, it is difficult for the Court to

ascertain what is predecisional or postdecisional.  If, as certain government

spokespersons have maintained, Secure Communities has always been

mandatory,[108] then all documents discussing the opt-out issue since the

commencement of the program in 2008 would be postdecisional.[109]  Instead, I base

my decision on the dates that clear and unambiguous statements of agency policy

were made.

        Accordingly, I hold that any discussions of the voluntary nature of the

program after January 27, 2010, when the agency publicly stated that it was

---

[107]     *Judicial Watch, Inc.*, 297 F. Supp. 2d at 260 (citations and some
quotation marks omitted).

[108]     *See, e.g.*, Lee Romney, *Congresswoman Says Federal Officials Lied
About Program Targeting Immigrant Inmates*, LOS ANGELES TIMES, April 23,
2011, Ex. A to Pl. 4/27/11 Letter (quoting an unnamed DHS official as saying,
"Secure Communities is not voluntary and never has been.  Unfortunately, this was
not communicated as clearly as it should have been to state and local jurisdictions
by ICE when the program began."); Elise Foley, *Janet Napolitano Defends Secure
Communities Deportation Program*, HUFFINGTON POST, April 26, 2011, Ex. C to
Pl. 4/27/11 Letter (quoting Sec. Napolitano as stating, "This whole opt-in, opt-out
thing was a misunderstanding from the get-go . . . and we have tried to correct
that[.]").

[109]     While I doubt that is the outcome defendants are seeking, I also doubt
whether they would be willing to acknowledge a policy shift, merely for the sake
of this litigation.

voluntary,[110] and any discussions of the mandatory nature of the program after

March 2010, when there is evidence that ICE and the FBI discussed its mandatory

nature with Washington, D.C. local law enforcement officials,[111] are

postdecisional.  Any documents discussing those already formulated policies –

even if in draft format, and even if containing "deliberative" discussions of how to

portray those policies to the public – are not protected by the deliberative process

privilege and must be released, unless covered by another privilege or FOIA

exemption.

        Defendants have also failed to include in the majority of entries in

their *Vaughn* indexes the documents' "'function and significance in the agency's

decision[-]making process,'"[112] information necessary to justify the assertion of the

_____

[110]    *See* Pl. Mem. at 6 (citing, *inter alia*, Secure Communities Frequently
Asked Questions, ICE (January 27, 2010), identified as ICE FOIA 10-
2674.001976-83 ("ICE does not require any entity to participate in the information
sharing technology at the state or local level")).

[111]    *See id.* at 7 (citing, *inter alia*, Email from Amy Loudermilk, D.C.
Coalition Against Domestic Violence, to Matthew Bromeland, Washington D.C.
Metropolitan Police Dep't, dated March 24, 2010 ("Loudermilk Email"), Ex. H to
Horton Decl., and Email from Bromeland to Loudermilk, dated March 30, 2010
("Bromeland Email"), Ex. I to Horton Decl.).

[112]    *New York Times Co.*, 499 F. Supp. 2d at 515 (quoting *The Wilderness
Soc'y v. United States Dep't of the Interior*, 344 F. Supp. 2d 1, 5 (D.D.C. 2004)).
*Accord Judicial Watch, Inc.*, 297 F. Supp. 2d at 259 (to invoke deliberative process
privilege, agency must "pinpoint an agency decision or policy to which the
document contributed, or identify a decisionmaking process to which a document

34

deliberative process privilege.  Nor is this information immediately apparent to me from my *in camera* review.  Thus, to the extent that defendants might have a valid claim to the deliberative process privilege, I have often been unable to discern it, due to incomplete information contextualizing the documents.

### 2.    Attorney-Client Privilege

Plaintiffs allege that the *Vaughn* entries are insufficiently detailed to ascertain whether the documents are "legal in nature, rather than nonlegal, policy-related or public relations discussions."[113]  However, this distinction is too simplistic.  The attorney-client privilege is of significant import in the governmental context, because "[i]t is crucial that government officials, who are expected to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice."[114]  Attorneys may provide advice on a broad range of matters, but "[s]o long as the predominant purpose of the communication is legal advice," the communication is privileged.[115]

I am not convinced, however, that defendants have sufficiently

---

contributed") (quotation marks and citations omitted).

[113]    Pl. Mem. at 21.

[114]    *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).

[115]    *Id.* at 420.

investigated and reported whether the confidentiality of the documents was

maintained such that the attorney-client privilege applies.  In the case of an

organizational client, the confidential communication must be "circulated no

further than among those members 'of the organization who are authorized to

speak or act for the organization in relation to the subject matter of the

communication.'"[116]  "[T]he attorney[-]client privilege can be waived if the

document is published, or disclosed to private individuals or to nonfederal

agencies."[117]  Plaintiffs have alleged, with convincing evidence, that defendants

have shared with individuals outside of the agencies at least some of the

information found in the documents that they now withhold as privileged

communications.

       For instance, plaintiffs have submitted to the Court an email from

Amy Loudermilk, of the D.C. Coalition Against Domestic Violence, to Matthew

Bromeland, of the Washington D.C. Metropolitan Police Department,[118] and

Bromeland's reply email, in which he writes that "according to ICE and the FBI,

there is no specific [federal] mandate, but rather it is grounded in a multitude of

---

[116]    *Coastal States*, 617 F.2d at 863 (quoting *Mead*, 566 F.2d at 253 n.24).

[117]    *Rein*, 553 F.3d at 376 (citing *Mead*, 566 F.2d at 253).

[118]    *See* Loudermilk Email.

36

information sharing initiatives.  They shared with us the main ones listed

below."[119]  A list of twelve orders, reports, and statutes then follows.  Similar lists

have been redacted from various documents in the production, with citations to the

attorney-client privilege.  If plaintiffs have been able to uncover this one

communication, there may well be more such information that defendants have

withheld from their production as privileged, despite having released the same

information to individuals outside of the agency.  Where the content of an

attorney-client communication has been disclosed to other parties, that

communication is no longer privileged.  Thus, for each document that defendants

seek to withhold under the attorney-client privilege, they must represent that

confidentiality has been maintained.[120]  If defendants are not able to make such a

representation as to a particular document, and no other privileges or FOIA

---

[119]     Bromeland Email.

[120]     I am not convinced by defendants' argument that they have
adequately established confidentiality because "[p]laintiffs are litigating this
motion precisely because the information is non-public" and "ICE's express reason
for not releasing the information is that '[d]isclosure of such information would
discourage [agency] clients from freely disclosing all pertinent information to their
[agency] attorneys.'"  Defendants' Reply in Support of Their Motion for Partial
Summary Judgment on Exemptions Applied to Opt-out Records and Opposition to
Plaintiffs' Cross-Motion for Summary Judgment ("Reply Mem.") at 10.  That a
document has not been released to the public does not necessarily mean that it
remains confidential.  Defendants must represent that *confidentiality*, as defined in
this Opinion, has been maintained.

exemptions have been asserted, that document must be released.

**B.    Exemptions 6 and 7(C)**

**1.    Threshold Issue of Type of File or Information**

Before examining the balance of privacy and public interests, the threshold issue is whether the documents in question constitute the types of records that the exemptions are intended to protect.  Specifically, Exemption 7 and its subdivisions address "records or information compiled for law enforcement purposes."[121]  While ICE, DHS and FBI – the three agencies that have invoked the 7(C) Exemption – are unquestionably federal law enforcement agencies, not every document produced by those agencies' personnel has been "compiled for law enforcement purposes" under FOIA.  Courts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency – in other words, investigatory files.[122]

---

[121]    5 U.S.C. § 552 (b)(7)(C).

