UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

NATIONAL DAY LABORER
ORGANIZING NETWORK, CENTER FOR
CONSTITUTIONAL RIGHTS, and
IMMIGRATION JUSTICE CLINIC OF
THE BENJAMIN N. CARDOZO SCHOOL
OF LAW,

                    Plaintiffs,

      - against -

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW,
FEDERAL BUREAU OF
INVESTIGATION, and OFFICE OF
LEGAL COUNSEL,

               Defendants.

-------------------------------------------------------X

**OPINION AND ORDER**

10 Civ. 3488 (SAS)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/24/11

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

        The National Day Laborer Organizing Network, the Center for

Constitutional Rights, and the Immigration Justice Clinic of the Benjamin N.

Cardozo School of Law bring this action for the purpose of obtaining records,

pursuant to the Freedom of Information Act ("FOIA"),[1] from the United States Immigration and Customs Enforcement Agency ("ICE"), United States Department of Homeland Security ("DHS"), Executive Office for Immigration Review, Federal Bureau of Investigation ("FBI"), and Office of Legal Counsel ("OLC"). Specifically, plaintiffs have sought information regarding Secure Communities, a federal immigration enforcement program launched in 2008. It has long been the practice for local law enforcement agencies to send the fingerprints of individuals arrested and booked into custody to the FBI to be checked against the national criminal history database.[2] Under the Secure Communities program, those fingerprints are also now sent to DHS to be checked against immigration records.[3]

A portion of the requested records relates to the issue of whether and how state and local law enforcement agencies may "opt-out" of participation in Secure Communities. On January 17, 2011, defendants produced over fourteen thousand pages of "opt-out" records, withholding all or part of certain records

---

[1]  5 U.S.C. § 552 *et seq.*

[2]  *See Secure Communities*, ICE, http://www.ice.gov/secure_communities/.

[3]  *See id.*

pursuant to FOIA's statutory exemptions.[4]  The parties then cross-moved for summary judgment on the propriety of the asserted exemptions, and, on July 11, 2011, I issued an Opinion and Order granting in part and denying in part the parties' cross-motions.[5]

　　　　With respect to certain documents in that production, I denied summary judgment without prejudice to both parties, giving them the opportunity to present additional information in support of their respective positions.  Since the July 11 Opinion and Order was issued, the parties have focused particular attention on a critical document referred to as the "October 2 Memorandum."  The parties have now renewed their cross-motions for summary judgment on the October 2 Memorandum.  For the reasons stated below, defendants' motion is denied and plaintiffs' motion is granted.

## II.　　BACKGROUND

　　　　Initially, the federal government indicated that participation in Secure Communities by state and local law enforcement agencies was voluntary and

---

[4]　　*See National Day Laborer Org. Network v. United States Immigration & Customs Enforcement*, No. 11 Civ. 3488, 2011 WL 2693655, at *3 (S.D.N.Y. July 11, 2011) ("*NDLON*" or "July 11 Opinion and Order").

[5]　　*See id.* The parties subsequently moved for partial reconsideration of the July 11 Opinion and Order, which I granted in part in a Memorandum Opinion and Order, dated August 8, 2011 [Docket No. 109].

predicated on a Memorandum of Agreement signed by ICE and the authorized state agency.[6]  Through at least the beginning of 2010, the federal government indicated that states and localities were not required to participate in the program.[7] As a result, a number of states and localities took steps to remove themselves from the program's planned deployment. During a press conference on October 6, 2010, Janet Napolitano, the Secretary of DHS, said that "DHS 'does not view [Secure Communities] as an opt-in, opt-out program.'"[8]  I discussed this shift in policy in more detail in the July 11 Opinion and Order, finding that the decision was made by March 2010.[9]

---

[6]     *See* ICE Secure Communities Standard Operating Procedure ("SOP"), http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009. pdf, at 3 ("Participation in [Secure Communities] at the state level is predicated on a Memorandum of Agreement (MOA), signed by ICE and the participating [State Identification Bureau] or other state authorized agency."); Secure Communities MOA Template, ICE, http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesmoatempla te.pdf; Brian Bennet, *States can't opt out of Secure Communities program*, Los Angeles Times, Aug. 6, 2011.

[7]     *See* Secure Communities Frequently Asked Questions, U.S. Immigration Customs Enforcement, (Jan. 27, 2010) ICE FOIA 10-2674.001976–83 ("ICE does not require any entity to participate in the information sharing technology at the state or local level.").

[8]     Shankar Vedantam, *U.S. Deportations Reach Record High*, Washington Post, Oct. 7, 2010 (quoting Secretary Napolitano's statement).

[9]     *NDLON*, 2011 WL 2693655, at *9.

Defendants withheld at least eighteen versions of the October 2
Memorandum under FOIA Exemption 5, primarily on the basis of the deliberative
process privilege and the attorney-client privilege.  In their *Vaughn* index,[10]
defendants described each version of the Memorandum with variations of "[l]egal
analysis of the mandatory nature of the 2013 Secure Communities deployment."[11]
In their initial summary judgment motion, plaintiffs asserted that the October 2
Memorandum lost its predecisional status when the agency relied upon it to change
its policy position, as announced by Secretary Napolitano on October 6.  Because
the Memorandum was dated October 2, the statement was made on October 6, and
an individual was congratulated for his "excellent SC paper" on October 8,
plaintiffs inferred that the Memorandum formed the basis for the shift in policy.
Defendants derided this argument as mere speculation, but did not provide
information about the role that the Memorandum did or did not play in the policy
shift.  In fact, DHS has failed to acknowledge that there has been any policy shift,
instead insisting that opt-out has never been an option, despite numerous public
statements to the contrary.[12]

---

[10]   *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

[11]   ICE *Vaughn* Index, attached to 1/28/11 Declaration of Catrina Pavlik-Keenan, director of ICE's FOIA office [Docket No. 35] at 39.

