**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL DAY LABORER ORGANIZING
NETWORK; CENTER FOR CONSTITUTIONAL
RIGHTS; and IMMIGRATION JUSTICE CLINIC OF
THE BENJAMIN N. CARDOZO SCHOOL OF LAW,

                              Plaintiffs,

    -    against -

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT AGENCY; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW;
FEDERAL BUREAU OF INVESTIGATION; and
OFFICE OF LEGAL COUNSEL,

                              Defendants.

No. 10 Civ. 3488 (SAS)
ECF Case

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ADEQUACY**
**OF SEARCH FOR OPT-OUT AND RAPID PRODUCTION LIST RECORDS**


PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761 / 2745 / 2737
Facsimile: (212) 637-2786 / 2686 2702
Email:   christopher.connolly@usdoj.gov
              joseph.cordaro@usdoj.gov
              ellen.london@usdoj.gov


CHRISTOPHER CONNOLLY
JOSEPH N. CORDARO
ELLEN LONDON
Assistant United States Attorneys
    -   Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .................................................................................................................................2

    A.    Plaintiffs' FOIA Request, the Instant Litigation, and the Opt-Out and Rapid Production List Productions ............................................................................2

    B.    ICE's Search for Responsive Records ....................................................................3

    C.    FBI's Search for Responsive Records ....................................................................7

    D.    DHS's Search for Responsive Records..................................................................10

    E.    EOIR's Search for Responsive Records ...............................................................13

    F.    OLC's Search for Responsive Records.................................................................15

ARGUMENT ....................................................................................................................................16

    A.    Summary Judgment Standards in FOIA Cases....................................................16

    B.    Adequacy of Search in FOIA Cases ....................................................................17

    C.    The Agencies Conducted Adequate Searches.......................................................19

CONCLUSION..................................................................................................................................20

## TABLE OF AUTHORITIES

*Amnesty Int'l USA v. CIA*,
   No. 07 Civ. 5435 (LAP), 2008 WL 2519908 (S.D.N.Y. Jun. 19, 2008) ........................... 16, 17

*Assassination Archives & Research Ctr. v. CIA*,
   720 F. Supp. 217 (D.D.C. 1989) ........................................................................ 17, 18

*Carney v. U.S. Dep't of Justice*,
   19 F.3d 807, 812 (2d Cir. 1994) ........................................................................ 16, 18

*Garcia v. DOJ, Office of Info. & Privacy*,
   181 F. Supp. 2d 356 (S.D.N.Y. 2002) ............................................................ 17, 18, 19

*Grand Cent. P'ship v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999) ................................................................................ *passim*

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ....................................................................................... 17

*Iturralde v. Comptroller of the Currency*,
   315 F.3d 311 (D.C. Cir. 2003) ................................................................................... 18

*Judicial Watch, Inc. v. Export-Import Bank*,
   108 F. Supp. 2d 19 (D.D.C. 2000) ....................................................................... 17, 18

*Moayedi v. U.S. Customs & Border Prot.*,
   510 F. Supp. 2d 73 (D.D.C. 2007) ............................................................................. 18

*Oglesby v. Army*,
   920 F.2d 57 (D.C. Cir. 1990) ............................................................................... 17, 18

*Perry v. Block*,
   684 F.2d 121 (D.C. Cir. 1982) ................................................................................... 18

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) .......................................................................... 17, 18

*Stone v. Def. Investigative Serv.*,
   816 F. Supp. 782 (D.D.C. 1993) ................................................................................ 18

*Triestman v. DOJ, Drug Enforcement Agency*,
   878 F. Supp. 667 (S.D.N.Y. 1995) ............................................................................ 18

*Weisberg v. DOJ*,
   745 F.2d 1476 (D.C. Cir. 1984) ................................................................................. 11

## PRELIMINARY STATEMENT

Defendants United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security ("DHS"), Federal Bureau of Investigation ("FBI"), Executive Office for Immigration Review ("EOIR"), and Office of Legal Counsel ("OLC") (collectively, "defendants" or the "agencies") respectfully submit this memorandum of law in support of their motion for partial summary judgment on the adequacy of their searches for "opt-out" records and records responsive to the "Rapid Production List" ("RPL"), two subcategories of records responsive to plaintiffs' Freedom of Information Act ("FOIA") request for information relating to the Secure Communities immigration enforcement strategy.

