**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

NATIONAL DAY LABORER ORGANIZING NETWORK, et al.,

    Plaintiffs,

-v-

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,

    Defendants.

------------------------------------------------------------- x

No. 10-CV-3488 (SAS)

**DECLARATION**
**OF DAVID J. PALMER**

David J. Palmer, pursuant to 28 U.S.C. § 1746, hereby declares and states as follows:

**I.   INTRODUCTION**

1. I am the Deputy Associate General Counsel, Legal Counsel, in the Office of the General Counsel ("OGC") at the U.S. Department of Homeland Security ("DHS"). I have held this position since July 2008. My responsibilities include the oversight and coordination of responses to Freedom of Information Act ("FOIA") requests made of DHS headquarters components, and the programs they conduct, once those requests become the subject of contested litigation. I am personally familiar with DHS' procedures for responding to FOIA requests, including search procedures.

2. As the Deputy Associate General Counsel, I am personally familiar with DHS' procedures and actions taken in response to the FOIA request at issue in the above-captioned case. I was responsible for overseeing and coordinating the search conducted by DHS in response to the FOIA request at issue after the filing of the complaint in the above-captioned case, and I am personally familiar with the searches conducted by DHS in response to the FOIA request at issue.

1

3.  I present this declaration in support of DHS's motion for partial summary judgment on the adequacy of its searches for "opt-out" and "Rapid Production List" records. The statements contained in this declaration are based on my personal knowledge, my review of relevant documents kept by DHS in the ordinary course of business, and information provided to me by other DHS employees in the course of their official duties. I incorporate by reference the declarations of Donna A. Lewis of January 14, 2011, William Holzerland of March 23, 2011, and my own declaration of November 12, 2010.

## II. PLAINTIFFS' FOIA REQUEST AND THE INSTANT LITIGATION

4.  On or about February 3, 2010, DHS's Privacy and Freedom of Information Office (DHS FOIA) received the request that is the subject of the instant litigation. The general subject matter of the request is Secure Communities, which is a comprehensive plan to identify and remove criminal aliens currently in the United States. Operation of Secure Communities is primarily the responsibility of Immigration and Customs Enforcement (ICE), a DHS component and a separate defendant in this litigation. All of ICE's operations, including Secure Communities, are conducted under the general supervision of DHS Headquarters.

5.  Plaintiffs' 21 page request sought records relating to several broad categories of records: "Policies, Procedures and Objectives"; "Data and Statistical Information"; "Individual Records"; "Fiscal Impact of Secure Communities"; "Communications"; "Secure Communities Program Assessment Records"; and "Secure Communities Complaint Mechanisms and Oversight." It was further divided into over 150 subparts, and sought "any and all records" related to virtually every aspect of Secure Communities.

6.  On or about March 3, 2010, DHS FOIA forwarded Plaintiffs' request to the U.S. Visitor and Immigrant Status Indicator Technology (US-VISIT) Program, the Office of the General Counsel (OGC), and the Office for Civil Rights and Civil Liberties (CRCL), which were identified as

the programs or offices within DHS that were likely to possess documents responsive to plaintiffs' FOIA request. CRCL and OGC are headquarters components, and US-VISIT is administered by the National Protection and Programs Directorate, which is part of DHS headquarters.

7. US-VISIT was tasked with searching for records because it provides support to ICE in its operation of Secure Communities. Specifically, US-VISIT manages the Automated Biometric Information System (IDENT), which is a database that houses more than 130 million unique fingerprint records. The overwhelming majority of those fingerprints were provided by foreign nationals in connection with their travel to and from the United States, the procurement of immigration benefits, or immigration enforcement actions. Beginning in October 2008, IDENT became interoperable with the Department of Justice's criminal fingerprint database, the Integrated Automated Fingerprint Identification System (IAFIS). "Interoperability" refers to the ability of IDENT and IAFIS to share biometric and other data between the two databases in near-real time. This capability allows decision makers in the immigration management and border security community to simultaneously search both criminal and immigration records when screening an individual, including screening visa applicants, foreign nationals seeking admission at the ports of entry, border patrol apprehensions, and background checks by the Office of Personnel Management for individuals pursuing federal employment. Interoperability plays a role in Secure Communities. When a person is arrested by law enforcement officers in a jurisdiction in which Secure Communities' use of Interoperability has been activated, that person's fingerprints are automatically checked against both IAFIS and IDENT. If there is a match to a record in IDENT, the database automatically generates and transmits a response to IAFIS, which in turn sends the information to ICE's Law Enforcement Support Center (LESC). The LESC then conducts an immigration status determination.

