**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL DAY LABORER ORGANIZING
NETWORK; CENTER FOR CONSTITUTIONAL
RIGHTS; and IMMIGRATION JUSTICE CLINIC OF
THE BENJAMIN N. CARDOZO SCHOOL OF LAW,

                     Plaintiffs,

-   against -

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT AGENCY; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW;
FEDERAL BUREAU OF INVESTIGATION; and
OFFICE OF LEGAL COUNSEL,

                     Defendants.

No. 10 Civ. 3488 (SAS)
ECF Case

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON
## ADEQUACY OF SEARCH FOR OPT-OUT AND RAPID PRODUCTION LIST
## RECORDS

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761 / 2745 / 2737
Facsimile: (212) 637-2786 / 2686 / 2702
Email:   christopher.connolly@usdoj.gov
          joseph.cordaro@usdoj.gov
          ellen.london@usdoj.gov

CHRISTOPHER CONNOLLY
JOSEPH N. CORDARO
ELLEN LONDON
Assistant United States Attorneys
-   Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT .........................................................................................................................3

    A.       Summary Judgment Standards in FOIA Cases....................................................3

    B.       Adequacy of Search in FOIA Cases ...................................................................4

          1.  Standards Applied Generally ..............................................................4

          2.  Standards Applied to Searches for Electronic Records ....................7

    C.       The Agencies Conducted Adequate Searches......................................................10

          1.  ICE's Search ......................................................................................10

          2.  FBI's Search ......................................................................................14

          3.  DHS's Search ....................................................................................18

          4.  EOIR's Search ...................................................................................21

          5.  OLC's Search ....................................................................................23

CONCLUSION......................................................................................................................26

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGES**

*Adamowicz v. Internal Revenue Service,*
    402 F. App'x 648 (2d Cir. 2010) .................................................................4, 7

*Adamowicz v. Internal Revenue Service,*
    672 F. Supp. 2d 454 (S.D.N.Y. 2009).................................................................7

*America Federation of Gov't Employees, Local 812 v. Broadcast Board of Governors,*
    711 F. Supp. 2d 139 (D.D.C. 2010) ..............................................................7, 8

*Amnesty Int'l USA v. CIA,*
    No. 07 Civ. 5435 (LAP), 2008 WL 2519908 (S.D.N.Y. June 19, 2008).........................3, 9

*Anderson v. U.S. Department of State,*
    661 F. Supp. 2d 6 (D.D.C. 2009) .....................................................................9

*Assassination Archives & Research Ctr. v. CIA,*
    720 F. Supp. 217 (D.D.C. 1989) ......................................................................6

*Carney v. U.S. Department of Justice,*
    19 F.3d 807 (2d Cir. 1994).................................................................... *passim*

*Citizens for Responsibility and Ethics in Washington v. Nat'l Indian Gaming Commission,*
    467 F. Supp. 2d 40 (D.D.C. 2006).....................................................................9

*Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice,*
    535 F. Supp. 2d 157 (D.D.C. 2008) ...................................................................9

*Defenders of Wildlife v. United States Department of Interior,*
    314 F. Supp. 2d 1 (D.D.C. 2002) .....................................................................7

*Families for Freedom v. U.S. Customs and Border Protection,*
    No. 10 Civ. 2705(SAS), 2011 WL 6780905 (S.D.N.Y. Dec. 27, 2011)............................4

*Ford Motor Co. v. U.S. Customs and Border Protection,*
    No. 06-13346, 2008 WL 4899401 (E.D. Mich. Nov. 12, 2008).....................................10

*Fox News Network v. U.S. Department of the Treasury,*
    678 F. Supp. 2d 162 (S.D.N.Y. 2009)................................................................9

*Garcia v. DOJ, Office of Information & Privacy*,
181 F. Supp. 2d 356 (S.D.N.Y. 2002) ........................................................................5, 25

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d at 488-89 .................................................................................... *passim*

*Habeas Corpus Resource Ctr. v. U.S. Department of Justice*,
No. C 08-2649 CW, 2008 WL 5111224 (N.D.Cal. Dec. 2, 2008)..................................10

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999).....................................................................................5

*Hasbrouck v. U.S. Customs and Border Protection, Number C 10-3793 RS*,
2012 WL 177563 (N.D. Cal. Jan. 23, 2012) ................................................................10

*Iturralde v. Comptroller of the Currency*,
315 F.3d 311 (D.C. Cir. 2003) ..................................................................................4

*Johnson v. Exec. Office for U.S. Attorneys*,
310 F.3d 771 (D.C. Cir. 2002) ..................................................................................6

*Judicial Watch, Inc. v. Export-Import Bank*,
108 F. Supp. 2d 19 (D.D.C. 2000) .............................................................................6

*Media Research Center v. U.S. Department of Justice*,
Civil Action Nos. 10-2013, 11-0426, 2011 WL 4852224 (D.D.C. Oct. 13, 2011) ............8

*Moayedi v. U.S. Customs & Border Prot.*,
510 F. Supp. 2d 73 (D.D.C. 2007) .............................................................................7

*Nation Magazine v. U.S. Customs Service*,
71 F.3d 885 (D.C. Cir. 1995) ....................................................................................7

*Nielsen v. U.S. Bureau of Land Management*,
252 F.R.D. 499 (D. Minn. 2008).................................................................................8

*Oglesby v. U.S. Department of Army*,
920 F.2d 57 (D.C. Cir. 1990) .................................................................................6, 7

*Oleskey v. DOD*,
658 F. Supp. 2d 288 (D. Mass. 2009) .......................................................................5, 6

*Perry v. Block*,
684 F.2d 121 (D.C. Cir. 1982) ..................................................................................4

*Physicians for Human Rights v. DOD*,
   675 F. Supp. 2d 149 (D.D.C. 2009) ...................................................................8

*Safecard Services, Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ...................................................................5, 6

*Stone v. Defense Investigative Serv.*,
   816 F. Supp. 782 (D.D.C. 1993) .....................................................................7

*Tarzia v. Clinton*,
   No. 10 Civ. 5654 (FM), 2012 WL 335668 (S.D.N.Y. Jan. 30, 2012) ................9

*Triestman v. DOJ, Drug Enforcement Admin.*,
   878 F. Supp. 667 (S.D.N.Y. 1995) ...................................................................5

*Vest v. Department of the Air Force*,
   793 F. Supp. 2d 103 (D.D.C. 2011) ..................................................................9

*Weisberg v. DOJ*,
   745 F.2d 1476 (D.C. Cir. 1984) .......................................................................6

## PRELIMINARY STATEMENT

Defendants United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security ("DHS"), Federal Bureau of Investigation ("FBI"), Executive Office for Immigration Review ("EOIR"), and Office of Legal Counsel ("OLC") (collectively, "defendants" or the "agencies") respectfully submit this memorandum of law in support of their renewed motion for partial summary judgment on the adequacy of their searches for "opt-out" records and records responsive to the "Rapid Production List" ("RPL"), two subcategories of records responsive to plaintiffs' Freedom of Information Act ("FOIA") request for information relating to the Secure Communities immigration enforcement strategy.