[122]    *See, e.g.*, *Ortiz v. United States Dep't of Health and Human Servs.*, 70 F.3d 729, 732 (2d Cir. 1995) (finding letter that HHS's Office of Inspector General "used . . . to launch a criminal investigation" qualifies as a law enforcement record under Exemption 7); *Vento*, 714 F. Supp. 2d at 148 (finding documents "compiled in the course of an investigation into plaintiff's tax liability" qualify as law enforcement records under Exemption 7, and compiling cases); *Ligorner v. Reno*, 2 F. Supp. 2d 400 (S.D.N.Y. 1998) (finding complaint letter that contained the identity of an individual who accused another of misconduct within the

38

Attempting to ascertain the types of documents or information that Congress intended to protect under Exemption 6 – articulated as "personnel and medical files and similar files" – is a more difficult matter.  The Supreme Court has interpreted the term "similar files" broadly to include any "detailed Government records on an individual which can be identified as applying to that individual."[123] While the privacy right protected by FOIA "was not intended to turn upon the label of the file which contains the damaging information,"[124] I disagree with those courts that have interpreted *Washington Post* so broadly as to render the threshold inquiry meaningless.[125]  In a 6-5 decision issued more than twenty years ago, the

---

Department of Justice qualifies as a law enforcement record under Exemption 7); *Lurie v. Department of Army*, 970 F. Supp. 19, 36 (D.D.C. 1997) (finding records pertaining to Army's informal investigation of military medical researcher's representations qualify as law enforcement records under Exemption 7).

[123]    *Washington Post*, 456 U.S. at 602.  *Accord Adamowicz v. Internal Revenue Serv.*, 672 F. Supp. 2d 454, 473 (S.D.N.Y. 2009).

[124]    *Washington Post*, 456 U.S. at 601.

[125]    *See id.* at 602 n.4 ("This construction of Exemption 6 will not render meaningless the threshold requirement that information be contained in personnel, medical, and similar files by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests.  As petitioners point out, there are undoubtedly many Government files which contain information not personal to any particular individual, the disclosure of which would nonetheless cause embarrassment to certain persons.  Information unrelated to any particular person presumably would not satisfy the threshold test.").

39

D.C. Circuit applied an expansive interpretation of the Supreme Court's holding in *Washington Post* to conclude that "similar files" included an audio tape recording the voices of the astronauts aboard the space shuttle Challenger before it exploded seventy-three seconds into its flight.[126]  That holding has not been explicitly adopted by the Second Circuit, and I decline to follow it.

The inquiry in this jurisdiction is "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file."[127]  Such information generally includes "'place of birth, date of birth, date of marriage, employment history,'" and other "identifying information," though not necessarily "intimate" information.[128]  Examples of records that would fall into the "similar files" category include administrative investigation files, which could contain personal information about the subject of the investigation and

---

[126]   *New York Times Co. v. National Aeronautics and Space Admin.* ("*NASA*"), 920 F. 2d 1002, 1003 (D.C. Cir. 1990).

[127]   *Wood*, 432 F.3d at 86 (reversing district court's holding that agency failed to meet Exemption 6 threshold in withholding names of government employees who were "'involved in the investigation and decision-making process'" but were not the "subjects of the investigation" from administrative investigation records) (quoting *Wood v. Federal Bureau of Investigation*, 312 F. Supp. 2d 328, 350 (D. Conn. 2004)).

[128]   *Id.* (quoting *Washington Post*, 456 U.S. at 600-01).

about third-party witnesses;[129] "files [that] would contain . . . the information that
normally is required from a passport applicant;"[130] or "[a]ttachments to an
individual's asylum request consisting of personal history data and supporting
affidavits."[131]   Some courts have either disregarded the threshold question
altogether, or else expanded the holding of *Washington Post* to apply to any
appearance of a name, address, or telephone number of a federal employee
regardless of the type of file in which it is found.[132]   That is precisely what
defendants urge here.

        In the instant case, defendants state that they have, "[t]hroughout their
respective productions . . . applied Exemption 6 and 7(C) to certain names,
telephone numbers, and email addresses of government employees, as well as

---

        [129]   *See id.*  Obviously certain kinds of investigatory files might fall under
both Exemptions 6 and 7(C).

        [130]   *Washington Post*, 456 U.S. at 600.

        [131]   *Phillips*, 385 F. Supp. 2d at 304.

        [132]   *See, e.g., Budik v. Department of Army*, 742 F. Supp. 2d 20, 38
(D.D.C. 2010) (no public interest in disclosing government employee's e-mail
address); *Amnesty Int'l v. Central Intelligence Agency*, No. 07 Civ. 5435, 2008 WL
2519908, at *15-16 (S.D.N.Y. June 19, 2008) (withholding third party phone
number); *Phillips*, 385 F. Supp. 2d at 308 (withholding telephone number of
government employee); *Judicial Watch, Inc. v. United States*, 84 Fed. App'x 335,
338-39 (4th Cir. 2004) (withholding names of lower level federal employees)).

names, telephone numbers, and email addresses of third parties."[133]  ICE has

withheld such information from "[v]arious documents across the production,"[134]

and DHS has withheld this information from "[a]ll document types throughout the

production."[135]  Although the FBI has identified the particular documents that it has

redacted, it has "withheld the names and/or identifying information of FBI and

non-FBI Federal government employees, and state and local government

employees" across the board, regardless of the type of document.[136]  EOIR redacted

employee telephone numbers from three documents under Exemption 6, all of

which are identified as "EOIR Correspondence Control Sheet[s]" attached to

various letters.[137]

It is not the case that any mention of a federal employee's name may

be withheld.  Such a blanket rule would fail both the threshold test – as to the type

of file or record or information in which such information is found – and the

balancing test of privacy versus public interests.  More suspect yet is the blanket

withholding of the names of the authors of files.  Interestingly, the D.C. Circuit in

---

[133]   Def. Mem. at 18.

[134]   ICE *Vaughn* Index, attached to Pavlik-Keenan Decl., at 1.

[135]   DHS *Vaughn* Index, attached to Lewis Decl., at 1.

[136]   Hardy Decl. at 8.

[137]   EOIR *Vaughn* Index, attached to Souza Decl., at 1.

*NASA* stated "[i]t is the rare file indeed for which the Government could, in good faith, assert an interest in authorial privacy, simply because it is most unusual for a government file to yield up any meaningful information about its author."[138]  The court went on to say "[e]ven more rarely . . . will the author's interest outweigh the public interest in disclosure of the government file that he or she authored."[139]  Even in the context of its holding that a voice recording constitutes a "similar file," the D.C. Circuit could not have contemplated that the Government would, in 2011, be making regular, across-the-board assertions of a privacy interest in the names, titles, places of work, and contact information of the authors of files.

        Plaintiffs argue that the withholding of names also impedes their ability to challenge the many assertions of the deliberative process privilege.[140]  Defendants contend that plaintiffs' desire to gain an advantage in the present

---

[138]    *NASA,* 920 F. 2d at 1009.  The court went even further in stating in a parenthetical, "[i]n fact, research reveals no case in which the Government has ever before even asserted the privacy interest of the author of a file."  *Id.*  This comment shows how much has changed in twenty years, as the Government now regularly asserts a privacy interest over information about the authors of government files. This shift likely derives from the abundance of email correspondence in the daily conduct of government affairs, with the result that many more government files subject to release under FOIA now consist of emails with names, email addresses, and often other identifying information appearing in the senders' signature lines.