[12]   *See NDLON*, 2011 WL 2693655, at *9.

After I reviewed the document *in camera*, I held in the July 11 Opinion and Order that the Memorandum constitutes legal advice and analysis about a Secure Communities mandate.[13]   However, I also found that defendants had failed to meet their burden of establishing the role that the document had played in the deliberative process.  I wrote, "I am unable to determine why the memorandum was written, and – of particular import for assessing whether it qualifies for protection under the deliberative process – whether it was written to justify an already existing policy or to lend support in an intra-agency debate about shifting the policy."[14]   Finding that the other concerns of the deliberative process privilege would not be implicated by the document's release, I held that that privilege did not apply.[15]

I then considered whether the document was protected by the attorney-client privilege.[16]   I noted that the Memorandum contains legal analysis and that it was written by the Office of the Principal Legal Advisor of ICE and addressed to Beth Gibson, the Assistant Deputy Director of ICE.  I found,

---

[13]      *See id.* at *17.

[14]      *Id.*

[15]      *See id.* at *18.

[16]      *See id.*

6

however, that defendants "failed to establish that the confidentiality of the document was maintained."[17]  I observed that if plaintiffs were correct that the legal analysis within the document had been shared outside of the agency, then attorney-client confidentiality was breached and the Memorandum would no longer be protected by that privilege.  Regarding defendants' assertions of the attorney-client privilege, I found that "plaintiffs have alleged, with convincing evidence, that defendants have shared with individuals outside of the agencies at least some of the information found in the documents that they now withhold as privileged communications."[18]  The attorney-client privilege is waived if the document or information therein has been shared with other individuals.  Finding that defendants had failed to assert with any specificity that confidentiality was maintained, I held that they must do so "for each document that defendants seek to withhold under the attorney-client privilege."[19]  I held that "[i]f defendants are not able to make such a representation as to a particular document, and no other privileges or FOIA exemptions have been asserted, that document must be

---

[17]    *Id.*

[18]    *Id.* at *10.

[19]    *Id.*

released."[20]

I also considered plaintiffs' contention that the Memorandum should be released because defendants were misusing FOIA Exemption 5 to conceal the agency's policy or "working law."[21]  I noted that although the working law doctrine has been discussed most often in the context of the deliberative process privilege, the Second Circuit held in *National Council of La Raza v. Department of Justice* ("*La Raza*") that

> Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy.  In such circumstances, the principle rationale behind the attorney-client privilege – to promote open communication between attorneys and their clients so that fully formed legal advice may be given . . . evaporates; for once an agency adopts or incorporates a document, frank communication will not be inhibited.[22]

Because the issue had been insufficiently briefed, I denied summary judgment as to both parties, ordering defendants "to provide more information as to the role that the document played in the deliberative process, and to establish

---

[20]     *Id.*

[21]     *See id.* at *17.

[22]     *National Council of La Raza v. Department of Justice*, 411 F.3d 350, 360 (2d Cir. 2005) (quotation marks and citations omitted).

that the confidentiality of the document has been maintained."[23]  I also invited

plaintiffs to submit "any additional proof that the Memorandum has been adopted

or incorporated by reference by the agency, such that it can be considered secret

law that should be released."[24]    Finally, I held that factual material in the report

was only protected by the attorney-client privilege to the extent that it was client-

supplied, and ordered defendants to release any factual material that came from

other sources.[25]

## III.    APPLICABLE LAW

### A.    FOIA and Summary Judgment

FOIA cases are generally resolved on motions for summary

judgment.[26]  Like in any other context, however, summary judgment is appropriate

only if the record "show[s] that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."[27]  "An issue of

---

[23]      *Id.* at *18.

[24]      *Id.*

[25]      *See id.* at *19 (citing *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)).

[26]      *See Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009); *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 369 (11th Cir. 1993).

[27]      Fed. R. Civ. P. 56(c).

fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit  under the governing law.'"[28]  "In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[29]  "Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion.  'That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts.'"[30]

However, unique to the FOIA context, "[a]ffidavits submitted by an agency are accorded a presumption of good faith," and so long as such affidavits "supply[] facts indicating that the agency has conducted a thorough search and giv[e] reasonably detailed explanations why any withheld documents fall within an exemption," they will sustain the agency's burden and summary judgment may be

---

[28]   *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[29]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

[30]   *Ferrigno v. United States Dep't of Homeland Sec.*, No. 09 Civ. 5878, 2011 WL 1345168, at *3 (S.D.N.Y. Mar. 29, 2011) (citing *Straube v. Florida Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992) and quoting *United States Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136, 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000)).

awarded without the need for discovery.[31]  Nonetheless, "[t]he agency's decision

that the information is exempt from disclosure receives no deference."[32]

Accordingly, a court is required to conduct a *de novo* review of the record,

deciding "'whether the agency has sustained its burden of demonstrating that the

documents requested are not agency records or are exempt from disclosure under

the FOIA.'"[33]

FOIA is intended "to 'promote honest and open government and to

assure the existence of an informed citizenry in order to hold the governors

accountable to the governed.'"[34]  At the heart of FOIA is "a policy strongly

favoring public disclosure of information in the possession of federal agencies."[35]

---

[31]     *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (quotation marks and citations omitted).