As set forth in the accompanying declarations, the agencies conducted detailed, multi-step searches of those record systems most likely to contain responsive records, including paper files, electronic files, shared drives and databases, and e-mail accounts. These searches were conducted between February 2010 and February 2011, and resulted in the production to plaintiffs of approximately 49,000 pages of responsive records. The searches were conducted broadly across the divisions, offices, and individual custodians identified as likely to have records responsive to the subject matter of plaintiffs' request based on their functions within the agencies and their relationship to Secure Communities. In compliance with the legal requirements, defendants' searches were reasonably calculated to discover responsive opt-out and RPL documents using all search methods available to the agencies and focusing on those record systems and areas of the agencies likely to contain responsive documents. Nothing more is required of the agencies under FOIA; they need not demonstrate that their searches were perfect, nor must they undertake searches that are unduly burdensome or beyond the boundaries of their technical capabilities.

Because the agencies adequately discharged their search obligations under FOIA, defendants' motion for partial summary judgment on the adequacy of their searches for opt-out and RPL records should be granted.

## BACKGROUND

**A.     Plaintiffs' FOIA Request, the Instant Litigation, and the Opt-Out and Rapid Production List Productions**

This case is well known to the Court, and defendants respectfully refer the Court to the record for a complete factual and procedural history.  At issue is a FOIA request dated February 3, 2010 (the "request"), which plaintiffs submitted to each of the defendant agencies, seeking "any and all Records" relating to numerous aspects of Secure Communities.  *See* Decl. of Bridget P. Kessler dated Oct. 28, 2010 [Docket # 12] ("Kessler Decl."), Ex. A (FOIA request dated Feb. 3, 2010).  Plaintiffs commenced the instant litigation on April 27, 2010.  *See* Compl. dated Apr. 27, 2010 [Docket # 1].

Plaintiffs' request potentially implicated millions of pages of responsive records.  *See* Decl. of Christopher Connolly dated Nov. 12, 2010 [Docket # 15] ("Connolly Decl."), Ex. A (Decl. of Catrina Pavlik-Keenan dated Nov. 12, 2010) ¶ 14; *id.* Ex. B (Decl. of David M. Hardy dated Nov. 12, 2010) ¶¶ 24-30; *id.* Ex. C (Decl. of David J. Palmer dated Nov. 12, 2010) ¶¶ 12, 16.  Consequently, following commencement of the instant litigation, defendants, through counsel, made numerous unsuccessful attempts to negotiate with plaintiffs to narrow the scope of the request.  *See id.* Ex. A ¶¶ 22-30; *id.* Ex. B ¶ 34; *id.* Ex. C ¶¶ 9-10; *id.* Ex. E (Decl. of Crystal Rene Souza dated Nov. 12, 2010) ¶ 9.

On June 25, 2010, plaintiffs presented defendants with a five-page "Rapid Production List" ("RPL"), which identified ten broad categories of records and fourteen discrete sets of records that plaintiffs sought on a priority basis.  *See id.* Ex. F (Rapid Production List with

appendix dated June 25, 2010).  Despite plaintiffs' unwillingness to agree to any of defendants' proposals for narrowing the scope of the request, defendants agreed to prioritize production of non-exempt materials responsive to the RPL.  *See* Kessler Decl., Ex. H (Letter from Christopher Connolly to Bridget Kessler dated July 9, 2010).  Between August 2010 and December 2010, ICE and the FBI produced a total of over 2,000 pages of records responsive to the RPL.  *See* Connolly Decl., Ex. A ¶¶ 32-35; *id.* Ex. B ¶ 31; Decl. of Catrina Pavlik-Keenan dated January 26, 2011 [Docket # 30] ¶ 34.

Among the categories of records identified by the RPL were "opt-out records," defined as "[n]ational policy memoranda, legal memoranda or communication relating to the ability of states or localities to opt-out or limit their participation in [Secure Communities]."  Kessler Decl., Ex. H at 1.  On October 28, 2010, plaintiffs moved for a preliminary injunction requiring defendants to produce opt-out records on an expedited basis.  *See* Pls.' Mot. for Prelim. Injunction dated Oct. 28, 2010 [Docket # 10] at 1-2.  In a scheduling order dated December 17, 2010, the Court ordered defendants to produce all responsive, non-exempt opt-out records to plaintiffs by January 17, 2011, and to produce all remaining records responsive to the rest of the RPL by February 25, 2011.  Order dated Dec. 17, 2010 [Docket # 25] ¶¶ 1-2.  With respect to the opt-out records, the Court imposed a search cut-off date of October 15, 2010.  *Id.* ¶ 3.

On January 17, 2011, pursuant to the Court's scheduling order, ICE, DHS, the FBI, and EOIR produced opt-out records to plaintiffs.  *See infra* Parts B, C D, E.  On February 25, 2011, ICE, DHS, and the FBI produced RPL records to plaintiffs.  *See infra* Parts B, C, D.