8. OGC provides legal support to DHS and all its components. Attorneys in components such as ICE report to the General Counsel and are part of the OGC. Additionally, OGC

headquarters attorneys provide legal support to the DHS General Counsel, the DHS components, and the agency in general. OGC was tasked with conducting a search because attorneys in several OGC headquarters sections were likely to have provided legal support either to ICE or to headquarters offices, such as US-VISIT or CRCL, on issues related to Secure Communities.

9. CRCL provides advice to the Secretary of DHS and to all DHS components on the impact that the agency's programs may have on civil rights and civil liberties. CRCL was tasked with searching for documents responsive to plaintiffs' request because it was involved in civil rights issues related to Secure Communities, and because it may have received complaints from the public regarding the operation of Secure Communities. CRCL operates a compliance unit that investigates allegations that the Department's programs have violated an individual's civil rights or civil liberties. While DHS was not aware of any such complaints at the time plaintiffs made their request, if such a complaint had been made it would have been made to the CRCL.

10. All DHS custodians were instructed to search for responsive records within their hard copy files and electronic files, the latter of which would include active email accounts, email archives, and other electronic files within their possession, custody, or control. In my role as Deputy Associate General Counsel, I reviewed the custodians' responses and the searches they conducted. All documents generated as a result of the custodians' searches would be sent to me and, together with subordinate counsel and other FOIA professionals, I would review those records for responsiveness. Custodians were instructed to search paper and electronic documents and files pursuant to search procedures discussed below.

### III. DHS' SEARCH FOR RECORDS RELATED TO THE RAPID PRODUCTION LIST, INCLUDING OPT-OUT RECORDS

11. As early as June 9, 2010, DHS, through counsel, attempted to clarify and focus the scope of plaintiffs' request but the parties could not reach agreement. Despite this failure to reach an

4

agreement, the DHS programs and offices described above continued searching for potentially responsive documents.

12. On June 25, 2010, plaintiffs provided defendants with a "Rapid Production List" ("RPL") that identified the categories of records they sought on a priority basis. Among the categories on the RPL were "opt-out records," i.e. records pertaining to the issue of whether states or localities may opt out or limit their participation in Secure Communities. On July 9, 2010, defendants agreed to search for, process, and produce records responsive to the RPL.

13. In October 2010, plaintiffs informed the defendant agencies that they sought "opt-out records" as their highest priority. DHS determined that the offices identified above, specifically OGC, CRCL and US-VISIT, as well as the Executive Secretariat (on behalf of the Office of the Secretary of DHS), would likely maintain records related to the Opt-Out issue and the RPL. Each of these offices was directed to initiate a separate, supplemental search for records concerning the phrase "OPT OUT" or that may have been otherwise related to a jurisdiction's ability to opt out of the Secure Communities program, and after that search was completed was directed to conduct searches for documents responsive to the remainder of the RPL.

14. Within US-VISIT, DHS determined that the Program Integration and Mission Services division (PIMS) - the US-VISIT division responsible for planning and deploying biometric services, and including the Business Policy and Planning, Identity Services and Project Management branches – would have responsive documents. At least one custodian from each of these relevant branches searched for, and provided, records in response to this request. DHS determined that these individuals were the persons most likely within US-VISIT to possess documents responsive to the Opt Out issue and the Rapid Production List because they were working directly on issues related to Secure Communities. Further, the US-VISIT documents and information described above in paragraph 7 above are maintained in such a way that one

custodian in each branch can access, search for and produce any responsive documents maintained in those databases by his or her branch.