As set forth in the accompanying declarations, the defendant agencies conducted detailed, multi-step searches of their record systems most likely to contain responsive records. These searches were conducted between February 2010 and February 2011, and involved hundreds of employees conducting searches for thousands of hours. The searches were conducted broadly across the divisions, offices, and individual custodians identified as likely to have records responsive to the subject matter of plaintiffs' request based on their functions within the agencies and their relationship to Secure Communities. The searches involved both manual and automated searches of paper records, electronic records, and e-mails. The searches resulted in the production to plaintiffs of approximately 49,000 pages of responsive records.

Defendants have conducted searches on a massive scale in this case, and they have described these searches in detail in the accompanying declarations. Indeed, defendants' declarations provide far more detail than is required under FOIA. Because the agencies more than adequately discharged their search obligations under FOIA, and because plaintiffs cannot

show that defendants acted in bad faith, defendants' motion for partial summary judgment on the adequacy of their searches for opt-out and RPL records should be granted.

## BACKGROUND

This case is well known to the Court, and defendants respectfully refer the Court to the record for a complete factual and procedural history. At issue is a FOIA request dated February 3, 2010 (the "request"), which plaintiffs submitted to each of the defendant agencies, seeking "any and all Records" relating to numerous aspects of Secure Communities. *See* Decl. of Bridget P. Kessler dated Oct. 28, 2010 [Docket # 12] ("Kessler Decl."), Ex. A (FOIA request dated Feb. 3, 2010). Plaintiffs commenced the instant litigation on April 27, 2010. *See* Compl. dated Apr. 27, 2010 [Docket # 1].

Plaintiffs' request potentially implicated millions of pages of responsive records. *See* Decl. of Christopher Connolly dated Nov. 12, 2010 [Docket # 15] ("Connolly Decl."), Ex. A (Decl. of Catrina Pavlik-Keenan dated Nov. 12, 2010) ¶ 14; *id.* Ex. B (Decl. of David M. Hardy dated Nov. 12, 2010) ¶¶ 24-30; *id.* Ex. C (Decl. of David J. Palmer dated Nov. 12, 2010) ¶¶ 12, 16. Consequently, following commencement of the instant litigation, defendants, through counsel, made numerous unsuccessful attempts to negotiate with plaintiffs to narrow the scope of the request. *See id.* Ex. A ¶¶ 22-30; *id.* Ex. B ¶ 34; *id.* Ex. C ¶¶ 9-10; *id.* Ex. E (Decl. of Crystal Rene Souza dated Nov. 12, 2010) ¶ 9.

On June 25, 2010, plaintiffs presented defendants with a five-page "Rapid Production List" ("RPL"), which identified ten categories of records and fourteen discrete sets of records that plaintiffs sought on a priority basis. *See id.* Ex. F (Rapid Production List with appendix dated June 25, 2010). Despite plaintiffs' unwillingness to agree to any of defendants' proposals for narrowing the scope of the request, defendants agreed to prioritize production of non-exempt

materials responsive to the RPL.  *See* Kessler Decl., Ex. H (Letter from Christopher Connolly to Bridget Kessler dated July 9, 2010).  Between August 2010 and December 2010, ICE and the FBI produced a total of over 2,000 pages of records responsive to the RPL.  *See* Connolly Decl., Ex. A ¶¶ 32-35; *id.* Ex. B ¶ 31; Decl. of Catrina Pavlik-Keenan dated January 26, 2011 [Docket # 30] ¶ 34.

Among the categories of records identified by the RPL were "opt-out records," defined as "[n]ational policy memoranda, legal memoranda or communication relating to the ability of states or localities to opt-out or limit their participation in [Secure Communities]."  Kessler Decl., Ex. H at 1.  On October 28, 2010, plaintiffs moved for a preliminary injunction requiring defendants to produce opt-out records on an expedited basis.  *See* Pls.' Mot. for Prelim. Injunction dated Oct. 28, 2010 [Docket # 10] at 1-2.  In a scheduling order dated December 17, 2010, the Court ordered defendants to produce all responsive, non-exempt opt-out records to plaintiffs by January 17, 2011, and to produce all non-exempt records responsive to the rest of the RPL by February 25, 2011.  Order dated Dec. 17, 2010 [Docket # 25] ¶¶ 1-2.  With respect to the opt-out records, the Court imposed a search cut-off date of October 15, 2010.  *Id.* ¶ 3.

On January 17, 2011, pursuant to the Court's scheduling order, ICE, DHS, the FBI, and EOIR produced opt-out records to plaintiffs.  On February 25, 2011, ICE, DHS, and the FBI produced RPL records to plaintiffs.

**ARGUMENT**

**A.      Summary Judgment Standards in FOIA Cases**

Summary judgment is "the preferred procedural vehicle for resolving FOIA disputes." *Amnesty Int'l USA v. CIA*, No. 07 Civ. 5435 (LAP), 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008).  In considering such a motion, "the defending agency has the burden of showing that its

search was adequate and that any withheld documents fall within an exemption to the FOIA."

*Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "Affidavits or declarations

supplying facts indicating that the agency has conducted a thorough search and giving

reasonably detailed explanations why any withheld documents fall within an exemption are

sufficient to sustain the agency's burden," and summary judgment may be granted solely on the

basis of such declarations. *Id.* (citations omitted); *see also Grand Cent. P'ship v. Cuomo*, 166

F.3d 473, 478 (2d Cir. 1999).