[139]    *Id.*

[140]    *See* Pl. Mem. at 23-24.

litigation is not a proper consideration under FOIA.[141]  While that may be true, it is likewise inappropriate for the agencies to withhold this information – over which they have sole access – in an attempt to gain their own advantage.  Courts have long recognized that the asymmetry of information in the FOIA context places a particular burden on the Government to act in good faith.[142]

Given defendants' blanket withholdings, this Court cannot ascertain with any specificity which, if any, documents would fall under either Exemption 6 or 7(C).  Nonetheless, assuming *arguendo* that the documents, or some portion thereof, could satisfy the threshold test of Exemption 6 or 7(C), I now turn to the balancing portion of the test.

## 2.    Public Interest Outweighs Privacy Interests

The D.C. Circuit has held that "[FOIA] does not categorically exempt individuals' identities . . . because the privacy interest at stake may vary depending

---

[141]    *See* Reply Mem. at 11.

[142]    *See, e.g., Vaughn I*, 484 F.2d at 824 ("[The] lack of knowledge by the party see[k]ing disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution"); *Schoenman v. Federal Bureau of Investigation*, 604 F. Supp. 2d 174, 196 (D.D.C. 2009) ("When a party submits a FOIA request, it faces an 'asymmetrical distribution of knowledge' where the agency alone possesses, reviews, discloses, and withholds the subject matter of the request.") (quoting *Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145-46 (D.C. Cir. 2006)).

on the context in which it is asserted."[143]  While "[t]he privacy interests of U.S.

government officials might be 'somewhat diminished' due to the countervailing

interest of the public 'to be informed about what their government is up to,'"[144]

federal employees nonetheless maintain "an identifiable privacy interest in

avoiding disclosures of information that could lead to annoyance or harassment."[145]

There is, however, persuasive authority for the proposition that information that

"merely identifies the names of government officials who authored documents and

received documents does not generally fall within Exemption 6."[146]

       Therefore, under either the Exemption 6 standard of whether

disclosure "would constitute a clearly unwarranted invasion of personal privacy"

or the Exemption 7(C) standard of whether disclosure "could reasonably be

expected to constitute an unwarranted invasion of personal privacy,"[147] I find that

---

[143]    *Judicial Watch*, 449 F.3d at 153.

[144]    *Phillips*, 385 F. Supp. 2d at 305 (quoting *Perlman v. United States Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002), *vacated*, 541 U.S. 970 (2004), *remanded to* 380 F.3d 110 (2d Cir. 2004) for further consideration in light of *National Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004)).

[145]    *Cawthon v. United States Dep't of Justice*, No. 05-0567, 2006 WL 581250, at *3 (D.D.C. Mar. 9, 2006).

[146]    *Aguirre*, 551 F. Supp. 2d at 53.

[147]    *Reporters Comm.*, 489 U.S. at 756 (considering the statutory language and legislative history of 6 and 7(C) to conclude that "the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records

45

the public interest in disclosure outweighs the privacy interest as regards the names of agency heads or high-level subordinates in the documents at issue, and the titles and places of work of *all* federal employees and third parties. There is a substantial public interest in knowing whether the documents at issue reflect high-level agency policy, helping to inform the public as to "what their government is up to."[148]  The disclosure of the places of work and titles but not the names of subordinate staff will provide plaintiffs with a greater ability to ascertain the degree to which documents reflect the views of the agency versus those of individual agency employees, and will enable plaintiffs to test defendants' assertions of deliberative process to a greater degree, without exposing lower level federal employees to the risk of harassment or annoyance. Accordingly, plaintiffs are entitled to summary judgment on this issue, and defendants are ordered to reproduce the documents without redacting the names of agency heads or high-level subordinates, or the titles and places of work of all federal employees and third parties, where such information has been withheld.[149]

---

compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files").

[148]    *Id.* at 773.

[149]    Defendants contend that they have "left unredacted the names and/or titles of senior government employees." Reply Mem. at 10. However, they have done so inconsistently. Additionally, to the extent that they have released only the

Plaintiffs evince no interest in the phone numbers or email addresses that have been withheld.  Thus, although defendants have failed so far to make the threshold showing as to the types of files, summary judgment is granted to defendants on the email addresses and phone numbers that have been redacted.

I now address the particular documents that I have reviewed *in camera*.

### C.   Exemption 5 Priority Policy Documents Reviewed *In Camera*[150]

### 1.   "Draft - internal PMO SC Issue Paper"[151]

This document, which was redacted in full as protected by the deliberative process privilege under Exemption 5, is an undated memorandum from Marc Rapp, the Acting Assistant Director of Secure Communities.  My evaluation of the document was impeded by a DRAFT marking obscuring half of the text in the ostensibly unredacted version of the document submitted for *in camera* review.  Based on the legible portions of the document, it appears to consist largely of factual recitations and legal justifications for Secure Communities.  The document does not reflect the "'agency give-and-take of the

---

titles of any senior government employees, they are now ordered also to release their names.

[150]   Ex. A to Pl. Mem.

[151]   [PP #1] ICE FOIA 10-2674.0003457-.0003460.

deliberative process by which the decision itself is made,'"[152] nor does it appear to have been prepared to assist the recipient in making a decision.

In the *Vaughn* index, ICE asserts that "[t]he comments do not reflect any final agency policy or decision."[153]  However, that boilerplate assertion is insufficient.  Defendants must identify the role that the document played in the deliberative process.  Defendants will be given one final opportunity to sufficiently justify withholding this document, after which the Court will order its release if not persuaded by the offered explanations.  Defendants are also directed to release the non-exempt factual portions of the document that can be separated from the potentially exempt portions.  I deny summary judgment without prejudice as to both parties with respect to this document.

### 2.    "Email between SC PMO Staff"[154]

This email exchange reflects a substantive debate about how to respond to a state's inquiry regarding opt-out.  I find that the redacted text has been properly withheld under Exemption 5, as it reflects a deliberative and predecisional discussion.  In contrast to other documents in this production, the discussion here is

---

[152]    *Coastal States*, 617 F.2d at 869 (quoting *Vaughn v. Rosen* 523 F.2d 1136, 1144 (D.C. Cir. 1975) ("*Vaughn II*").

[153]    ICE *Vaughn* Index at 33.

[154]    [PP #2] ICE FOIA 10-2674.0008844-.0008845.

48

not about what rhetoric the agency should use in its response, but rather about how it should modify its approach in actual fact, in order to respond substantively to a state's concerns.  Defendants are granted summary judgment as to the withheld text.

### 3.    "Email from Deputy Press Secretary"[155]

This email string reflects discussions regarding what the agency's message to the public about opt-out should be.  Defendants have only redacted two paragraphs of text.  The redacted portions are no more deliberative than those left unredacted, even if they are more embarrassing to the agency, which of course is not a relevant consideration under FOIA.  I find that those two passages do not reflect the "'agency give-and-take of the deliberative process.'"[156]  Furthermore, I find that one of the normal justifications for the deliberative process privilege – that premature disclosure of the agency's position could lead to public confusion – has little application here, because the entire purpose of this FOIA request is to obtain clarity as to the agency's position, where the agency has made contradictory and confusing representations.  Plaintiffs are granted summary judgment as to the redacted text in this email string and defendants are ordered to release the text in

---

[155]    [PP #3] ICE FOIA 10-2674.0010776-.0010778.