[32]     *Bloomberg, L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

[33]     *In Defense of Animals v. National Inst. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (quoting *Assassination Archives & Research Ctr. v. Central Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003)).  *See also* 5 U.S.C. § 552(a)(4)(B); *Carney*, 19 F.3d at 812 ("In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.").

[34]     *La Raza*, 411 F.3d at 355 (quoting *Grand Cent. P'ship. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999)).

[35]     *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 286 (2d Cir. 1999).

However, FOIA provides nine categories of information that are exempt from disclosure.[36]  The "exemptions are 'explicitly made exclusive,' and must be 'narrowly construed.'"[37]

### B.    FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency."[38]  The exemption incorporates "all normal civil discovery privileges,"[39] including the deliberative process privilege and the attorney-client privilege.[40]  "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance."[41]

The deliberative process privilege protects from disclosure

---

[36]    *See id.* at 287.

[37]    *Milner v. Department of the Navy*, — U.S. —, 131 S.Ct. 1259, 1262 (2011) (quoting *Environmental Prot. Agency v. Mink*, 410 U.S. 73, 79 (1973) and *Federal Bureau of Investigation v. Abramson*, 456 U.S. 615, 630 (1982)).

[38]    5 U.S.C. § 552(b)(5).

[39]    *Hopkins v. United States Dep't of Housing and Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

[40]    *See National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149-55 (1975); *Grand Cent. P'ship*, 166 F.3d at 481.

[41]    *Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *Sears, Roebuck* , 421 U.S. at 148-49).

"'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"[42]   The privilege is intended "'to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government.'"[43]

In order to qualify for the privilege, a document must be "predecisional" and "deliberative."[44]   A document is predecisional if it was "'prepared in order to assist an agency decisionmaker in arriving at [her] decision.'"[45]   The agency claiming privilege "must be able to demonstrate that . . . the document for which . . . privilege is claimed related to a specific decision facing the agency."[46]   A document is deliberative if it is "'actually . . . related to the

---

[42]   *La Raza*, 411 F.3d at 356 (quoting *Tigue v. United States Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002)).

[43]   *Tigue*, 312 F.3d at 76 (quoting *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)).

[44]   *La Raza*, 411 F.3d at 356.

[45]   *Id.* (quoting *Grand Cent. P'ship*, 166 F.3d at 482).   Such materials include "recommendations, draft documents, proposals, suggestions, and other subjective documents [that] reflect the personal opinions of the writer rather than the policy of the agency."   *Grand Cent. P'ship*, 166 F.3d at 482.

[46]   *Tigue*, 312 F.3d at 80 (citing *Sears, Roebuck*, 421 U.S. at 151 n.18).

13

process by which policies are formulated.'"[47]  Factors used to determine whether a

document is deliberative include "whether the document (i) formed an essential

link in a specified consultative process, (ii) reflects the personal opinions of the

writer rather than the policy of the agency, and (iii) if released, would inaccurately

reflect or prematurely disclose the views of the agency."[48]  The privilege does not

extend to "'purely factual' material"[49] or documents later adopted or incorporated

into a final agency opinion.[50]  "The privilege also does not extend to materials

related to the explanation, interpretation or application of an existing policy, as

opposed to the formulation of a new policy."[51]

     The attorney-client privilege extends to the governmental context,

---

[47]     *La Raza*, 411 F.3d at 356 (quoting *Grand Cent. P'ship*, 166 F.3d at 482).

[48]     *Grand Cent. P'ship*, 166 F.3d at 482 (quotation marks and citation omitted).

[49]     *Id.* (quoting *Hopkins*, 929 F.2d at 85).  *Accord Mink,* 410 U.S. at 88 (requiring disclosure of "purely factual material contained in deliberative memoranda" which is "severable from its context").

[50]     *See La Raza*, 411 F.3d at 356 (citing *Sears, Roebuck*, 421 U.S. at 161); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

[51]     *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991) (citing *Mobil Oil Corp. v. Department of Energy*, 102 F.R.D. 1, 5 (N.D.N.Y. 1983)).

where "the client may be the agency and the attorney may be an agency lawyer."[52]
The attorney-client privilege under Exemption 5 "is narrowly construed and is
limited to those situations in which its purpose will be served."[53] "The agency
bears the burden of showing that the information exchanged was confidential.
That is, the agency must show that it supplied information to its lawyers 'with the
expectation of secrecy and was not known by or disclosed to any third party.'"[54]

Both the deliberative process privilege and the attorney-client
privilege are "designed to promote the quality of agency decisions by preserving
and encouraging candid discussion between officials."[55] But, as the Supreme
Court has explained, the need to protect honest deliberation from public scrutiny
disappears once an agency has adopted the logic of a document:

> The probability that an agency employee will be inhibited from
> freely advising a decisionmaker for fear that his advice *if adopted*,
> will become public is slight. First, when adopted, the reasoning
> becomes that of an agency and becomes its responsibility to
> defend. Second, agency employees will generally be encouraged

---

[52]     *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 618 (D.C.
Cir. 1997).

[53]     *Coastal States*, 617 F.2d at 862.