**B.      ICE's Search for Responsive Records**

Upon receiving Plaintiffs' initial request, the ICE FOIA Office ("ICE FOIA") identified those offices and divisions that either had direct oversight over Secure Communities or may have

3

been tangentially involved with the program as a part of general operations.  *See* Declaration of Ryan Law dated January 12, 2012 ("Law Decl.") ¶ 9.  ICE FOIA identified and tasked the following offices and divisions with searching for potentially responsive records: the Office of Enforcement and Removal Operations ("ERO"), the Office of Policy, the Office of the Principal Legal Advisor ("OPLA"), the Office of State, Local, and Tribal Coordination ("OSLTC"), the Office of Congressional Relations ("OCR"), the Office of Public Affairs ("OPA"), the Office of Homeland Security Investigations ("HSI"), the Office of the Chief Financial Officer ("CFO"), the Office of Acquisitions ("OAQ"), the Office of Professional Responsibility ("OPR"), the Office of Training and Development ("OTD"), and the Office of the Assistant Secretary ("OAS").  *Id.*

Each of these offices was instructed to identify employees who might have responsive documents and to search paper, electronic, and database files as appropriate.  *Id.* ¶ 10.  Each employee was required to fill out search tracker forms describing the actions taken.  *Id.*  Between March 2010 and September 2010, ICE FOIA received potentially responsive documents from OCR, OPA, OPLA, ERO, OAS, and OSLTC.  *Id.* ¶ 11.  The following offices indicated that they had not located any potentially responsive documents: CFO, OTD, HSI, and OPR.  *Id.*

When ICE FOIA received the RPL, its personnel (along with agency counsel) reviewed the records already submitted by the offices and divisions described above during the initial search, identifying specific documents relating to the RPL.  *Id.* ¶ 17.  In addition, ICE FOIA and agency counsel reached out to several ICE program offices that they reasonably believed were likely to have additional RPL-responsive documents.  *Id.* ¶ 18.  These program offices then conducted targeted searches for certain specific documents and categories of documents included in the RPL.  *Id.*  For example, item VI of the RPL requested records relating to three specific media

4

documents, and agency counsel contacted the two employees who had worked with these documents. *Id.* ¶ 24. These employees conducted a search of their email files based on a relevant date range, and the responsive emails that were located were produced to Plaintiffs. *Id.* Certain categories of documents were not located or were determined not to exist, such as records relating to specific presentations. *Id.* ¶ 31. As a result of the RPL searches, ICE produced documents to Plaintiffs on July 30, 2010, September 10, 2010, October 21, 2010, and December 6, 2010. *Id.* ¶ 32.

ICE commenced its search for the opt-out documents in the fall of 2010. *Id.* ¶¶ 34-35. ICE FOIA instructed OSLTC, OPA, OCR, OAS, OPLA, and ERO (including the ERO Secure Communities Program Office) to conduct targeted supplemental searches for opt-out records. *Id.* ¶ 35. ICE FOIA directed these offices to comprehensively search paper and electronic files, using eight suggested search terms. *Id.* However, ICE FOIA instructed these offices not to limit their searches to the suggested search terms and to use any search they believed likely to uncover responsive documents. *Id.*

Every staff member of the six branches of the ERO Secure Communities office was instructed to conduct a search for opt-out records. *Id.* ¶ 36. The six branches are as follows: the Business Transformation Unit ("BT"); the Information Technology Management Unit ("IT Management"); the Deployment Unit ("NDU"); the Enforcement Portfolio Unit ("EPU"); the Strategy and Operational Analysis Unit ("SOA"); and the Communications & Outreach Staff ("C&O"). *Id.* In addition, front office staff – including the Assistant Director – and mission support personnel conducted searches following the same protocols. *Id.* Each of these ERO Secure Communities Program Office staff members searched their network drives, hard drives, and email files. *Id.* ¶ 44.

5

ICE ERO also encompasses 24 field offices, and the Field Coordinators at each of these offices searched their network drives, hard drives, and email files in accordance with the same instructions provided by ICE FOIA as described above. *Id.* ¶ 44. The 24 ERO Field Office Directors did the same. *Id.* ¶ 45. In addition, the Field Office Directors were asked to instruct those employees in their office who would most likely have information responsive to the opt-out issue to search their paper and electronic files as well. *Id.* ¶ 46.

OPLA Homeland Security Investigations Law Division ("HSILD"), a component within OPLA, was searched because it provides ICE's operational side legal support pertaining to enforcement operations. *Id.* ¶ 48. OPLA HSILD employees searched network drives, hard drives and email files using the search terms "opt-out" and "opt out." *Id.* ¶ 48. A search was also done within the OPLA Enforcement and Removal Operations Law Division ("EROLD"); this division advises ICE on detention and removal issues and provides support to the Secure Communities Program. *Id.* ¶ 49. Staff in the Detention and Removal Law, District Court Litigation, and Enforcement Law Sections of EROLD conducted manual searches of paper files as well as electronic searches of hard drives, network shared drives, and email files using nine different search terms. *Id.* Senior OPLA leadership also searched for documents, using the same set of search terms as the EROLD staff. *Id.* ¶ 50.