15.     Two OGC attorneys assigned specifically to US-VISIT were, like the US-VISIT custodians in PIMS, most likely to possess any responsive documents. This is because their specific duties were to advise US-VISIT on legal issues and to provide support on matters being handled by US-VISIT, including Secure Communities. In addition, attorneys in the OGC's Immigration Division and OGC leadership were also tasked with searching for responsive documents. These attorneys, including OGC leadership, would all be responsible for either providing general advice on immigration matters, would have reviewed the work of attorneys who were assigned to provide advice on Secure Communities, or would have provided advice specifically on Secure Communities.

16.     CRCL's search included various sections within that office including all CRCL employees in CRCL sections that deal generally with immigration issues. These are the CRCL Compliance Unit, which investigates complaints alleging civil rights violations, and the Programs Section, which provides general civil rights advice on DHS programs. The CRCL search also included the CRCL's Front Office, and files maintained by the Officer for Civil Rights and Civil Liberties, who is the appointee who leads CRCL. In addition to specifically tasking these sections, CRCL sent a general email to all its employees advising of the search and requesting that any employees outside of these sections who may have responsive documents conduct a search. Only a small number of CRCL staff worked on issues related to Secure Communities, including the Officer for Civil Rights and Civil Liberties.

17.     CRCL custodians searched their email for any records related to Secure Communities and specifically any records that discussed the Opt-Out topic. This search also

included paper files, although CRCL primarily maintains its records in electronic formats. The only positive results were produced by the Officer for Civil Rights and Civil Liberties.

18. Records maintained by the Office of the Secretary were searched through the Executive Secretariat. Included in that search would be the email, electronic, and paper files of the Secretary's staff, including the Chief of Staff, Counselors to the Secretary and other DHS leadership. All documents sent to and from the Office of the Secretary, including the Secretary herself, are maintained by the Executive Secretariat in electronic and paper format. The Executive Secretariat conducted word searches of computer files, including electronic mail, using terms based on plaintiff's RPL requests.

19. There were no uniform search terms that were used for searching electronic and paper files by every DHS custodian. Rather, the custodians were provided with a definition of opt-out records and a copy of the RPL. The definition of opt-out records was as follows, "For purposes of this search, 'opt out' is defined as: (1) the process by which jurisdictions may (or may not) decline or limit their participation in the Secure Communities program; and (2) the technical capability of DHS or the FBI to honor requests by jurisdictions to decline or limit their participation in the program."

20. Although custodians did not all use the exact same search terms, it was recommended that DHS custodians use the following search terms during the search for responsive records relating to the opt out search: "opt-out," "mandatory," "voluntary," "participation," opting-out," "choosing," "mandate," and "opt out." In matters in litigation such as the instant matter, it is DHS' practice to advise custodians that they should not limit their searches to suggested search terms, but rather that they should use their knowledge of their particular record keeping systems and practices to conduct a search that they believed was likely

to uncover any and all records that would be potentially responsive Plaintiffs' request. For example, the Officer for Civil Rights and Civil Liberties knew that all of her documents could be found by using the term "secure communities" and that this search would uncover any documents in her possession that were responsive to plaintiffs request.

21. In addition, after completing the search for Opt Out documents, the offices described in paragraphs 6-9 and 13-16 above then undertook a search for documents responsive to the Rapid Production List. This search was done in a manner that was consistent with the search instructions identified in paragraphs 11-20 above. These programs and offices were tasked with searching for Rapid Production List documents because it had already been determined that they would be the most likely to have documents responsive to the plaintiffs' request as a whole. The number of DHS headquarters offices, programs and employees involved with Secure Communities is limited, and all of those offices, programs and employees are identified in this declaration.

22. DHS produced all of the records it located in response to the opt-out search to the plaintiffs on January 17, 2011. This was approximately 317 pages of documents. DHS produced all of the records it located in response to the Rapid Production List on February 25, 2011. This was approximately 300 pages of documents.

### VI. JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this 12th day of January 2012.

_____
David J. Palmer