**B.    Adequacy of Search in FOIA Cases**

**1.    Standards Applied Generally**

The sole issue before the Court on the instant motion is whether the agencies conducted

adequate searches for the opt-out and RPL records.  It is well established that an adequate search

is one that is "reasonably calculated to discover the requested documents." *Grand Cent. P'ship*,

166 F.3d at 489; *see also Families for Freedom v. U.S. Customs and Border Protection*, --- F.

Supp. 2d ---, No. 10 Civ. 2705 (SAS), 2011 WL 6780905, at *3 (S.D.N.Y. Dec. 27, 2011)

("Under FOIA, agencies must conduct an adequate search using methods reasonably calculated

to produce documents responsive to the FOIA request." (citation and internal quotation marks

omitted)).  Once the government submits declarations describing a reasonable search,[1] there is a

presumption of good faith, and the Court may award summary judgment on that basis. *Carney*,

---

[1] To describe a reasonable search, a declaration should explain "the search terms and the type of
search performed, and aver[] that all files likely to contain responsive materials . . . were
searched," *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003)
(citation and internal quotation marks omitted), but the declaration need not "set forth with
meticulous documentation the details of an epic search," *Perry v. Block*, 684 F.2d 121, 127 (D.C.
Cir. 1982). *See also Adamowicz v. IRS*, 402 F. App'x 648, 650-51 (2d Cir. 2010) ("Insofar as
plaintiffs argue that Dichter's declaration lacked sufficient detail, the law demands only a
'relatively detailed and nonconclusory' affidavit or declaration, a standard that Dichter's
declaration easily satisfies.") (quoting *Grand Cent. P'ship*, 166 F.3d at 488-89).

19 F.3d at 812; *see also Grand Cent. P'ship*, 166 F.3d at 489. Such declarations may be made by the individuals supervising each agency's search. *Carney*, 19 F.3d at 814 ("An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search."). A FOIA plaintiff may then defeat summary judgment only upon a demonstration of bad faith. *Grand Cent. P'ship*, 166 F.3d at 489; *see also Triestman v. DOJ, Drug Enforcement Admin.*, 878 F. Supp. 667, 672 (S.D.N.Y. 1995) ("[O]n a motion by the government for summary judgment, if the government's affidavits are adequate on their face to merit judgment in the government's favor, summary judgment should be denied . . . only if the plaintiff makes a showing of bad faith sufficient to impugn the affidavits." (citing *Carney*, 19 F.3d at 813)). A FOIA plaintiff cannot establish bad faith "by purely speculative claims about the existence and discoverability of other documents.'" *Grand Cent. P'ship*, 166 F.3d at 489 (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

This test reflects the balance struck in FOIA cases between providing information and not unduly burdening the government. *See Oleskey v. DOD*, 658 F. Supp. 2d 288, 298 (D. Mass. 2009) ("What FOIA was intended to provide was an increased openness between the government and its citizens by requiring the production of requested non-exempt records located by a good faith search conducted by the agency that possesses them."). Because the standard is one of reasonableness, "an agency's search need not be perfect." *Grand Cent. P'ship*, 166 F.3d at 489. An "agency is not expected to take extraordinary measures to find the requested records." *Garcia v. DOJ, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002); *see also Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999) ("[A]n agency need not conduct a search that plainly is unduly burdensome."). As one court put it:

> FOIA was not intended as an invitation to a snipe hunt. A FOIA search need not proceed with the avidity of a miller's quest for grist; it need only be properly motivated, sufficiently energetic, and reasonably designed to uncover the information requested.

*Oleskey*, 658 F. Supp. 2d at 296. After all, "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters.'" *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (*Assassination Archives & Research Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989)). Thus, in considering whether a search was adequate, courts must limit their review to the search itself, as opposed to the results of the search. Adequacy turns on "whether the search was reasonably calculated to discover the requested documents, *not* whether it actually uncovered every document extant.'" *Grand Cent. P'ship*, 166 F.3d at 489 (quoting *SafeCard Servs.*, 926 F.2d at 1201) (emphasis added); *see also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." (emphases in original)). What constitutes a reasonable search is, to some extent, left to the agency's discretion. The D.C. Circuit has explained, "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

The standard of reasonableness applies to each subsidiary decision that is made as a part of the search. Accordingly, "agencies are not required to perform searches which are not compatible with their own document retrieval systems.'" *Judicial Watch*, 108 F. Supp. 2d at 27 (quoting *Assassination Archives & Research Ctr.*, 720 F. Supp. at 219). Nor must an agency search each and every one of its record systems. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68

(D.C. Cir. 1990); *see also, e.g., Moayedi v. U.S. Customs & Border Prot.*, 510 F. Supp. 2d 73, 79-80 (D.D.C. 2007); *Stone v. Def. Investigative Serv.*, 816 F. Supp. 782, 786 (D.D.C. 1993). Instead, a reasonable search should include a records system likely to contain responsive documents. *See Oglesby*, 920 F.2d at 68. Analogously, an agency need only search the files of offices that are likely to possess responsive documents and, within the relevant sections of the agency, need only search the files of individual employees who are likely to possess responsive documents. *See, e.g., Defenders of Wildlife v. United States Dep't of Interior*, 314 F. Supp. 2d 1, 10-14 (D.D.C. 2002); *Adamowicz*, 402 Fed. App'x at 651 (finding that a search of the files of one employee was sufficient where that was the only employee assigned to the particular issue). Finally, individuals are permitted reasonably to exercise their discretion in making decisions about how best to locate records within their own files. *See Am. Fed'n of Gov't Employees, Local 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 151 n.11 (D.D.C. 2010).

### 2. Standards Applied to Searches for Electronic Records

As technology has progressed, FOIA requests have necessarily implicated electronic records. Nonetheless, courts have applied identical adequacy standards to electronic searches. *See, e.g., Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 889-92 (D.C. Cir. 1995) (discussing the adequacy of the search of both electronic records systems and physical files). For example, in 2010, the Second Circuit affirmed the grant of summary judgment in favor of the government for an electronic and hard copy search under the standards provided by *Carney* and *Grand Central Partnership*. *Adamowicz*, 402 Fed. App'x at 650-51.[2]

---

[2] The district court opinion makes it clear that the government conducted both electronic and physical searches in that case. *See Adamowicz v. Internal Revenue Service*, 672 F. Supp. 454, 465 (S.D.N.Y. 2009) (─After Dichter sent her the December 16 FOIA request, Leboff searched all of her electronic and paper files relating to the Estate.").