[156]    *Coastal States*, 617 F.2d at 869 (quoting *Vaughn II,* 523 F.2d at 1144).

full.

### 4.    "Draft paper on LEA Deployment Issues"[157]

This paper is clearly deliberative and predecisional in nature,

including "pros and cons, perceived adverse consequences, and

recommendations"[158] about how best to deploy Secure Communities in local

jurisdictions, and hence is privileged.  Nonetheless, there are factual recitations that

could be disclosed – particularly the statements of each jurisdiction's position.

Defendants are granted summary judgment as to the bulk of the redactions, but are

ordered to release the factual portions of the document.

### 5.    October 1, 2010 Memorandum[159]

At least one iteration of the October 1, 2010 memorandum has been

released almost in full, with the exception of the second and third paragraphs.[160]

The memorandum contains "new language describing the manner in which SC

---

[157]    [PP #4] ICE FOIA 10-2674.0013116-.0013117.

[158]    ICE *Vaughn* Index at 77.

[159]    [PP #5] ICE FOIA 10-2674.0013894-.0013896 and [PP #6] ICE
FOIA 10-2674.0012488-.0012493.  The other iterations of this memorandum have
been identified by Bates number in n. 100 *supra*.  My holding here pertains to all
iterations of the memorandum.

[160]    [Portion of PL #3] ICE FOIA 10-2674.0009133-.0009136.

50

program operates."[161]  I do not view the withheld paragraphs as more deliberative
or predecisional than the remainder of the memorandum, though potentially more
embarrassing to the agency.  Nonetheless, ICE may be able to provide additional
information about the role that the document played in the deliberative process that
would justify its withholding.  As a result, I deny summary judgment without
prejudice to both parties as to the withholding of the two paragraphs, and order
defendants to provide a more detailed explanation for their assertion of the
deliberative process privilege with respect to these paragarphs.

One draft of the document – labeled by plaintiffs as Priority Policy
Document #6[162] –  contains extensive comments from the Office of the Principal
Legal Advisor (OPLA).  In evaluating the legal sufficiency of the proposed
language, agency attorneys performed an essential legal task.  Thus, the assertion
of attorney-client privilege is proper, to the extent that defendants represent that
confidentiality was maintained.  At this time, summary judgment regarding this
draft is denied without prejudice as to both parties.

6.      **"Draft Public Affairs Guidance Memo"**[163]

------

[161]      ICE *Vaughn* Index at 22 (describing ICE FOIA 10-2674.0003008-
.0003022).

[162]      ICE FOIA 10-2674.0012488-.0012493.

[163]      [PP #7] ICE FOIA 10-2674.0011411-.0011421.

The *Vaughn* index indicates that the information withheld from this document consists of "[t]he draft portions of the memorandum which were not finalized."[164]  In fact, the entire document was redacted except for portions of the introductory email, the heading information of the memorandum, and first line of the memorandum.  The *Vaughn* index also indicates that "[t]hese portions of the memorandum deliberated public affairs guidance that did not reflect any final agency policy or position."[165]  However, there is nothing inherently deliberative about the content of the memorandum itself.

Furthermore, the introductory email, while referring to the memorandum as a "draft," also indicates that it is "due COB," suggesting that it was likely in its final or close to final form.  Given the extensive contents of the document, which has been almost entirely redacted, it is unlikely that none of the redacted portions reflect a final agency policy or position.  Even after having reviewed the document in unredacted form *in camera*, without having more information about its context, I cannot determine whether it does or does not reflect final agency positions.  However, much of what appears in this document has been previously released in one form or another in response to this very FOIA request.

---

[164]    ICE *Vaughn* Index at 61.

[165]    *Id.*

Where the exact information at issue has already been released, the agency has waived its right to claim an exemption as to that information.[166]

Apart from the boilerplate statements in their *Vaughn* index, defendants – who bear the burden of establishing the propriety of the asserted exemptions – have provided no evidence suggesting that this document is truly deliberative or predecisional.  Thus, while talking points and public affairs guidance documents, when in draft form, *may* be protected under the deliberative process privilege,[167] I do not have enough information about the role that this document played in the deliberative process to find that it qualifies for such protection at this time.[168]  At this time, I deny summary judgment to both parties

_____

[166]    *See Coastal Delivery Corp. v. United States Customs Serv.*, 272 F. Supp. 2d 958, 965-66 (C.D. Cal. 2003) (finding that waiver of right to argue exemptions exists if agency "disclosed the exact information at issue").

[167]    *See American Civil Liberties Union v. United States Department of Homeland Security,* 738 F. Supp. 2d 93, 112 (D.D.C. 2010) ("The creation of a 'talking points' document itself suggests that a public statement was anticipated at the time of its creation, and given that [] no official statement has yet been made, the talking points remain ripe recommendations that are ready for adoption or rejection by the Department."); *Sierra Club*, 384 F. Supp. 2d at 19 (finding agency's explanation that "draft talking points are an internal proposal . . . predecisional to the actual communication of such information and issues" sufficient to establish deliberative process privilege).

[168]    *See  Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d 252, 265-66 (D.D.C. 2004) (court unable to grant summary judgment on withholding of "draft talking points" where agency "identifies nothing more specific about the content of this document, does not specify its place in a

without prejudice.  Defendants are ordered to provide more information to justify

its withholding under the deliberative process privilege, taking into account that

information that has already been released cannot now be withheld.

> **7.    "Emails between SC and OPLA"[169]**

I find that this email exchange, in which ICE attorneys provide

requested legal advice, has been properly withheld under the attorney-client

privilege within Exemption 5, to the extent that defendants represent that

confidentiality was maintained.  I note, in providing guidance to defendants in their

revision of the *Vaughn* index, that the description of information withheld in the

entry for this document in the *Vaughn* index is the sort of detailed entry that this

Court expects for all withheld documents.  However, the index should explicitly

indicate that confidentiality was maintained.

> **8.    "Email from OPLA containing attachments with drafts of**

---

particular decisionmaking context, and does not indicate whether, as a draft, these
talking points were actually used in a communication with the public"); *Citizens
for Responsibility and Ethics in Washington v. United States Dep't of Homeland
Security*, 648 F. Supp. 2d 152, 161 (D.D.C. 2009) ("*Citizens I*") (where, even after
*in camera* review, court was unable to determine whether Exemption 5 was
properly invoked over "talking points" document labeled "draft" and "for official
use only" because *Vaughn* submission lacked sufficient detail about the document
and its role in decisionmaking process).

[169]    [PP #8] ICE FOIA 10-2674.0003140-.003143.

54

documents in preparation for meetings"[170]

ICE deemed much of this document unresponsive, which I find to be accurate.  ICE FOIA 10-2674.0002927 has been produced in its entirety, although it resembles the type of information redacted from other documents.  Because ICE FOIA 10-2674.0002928-.0002976 is a draft document with extensive commentary by OPLA advising on the legal sufficiency of the language, I find that those pages are properly protected under the attorney-client privilege, to the extent that defendants represent that confidentiality was maintained.  A greater attempt should be made to separate factual recitations, which are not protected unless they reflect information supplied by the client.  Summary judgment is granted in part to plaintiffs.  Defendants are ordered to release the factual portions of the document that can be separated from the legal analysis, and to represent that confidentiality was maintained.

9.     "Email chain between The CRCL Officer and ICE Personnel"[171]

This email string between Margo Schlanger, Officer for Civil Rights and Civil Liberties at DHS, and David Venturella, Assistant Director of Secure Communities, was withheld under Exemption 5, though the particular privilege has

---

[170]     [PP #9] ICE FOIA 10-2674.0002912-.0002976.