[54]     *Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d
252, 267 (D.D.C. 2004) (quoting *Mead Data Cent., Inc. v. Department of the Air
Force*, 566 F.2d 242, 254 (D.C. Cir. 1977)).

[55]     *La Raza*, 411 F.3d at 356.

rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency. Moreover, the public interest in knowing the reasons for a policy actually adopted by an agency supports [disclosure].[56]

Thus, a predecisional document "'can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.'"[57]  The same logic applies to documents otherwise protected by the attorney-client privilege.[58]  Determining whether an agency has adopted a legal memorandum as its policy is not always simple.  This is particularly so because "[m]ere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."[59]  Once an agency has adopted a legal analysis as its own, however, that analysis becomes the government's "working law," and the public "can only be enlightened

---

[56]     *Sears, Roebuck*, 421 U.S. at 161.

[57]     *La Raza*, 411 F.3d at 356-57 (quoting *Coastal States*, 617 F. 2d at 866).

[58]     *Id.* at 360 ("[T]he attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy.").

[59]     *Id*. at 358.

by knowing what the [agency] believes the law to be."[60]

## IV.   DISCUSSION

### A.   Deliberative Process Privilege

As a preliminary matter, I reaffirm my July 11 ruling that the October 2 Memorandum is not protected by the deliberative process privilege, for the reasons stated in that opinion.[61]  Based on the additional evidence presented by plaintiffs in the instant motion, it is even clearer that the document was used to justify an already decided policy, rather than to persuade parties debating a policy shift.

### B.   Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."[62] In order to be eligible for withholding under FOIA Exemption 5, the defendants must satisfy this test with respect to the October 2 Memorandum.

---

[60]   *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997).

[61]   *NDLON*, 2011 WL 2693655, at *18.

[62]   *United States v. Mejia*, — F.3d —, 2011 WL 3715293, at *4 (2d Cir. Aug. 25, 2011).

The Memorandum is addressed to the Assistant Deputy Director of ICE from the Deputy Principal Legal Advisor.  It is entitled "Secure Communities – Mandatory in 2013."  It contains an executive summary, provides background factual information about how Secure Communities operates, discusses the legal authority for the program, and addresses the merits of legal challenges that may be brought against the program.

It is undisputed that the memo constitutes communications between a client (ICE policy makers) and its attorney (the office of the legal advisor). Plaintiffs argue, however, that *first*, the document does not contain legal advice and *second*, that it was not intended to be and was not kept confidential.

I find that at least one purpose of the memo was to provide legal advice.  Plaintiffs argue that because the Memorandum was written after ICE had decided to make Secure Communities mandatory, it constitutes only a post-hoc legal rationale and is thus not protected "legal advice."[63]  However, a communication may still be considered "legal advice" even if the agency has already taken some action related to the subject matter of the advice.

---

[63]     *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Renewed Motion for Summary Judgment on Its Withholdings Pursuant to Exemption (b)(5) and Attorney-Client Privilege, and in Support of Plaintiffs' Renewed Cross-Motion for Summary Judgment on the Inapplicability of Exemption (b)(5) to Withheld Information in the October 2 Memorandum, or for Discovery Pursuant to Fed. R. Civ. P. 56(d) ("Pl. Mem.") at 14.

"Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct."[64]  Thus, the fact that the agency may have already adopted a policy that Secure Communities would be mandatory does not mean that a memorandum containing legal analysis of the Secure Communities mandate does not constitute legal advice.

More persuasive is the plaintiffs' argument that the content of the Memorandum was not in fact kept confidential.  On this issue, the parties disagree as to who bears the burden of proof.[65]  It is well established that the party claiming the attorney-client privilege "bears the burden of establishing its essential elements,"[66] including that confidentiality was maintained.  Furthermore, the text of FOIA is unambiguous: in civil actions to determine whether a government record is properly withheld, "the burden is on the agency."[67] That textual evidence notwithstanding, the defendants argue that "once an agency has shown a logical

---

[64]     *In re the County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).

[65]     *See* Defendant United States Immigration and Customs Enforcement's Renewed Motion for Summary Judgment on Its Withholdings Pursuant to Exemption (b)(5) and the Attorney-Client Privilege ("Def. Mem.") at 7; Pl. Mem. at 12-13.

[66]     *Mejia*, 2011 WL 3715293, at *4.  *Accord von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

[67]     5 U.S.C. § 552(a)(4)(B).

connection between the withheld information and the claimed exemption, the

burden shifts to the requester to prove waiver, adoption, or some other reason why

the exemption should not apply."[68]  The defendants seek to radically expand the

government's ability to resist FOIA requests by importing a low "logical

connection" standard – derived from what is known as the *Glomar* doctrine[69] – that

applies only in rare cases when the very act of confirming or denying the existence

of records "would cause harm cognizable under a[ ] FOIA exception."[70]  This

standard, which is primarily applicable in the national security context, is

inappropriate here, where the government has already acknowledged the existence

of the October 2 Memorandum and released parts of it.  Furthermore, defendants

misrepresent the *Glomar* standard itself.[71]

---

[68]    Def. Mem. at 7.

[69]    *See Phillippi v. Central Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).

[70]    *Wilner v. National Security Agency*, 592 F.3d 60, 68 (2d Cir. 2009).