Two OSLTC staff members are in frequent contact with various NGOs, and the opt-out issue was likely to have come up during some of this communication. *Id.* ¶ 51. Accordingly, these staff members conducted searches of their hard drives, shared drives, and email files using the keywords "opt-out," "voluntary," and "mandatory." *Id.*

A search was conducted within OCR of hard drives, shared drives, and email files, using a list of eight search terms. *Id.* ¶ 52. Within OPA, a manual search was conducted of paper files,

in addition to an electronic search of hard drives, shared drives, and email files, using a list of nine search terms. *Id.* ¶ 53. At OAS, searches were conducted of the ICE director, ICE Assistant Deputy Director, the ICE Chief of Staff, the ICE Executive Associate Director for Management and Administration, and a former Special Assistant to the Director. *Id.* ¶ 54. Each of these individuals' emails sent or received between October 2008 and October 15, 2010 was searched using the search terms "opt out" and "opt-out." *Id.*

In sum, over 200 agency employees spent over 1,000 man-hours searching for records pertaining to the "opt-out" request. *Id.* ¶ 55. ICE identified over 100,000 pages of potentially responsive documents. *Id.* ¶ 57. After reviewing the records, ICE identified as responsive and produced to Plaintiffs 12,388 pages of material on December 6, 2010, and January 17, 2011. *Id.*

## C.     FBI's Search for Responsive Records

The FBI's role with regard to Secure Communities is to provide ICE with access to the FBI's Integrated Automated Fingerprint Identification System ("IAFIS"). *See* Sixth Declaration of David M. Hardy dated January 12, 2012 ("Hardy Decl.") at ¶¶ 6, 15. IAFIS is a biometric database containing fingerprints and criminal-history information that is managed by the FBI's Criminal Justice Information Services Division ("CJIS"). *Id.* ¶ 6. Information is shared between IAFIS and DHS's Automated Biometric Identification System ("IDENT") as part of what is known as "biometric interoperability." *Id.*

The Record/Information Dissemination Section ("RIDS") of the FBI's Records Management Division ("RMD") commenced its search for documents responsive to plaintiff's FOIA request electronically, using its Central Records System ("CRS"). *Id.* ¶¶ 1, 7-8. The CRS – which contains administrative, applicant, criminal, personnel, and other files compiled for the FBI's law enforcement work – contains indices organized by subject matter, including the names of

7

individuals and organizations. *Id.* ¶ 10. These indices can be searched through the Automated Case Support System ("ACS"), which provides the FBI with the ability to track investigative and administrative cases, to maintain all official text-based documents, and to search an index of approximately 111.7 million records representing names and cases considered to be relevant for future use. *Id.* ¶¶ 8, 12, 13.

On March 2, 2010, RIDS used ACS to run a search for "secure communities" in the CRS, but this search did not yield any responsive records. *Id.* ¶ 14. Because of the FBI's limited involvement in Secure Communities and because of the lack of responses to the CRS search, RIDS decided to conduct an individualized inquiry outside of the CRS system. *Id.* ¶ 15. RIDS thus prepared a search memorandum based on the request as well as its own knowledge of Secure Communities. *Id.* ¶ 16. On April 6, 2010, this search memorandum was distributed to the following FBI Headquarters ("FBIHQ") divisions and offices: Counterterrorism, Criminal Investigative, CJIS, Cyber, Inspection, Intelligence Directorate, the National Security Law Branch in the Office of the General Counsel, and the Office of Public Affairs within the FBI Director's Office. *Id.* RIDS chose these divisions and offices because it believed that they were most likely to have potentially responsive material. *Id.* The search memorandum requested that personnel from each of these offices and divisions conduct a thorough search for any potentially responsive documents for the relevant time period, including searching database systems and employee email. *Id.*

Each of the divisions and offices listed above conducted the searches as directed by the search memorandum, and all but CJIS indicated that they located no responsive materials. *Id.* ¶ 17. CJIS commenced a comprehensive review of documents relating to interoperability, which would cover the FBI's involvement with Secure Communities. *Id.* The Interoperability

Initiatives Unit ("IIU"), which is part of CJIS's Operational Programs Branch and which is responsible for the coordination and documentation of IAFIS with IDENT, searched for documents by requiring each of its 22 employees to search their paper files, email and personal drives for relevant material. *Id.* ¶ 18. In addition, CJIS searched for potentially responsive records within the Access Integrity Unit ("AIU"), which is a unit of the FBI's Office of the General Counsel that is embedded within CJIS. *Id.* CJIS's searches yielded a large volume of potentially responsive material – including two CD-Roms and three DVDs containing nine gigabytes of information – which was sent to RIDS for scoping, review, and processing. *Id.*