Courts have also applied the reasonableness standard with respect to the use of search terms to locate electronic records. Agency discretion necessarily extends to decisions as to which search terms to employ, as the agency and its employees, rather than the requesting party, would have the requisite knowledge of what search terms would most likely uncover responsive documents. *See Physicians for Human Rights v. DOD*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("Additionally, as evidenced in their affidavits, Defendants properly exercised their discretion in crafting lists of search terms that they believed to be reasonably tailored to uncover documents responsive to the FOIA request . . . [I]n responding to a FOIA request, an agency is only held to a standard of reasonableness; as long as this standard is met, a court need not quibble over every perceived inadequacy in an agency's response, however slight."); *Am. Fed'n of Gov't Employees,* 711 F. Supp. 2d at 151 n.11 (holding that "Plaintiffs' argument that the search was inadequate because different officials used different terms when searching their own files is also unpersuasive" because "declarants play different roles within the agency" and the agency properly exercised its discretion in creating a list of search terms); *Nielsen v. U.S. Bureau of Land Mgmt.*, 252 F.R.D. 499, 514 (D. Minn. 2008) ("Defendant has not provided this Court any authority, nor can this Court find any support for the proposition that a FOIA claimant can dictate the search terms to be used as the benchmark for determining whether an agency's search is reasonable.").

As a part of this discretion, an agency need not use the broadest possible search terms or employ any specific search methods in an electronic search, so long as the search terms or other methods used were reasonably calculated to turn up responsive documents. *See, e.g., Media Research Center v. U.S. Dep't of Justice*, Civil Action Nos. 10–2013 (ESH), 11–0426 (ESH), 2011 WL 4852224, at *5-6 (D.D.C. Oct. 13, 2011) (denying challenge to adequacy of search on

ground that certain additional search terms should have been used); *Vest v. Dep't of Air Force*, 793 F. Supp. 2d 103, 120 (D.D.C. 2011) (holding that a search for spelling variants of the names submitted in FOIA request was not required); *Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12-13 (D.D.C. 2009) (rejecting plaintiff's argument that search was inadequate where agency did not use two particular search terms); *Amnesty Int'l v. Central Intelligence Agency*, No. 07 Civ. 5435 (LAP), 2008 WL 2519908, at *14-15 (S.D.N.Y. June 19, 2008) (suggesting that use of Boolean operators is not required when other search methods employed were reasonably calculated to uncover responsive records).

Furthermore, the declarations submitted by the government need not provide the most detailed description possible of the electronic search and the use of the search terms. *See, e.g., Citizens for Responsibility and Ethics in Washington v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 50 (D.D.C. 2006) (declarations need not indicate which Boolean operators, if any, were used in the electronic search); *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 535 F. Supp. 2d 157, 162 (D.D.C. 2008) (denying challenge to adequacy based on claim that declarations did not indicate ―what specific files were searched, how many files were searched, or which specific former employee's files were searched").

In the instances where courts have found the electronic search terms used by an agency to be unreasonable, the terms have been exceedingly narrow or obviously incomplete. *See, e.g., Fox News Network v. U.S. Dep't of the Treasury*, 678 F.Supp.2d 162, 166 (S.D.N.Y. 2009) (requiring government to explain failure to use the acronym ―BONY" as a search term for documents related to the ―Bank of New York Mellon"); *Tarzia v. Clinton*, No. 10 Civ. 5654 (FM), 2012 WL 335668, at *9 (S.D.N.Y. Jan. 30, 2012) (requiring broader search after agency searched for only the exact title of a report, and finding that the broader search would not be

unduly burdensome); *Hasbrouck v. U.S. Customs and Border Protection*, No. C 10–3793 RS, 2012 WL 177563, at \*4 (N.D. Cal. Jan. 23, 2012) (requiring agency to search spelling variants of the plaintiff's name within records systems containing personal identifiers after government failed to show why this would be unduly burdensome); *Habeas Corpus Resource Ctr. v. U.S. Dept. of Justice*, No. C 08-2649 CW, 2008 WL 5111224, at \*1 (N.D. Cal. Dec. 2, 2008) (finding that declarations which specified two or three search terms were not sufficient to demonstrate adequacy); *Ford Motor Co. v. U.S. Customs and Border Protection*, No. 06-13346, 2008 WL 4899401, at \*1 (E.D. Mich. Nov. 12, 2008) (holding that it was inadequate to merely search for one string, ―Ford Motor Company," only in e-mail header fields).

## C.    The Agencies Conducted Adequate Searches

Here, the agencies are entitled to summary judgment because they each conducted more than reasonable searches in response to the FOIA request, and their declarations describe these searches in sufficient detail.

### 1.    ICE's Search

ICE's search involved over 200 agency employees who spent well over 1,000 man hours searching for opt-out records alone.  Declaration of Ryan Law dated March 2, 2012 (―Law Decl.") at ¶ 54.  ICE's broader search for documents responsive to the RPL was also thorough and as to both searches there is no basis for asserting that the agency did not act in good faith. The entire search has taken thousands of man hours and is the most expensive search ever undertaken by ICE in response to a FOIA request, costing hundreds of thousands of dollars.  *Id*. ¶ 55.

Upon receiving plaintiffs' request, the ICE FOIA Office identified all of the ICE offices and divisions that would have had some involvement with Secure Communities, including those

with only a tangential involvement. *Id.* ¶ 18. A total of 13 offices were identified: ICE Office of Enforcement and Removal Operations ("ERO"), ICE Office of Policy, ICE Office of the Principal Legal Advisor ("ICE OPLA"), ICE Office of State, Local, and Tribal Coordination ("ICE OSLTC"), ICE Office of Congressional Relations ("ICE OCR"), ICE Office of Public Affairs ("ICE OPA"), ICE Office of Homeland Security Investigations ("ICE HSI"), ICE Office of the Chief Financial Officer ("ICE CFO"), ICE Office of Acquisitions ("ICE OAQ"), ICE Office of Professional Responsibility ("ICE OPR"), ICE Office of Training and Development ("ICE OTD"), ICE Office of Assistant Secretary ("ICE OAS"), and ICE Office of the Executive Secretariat ("Exec Sec"). *Id.* As this list demonstrates, the ICE FOIA Office did not create an unduly narrow list; quite to the contrary, the list swept broadly in an effort to cover any potentially responsive materials.