[171]     [PP #10, also DPC #3] DHS000196-000317.

55

not been specified.[172]  I find that this document has been improperly withheld.

The document has been described in the *Vaughn* index as "[p]re-decisional and

deliberative conversation via Email on Implementation of Policy and how to

respond to inquiries about said Policy."[173]  There is nothing deliberative or pre-

decisional about the exchange.  It consists of inquiries from Schlanger as to what

the Secure Communities policy is, and a series of nonresponsive answers from

Venturella.  The exchange does not reflect recommendations from a subordinate to

a superior, as is characteristic of the deliberative process.[174]  Nor does it reflect the

---

[172]    Originally these pages were redacted in full, however, before
producing them for *in camera* review, defendants recognized that full redaction
was an error and reproduced a partially redacted version to plaintiffs.  *See*
Defendants' 6/1/11 Letter to the Court.  The names of Schlanger and Venturella
have been left unredacted in the second produced version.

[173]    DHS *Vaughn* Index at 1.

[174]    *See Senate of the Commonwealth of Puerto Rico*, 823 F.2d 574, 586
(D.C.Cir. 1987); *Citizens For Responsibility and Ethics in Washington v. National
Archives and Records Admin*. 583 F. Supp. 2d 146 (D.D.C. 2008) ("*Citizens II*")
("in determining whether the deliberative process privilege applies to a particular
document, courts often look to 'the nature of the decisionmaking authority vested
in the officer or person issuing the disputed document, and the relative positions in
the agency's chain of command occupied by the document's author and
recipient.'") (quoting *Animal Legal Def. Fund, Inc.*, 44 F. Supp. 2d at 300);
*Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior
official is more likely to be predecisional, while a document moving in the
opposite direction is more likely to contain instructions to staff explaining the
reasons for a decision already made.").

"'agency give-and-take of the deliberative process.'"[175]  Instead, the exchange

reflects a request from one part of the agency for clarification as to what the policy

is, met with clearly obfuscating answers from another part of the agency, along

horizontal lines.[176]  Plaintiffs are granted summary judgment as to the text of this

document, which defendants are ordered to release.

D.    **Exemption 5 Priority Policy Documents Reviewed *In Camera***[177]

Despite a variety of descriptions listed in ICE's *Vaughn* index, the

twenty documents that I reviewed *in camera* from this category consisted of the

October 2 memorandum attached to various emails; the October 1 memorandum

embedded in various email strings; and email strings in which the October 1

memorandum was embedded and to which the October 2 memorandum was

attached.  The short email conversations attached to the two memoranda were

released in part.  I find that the redacted parts of the email conversations were

---

[175]    *Coastal States*, 617 F.2d at 869 (quoting *Vaughn II*, 523 F.2d at 1144).

[176]    *See Evans v. United States Office of Personnel Mgmt.*, 276 F. Supp. 2d 34, 40 (D.D.C. 2003) (finding that "the horizontal movement of the document [between agency components] simply does not match the 'classic case of the deliberative process at work,' which involves a vertically-moving memorandum simply recommending legal strategy") (quoting *Murphy v. United States Dep't of the Army*, 613 F.2d 1151, 1154 (D.C. Cir. 1979)).

[177]    Ex. B to Pl. Mem.

properly withheld under either the attorney-client privilege or the deliberative process privilege encompassed in Exemption 5.  Having already addressed the October 1 memorandum above, I now address the October 2 memorandum.

### 1.    October 2, 2010 Memorandum[178]

Plaintiffs assert that this memorandum, which has been produced for *in camera* review some eighteen times in various forms, lost its predecisional status when the agency relied upon it to change its position, as announced in an October 6, 2010 statement by DHS Secretary Janet Napolitano.[179]  Because the memorandum was dated October 2, the statement was made on October 6, and an individual was congratulated for his "excellent SC paper" on October 8, plaintiffs infer that the memorandum must form the basis for the shift in policy.[180]

The memorandum constitutes, as defendants have maintained, legal advice and analysis about a Secure Communities mandate.  It does not dictate a shift in policy, though it is conceivable that it was relied upon by agency personnel contemplating such a shift.  Under *NCLR*, mere reliance on a document's conclusions is not enough for it to lose its predecisional status; the agency must

---

[178]    The memorandum was produced at the Bates numbers listed in n.99 *supra*.

[179]    *See* Pl. Mem. at 14-15.

[180]    *Id.* at 15.

also have relied on its analysis.[181]  In *NCLR*, because the agency explicitly relied

upon the reasoning contained in a legal memorandum and referred to it repeatedly

in public presentations, the court concluded that the agency was obliged to disclose

the memorandum as the basis for the agency's shift in policy.[182]  The court relied

upon the Supreme Court's reasoning in *Sears, Roebuck*, that

> "[t]he public is only marginally concerned with reasons
> supporting a policy which an agency has rejected, or with
> reasons which might have supplied, but did not supply, the
> basis for a policy which was actually adopted on a different
> ground.  In contrast, the public is vitally concerned with the
> reasons which did supply the basis for an agency policy
> actually adopted.  These reasons, if expressed within the
> agency, constitute the 'working law' of the agency."[183]

In the instant case, Secretary Napolitano has not acknowledged that there has been

any shift in policy, much less specifically attributed any such shift to the

memorandum in question.  The agency has not publicly relied upon the

---

[181]    *See NCLR*, 411 F.3d at 358.

[182]    *See id.*

[183]    *Id.* at 360 (quoting *Sears, Roebuck*, 421 U.S. at 152-53).  *See also Coastal States*, 617 F.2d at 867 ("an agency will not be permitted to develop a body of 'secret law,' sued by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'"); *Evans*, 276 F. Supp. 2d at 41 ("Because the memo at issue describes [the agency's] legal position in terms and under circumstances strongly suggestive of finality, the agency may not claim deliberative process to shield its articulation of that position.").

memorandum or adopted it by reference.[184]

Still, it is not enough for defendants to say simply that plaintiffs are impermissibly inferring that the memorandum was the basis for Napolitano's shift;[185] it is defendants' burden to establish the role that the memorandum played in the deliberative process.  Defendants have failed to meet that burden.  The eighteen *Vaughn* entries describing this document contain some variation of "[l]egal analysis of the mandatory nature of the 2013 Secure Communities deployment."[186]  That description is insufficient to allow plaintiffs or the Court to ascertain the role that the document played.  I am unable to determine why the memorandum was written, and – of particular import for assessing whether it qualifies for protection under the deliberative process – whether it was written to justify an already existing policy or to lend support in an intra-agency debate about shifting the policy.

I note, however, that the other concerns of the deliberative process privilege would not be implicated by the document's release.  *First*, the

---

[184]     *Cf. Coastal States*, 617 F.2d at 867 ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.").

[185]     *See* Reply Mem. at 5-6.

[186]     ICE *Vaughn* Index at 39.

memorandum does not reflect the personal opinions of a single writer, as it appears to have been the product of a collaborative process and provides legal justification for what, at some unspecified time, became agency policy. *Second*, there is no risk of confusing the public by the inaccurate or premature disclosure of agency views, as the public *is* confused, and it is plaintiffs who seek to clarify by obtaining the release of a fuller explanation of agency views.[187]

It appears that the agency has attempted to shield the memorandum from disclosure by maintaining it in draft form, which is unacceptable.[188]  It was apparently *only* circulated in "draft" format, as defendants have confirmed to plaintiffs that there is no "final" version of the document.[189]  Although the memorandum was never finalized, the attached email correspondence suggests that the memorandum's analysis was viewed as persuasive, and was at no point rejected for inaccurately reflecting agency views.  For all of these reasons, I find that the

---

[187]    *Cf. Citizens I*, 648 F. Supp. 2d at 156 (listing three rationales for deliberative process privilege).