[71]    The Second Circuit first adopted the *Glomar* doctrine in *Wilner*.  In addition to inappropriately attempting to apply *Wilner* to this case, the defendants misread it.  As plaintiffs correctly point out, *Wilner* still requires an agency to justify a FOIA exemption with "reasonably specific detail" as set out in agency affidavits and it does not allow an agency to prevail on summary judgment if its showing is "controverted by . . . contrary evidence in the record." *Wilner*, 592 F.3d at 73; Pl. Mem. at 11, n. 32.  The burden of proof is by no means shifted to the requester.

The correct reading of the case law indicates that in some instances, courts have assigned the initial burden of production (not the burden of proof) to plaintiffs who assert that a prior disclosure of attorney-client material has waived confidentiality.[72] That is to say, as the D.C. Circuit has put it, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld."[73] If such information exists, the agency must then meet its burden of proof to establish the exemption. In the absence of controlling law from either the Second Circuit or the Supreme Court, I adopt the D.C. Circuit's reasonable burden-shifting formula.

Plaintiffs have produced evidence showing that ICE officials

---

[72] "The ultimate burden of persuasion, to be sure, remains with the government, but a party who asserts that material is publicly available carries the burden of production on that issue . . . . This is so because the task of proving the negative – that information has not been revealed – might require the government to undertake an exhaustive, potentially limitless search." *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (citing *Occidental Petroleum Corp. v. Securities & Exch. Comm'n*, 873 F.2d 325, 342 (D.C. Cir. 1989)). *See also Bronx Defenders v. United States Dep't of Homeland Sec.*, No. 04 Civ. 8576, 2005 WL 3462725, at *3 (S.D.N.Y. Dec. 19, 2005).

[73] *Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). *Accord Dow Jones & Co. v. United States Dep't of Justice*, 880 F.Supp. 145, 151 (S.D.N.Y. 1995) ("Specificity is the touchstone in the waiver inquiry, and thus, neither general discussions of topic nor partial disclosures of information constitute waiver of an otherwise valid FOIA exemption.").

21

discussed the legal justification for making Secure Communities mandatory with

elected officials, immigrant advocates, and other law enforcement agencies at

various times during 2010 and 2011.  Some of these discussions were general,

referring simply to the "Congressional mandate" for information sharing.[74]

However, a number of these discussions were more specific.  For example, ICE

apparently sent the Washington D.C. Metropolitan Police Department a list of

statutes and executive orders that provided legal justification for the policy shift,

including section 534 of Title 28 of the United States Code and section 14616 of

Title 42 of the United States Code, statutes that are discussed on pages four and six

of the October 2 Memorandum.[75]  On August 5, 2011, John Sandweg, Counselor to

---

[74]    *See* 7/14/11 Email Correspondence, Ex. DD to Declaration of Sonia
R. Lin, Plaintiffs' Counsel ("Lin Decl."), in support of Plaintiffs' Opposition to
Defendants' Renewed Motion for Summary Judgment and Plaintiffs' Renewed
Cross-Motion for Summary Judgment or Discovery Pursuant to Fed. R. Civ. P.
56(d) (communications regarding a request for information by the Skagit County,
Washington Sheriff's Office); 8/11/10 Email, Ex. C to Lin Decl. (communications
with Maryland law enforcement officials discussing the Congressional mandate for
increased information sharing); Undated Draft Letter from David Venturella,
Assistant Director of ICE to Barbara M. Donnellan, County Manager of Arlington,
Virginia, Ex. W to Lin Decl. (explaining that Secure Communities' information
sharing is "mandated by Congress"). *See also* Declaration of Sarah Uribe, National
Campaign Coordinator for Plaintiffs National Day Laborer Organizing Network
("Uribe Decl."), ¶¶ 15-16 (describing meetings on November 8, 2010 and
November 18, 2010 at which David Venturella and other ICE officials explained,
in general terms, that Congress mandated participation in Secure Communities).

[75]    *See* 3/30/11 Email from Matthew Bromeland, Washington D.C.
Metropolitan Police Dep't, to Amy Loudermilk, D.C. Coalition Against Domestic

22

the Secretary of DHS, participated in a conference call with approximately one

hundred people from the immigrant-rights advocacy community. On that phone

call, when asked about the legal authority for mandating participation in the

program, Sandweg said that agency lawyers had determined that section 1722 of

Title 8 of the United States Code provided the authority for the FBI and ICE to

share information about a person's criminal history, which is relevant to a person's

deportability.[76]  This explanation is a summary of the argument on pages four, five,

and six of the Memorandum.

> In addition, much of the precise information in the October 2

Memorandum has already been produced as part of this litigation. In a document

entitled "Overview of Secure Communities," under a heading entitled "Legal

Background – Appropriations Acts Summaries," the agency explains that the fiscal

year 2008 appropriations bill provided the funding to start Secure Communities.[77]

The language explaining that appropriation repeats, nearly verbatim, language

found on page two of the October 2 Memorandum.  An undated document entitled

---

Violence, ("Bromeland Email"), Ex. GG to Lin Decl. (forwarding a list of
information sharing initiatives received from ICE).

[76]      *See* Uribe Decl. ¶¶ 18-21; Declaration of Sarang Sekhavat, Federal
Policy Director at the Massachusetts Immigrant and Refugee Coalition, ¶¶ 8-9.

[77]      *See* Overview of Secure Communities, ICE FOIA 10-2674.0002925.