RIDS received the RPL while scoping this large volume of potentially responsive information. *Id.* ¶ 19. Because the FBI reasonably believed it had already identified all documents potentially responsive to the original request – of which the RPL is a subset – the FBI did not conduct a separate search. *Id.* Instead, it reviewed the potentially responsive records that it had already received for materials responsive to the RPL. *Id.* The FBI produced five RPL documents in August 2010, and 11 documents responsive to the original request in November 2010. *Id.* ¶ 20. In February 2011, the FBI released nearly all of the documents identified as responsive to Plaintiffs' request (5,398 documents consisting of over 29,000 pages), including 89 spreadsheets responsive to the RPL. *Id.*

When the Court directed the defendants to produce "opt-out" records using a search cut-off date of October 15, 2010, RIDS used the terms "opt-out" and "opt out" to conduct a search of the information previously collected. *Id.* ¶ 21. This search cut-off date was later than the date used for the initial search, so the FBI also conducted a new search for "opt-out" records created during the time period not already covered. *Id.* This search was commenced by the issuance of a search memorandum to CJIS, as well as to the Office of Public Affairs ("OPA") and Office of

Congressional Affairs ("OCA"), both of which are within the Director's Office. *Id.* ¶ 22. RIDS included CJIS due to CJIS's role with regard to IAFIS and because all previously identified responsive documents originated within CJIS. *Id.* However, to be as thorough as possible, RIDS included OPA and OCA in light of the increased public interest in the opt-out issue at the time. *Id.* OCA identified one page of responsive material, and OPA did not locate any responsive records. *Id.*

CJIS conducted its search for opt-out records in coordination with IIU, as with the original search. *Id.* ¶ 23. The IIU realized that the parties involved with Secure Communities would not necessarily use the term "opt-out"; accordingly, CJIS conducted a manual review of its records to locate potentially responsive material. *Id.* This search involved each regional point of contact within the IIU reviewing materials in his or her possession as well as on the IIU shared drive. *Id.* As a result of this search, CJIS located 2,112 pages of potentially responsive documents, and all responsive documents were produced to plaintiffs on January 17, 2011. *Id.* ¶ 24.

**D.      DHS's Search for Responsive Records**

ICE operations – including Secure Communities – are conducted under the general supervision of DHS Headquarters. *See* Declaration of David J. Palmer dated January 12, 2012 ("Palmer Decl.") at ¶ 4. After receiving Plaintiffs' FOIA request, DHS FOIA determined that the following DHS programs and offices were likely to have documents responsive to the request: the U.S. Visitor and Immigration Status Indicator Technology ("US-VISIT") Program, the Office of the General Counsel ("OGC"), and the Office for Civil Rights and Civil Liberties ("CRCL"). *Id.* ¶ 6. US-VISIT was identified in this list because it provides support to ICE in its operation of Secure Communities by managing IDENT. *Id.* ¶ 7. OGC was included given the likelihood that OGC attorneys provided advice relating to Secure Communities, and CRCL was

10

included because it was involved with civil rights issues (and possibly complaints) relating to Secure Communities. *Id.* ¶¶ 8-9. All of the DHS custodians were instructed to search their hard copy and electronic files (including active email accounts, email archives, and other electronic files). *Id.* ¶ 10.

When DHS was instructed to prioritize the opt-out and RPL searches, DHS determined that the offices and programs already identified, in addition to the Executive Secretariat (on behalf of the Office of the Secretary of DHS), would likely maintain records responsive to these particular issues. *Id.* ¶ 13. Each of these offices was instructed to begin new supplemental searches regarding the opt-out request and then run searches for documents responsive to the remainder of the RPL. *Id.* Within US-VISIT, DHS determined that the Program Integration and Mission Services division ("PIMS"), which includes the Business Policy and Planning, Identity Services and Project Management branches, would have responsive documents because they worked on issues regarding Secure Communities. *Id.* ¶ 14. Accordingly, at least one custodian from each of these branches ran searches covering the databases for his or her branch. *Id.*

Two OGC attorneys who were assigned to US-VISIT (and were thus most likely to have responsive material) were tasked with running searches, as were attorneys in the OGC's Immigration Division and within OGC leadership who would have provided general immigration-related advice or advice relating specifically to Secure Communities. *Id.* ¶ 15.