ICE provided the designated FOIA point of contact ("POC") at each of these offices with a copy of plaintiffs' request and instructed them to identify the employees within their respective offices who might reasonably be expected to have responsive documents. *Id.* ¶ 19. The POCs then tasked the appropriate employees with conducting searches, which were to include paper files, email files, other electronic files, and database files as appropriate. *Id.* To ensure compliance with these instructions, each employee was required to fill out a search tracker form describing the actions taken and to return the form to the ICE FOIA Office. *Id.* As of September 2010, ICE had received potentially responsive documents from ICE OCR, ICE OPA, ICE OPLA, ICE ERO, the Secure Communities Program Office within ICE ERO, ICE OAS, and ICE OSLTC. *Id.* ¶ 24. The following offices confirmed that they had completed their searches and had not located any potentially responsive records: ICE CFO, ICE OTD, ICE HSI, and ICE OPR. *Id.*

When ICE began its search specifically for RPL documents, it first identified RPL-responsive documents collected during the initial searches described above. *Id.* ¶ 28. In addition, however, ICE conducted new searches for records responsive to the RPL. *Id.* ¶ 29. Because the RPL often sought specific records or categories of records, ICE was able to task those offices most likely to possess records responsive to specific parts of the RPL. *Id.* For example, Item I of the RPL requested certain statistical reports, and ICE directed this request to the Communications and Outreach Branch of the ICE ERO Secure Communities Program Office, which is responsible for generating and maintaining statistics on Secure Communities. *Id.* ¶ 29(a). As a result of these targeted searches, ICE produced over 2,000 pages of documents responsive to the RPL in various productions between July 2010 and February 2011. *Id.* ¶¶ 30-34.

In November 2010, the ICE FOIA Office instructed ICE OSLTC, ICE OPA, ICE OCR, ICE OAS (specifically the ICE Office of the Director within ICE OAS), ICE OPLA, and ICE ERO (including the ICE ERO Secure Communities Program Office) to conduct priority searches for opt-out records. *Id.* ¶ 36. Specifically, the ICE FOIA Office provided these offices with a copy of the RPL; instructed them to conduct a comprehensive search of paper and electronic files for potentially responsive records; and requested that they forward any potentially responsive records to the ICE FOIA Office for review and processing. *Id.* In addition, the ICE FOIA Office suggested eight broad search terms for use in conducting these searches, while also instructing the offices to use their knowledge of their own recordkeeping systems and practices and not to limit their searches to these suggested search terms. *Id.*

The ICE ERO Secure Communities program office's opt-out search involved every staff member in the program's six branches. *Id.* ¶ 37. Additionally, the office's front office

staff, including the Chief of Staff among others, also conducted searches. *Id.* The searches were run across network drives, hard drives, and Microsoft Outlook email files. *Id.* ¶ 39. The custodians were provided with a document entitled "How to Search for Opt-Out Records," which was created by the Secure Communities Chief of Staff. *Id.* This document provided the relevant date range, the eight suggested search terms, a reminder not to be limited by these search terms, a step-by-step guide to using the "Advanced Find" tool within Microsoft Outlook, and instructions on what to do with any responsive documents that were located. *Id.* Employees serving as Field Coordinators or Field Office Directors at each of the 24 ICE ERO Field Offices also conducted searches of their network drives, hard drives, and email files using these same instructions and the "How to Search for Opt-Out Records" form. *Id.* ¶ 40. These individuals at each ICE ERO Field Office were additionally instructed to ask other employees who, in their opinion, would be most likely to have information related to Secure Communities to search for responsive records. *Id.* ¶ 41. These additional employees were provided copies of the Plaintiffs' RPL, the same instructions provided by the ICE FOIA Office, and the "How to Search for Opt-Out Records" document. *Id.* Over 100 ERO employees holding various positions conducted searches using this guidance. *Id.*[3] ICE ERO front office staff searched the records of various ICE ERO executives for responsive records using the same guidance. *Id.* ¶ 42.

Several divisions of ICE OPLA also ran searches for opt-out records. *Id.* ¶¶ 43-48. OPLA Homeland Security Investigations Law Division ("HSILD") ran searches because it provides legal advice to ICE in the context of enforcement operations. *Id.* ¶ 44. OPLA HSILD ran searches of network drives, hard drives, and Microsoft Outlook email files using the broad terms "opt out" and "opt out." *Id.* Searches also were run in the OPLA Enforcement and

---

[3] In addition, Headquarters ICE ERO staff conducted searches of the archived emails of a retired ICE ERO Field Office Director using these same instructions. *Id.* ¶ 43.

Removal Operations Law Division ("EROLD"), because this division provides support to Secure Communities relating to detention and removal issues. *Id.* ¶ 45. The relevant OPLA EROLD staff conducted manual searches of paper files and electronic searches of hard drives, network shared drives, and Microsoft Outlook email files using nine broad search terms. *Id.* Two attorneys within OPLA Legislative Counsel section, including the section's chief, conducted manual searches of paper files and searched the same types of electronic records as OPLA EROLD staff using the same nine keywords. *Id.* ¶ 46. Several members of ICE OPLA's leadership team also searched the same types of electronic records using the same nine terms. *Id.* ¶ 47. All ICE OPLA employees who conducted searches were provided with a copy of the "How to Search for Opt-Out Records" document prior to their search. *Id.* ¶ 48.

Several other offices, ICE OSLTC, ICE OCR, and ICE OPA, ran searches using tailored search terms designed reasonably to capture any potentially responsive opt-out materials. *Id.* ¶¶ 49-51. Finally, within the ICE Office of the Director, the email files, including individually archived emails, of a number of individuals, including the ICE Director, were searched using the search terms and other guidance provided in the "How to Search for Opt-Out Records" document. *Id.* ¶¶ 52-53. As a result of these searches, ICE identified over 100,000 pages of potentially responsive opt-out material. *Id.* ¶ 57. After reviewing this material, ICE identified 12,388 pages of responsive records; to the extent it was non-exempt, ICE produced this material to plaintiffs in December 2010 and January 2011. *Id.*

## 2. FBI's Search

The FBI's search for records responsive to plaintiffs' FOIA request was conducted in two parts, which illustrates the thorough nature of its efforts: first, the agency ran its standard electronic search in the FBI's Central Records System ("CRS"), and then when that search did

14

not yield any responsive documents, the agency commenced an extensive manual search in those divisions and offices reasonably likely to have responsive records. Seventh Declaration of David Hardy dated March 2, 2012 ("Seventh Hardy Decl.") at ¶¶ 7, 19.