[188]    *See* ICE FOIA 10-2674.0002509 (where, in unredacted text, Section Chief writes at 10:52 a.m. on October 1, 2010 "Give me 30 minutes and we will send the final version," and at 1:23 p.m. on the same date sends another email stating "[a]ttached is ELS' draft memorandum regarding the legal support for the 'mandatory' nature of participation in Secure Communities in 2013").

[189]    *See* Pl. 6/2/11 Letter at 2; 4/20/11 Email from Christopher Connolly, Defendants' Counsel, to Sunita Patel, Plaintiffs' Counsel, Ex. D to Pl. 6/2/11 Letter.

document is not protected by the deliberative process privilege.

I must also consider whether the document is protected by the attorney-client privilege.[190]  The memorandum contains legal analysis, and was written by the Office of the Principal Legal Advisor (OPLA) of ICE, and addressed to Beth Gibson, the Assistant Deputy Director of ICE.[191]  However, defendants have failed to establish that the confidentiality of the document was maintained. Plaintiffs plausibly allege that the legal analysis contained within the document was shared outside of the agency, including with state and local governments and/or with other agencies and branches of the federal government.[192]  If that is the case, then attorney-client confidentiality has been breached and the memorandum is no longer protected by that privilege.

Plaintiffs also argue that the document must be released because the

---

[190]   There are two versions of the memorandum (PL #4 and PL #5) that were marked as attorney work product and deliberative process, but not as an attorney-client communication. The *Vaughn* entry for both documents includes the attorney-client privilege, however, so I will deem the privilege to have been asserted over all versions of the memorandum.

[191]   I note in passing that the memorandum is clearly not attorney work product, as defendants claimed on certain versions of the memorandum, as there has been no suggestion that the memorandum was prepared for ongoing or anticipated litigation.  *See Coastal States*, 617 F.2d at 865 ("at the very least some articulable claim, likely to lead to litigation, must have arisen").

[192]   *See* Pl. Mem. at 21-22 (discussing Bromeland Email).

agency is misusing Exemption 5 to conceal "secret law."[193]  While the secret law

doctrine has been discussed most often as an exception to the deliberative process

privilege, the Second Circuit held in *NCLR* that

> [l]ike the deliberative process privilege, the attorney-client
> privilege may not be invoked to protect a document
> adopted as, or incorporated by reference into, an agency's
> policy.   In such circumstances, the principle rationale
> behind the attorney-client privilege – to promote open
> communication between attorneys and their clients so that
> fully formed legal advice may be given . . . evaporates; for
> once an agency adopts or incorporates a document, frank
> communication will not be inhibited.[194]

In the instant case, the agency has not explicitly adopted or

incorporated the memorandum at issue as the basis of its policy shift.  Indeed,

despite overwhelming evidence to the contrary, it has failed to even acknowledge

any policy shift.  Thus, at this point, I deny summary judgment without prejudice

as to both parties.  Defendants are ordered to provide more information as to the

role that the document played in the deliberative process, and to establish that the

confidentiality of the document has been maintained.  I will also accept from

plaintiffs any additional proof that the memorandum has been adopted or

---

[193]     Pl. Mem. at 13-16.

[194]     *NCLR*, 411 F.3d at 360 (quotation marks and citations omitted).  *Cf. Tax Analysts v. Internal Revenue Serv.*, 391 F. Supp. 2d 122, 127 ("*Tax Analysts II*") (rejecting the argument that "agency working law is inherently separate and distinct from attorney work product and therefore must always be disclosed").

incorporated by reference by the agency, such that it can be considered secret law that should be released.

I also highlight that "the privilege applies only to the opinion or recommendatory portion of the report, not to factual information which is contained in the document."[195]  The memorandum contains a significant amount of factual "background" material that must be disclosed.  Such factual material is only protected to the extent that it is client-supplied.  Where the factual portion has come from other sources, it must be disclosed.[196]

**E.    Exemption 5 Deliberative Process Challenges Reviewed *In Camera*[197]**

**1.    "Emails among DHS, FBI and state employees concerning NY Commission letter to Northern Manhattan Coalition for Immigrant Rights"[198]**

This email string, discussing a letter sent to a non-profit organization in which opt-out was addressed, was redacted in part.  The redactions in the body of the email were proper under the deliberative process privilege of Exemption 5,

---

[195]    *Coastal States*, 617 F.2d at 867.

[196]    *See Vento*, 714 F. Supp. 2d at 151.

[197]    Ex. C to Pl. Mem.  DPC #3 is the same as PP #10, and has already been addressed.

[198]    [DPC #1] FBI-SC-1413-1415.

as the discussions contained therein are both deliberative and predecisional.

Defendants are granted summary judgment as to their withholdings in these emails.

> **2.** **"Issue paper entitled 'Originating Agency Identifier (ORI)' Validation Process"**[199]

This two-page issue paper is deliberative – in that it discusses a proposed change in protocol – and predecisional, in that it is not only marked "draft," but reflects comments and deletions from an unidentified reader.  Thus, this document was properly redacted in full under the deliberative process privilege of Exemption 5.  Defendants are granted summary judgment as to their withholding of this document.

> **3.** **"Email between SC PMO staff"**[200]

This email string consists of a discussion regarding how to revise a Questions and Answers document about Secure Communities.  The discussion is both deliberative and predecisional, in that it reflects some back and forth regarding revisions.  However, what is being deliberated is not whether or not participation in Secure Communities should be mandatory, but rather how that policy should be communicated to the public.  As discussed above, such discussions are not covered by the deliberative process privilege.  Thus, summary

---

[199]    [DPC #2] DHS000118-000119.

[200]    [DPC #4] ICE FOIA 10-2674.0003393-.0003395.

judgment is granted to plaintiffs, and defendants are ordered to release the withheld text.

### 4.   "Email between SC program staff elements"[201]

This email string was withheld in part, pursuant to the deliberative process privilege.  It is apparent from the released portions of the string that agency personnel or consultants prepared answers in reply to a reporter's questions, but the answers ultimately were not sent to the reporter.  Those answers, which have been withheld, do not merely reflect the personal opinions of an individual, nor would they inaccurately or prematurely disclose an agency position.  Furthermore, what is being debated is not agency policy, but rather how to portray that policy to the media.  Therefore, the answers are not privileged and were improperly withheld.  Summary judgment is granted to plaintiffs, and defendants are ordered to release the redacted text.

### 5.   "DraftMemo from SC PMO to department staff component"[202]

This document was withheld in full, pursuant to the deliberative process privilege.  It consists of an undated memorandum from one high-ranking agency official to his superior.  Although the document is labeled "Draft for

---

[201]   [DPC #5] ICE FOIA 10-2674.0003396-.0003403.

[202]   [DPC #12] ICE FOIA 10-2674.0003461-.0003463.

Discussion Purposes," the label is misleading.  The conclusion of the document

articulates the decision to be made, and is followed by the recipient's decision.