"Secure Communities Briefing Notes," which was produced by the FBI as part of this litigation, describes in detail how Secure Communities uses the federal government's IDENT/IAFIS Interoperability information sharing program.[78]  This information replicates the factual description on pages two and three of the Memorandum.  An undated document disclosed by ICE entitled "'Opt-Out' Background" describes the agreement between ICE Assistant Director David Venturella and the FBI on information sharing and the 2013 deadline.[79]  This precise information is repeated on page three of the Memorandum.  The Opt-Out Background document also includes a discussion of sub-sections 534(a)(1) and (4) of Title 28 of the United States Code,[80] the exact sub-sections that are discussed on page four of the Memorandum. The Opt-Out Background document goes on to discuss whether Secure Communities can be mandatory, in light of the Tenth Amendment and the Supreme Court's ruling in *Printz v. United States*.[81]  This analysis is similar to the analysis found on pages six, seven, and eight of the Memorandum, although the conclusion – "SC's position that participation in the

---

[78]    *See* Secure Communities Briefing Notes, Ex. EE to Lin Decl.

[79]    *See* 'Opt-Out' Background, ICE FOIA 10-2674.0002927.

[80]    *See id*.

[81]    *See id*. (discussing *Printz v. United States*, 521 U.S. 898 (1997)).

'Secure Communities initiative' is voluntary is supported by applicable case-law"

– is the opposite of that found in the October 2 Memorandum.[82]  Finally, the Opt-

Out Background document explains that sections 1373 and 1644 of Title 8 of the

United States Code and *City of New York v. United States* do not support

mandatory participation in Secure Communities.[83]  This discussion is found, in

slightly longer form, on page nine of the Memorandum.

　　　　　Nearly every component of the October 2 Memorandum appears in

some public document or statement by the defendants.  This includes nearly all of

the factual background, specific references to and discussions of all of the statutes

upon which the Memorandum relies, and even significant components of the legal

discussion regarding the strengths and weaknesses of the agency's position.  In

short, plaintiffs have produced extensive specific evidence of waiver.

　　　　　In the July 11 Opinion and Order, I held that in order to secure

exemption from FOIA disclosure, defendants must "establish that the

confidentiality of the document has been maintained."[84]  In response, ICE counsel

and FOIA officers, working through the agency's program offices, obtained from

---

[82]　　*Id.*

[83]　　*See id.* (discussing *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999)).

[84]　　*NDLON*, 2011 WL 2693655, at *18.

the senders and recipients of all allegedly privileged documents either verbal or written confirmation that "they had not disseminated the withheld documents to any non-Agency personnel."[85]

Given the extensive specific evidence of waiver produced by the plaintiffs, I find that the Declaration of Ryan Law, Deputy FOIA Officer at ICE, is insufficient to carry the agency's burden of proving that ICE has maintained the confidentiality of the Memorandum.  According to Law's declaration, only senders and recipients who were named on the face of a withheld document were asked whether they had disseminated it outside of DHS and its component agencies.[86] That is to say, only the nominal author of the memo (ICE's Deputy Principal Legal Advisor) and its recipient (Beth Gibson) were asked about its confidentiality. According to emails that I reviewed in camera, at least ten other ICE employees, in addition to the two named on the face of the memo, received the final version of the Memorandum.  These individuals were not queried about whether they kept the document confidential.  Nor were any individuals who received hard copies of the

---

[85]     Declaration of Ryan Law, Ex. D to Declaration of Christopher Connolly, Defendants' Counsel, in Support of Defendant United States Immigration and Customs Enforcement's Renewed Motion for Summary Judgment On Its Withholdings Pursuant to Exemption (b)(5) and the Attorney-Client Privilege, ¶ 9.

[86]     *See id.* ¶¶ 5-7.

document asked about waiver.

Furthermore, Gibson and the Deputy Principal Legal Advisor were only asked whether they had circulated the document to any non-DHS personnel. This question fails to reflect the appropriate legal standard for attorney-client privilege, which extends only to "agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication."[87]  If any one of the dozen individuals who received the document by email sent it – or the legal analysis contained in it – to an agent or employee who was not authorized to speak on behalf of ICE about the mandatory nature of Secure Communities, the document lost its privileged status.  Defendants had the burden of showing that no such disclosure happened and this Court has given them ample opportunity to make such a showing.

The defendants' effort to verify confidentiality could have and should have been significantly more robust.  Given the extensive and specific evidence produced by plaintiffs showing that the factual information, legal analysis, and legal conclusions in the Memorandum have been disclosed to the public, I find that ICE has failed to meet its burden of proving that confidentiality was maintained.

---

[87]     *Mead Data Central, Inc. v. United States Dept. of Air Force*, 566 F.2d 242, 253 n.24. (D.C. Cir. 1977).

## C.    Adoption of the Memo as Agency Working Law

Plaintiffs have produced significant evidence suggesting that ICE adopted the logic and conclusion of the October 2 Memorandum and used the document in its dealings with the public.  Because the defendants have produced no evidence rebutting the claim of adoption – indeed, because the defendants have failed to even dispute plaintiffs' claim that adoption took place – I find that there is no dispute of material fact on this issue.

On the issue of adoption, as on the issue of waiver, the plaintiffs and defendants disagree about which party bears the burden of proof.  Defendants incorrectly seek to apply the same minimal "logical connection" standard, gleaned from the *Glomar* context, that they sought to apply to waiver.[88]  The defendants also cite to two cases in which the District Court for the District of Columbia refused to place a burden of persuasion on the government to show that withheld documents had never been adopted.[89]  Plaintiffs, in turn, point to a collection of cases placing the burden on the government.[90]

---

[88]     Def. Mem. at 7.