At CRCL, the searches involved the CRCL Compliance Unit (which investigates civil rights complaints) and the Program Section (which provides general civil rights advice). *Id.* ¶ 16. CRCL's Front Office also was searched, as were files maintained by the Officer for Civil Rights and Civil Liberties. *Id.* CRCL also sent a general email to all of its employees advising them of the search and requesting that any employees not already searching do so if they might have

responsive documents. *Id.* Although CRCL primarily maintains electronic records, CRCL's search also included paper files. *Id.* ¶ *17* Only the Officer for Civil Rights and Civil Liberties located potentially responsive documents. *Id.*

The Executive Secretariat searched the records maintained by the Office of the Secretary. *Id.* ¶ 18. That search covered the email and electronic and paper files of the Secretary's staff, including the Chief of Staff and Counselors to the Secretary. *Id.* The Executive Secretariat searched computer files, including email, using search terms based on the RPL. *Id.*

Rather than using uniform search terms, the various DHS custodians were given a definition of the opt-out records and the RPL. *Id.* ¶ 19. The definition for opt-out records was as follows: "[f]or purposes of this search, 'opt out' is defined as: (1) the process by which jurisdictions may (or may not) decline or limit their participation in the Secure Communities program; and (2) the technical capability of DHS or the FBI to honor requests by jurisdictions to decline or limit their participation in the program." *Id.* Although there was no set list of terms, the following search terms were recommended for use in the opt-out search: "opt-out," "mandatory," "voluntary," "participation," "opting-out," "choosing," "mandate," and "opt out." *Id.* ¶ 20. In cases such as this one, it is DHS's practice to advise custodians that they should not limit their searches to the suggested terms but should use their knowledge to conduct a search that they believe is likely to uncover any and all responsive records. *Id.*

After the opt-out searches were complete, the same offices then conducted a search based on the RPL. *Id.* ¶ 21. The same offices were tasked with the RPL searches because they had already been identified as the most likely to have documents responsive to Plaintiffs' initial request. *Id.* The RPL search was done according to the same instructions as described above for the opt-out searches. *Id.*

DHS produced all of the documents (approximately 317 pages) it located through the opt-out search on January 17, 2011.  *Id.* ¶ 22.  On February 25, 2011, DHS produced all of the records (approximately 300 pages) it located in response to the RPL.  *Id.*

### E.     EOIR's Search for Responsive Records

EOIR oversees the immigration court and appeals processes.  *See* Declaration of Crystal Rene Souza dated January 12, 2012 ("Souza Decl.") ¶ 3.  Because DHS's enforcement of the immigration laws has a direct impact on EOIR's caseload, EOIR is kept apprised of DHS enforcement initiatives such as Secure Communities.  *Id.*

The EOIR FOIA Service Center assessed plaintiffs' initial FOIA request in consultation with agency counsel and determined that, due to the nature of EOIR's relationship to Secure Communities, EOIR was only likely to have information responsive to certain parts of the request.  *Id.* ¶ 4.  However, the FOIA Service Center sent plaintiffs' entire request to the following components it deemed most likely to have potentially responsive information: the Office of the Chief Immigration Judge ("OCIJ"); the Board of Immigration Appeals ("BIA"); the Office of Legislative and Public Affairs ("OLPA"); and the Office of General Counsel ("OGC").  *Id.* ¶¶ 4-5.  The FOIA Service Center determined that EOIR's remaining components were unlikely to have responsive material because these components do not adjudicate immigration removal proceedings.  *Id.* ¶ 7.  Moreover, the FOIA Service Center did not send the request to the individual immigration courts because these courts conduct case-by-case adjudication, which was not a subject of plaintiffs' request; in any event, any information regarding Secure Communities from the individual courts would also have been in the possession of OCIJ, which did conduct searches.  *Id.*

The FOIA Service Center submitted search requests to the FOIA points of contact ("POCs") for each of the identified EOIR components. *Id.* ¶ 8. The POCs worked with component management to identify individuals to handle the subject matter of the request. *Id.* Once identified, these individuals searched paper records, emails, and their computer records on shared drives located within the various components. *Id.*

When the Court issued its order pertaining to opt-out records and the RPL, EOIR used the paper documents provided to the FOIA Service Center by the components as a part of the original search to identify an expanded list of custodians likely to possess the relevant information. *Id.* ¶ 11. These custodians were instructed to conduct new searches, using a cut-off date of October 15, 2010, for records pertaining to the opt-out issue or the RPL. *Id.* ¶ 12. The new searches covered paper files, the Case Access System for EOIR ("CASE") database, email accounts, and shared drives. *Id.* The custodians' responses were monitored by email and through the use of a spreadsheet to ensure that the searches were carried out as requested. *Id.* ¶ 14.