The electronic search in the CRS covered the administrative, applicant, criminal, personnel and other files compiled by the FBI for law enforcement purposes. *Id.* ¶ 8. The CRS is organized by the General Indices, which encompass all file names and cross references that are arranged in alphabetical order and searchable either electronically or manually. *Id.* ¶ 9. The General Indices ensure that the FBI can search for a particular topic, *e.g.*, "Secure Communities," to determine if there is any responsive information in the CRS. *Id.* ¶ 13. The CRS is searched by means of the Automated Case Support System ("ACS"), which encompasses the following components: (a) Investigative Case Management ("ICM"), which provides the ability to open, assign, close and track leads in investigative and administrative cases; (b) Electronic Case File ("ECF"), which is the central electronic repository for the FBI's official text-based documents; and (c) Universal Index ("UNI"), which provides a complete subject/case index to all cases and includes approximately 111.7 million records. *Id.* ¶¶ 8, 12.

In March 2010, the FBI searched the CRS using the term "Secure Communities," but this search did not yield any responsive records. *Id.* ¶ 14. The FBI then determined that it needed to conduct an individualized inquiry outside of the CRS system. *Id.* ¶ 15. Accordingly, the FBI's Record/Information Dissemination Section ("RIDS") prepared a memorandum to distribute to those divisions and offices that it determined were reasonably likely to have potentially responsive records. *Id.* ¶ 16. The memorandum was distributed to eight different divisions and offices, and directed the front office personnel at each of the eight divisions and offices to coordinate a search for any documents from the time period January 2007 through

February 3, 2010, including a review of database systems and all employee email.  *Id.*  The

memorandum indicated that the employees did not need to search the CRS because that search

had already been completed, but it specified the following exhaustive list of types of records: all

records or communications preserved in electronic or written form, including but not limited to

correspondence, documents, data, faxes, files, guidance, evaluations, instructions, analysis,

memoranda, agreements, notes, rules, technical manuals, technical specifications, training

manuals or studies; electronic records maintained on computers, and audio or video tapes; emails

(regardless of whether they were designated as a ―record" or ―non-record"); any portable media

such as CD-Roms, diskettes, etc.; and any other stand-alone database created for a particular

investigation.  *Id.*

      Only one division – the Criminal Justice Information Services Division (―CJIS") –

indicated that it had records that were potentially responsive to the request.  *Id.* ¶ 17.  The other

divisions and offices identified no responsive documents.  *Id.*  The relevant unit within CJIS was

the Interoperability Initiatives Unit (―IIU"), because this is the unit that coordinates the FBI's

involvement in Secure Communities with DHS.  *Id.* ¶ 18.  Accordingly, RIDS worked with IIU

to ensure that the search was thorough, beginning with an assessment of the ways that IIU

employees store their electronic files.  *Id.*

      Each of the 22 IIU employees was required to search his or her paper files, email, and

personal drives for files related to Secure Communities.  *Id.* ¶ 19.  Each of these individuals

conducted a manual search of their records—*i.e.*, a search involving review of every individual

document for potential responsiveness.  *Id.*  In addition, CJIS personnel conducted manual

searches of all other IIU operations folders on shared drives on both the Unclassified and Secret

Systems.  *Id.*  Finally, the Assistant General Counsel within the Access Integrity Unit (―AIU"),

which is embedded within CJIS to provide legal counsel, conducted manual searches of current and former employees' documents to locate any potentially responsive records. *Id.* ¶ 21. The IIU estimates that it spent approximately 265 hours searching for potentially responsive material. *Id.* ¶ 24.

All of these CJIS searches yielded approximately nine gigabytes of potentially responsive information. *Id.* ¶ 22. While RIDS was in the process of reviewing this information, plaintiffs submitted the RPL. *Id.* ¶ 23. Because the FBI reasonably believed that it had identified all of the documents that were potentially responsive to plaintiffs' entire FOIA request, it began reviewing the information it had gathered for materials specifically responsive to the RPL. *Id.* As a result of these searches, the FBI produced five documents responsive to the RPL in August 2010; 11 documents responsive to the original request in November 2010; and 5,398 RPL-responsive documents (consisting of over 29,000 pages) in February 2011. *Id.* ¶ 24.

Upon receiving the Court's order to produce opt-out records, RIDS conducted a [manual] search of the emails and PowerPoint documents previously collected as potentially responsive, using the terms —opt out" and —opt out." *Id.* ¶ 25. In addition, CJIS personnel manually reviewed all of the other types of records that had already been collected in an effort to locate opt-out records. *Id.* Moreover, because the FBI was required to search for opt-out records created after the cut-off date used in the initial search, the FBI commenced a new search for opt-records created between March 2, 2010, and October 15, 2010. *Id.* ¶ 26. This search began with the circulation of a search memorandum similar to the one used for the initial search, as described above. *Id.* The memorandum was sent to CJIS as well as to the Office of Public Affairs (—OPA") and the Office of Congressional Affairs (—OCA"), both within the Director's Office. *Id.* The latter two offices were included in an effort to be as thorough as possible, and in

light of the increased public interest in the opt-out issue at the time, which led the FBI to conclude that they might possess potentially responsive records. *Id.* As with the previous memorandum, the new memorandum provided an exhaustive list of records to be included in the search. *Id.* OCA identified one page of responsive information, and OPA indicated that it did not locate any responsive records. *Id.*

CJIS searched its records using the term "opt-out" on both the Unclassified and Secret systems. *Id.* ¶ 23. However, IIU recognized that the relevant individuals would not necessarily use this term, and accordingly, CJIS personnel conducted an additional manual review of its records. *Id.* This manual review was performed by the points of contact for the four geographic regions covered by IIU; these points of contact reviewed materials in their possession as well as material on the IIU shared drives, including emails. *Id.* As a result of this search, CJIS identified 2,112 pages of potentially responsive records. *Id.* ¶ 24. All responsive opt-out records were produced to plaintiffs in January 2011. *Id.*

### 3. DHS's Search

The DHS's Privacy and Freedom of Information Office ("DHS FOIA") forwarded plaintiffs' original request to three offices that were likely to possess potentially responsive documents. Declaration of David J. Palmer dated March 2, 2012 ("Palmer Decl."), at ¶ 6. These three offices were the U.S. Visitor and Immigration Status Indicator Technology ("US-VISIT") Program, the Office of the General Counsel ("OGC"), and the Office for Civil Rights and Civil Liberties ("CRCL"). US-VISIT provides support to ICE regarding the operation of Secure Communities, OGC was likely to have provided legal support regarding Secure Communities, and CRCL would have addressed any complaints made in connection with Secure Communities. *Id.* ¶¶ 7-9.