Thus, it seems obvious that there was no later version of this document, and the

draft label was inaccurate.  It does, however, reflect the deliberative process,

particularly insofar as it is authored by a subordinate to his superior, explicitly

making recommendations and asking for the superior's decision.  Nonetheless,

there is segregable material within the document.  The names of the high-ranking

author and recipient, as well as the subject line, should be released. The first two

paragraphs of the memorandum – under the heading "Background" – constitute

segregable factual information that should be released, with the exception of the

last sentence of the second paragraph.

Also included is an appendix, which merely lists various authorities,

including laws and reports, followed by one-line summaries of the relevance of

each.  The authorities must be released, as they do not reflect any deliberation.

Furthermore, this list overlaps substantially with the list released to Matthew

Bromeland of the D.C. Metropolitan Police Department, as discussed above.

Having already released the exact information at issue, defendants have waived the

claimed exemption as to that information.[203]  The summaries of the authorities'

---

[203]     *See Coastal Delivery Corp.*, 272 F. Supp. 2d at 965-66.

relevance may be withheld as forming part of the deliberative portions of the memorandum.

### 6.    "Email between SC PMO staff"[204]

This is an email string containing "[d]eliberations of language to be used in response to a state's inquiry about the deployment of biometric i[]dentification systems."[205]  Once again, what is being deliberated is not the actual Secure Communities policy regarding opt-out, but rather how to articulate that position to the state.  For the reasons stated elsewhere, I do not find that these are the sorts of deliberations intended to be protected by the deliberative process privilege.  Accordingly, plaintiffs are granted summary judgment as to this document, and defendants are ordered to release the redacted text.

### 7.    "Email from FBI to SC"[206]

This set of documents includes an email string between FBI and ICE personnel, and attached "external" and "internal" Frequently Asked Questions.  The majority of the text has been released.  The portions that have been redacted may be withheld as deliberative process under Exemption 5, as they contain

---

[204]    [DPC #15] ICE FOIA 10-2674.0003544-.000347.

[205]    ICE *Vaughn* Index at 34.

[206]    [DPC #47] ICE FOIA 10-2674.0012235-.0012255.

discussions that reflect the give-and-take of the deliberative process and make clear that a final decision had not yet been made.  Thus, release of the redacted portions would inaccurately reflect a final agency position or policy.  Defendants are granted summary judgment as to the withheld text.

### 8.    "Briefing Paper"[207]

This is a briefing paper, which has been described in detail in the *Vaughn* index as

> [c]ontain[ing] an agency employees' assessment of internal collaborative discussions that took place between Illinois State Police (ISP) officials regarding the possible deployment of [Secure Communities] in that state, including the agency employee's interpretation of the reaction of the ISP officials.[208]

The majority of the paper has been released, but a sentence and a half has been withheld.  I do not find that the withheld text is any more deliberative than the rest of the memorandum.  Contrary to the *Vaughn* description, the withheld text consists of factual reporting, rather than an agency employee's interpretation of the facts.

Instead, I suspect that this passage has been withheld based on the concern articulated in the Pavlik-Keenan Declaration that "disclosure of

---

[207]    [DPC #60] ICE FOIA 10-2674.0013008-.0013009.

[208]    ICE *Vaughn* Index at 75.

information exchanged between ICE employees and our federal, state, and local

partners could compromise the working relationships between these agencies."[209]

Pavlik-Keenan goes on to state,

> Much of the law enforcement process depends on
> cooperation at the Federal, State, and local levels and
> damaging these relationships could result in a deleterious
> impact on the ability of the agencies to carry out law
> enforcement and national security operations.[210]

While the privileges embodied in Exemption 5 reflect a concern with damaging

deliberative processes within an agency, or relationships between an agency and its

attorneys, neither the deliberative process privilege nor FOIA evinces a concern

with negatively affecting the relationships between various agencies of

government.  As I find defendants' *Vaughn* description insufficient to justify the

withholding of the text, plaintiffs are granted summary judgment, and defendants

are ordered to release the withheld text.

### 9.    "Document outlines updated messaging to support ICE maintaining its position to fully use federal information sharing by 2013"[211]

The majority of this document has been released.  The only portion

---

209    Pavlik-Keenan Decl. at 4.

210    *Id.*

211    [DPC #81] ICE FOIA 10-2674.0003237-.0003239.

that has been withheld under the deliberative process privilege is, as indicated in the *Vaughn* index, "[i]nformation about how the current messaging differs from previous messaging."[212]   The redacted lines do not appear to be any more deliberative than the rest of the memorandum.  They are, however, potentially more embarrassing, insofar as they highlight the inconsistencies in the agency's public stance.  The purpose of FOIA is to shed light on the operation of government, not to shield it from embarrassment.  That is particularly the case here, where there is no individual agency employee to whom the statements are attributed, so no individual will be embarrassed.  Nor is there any suggestion that the document is a draft, or that the redacted information would inaccurately or prematurely reflect the agency's position.  As a result, I grant summary judgment to plaintiffs, and order that the document be released in full.

## F.   Exemption 5 Attorney Client Challenges Reviewed *In Camera*

I reviewed seven documents that plaintiffs categorized as attorney-client challenges.  The remaining three documents were produced, reviewed, and addressed as "priority legal" documents above.[213]

---

[212]      ICE *Vaughn* Index at 27.

[213]      [ACC #30] ICE FOIA 10-2674.0010815, is simply the first page of an earlier draft of the same October 2, 2010 memorandum;[ACC #39] ICE FOIA 10-2674.0010839 is a summary email of the same October 2 memorandum; and [ACC #60] is the same as [PL #4] ICE FOIA 10-2674.0002534-.0002547.

1.    **"Emails among OCR, ICE, senior leadership, ICE Office of the Assistant Secretary's Counsel, and SC PMO staff addressing a response to Representative Anna Eshoo's concerns re San Mateo County, California"**[214]

This email string includes, as indicated in the *Vaughn* index, "proposed language" for a response to an inquiry by U.S. Representative Anna Eshoo.  Again, the document includes deliberations regarding the message the agency wants to convey, rather than the formulation of the policy itself.[215]  Such deliberations are not privileged.  Furthermore, the vast majority of the redacted text has already been released verbatim in other contexts – specifically in a letter from Secretary Napolitano to Representative Lofgren,[216] and in a publicity document that originally appeared on the ICE website.[217]  Where the exact information has already been released, the agency waives the right to withhold that information.  The few words that may not have been released already constitute mere

---

[214]    [ACC #1] ICE FOIA 10-2674.0003386-.0003389.

[215]    *But see Sierra Club*, 384 F. Supp. 2d at 27 (finding draft responses to members of Congress to be covered by Exemption 5 because "[c]ongressional relations over controversial legislation can require the utmost attention and tact.  These draft responses . . . constituted recommendations from staff about how to answer concerns expressed by Capitol Hill").

[216]    *See* 9/7/10 Letter from Sec. Napolitano to U.S. Representative Zoe Lofgren.

[217]    *See* ICE, *Secure Communities: Setting the Record Straight*, Aug. 17, 2010, available at https://crocodoc.com/b7hu8, at 6.

wordsmithing and are not protected by the deliberative process privilege.

According to the *Vaughn* index, the string includes "edits by an attorney which

reflected client-supplied information,"[218]   However, those edits are no more than

further tinkering with syntax and do not constitute legal advice.  Thus, the

attorney-client privilege does not apply.  Plaintiffs are granted summary judgment

and defendants are ordered to release the withheld text.

### 2.   "Email string between SC PMO staff and legal office preparing Draft response to media inquiry"[219]

This email string between Secure Comunities staff and OPLA has

been partially withheld under the deliberative process and attorney-client

privileges.  The withheld portions appear to be protected by the attorney-client

privilege, to the extent that defendants represent that confidentiality was

maintained.  At this time, summary judgment is denied to both parties without

prejudice.