[89]     *Electronic Privacy Info. Ctr. v. Department of Justice*, 584 F. Supp. 2d 65, 78 (D.D.C. 2008) and *Trans Union LLC v. Federal Trade Comm'n*, 141 F. Supp. 2d 62, 70 (D.D.C. 2001).

[90]     Pl. Mem. at 18 (citing, inter alia, *Afshar*, 702 F.2d at 1143; *Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F.2d 254, 258 (D.C. Cir. 1982); *Lee*

The holdings of these cases can be reconciled.  In both *Electronic Privacy Information Center* and *Trans Union LLC*, the cases that the government cites, the courts found that there was "no evidence" suggesting adoption of the withheld documents and reasonably refused to require the government to prove a negative in the absence of such evidence.[91]  In the cases that plaintiffs cite, however, the requesters did present evidence that such adoption may have occurred and the ultimate burden of persuasion was placed on the government.[92] As in the context of waiver, the burden-shifting formula that courts have relied upon (with different degrees of clarity) is a reasonable approach.  It places the ultimate burden on the agency to prove exemption, as clearly required by the text of FOIA, but requires that if plaintiffs are to defeat the agency's initial assertion of exemption, they must show *some* evidence of agency adoption.

In this case, plaintiffs have presented the following evidence that ICE adopted the October 2 Memorandum:  On September 9, 2010, ICE Assistant

---

*v. Federal Deposit Ins. Corp.*, 923 F. Supp. 451, 456 (S.D.N.Y. 1996)).

[91]    *Electronic Privacy Info. Ctr.*, 584 F. Supp. 2d at 78; *Trans Union LLC*, 141 F. Supp. 2d at 71.

[92]    *See, e.g.*, *Afshar*, 702 F.2d at 1143 (explaining that "since this record raises a genuine issue of fact as to whether the portions of the memoranda withheld . . . were expressly adopted by the agency," the government could not prevail on summary judgment without showing that the documents were not so adopted).

Deputy Director Beth Gibson sent an email to Peter Vincent (ICE's Principal Legal Advisor) and assigned him the task of "gathering the legal support for the 'mandatory' nature of [Secure Communities] participation in 2013."[93]  By that time, as I held in my July 11 Opinion and Order,  it had been approximately six months since ICE had decided that Secure Communities would become mandatory.[94]  Vincent's task, therefore, was to lay out the legal justification for the agency's policy choice.  Simultaneously, John Morton, the head of ICE, asked Vincent to compile "a binder of the legal underpinnings" for the mandatory policy.[95]  In late September, Gibson directed the legal staff to "rewrite" an early version of the memo "to argue for the 'mandatory' participation in 2013."[96]  She was given a new version of the memo to review on October 4, at which time the author of the memo was changed from an Associate Legal Advisor to the Deputy Principal Legal Advisor and the recipient of the memo was changed from Vincent (the Principal Legal Advisor) to Gibson (the Assistant Deputy Director).[97] By October, 8 the Memorandum had been reviewed very favorably by DHS Principal

---

[93]    9/9/10 Email, Ex. J to Lin Decl.

[94]    *NDLON*, 2011 WL 2693655, at *9.

[95]    9/29/10 Email, Ex. M to Lin Decl.

[96]    9/29/10 Email, Ex. N to Lin Decl.

[97]    10/4/10 Email, Ex. T to Lin Decl.

Deputy General Counsel David Martin.[98]

On October 6, DHS Secretary Napolitano made the first unequivocal public statement confirming the mandatory nature of Secure Communities.[99] Beginning at that time and continuing though 2011,  ICE officials have repeatedly explained to members of Congress, local law enforcement agencies, and the public, that participation in the program is mandatory and required by federal law.[100]

In *National Council of La Raza*, the Second Circuit considered whether the Department of Justice had adopted a memorandum from its Office of Legal Counsel.  The court noted that the Attorney General had made references to the legal interpretation of OLC and that his chief counsel had made public remarks summarizing the memorandum itself.  As the court explained, "the Department publicly and repeatedly depended on the Memorandum as the primary legal authority justifying and driving [its change in policy.]"[101]

There is no bright-line test to determine adoption, and "courts must examine *all* the relevant facts and circumstances in determining whether express

---

[98]     10/8/10 Email, Ex. V to Lin Decl.

[99]     Shankar Vedantam, *U.S. Deportations Reach Record High*, Washington Post, Oct. 7, 2010.

[100]     *See* Pl. Mem. at 8-9 and the evidence cited therein.

[101]     *La Raza*, 411 F.3d at 358.

adoption or incorporation by reference has occurred."[102]   In this case, the evidence is unambiguous that ICE adopted the conclusions of the October 2 Memorandum – that there is sufficient legal support to make Secure Communities mandatory in 2013.   However, in *La Raza*, the court cautioned that "[m]ere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."[103]

> There is significant direct evidence that the agency adopted the analysis of the October 2 Memorandum:  on September 29, the Assistant Deputy Director instructed her legal department to make specific arguments in the Memorandum and on October 8, ICE's Principal Legal Advisor called the Memorandum "excellent" (praise that almost surely refers to the memo's legal analysis, not just its conclusions) and relayed praise for the Memorandum from the

---

[102]      *Id.* at 357.