EOIR's second search involved searches of 52 EOIR employees' files; these employees worked in various EOIR components, and they included, among others, the former Director and the Acting Director, the General Counsel, and the Chief Immigration Judge. *Id.* ¶ 11. The electronic searches were conducted using a variety of search terms, as well as any other terms that the custodians believed to be relevant. *Id.* ¶ 13.

Once the searches were complete, any potentially responsive records were submitted to the FOIA Service Center. *Id.* ¶ 15. In some cases, no records were produced; however, in these cases, the custodians affirmed that they had conducted the requested searches. *Id.* Of the records collected, EOIR identified four documents responsive to the opt-out issue, consisting of

14

27 pages, that it produced to plaintiffs on January 17, 2011.  *Id.*  In searching for information responsive to the RPL, EOIR conducted a page-by-page review of all of the information collected but did not locate any information responsive to the RPL.  *Id.* ¶ 16.

**F.     OLC's Search for Responsive Records**

OLC's principal function is to assist the Attorney General in his role as legal advisor to the President and to Executive Branch departments and agencies.  *See* Declaration of Paul P. Colborn dated January 12, 2012 ("Colburn Decl.") ¶ 2.  OLC commenced its search in response to Plaintiff's request on or about May 7, 2010 by running approximately 17 search terms through a database containing all unclassified, final OLC advice.  *Id.* ¶ 4 and Ex. A.  On or about November 8, 2010, OLC supplemented its search by searching for documents generated between May 7, 2010 and November 8, 2010, using the same search terms as in the original search.  *Id.* No responsive documents were identified as a result of these searches.  *Id.*  During this same time period, OLC ran searches of the email accounts of employees who had left using the terms "secure communities" and "interoperability"; no responsive documents were identified.  *Id.*  Also in November 2010, OLC sought input from two long-term career OLC attorneys who have general knowledge regarding assignments at OLC.  *Id.* ¶ 5.  These two attorneys indicated that they had no familiarity with the Secure Communities program and no recollection of OLC working on immigration issues relating to the program.  *Id.*

In December 2010, OLC sent a general query to all OLC attorneys directing them to identify any hard copy or electronic document (including emails in their possession) containing the term "secure communities as well as any documents relating to information-sharing agreements between federal, state, and local governments.  *Id.* ¶ 6.  OLC personnel identified two responsive documents as a result of these searches: (1) a draft declaration by David C. Palmatier, Unit Chief

for ICE's Law Enforcement Support Center, and (2) a draft declaration by Daniel H. Ragsdale,

Deputy Assistant Secretary for Management at ICE.  *Id.*  Final versions of these two declarations

were filed on July 7, 2010 in the United States District Court for the District of Arizona as

exhibits to a Motion for Preliminary Injunction in *United States v. State of Arizona*, Case No.

2:10-CV-01413-SRB.  *Id.*  The draft declarations were provided to DHS for processing and

production to Plaintiffs.  *Id.*

## ARGUMENT

### A.  Summary Judgment Standards in FOIA Cases

Summary judgment is "the preferred procedural vehicle for resolving FOIA disputes."

*Amnesty Int'l USA v. CIA*, No. 07 Civ. 5435 (LAP), 2008 WL 2519908, at *8 (S.D.N.Y. June 19,

2008).  In considering such a motion for summary judgment, "the defending agency has the

burden of showing that its search was adequate and that any withheld documents fall within an

exemption to the FOIA."  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

"Affidavits or declarations supplying facts indicating that the agency has conducted a thorough

search and giving reasonably detailed explanations why any withheld documents fall within an

exception are sufficient to sustain the agency's burden."  *Id.* (citations omitted).  Summary

judgment may be granted solely on the basis of declarations "supplying facts indicating that the

agency has conducted a thorough search and giving reasonably detailed explanations why any

withheld documents fall within an exemption."  *Id.*; *see also Grand Cent. P'ship v. Cuomo*, 166

F.3d 473, 478 (2d Cir. 1999) (noting that district courts may grant summary judgment based on

agency affidavits that contain "reasonable specificity of detail" if there is no evidence of bad

faith) (citation omitted).  Such declarations may be made by any individual supervising an

agency's search.  *Carney*, 19 F.3d at 814 ("An affidavit from an agency employee responsible

for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search.").

B.     **Adequacy of Search in FOIA Cases**

The adequacy standard is not a difficult hurdle: an agency's search is adequate if it is reasonable, and a search is reasonable if it is "reasonably calculated to discover the requested documents." *Grand Cent. P'ship*, 166 F.3d at 489; *see also Amnesty Int'l*, 2008 WL 2519908, at *9 ("A search will be considered adequate if it was reasonably calculated to uncover all relevant documents.") (internal citation and quotation omitted).   Adequacy thus turns on "'whether the search was reasonably calculated to discover the requested documents, *not* whether it actually uncovered every document extant.'" *Grand Cent. P'ship*, 166 F.3d at 489 (quoting *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)) (emphasis added); *see also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." (emphases in original)).