All of the relevant DHS custodians were instructed to run searches within their hard copy files as well as their electronic files, which would include active email accounts, email archives, and any other electronic files within their possession, custody, or control. *Id.* ¶ 10. As a general matter, DHS employees understand that FOIA searches encompass electronic searches of Microsoft Outlook as well as the Symantec Enterprise Vault, which is the program that DHS uses to store archived emails. *Id.* ¶¶ 11-12. Searches in both of these programs default to searching the full text of emails, which DHS employees are expected to do when conducting electronic searches. *Id.* ¶ 13.

When DHS began its search for opt-out records, it determined that these three offices (US-VISIT, OGC, and CRCL), as well as the Executive Secretariat (on behalf of the Office of the Secretary of DHS) would likely maintain potentially responsive records as to both the opt-out issue and the RPL. *Id.* ¶ 17. Accordingly, each of these offices was instructed to initiate a separate search for these records. DHS recommended that the custodians use certain broadly-phrased search terms but also advised that they should use their knowledge of their own recordkeeping practices and files to conduct a search in their discretion. *Id.* ¶ 19. All of the custodians searched their files, and their responses were tracked by an Attorney-Advisor tasked with monitoring the searches as well as reviewing the results. *Id.* ¶ 20. Moreover, the Attorney-Advisor discussed the search results with the custodians, which served as confirmation that the searches were reasonable. *Id.*

With regard to US-VISIT's search, DHS identified the division likely to have responsive documents, which was the Program Integration and Mission Services Division ("PIMS"). *Id.* ¶ 21. Six custodians were identified within PIMS to run the searches. *Id.* ¶ 22. In addition, two OGC Attorney-Advisors assigned to advise US-VISIT, as well as several other

attorneys who worked on Secure Communities issues, searched for records.  *Id.* ¶ 24.  No other OGC employees would have had responsive documents.  *Id.*  Most of the US-VISIT custodians manually reviewed their documents (including emails).  *Id.* ¶ 26.

CRCL's search consisted of searches done by the Officer for Civil Rights and Civil Liberties (the ―Officer"), who heads this office.  *Id.* ¶ 27.  As the head of the office, the Officer knew that she was the only CRCL employee who was involved with Secure Communities during the relevant time period.  *Id.* ¶ 28.  She reviewed her email files as well as her paper files for any potentially responsive documents, and confirmed that her search uncovered all of the documents in CRCL's possession that were responsive to these requests.  *Id.* ¶ 29.

The Executive Secretariat searched the records maintained by the Office of the Secretary.  *Id.* ¶ 30.  All of the officials in this office who would have had potentially responsive documents searched their paper and electronic files.  *Id.* ¶ 30.  In addition, the Executive Secretariat searched all documents sent to and from the Office of the Secretary.  *Id.*  All of these searches used a list of search terms but the custodians were advised not to limit themselves to this list.  *Id.* ¶ 32.  DHS counsel personally reviewed the results of these searches and asked each of the custodians to explain what steps they had taken.  *Id.* ¶ 33.  He confirmed that the custodians followed the instructions provided to them.  *Id.*

After completing the opt-out searches described above, the same offices and custodians began searching for RPL documents.  These custodians were tasked with the search because it had already been determined that they were the employees most likely to have documents responsive to plaintiffs' request as a whole.  *Id.* ¶¶ 33-34.  The custodians were provided with a copy of the RPL.  *Id.*  With the exception of CRCL, the searches were carried out in the exact same manner as the opt-out searches.  *Id.*  CRCL did not conduct an additional search because

its original search had uncovered all of the documents responsive to both the opt-out request and the RPL.  *Id.* ¶ 35.

As noted above, the remaining custodians' searches were conducted in the same manner as in the opt-out context, but the custodians used different search terms.  *Id.* ¶ 36.  The custodians were not given specific search terms; rather, they were asked to carefully review the RPL to determine whether they had any potentially responsive documents and to search for such documents based on their knowledge of their work and their files.  *Id.* ¶ 37.  US-VISIT custodians were able to search for certain specific categories of documents based on the RPL and without the use of search terms, such as the request for ―regularly generated statistical reports.‖  *Id.* ¶ 38.  The custodians in the Office of the Secretary were able to do the same for most documents.  *Id.* ¶ 39.

DHS produced approximately 317 pages of opt-out records to plaintiffs in January 2011, and approximately 300 pages of documents responsive to the RPL in February 2011.  *Id.* ¶ 42.

**4.  EOIR's Search**

Consistent with standard agency practice, upon receiving plaintiffs' FOIA request, EOIR identified those offices most likely to possess responsive records.  Declaration of Crystal Rene Souza dated March 2, 2012 (―Souza Decl.‖) at ¶¶ 4-6.  The EOIR FOIA Service Center then supplied those offices with a copy of plaintiffs' FOIA request and the agency's standard search memorandum, which requested a search for all potentially responsive records, including but not limited to paper records, electronic records, and e-mails.  *Id.* ¶ 7.  Relevant custodians within each of those offices were identified, and those custodians conducted searches of their paper records, electronic records including e-mail accounts, and shared drives.  *Id.* ¶ 8.  Each

office then returned to the FOIA Service Center any potentially responsive records identified by its employees.  *Id.*

With respect to the opt-out and RPL searches, EOIR began by identifying 43 custodians named on the documents that were identified as a part of the agency's original search for records responsive to plaintiffs' overall FOIA request.  *Id.* ¶ 12.  EOIR determined that, although it was unlikely to possess any opt-out records, these custodians would be most likely to have any such documents to the extent they existed.  *Id.*  In addition, to be sure that no information was missed, EOIR directed these 43 individuals to refer the search request to any additional employees whom they believed could identify potentially responsive documents.  *Id.*  Nine additional custodians ultimately provided documents to the FOIA Service Center (for a total of 52 custodians across seven agency offices who conducted searches), demonstrating that the original 43 custodians carried out the instructions in good faith.  *Id.* ¶¶ 12-13.