### 3.   "Draft letter in response to Congressional inquiry"[220]

Portions of this undated draft letter from Secretary Napolitano to

Representative Lofgren have been redacted under the attorney-client or

---

[218]   ICE *Vaughn* Index at 31.

[219]   [ACC #5] ICE FOIA 10-2674.0003496-.0003498.

[220]   [ACC #8] ICE FOIA 10-2674.0003582-.0003583.

deliberative process privileges.  Edits or comments by an agency attorney as to the legal sufficiency of the language may be withheld under the attorney-client privilege, to the extent that defendants represent that confidentiality was maintained.

It is not clear whether the redacted text in the body of the letter reflects agency policy that was still in development, in part because the letter is undated and insufficient context has been provided.  I do know that some of the withheld language was not ultimately included in the final version of the letter.[221] However, as with many other documents in this production, I am unsure whether the text was ultimately omitted because of a decision about what should constitute agency policy or a decision about what message to convey about agency policy.

To the extent that the letter reflects a proposed agency policy that was never adopted, it may be withheld under the deliberative process privilege. However, defendants are warned that they may not withhold this text simply because it reveals an otherwise unacknowledged but actual shift in agency policy that could prove embarrassing.  Thus, at this point I deny summary judgment without prejudice as to both parties on the propriety of the deliberative process

---

[221]   I have been able to ascertain that this document is a draft of the letter that plaintiffs submitted to the Court in final form.  *See* 9/7/10 Letter from Sec. Napolitano to Rep. Lofgren.

privilege assertions in this document.  Defendants are ordered to provide more information about the role that the document played in the deliberative process in order to justify their withholding.

### 4. "Email string from SC asking OPLA for legal advice"[222]

This email string, in which Secure Communities personnel request legal advice from OPLA, falls squarely within the attorney-client privilege.  The withheld portions are properly privileged, to the extent that defendants represent that confidentiality was maintained.  At this time, summary judgment as to both parties is denied without prejudice.

### 5. "Email from a Secure Communities Employee to an ICE Attorney seeking legal advice and recommendations and the Attorney's response to that inquiry"[223]

This document, which has been redacted in part, reflects agency personnel's requests for legal advice and an agency attorney's response.  It is not clear why the agency personnel's inquiry was released, while attorney-client privilege was asserted over the attorney's response.  Nonetheless, I find that the attorney-client privilege was properly asserted, to the extent that defendants represent that confidentiality was maintained.  At this time, summary judgment is

---

[222] [ACC #25] ICE FOIA 10-2674.0010589-.0010592.

[223] [ACC #49] ICE FOIA 10-2674.0011149-.0011151.

denied as to both parties without prejudice.

**6.      "Email between SC PMO staff regarding draft response letter attachment to the County Counsel, County of Santa Clara"[224]**

This document has been partially redacted under the attorney-client privilege.  I find that edits and comments made by agency attorneys regarding the legal sufficiency of the language in the document are properly protected under the attorney-client privilege, to the extent that defendants represent that confidentiality was maintained.  At this time, summary judgment is denied as to both parties without prejudice.

**7.      "Draft letter from ICE to locality"[225]**

This draft letter reflects comments by an agency attorney as to the legal sufficiency of the language.  For some reason, the attorney's comments were redacted but her edits were not.  Once again, defendants' redactions seem inconsistent both within and between documents.  Nonetheless, I do not find a waiver, as the edits do not reflect the identical information as the comments.  I find that what has been redacted here is properly covered by the attorney-client privilege, to the extent that defendants represent that confidentiality was

---

[224]    [ACC #50] ICE FOIA 10-2674.0003211-.0003219.

[225]    [ACC #79] ICE FOIA 10-2674.0003149-.0003153.

maintained.  At this time, summary judgment is denied to both parties without prejudice.

**G.    Reasonably Segregable Challenges Reviewed *In Camera***

I reviewed three documents of the eighty-seven documents identified by plaintiffs as "reasonably segregable challenges."  The remaining two documents that I ordered produced for *in camera* review I reviewed as "priority legal" documents and addressed the segregability concerns with respect to those documents above.[226]

**1.    "Draft Talking Points Sent by Public Affairs"**[227]

This seven-page document was redacted in its entirety.  Although there is no "draft" label on the document, defendants claim in their *Vaughn* index that the document is a draft.  However, the fact that something is a draft it not enough to withhold the entire document.  A great deal of the content of this document is either purely factual information, which must be released, or information that has been released verbatim in other documents, which must also be released.  I find that defendants have failed to make adequate efforts to separate

---

[226]    In particular, RSC #14 is the same as PLD #9 ( ICE FOIA 10-2674.0003740-.0003748), and RSC #15 is the same as PLD #17 (ICE FOIA 10-2674.0003754-.0003759).

[227]    [RSC #16] ICE FOIA 10-2674.0008861-.0008867.

and release non-exempt information from exempt information in this document. Defendants are ordered to release all reasonably segregable non-exempt materials from this document, including information that has already been released elsewhere. If defendants fail to separate and release non-exempt material appropriately, I will order that the entire document be released.

### 2.  "Emails string within OPLA"[228]

This email string among agency attorneys was redacted in part. Defendants have appropriately withheld all of the privileged portions and released the few lines that are non-privileged. All of the redacted portions reflect legal advice and analysis, and thus are protected by the attorney-client privilege, to the extent that defendants represent that confidentiality has been maintained. At this time, summary judgment is denied to both parties without prejudice.

### 3.  "Email from Associate Legal Advisor to OPLA team"[229]

This email, from one agency attorney to other agency attorneys, was redacted almost entirely. The redacted language consists of legal advice and analysis, and thus is protected by the attorney-client privilege. However, except for the first three lines of the body of the email and the sentence that begins "In

---

[228]   [RSC #20] ICE FOIA 10-2674.0010589-.0010592.

[229]   [RSC #36] ICE FOIA 10-2674.0010833.

fact," all of the redacted language appeared verbatim in ICE FOIA 10-

2674.0002927, which was released in its entirety.[230]  When the exact information at

issue has already been released, an agency waives any claim of privilege as to that

information.  Accordingly, defendants are ordered to reproduce this document

unredacted, except as to the few lines that have not already been released

elsewhere.

## V.    CONCLUSION

Summary judgment is granted in part and denied in part as to each

party.  As detailed above, defendants are required to submit revised *Vaughn*

indexes containing further justifications for certain of their withholdings –

including representations regarding the confidentiality of attorney-client

communications – and to produce certain documents, or portions thereof, that have

previously been withheld.  They are required to do so by August 1, 2011.  The

Clerk of the Court is directed to close these motions [Docket Nos. 32 and 47].  A

conference is scheduled for August 11, 2011 at 5 p.m.

---

[230]     This page was contained within PLD #9, which is also RSC #14.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             July 11, 2011

**- Appearances -**

**For Plaintiffs:**

Bridget Kessler, Esq.
Peter L. Markowitz, Esq.
Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Ave., Rm 1154
New York, New York 10003
(212) 790-0213

Anthony J. Diana, Esq.
Lisa R. Plush, Esq.
Jeremy D. Schildcrout, Esq.
Mayer Brown LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sunita Patel, Esq.
Darius Charney, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

**For Defendants:**

Joseph N. Cordaro
Christopher Connolly
Assistant U. S. Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10004
(212) 637-2745/2761