[103]      *Id.* at 358 (citing *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 US 168 (1975)). *Accord Wood v. Federal Bureau of Investigation*, 432 F.3d 78, 84 (2d Cir. 2005) ("There is no evidence in the record from which it could be inferred that the DOJ adopted the *reasoning* of the Memo, and . . . this failure is fatal.") (emphasis added); *Access Reports v. Department of Justice*, 926 F.2d 1192, 1197 (D.C. Cir. 1991) (explaining that reference to a report's conclusion does not equal adoption of its analysis).

Principal Deputy General Counsel of the Department of Homeland Security.[104]  In addition, as I detailed in my analysis of waiver above, the agency has repeatedly reiterated the arguments of the October 2 Memorandum in other documents and in discussions with the public.[105]  This is not an instance "like *Grumman*, where an agency, having reviewed a subordinate's non-binding recommendation, makes a 'yes or no' determination without providing any reasoning at all . . . ."[106]  Rather, it is an instance where the agency has continually relied upon and repeated in public the arguments made in the Memorandum.

As persuasive as the direct evidence is the circumstantial evidence:  in September 2010, high-level ICE officials sought to gather into one memorandum the legal support for a policy that they had decided to implement in March 2010; that Memorandum was produced and revised according to the officials' specifications; four days after the Memorandum was complete, for the first time ever, Secretary Napolitano articulated the conclusions of the Memorandum – that Secure Communities would be mandatory – and her agency began reiterating her message and asserting its legal legitimacy.  Defendants affirm that the October 2

---

[104]   9/29/10 Email, Ex. N to Lin Decl.

[105]   *See supra* notes 74 to 83 and accompanying text.

[106]   *La Raza*, 411 F.3d at 359.

Memorandum was the final version of the document, despite its "draft" status.[107]

And unless the defendants have unlawfully withheld other legal memoranda from

plaintiffs and this Court, it was the *only* document comprehensively laying out the

legal authority for making Secure Communities mandatory. Thus, the analysis in

the Memorandum seems to be the only rationale that the agency could have relied

upon and adopted as the legal basis for the policy.

In the face of this significant evidence, defendants fail to even *assert*

that the October 2 Memorandum was not adopted by the agency. Instead, they

argue simply that plaintiffs have failed to meet their burden of proving adoption.

Defendants have offered no testimonial or documentary evidence showing that the

Memorandum's arguments were not adopted by the agency.

As the Second Circuit has explained, an agency's view "that it may

adopt a legal position while shielding from public view the analysis that yielded

that position is offensive to FOIA."[108] In this case, defendants have been given

ample opportunity to submit evidence showing that the October 2 Memorandum is

exempt from disclosure. In the face of plaintiffs' specific evidence of waiver, the

declaration of Ryan Law is insufficient to show that the agency maintained

---

[107]     *NDLON*, 2011 WL 2693655, at *18; 4/20/11 Email, Ex. S to Lin. Decl.

[108]     *La Raza*, 411 F.3d at 360.

34

confidentiality of the Memorandum.  And in the face of significant direct and

circumstantial evidence suggesting that ICE adopted the Memorandum as its

policy, the defendants have chosen to submit no affidavits or documentary

evidence showing otherwise.  In order to withhold the Memorandum from

disclosure, the defendants must meet their burden of persuasion on both issues.

They have done neither.

### D.    Early Drafts of the Memorandum

Defendants have produced eighteen versions of the October 2

Memorandum.  The early versions of the Memorandum contained the same legal

conclusion as that in the 'Opt-Out' Background document that ICE produced in

unredacted form (that is, that ICE's "position that participation in the 'Secure

Communities initiative' is voluntary is supported by applicable case law.").[109]

Later versions of the Memorandum accord with the instruction of Assistant Deputy

Director Beth Gibson to the legal staff to "rewrite" the document "to argue for the

'mandatory' participation in 2013."[110]  The early versions of the Memorandum

were clearly *not* adopted by the agency as working law; their arguments and

conclusions were revised precisely because they did not comply with the policy

---

[109]    ICE FOIA 10-1674.0002927.

[110]    9/29/10 Email, Ex. N to Lin Decl.

35

determination made by the agency.  Much of the material in the early drafts of the Memorandum replicates material in the final version of the document; some of the material was eliminated from the final version and does not appear to replicate material that is publicly available.

Defendants are ordered to release the final version of the October 2 Memorandum, redacting only the final paragraph of page 3 and its accompanying footnote, which are covered by the deliberative process privilege.  Defendants are also ordered to release all earlier drafts of the October 2 Memorandum, redacting only information that does not appear in the final version of the document, in the 'Opt-Out' Background document, or in any other publicly-available document. Defendants may also redact the names of employees other than agency heads and high-level subordinates that appear in the final Memorandum or the earlier drafts. All documents shall be released by November 1, 2011.

## V.    CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied and plaintiffs' motion for summary judgment is granted.  The Clerk of the Court is directed to close these motions [Docket Nos. 125 and 128].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 24, 2011

**- Appearances -**

**For Plaintiffs:**

Sonia Lin, Esq.
Peter L. Markowitz, Esq.
Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Ave., Rm 1154
New York, New York 10003
(212) 790-0213

Anthony J. Diana, Esq.
Lisa R. Plush, Esq.
Jeremy D. Schildcrout, Esq.
Mayer Brown LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sunita Patel, Esq.
Darius Charney, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

**For Defendants:**

Joseph N. Cordaro
Christopher Connolly
Assistant U. S. Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10004
(212) 637-2745/2761