The Second Circuit has stressed that "an agency's search need not be perfect." *Grand Cent. P'ship*, 166 F.3d at 489.   An "agency is not expected to take extraordinary measures to find the requested records." *Garcia v. DOJ, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002); *see also Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999) ("[A]n agency need not conduct a search that plainly is unduly burdensome.").   For instance, "'[a]gencies are not required to perform searches which are not compatible with their own document retrieval systems.'" *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (quoting *Assassination Archives & Research Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989)).   Nor must an agency search each and every one of its record systems. *Oglesby v. U.S. Dep't of*

17

*Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also, e.g., Moayedi v. U.S. Customs & Border Prot.*, 510 F. Supp. 2d 73, 79-80 (D.D.C. 2007); *Stone v. Def. Investigative Serv.*, 816 F. Supp. 782, 786 (D.D.C. 1993).  Instead, a reasonable search will include those systems of records reasonably believed likely to contain responsive documents.  *See Oglesby*, 920 F.2d at 68.  After all, "'FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters.'"  *Judicial Watch*, 108 F. Supp. 2d at 27 (quoting *Assassination Archives & Research Ctr.*, 720 F. Supp. at 219).

Once an agency submits a search declaration describing a reasonable search, the agency is entitled to a presumption of good faith, and the Court may award summary judgment on that basis.  *Carney*, 19 F.3d at 812; *see also Grand Cent. P'ship*, 166 F.3d at 489.  To describe its reasonable search, an agency declaration should explain "the search terms and the type of search performed, averring that all files likely to contain responsive materials . . . were searched," *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003), but the agency need not "set forth with meticulous documentation the details of an epic search," *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).  A FOIA plaintiff may then defeat summary judgment only upon a demonstration of bad faith.  *Grand Cent. P'ship*, 166 F.3d at 489; *see also Triestman v. DOJ, Drug Enforcement Admin.*, 878 F. Supp. 667, 672 (S.D.N.Y. 1995) ("[O]n a motion by the government for summary judgment, if the government's affidavits are adequate on their face to merit judgment in the government's favor, summary judgment should be denied . . . only if the plaintiff makes a showing of bad faith sufficient to impugn the affidavits."); *Garcia*, 181 F. Supp. 2d at 366.  A plaintiff cannot establish bad faith "'by purely speculative claims about the existence and discoverability of other documents.'"  *Grand Cent. P'ship*, 166 F.3d at 489 (quoting *SafeCard*, 926 F.2d at 1200).

**C.   The Agencies Conducted Adequate Searches**

Here, the agencies are entitled to summary judgment because, as described in detail above, they each conducted more than reasonable searches in response to the FOIA Request.  For example, ICE identified the offices and divisions that were both directly and tangentially involved with Secure Communities and tasked them with conducting searches of both paper and electronic files.  With regard to the RPL, ICE both reviewed its initial search results and directed specific offices and custodians to conduct targeted searches.  ICE also conducted a supplemental search for opt-out records that spanned numerous offices and programs within the agency.  The FBI likewise conducted an electronic search of its criminal-records database as is customary in all FBI FOIA searches, and when that search yielded no results, it implemented an individualized search strategy aimed at those custodians most likely to have responsive records.  DHS similarly conducted a systematic search based on its initial determination of the divisions and offices within the agency that were most likely to have responsive documents.  Lastly, while neither EOIR nor OCL produced large numbers of responsive documents, these agencies conducted thorough searches of appropriate custodians and record systems that were more than reasonable to respond to plaintiffs' opt-out and RPL requests.

In short, the agencies satisfied their obligations under FOIA by conducting a reasonable search for responsive records.  *Cf. Garcia*, 181 F. Supp. 2d at 368.  In the absence of any evidence of bad faith, the agencies are therefore entitled to summary judgment.  *See Grand Cent. P'ship*, 166 F.3d at 489.

19

**CONCLUSION**

For the reasons stated above, the Court should grant summary judgment to the agencies and hold that they conducted adequate searches for opt out and Rapid Production List records.

Dated:   New York, New York
         January 12, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        *Attorney for Defendant United States*
                                        *Immigration and Customs Enforcement*

                                   By:   s/ Christopher Connolly
                                        CHRISTOPHER CONNOLLY
                                        JOSEPH N. CORDARO
                                        ELLEN LONDON
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2761 / 2745 / 2737
                                        Facsimile:  (212) 637-2786 / 2686 / 2702
                                        E-mail:  christopher.connolly@usdoj.gov
                                                 joseph.cordaro@usdoj.gov
                                                 ellen.london@usdoj.gov