EOIR provided the custodians with guidance for their opt-out and RPL searches, including guidance on recommended search terms, the types of files that should be searched, and a request to maintain e-mails in .pst format.  *Id.* ¶ 14.  In addition, the custodians received the original litigation hold notice issued by EOIR in May 2010, which provided further guidance on the types of records to be searched by instructing employees to preserve information including, but not limited to, all documents, records, data, correspondence, notes, emails (on a computer or personal digital assistant), and other materials, whether official or unofficial, original or duplicates, spreadsheets, databases, calendars, voice messages, videos and/or photographs.  *Id.* ¶¶ 14, 17.  The custodians were also given a non-exclusive list of search terms (which are set forth in the accompanying declaration) and instructions to conduct full text word searches.  *Id.* ¶ 14.  The search terms that were provided were broad, including the term ―Secure

Communities," making it likely that any relevant record would be identified. *Id.* EOIR also reminded the custodians that they were not limited to the recommended search terms, but should also employ other terms if, in their judgment, doing so would assist in locating potentially responsive records. *Id.* In sum, while the custodians had discretion to run their searches as they thought most effective in light of their understanding of their own records, EOIR also made it clear that the searches needed to be thorough. Lastly, the FOIA Service Center enlisted IT personnel to search the electronic accounts of five users who were not available to conduct searches on their own, and made itself available to all custodians to answer any search questions that arose. *Id.* ¶¶ 14-16.

EOIR kept close track of the search as it progressed, monitoring responses via a spreadsheet listing the 52 custodians. *Id.* ¶ 19. Each of the custodians either provided potentially responsive information or indicated that he or she had conducted a search and had no additional information beyond that which had originally been provided. *Id.* ¶ 20. Once EOIR had received the documents from the custodians, it conducted a page-by-page review of the records. *Id.* ¶¶ 21-22. After completing its review of the material provided by the custodians, EOIR produced four responsive opt-out documents to plaintiffs, and determined that it did not possess any responsive RPL records. *Id.* ¶¶ 21-22.

### 5. OLC's Search

OLC is a small component of the Department of Justice, employing approximately twenty attorneys. Declaration of Paul Colborn dated March 2, 2012 ("Colborn Decl.") at ¶ 3. Accordingly, when OLC receives a FOIA request, it is generally a straightforward matter to determine whether anyone in the office has worked on the matter in question. *Id.* What is a reasonable search for OLC will thus be different than in the context of other agencies. Given its

relatively small size, OLC's search involved multiple steps and was exceedingly thorough. The steps taken were: (i) searching the office's central storage system containing final OLC advice; (ii) searching departed users' email files; (iii) asking two career attorneys who are familiar with OLC assignments whether, to their knowledge, OLC had done any work relating to Secure Communities; and (iv) asking the attorneys in the office to check their own files. *Id.* ¶¶ 5-9.

First, an OLC paralegal used OLC's search engine (Isys Search Software) to search the entirety of OLC's central storage system of final unclassified legal advice, using 17 search terms that were broad enough to capture any potentially responsive documents. *Id.* ¶¶ 5-6. Each of the search terms was used on its own, without any limiting connectors or date restrictions. *Id.* ¶ 6. None of these searches yielded any responsive documents. *Id.*

Second, OLC ran searches using the terms "secure communities" and "interoperability" through the email files of attorneys who were no longer with OLC at the time this search was conducted in December 2010. *Id.* ¶ 8. The former attorneys whose emails were searched held the job titles of deputy assistant attorney general, senior counsel, counsel, and attorney advisers. *Id.* The majority of these previous attorneys' email files are available on OLC's shared network drive and thus capable of being searched. *Id.* All available email files for departed attorneys employed by OLC between June 1, 2007 and October 15, 2010 were searched using these two terms. *Id.* No responsive documents were identified as a result of these email searches. *Id.*

Third, OLC queried two long-time career OLC attorneys who are generally knowledgeable about the work assignments at OLC. *Id.* ¶ 7. One of these attorneys became the Deputy Assistant Attorney General in OLC in April 2008, and in that role, participates in the meetings at which work assignments are discussed. *Id.* If OLC was working on issues relating to Secure Communities, he likely would have known about it, but instead he confirmed that he

knew of no assignments related to Secure Communities—which was consistent with the earlier electronic searches that had not uncovered any potentially responsive records. *Id.*

Finally, to ensure that nothing had been missed, OLC circulated a general inquiry to all OLC attorneys regarding the FOIA request, asking the attorneys whether they recalled working on either Secure Communities, or more broadly, on issues relating to information-sharing agreements between ICE and state and local law enforcement agencies. *Id.* ¶ 9. Two attorney-advisers responded that documents in their possession regarding litigation over Arizona's immigration statute could include records responsive to the request. *Id.* One of the attorney advisers manually searched that set of documents, identifying several versions of two declarations prepared in anticipation of litigation concerning Arizona's immigration statute. *Id.* The second attorney-adviser also searched the set of documents and located the same versions of the two declarations. *Id.* OLC confirmed that a Deputy Assistant Attorney General in the office had an identical third set of these documents. *Id.* The versions of the first declaration were referred to ICE for processing. *Id.* ¶ 10. OLC recently determined that the versions of the second declaration were inadvertently left out of its referral to ICE, but these versions were referred promptly to ICE on March 1, 2012. *Id.* ¶ 10 & n.1.[4]

\* \* \*

Based on the foregoing descriptions, the agencies satisfied their obligations under FOIA. The record demonstrates that the agencies conducted a reasonable search for responsive records, and their declarations provide sufficiently detailed descriptions of those searches. *Cf. Garcia*, 181 F. Supp. 2d at 368. Nothing more is required from the agencies to demonstrate the

---

[4] OLC thus completed its search for records responsive to the entirety of plaintiffs' FOIA request, including the opt-out and RPL records, and referred all responsive records that it identified to ICE. A ruling in OLC's favor on the instant motion therefore would constitute summary judgment on the entirety of its searches in response to plaintiffs' FOIA request.

adequacy of their searches.  In the absence of any evidence of bad faith, the agencies are entitled

to summary judgment.  *See Grand Cent. P'ship*, 166 F.3d at 489-90.

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons stated above, the Court should grant summary judgment to the agencies

and hold that they conducted adequate searches for opt out and Rapid Production List records.

Dated:   New York, New York
         March 2, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:   s/ Christopher Connolly
CHRISTOPHER CONNOLLY
JOSEPH N. CORDARO
ELLEN LONDON
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761 / 2745 / 2737
Facsimile:  (212) 637-2786 / 2686 / 2702
E-mail:  christopher.connolly@usdoj.gov
       joseph.cordaro@usdoj.gov
       ellen.london@usdoj.gov