**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

NATIONAL DAY LABORER ORGANIZING
NETWORK; CENTER FOR CONSTITUTIONAL             ECF CASE
RIGHTS; and IMMIGRATION JUSTICE
CLINIC OF THE BENJAMIN N. CARDOZO
SCHOOL OF LAW,                                 10 CV 3488 (SAS) (KNF)

                        *Plaintiffs*.

            v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW;
FEDERAL BUREAU OF INVESTIGATION;
and OFFICE OF LEGAL COUNSEL,

                        *Defendants*.

-------------------------------------------------------------X

**DECLARATION OF DANIEL L. REGARD II IN SUPPORT OF PLAINTIFFS' CROSS-
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON ADEQUACY OF SEARCH**

    I, Daniel L. Regard II, declare, pursuant to 28 U.S.C. § 1746 and subject to the penalties

of perjury, that the following is true and correct:

**I.      QUALIFICATIONS AND SUMMARY OF CONCLUSIONS**

1.      I am the co-founder and Managing Director of Intelligent Discovery Solutions, Inc.,

("IDS") an electronic discovery and enterprise security consulting firm founded in 2008.  Prior to

founding IDS, I was the Global Director of electronic discovery for LECG Corporation, an

expert services and consulting firm.  I was also the National Director of Electronic Evidence &

Consulting for FTI Consulting and a Senior Manager in Analytical Dispute Services at Deloitte

& Touche.  I have over 20 years of experience in providing litigation technology consulting services to legal and corporate entities.

2.      I have worked as a testifying expert and as a court appointed neutral on issues of electronic discovery.  I have been retained as an expert in civil cases as well as in cases under the Freedom of Information Act ("FOIA").  Attached as Exhibit A is a copy of my CV detailing my expert engagements.

3.      I have been retained by counsel for the Plaintiffs to provide an analysis of the data collection efforts undertaken by the defendant agencies ("Agencies") in the above-captioned FOIA action and to opine on whether the information provided in the declarations submitted by the Agencies  in support of their summary judgment motions (as required under FOIA) supports their conclusions that the searches conducted for electronic documents were adequate.

4.      I am providing my services pro bono.

## II.     ANALYTICAL FRAMEWORK

5.      In evaluating the search and collection efforts engaged in by the Agencies here, I took into account the process prescribed by FOIA.  My understanding of the FOIA process is based on my experience as an expert advising on FOIA matters since 2008  It is my understanding that the first step in the FOIA process is that the requestor submits a FOIA request describing the records requested to the applicable government agency or agencies.  Upon receiving such request, the government agency has the option to work with the requestor to clarify the request, particularly where the request is broad and poses significant challenges to the government agency. If the government agency does not have such discussions, the agency is free to use its own methodology to search for and collect records relevant to the request.  The agency will then review those records for responsiveness and specific FOIA exemptions, and then release any non-exempt information to the requestor.

6.      FOIA provides a right of federal court review (through the filing of a complaint in federal court).  If the requestor exercises this right, the government again has the option to negotiate with the requestor regarding the scope of the request and searches.  In FOIA litigation, the requestor may challenge the government agency's search for relevant records as inadequate.  At that point, the government agency has several options:  (a) elect to continue its efforts to locate relevant documents; (b) work with the requestor to attempt to remedy the inadequacies in the original search; or (c) resolve the disputes through a motion for summary judgment.

7.      If the government agency elects to resolve the dispute through summary judgment, the burden is on the government agency to demonstrate to the court that its search for relevant records was adequate.  To meet that burden, the government agency must submit declarations that reasonably describe the searches conducted so that the court can evaluate the adequacy of that search.  These declarations generally include a description of the agencies' information systems, the custodians/offices searched, the search terms used, and the general search process/method (i.e., search instructions, who conducted the searches, etc.).  It is my understanding that, in this case, the agencies involved have chosen option "c" (*i.e.*, to resolve disputes through summary judgment by submitting the declarations mandated by FOIA).

8.      Based on my understanding of the process described above and the apparent limitations of technology, people, process, and resources described in the declarations submitted by the Agencies in this FOIA action, it is my opinion that some cooperation between the government agencies and requestors early on in the FOIA process in this case likely would have promoted the more efficient use of government resources.  Much like the meet-and-confer process engaged in by civil litigants, such a dialogue would have allowed the requestors to clarify the scope of the request before the searches were conducted and allowed the Agencies to address search-related

challenges or burdens unique to that agency.  This is particularly true for the search and collection of electronically stored information ("ESI"), especially given the volume of ESI at issue here, the claimed limited resources of the Agencies, and the volume of FOIA requests some of the Agencies receive.

9.      In general, an assessment of whether the overall quality of the search and collection efforts for electronic data meet the applicable standard under FOIA should involve the evaluation of the three key components of the Agencies' search efforts.   Those components are:

      (a)      <u>Available Technology</u>.  Whether the technology actually employed was suitable for locating relevant records;

      (b)      <u>Available People</u>.  Whether the competence and technical proficiency of the people entrusted to develop strategies for locating relevant records based on the available technology and the people designated to employ those strategies were appropriate under the circumstances, including whether the instructions provided to the individual custodians (*i.e.*, lay people and not IT professionals or third party vendors) actually conducting the search were adequate; and

      (c)      <u>Available Process</u>.  Whether the process employed to evaluate and refine the proposed strategies for locating relevant records was sufficient to ensure that the search for and collection of relevant records was, in fact, effective.

10.     Thus, the Agencies' search methodology must be evaluated to determine whether the Agencies engaged in a thoughtful, diligent process that effectively used available technology, people and processes.  This type of evaluation is made more difficult here, where the Plaintiffs must rely almost entirely upon the mandated FOIA declarations describing the searches conducted.

11.     I have analyzed the following information in conducting my analysis: (a) declarations submitted in support of the Agencies' Renewed Motion for Partial Summary Judgment on Adequacy of Search for Opt-Out and Rapid Production List Records ("Agencies' Declarations", or "Declarations"), (b) certain of the declarations incorporated by reference into Agencies' Declarations, (c) the declaration of Ryan Law, dated January 12, 2012 (the "January Law Declaration"); (d) the declaration of Bridget Kessler in Support of Plaintiffs' Motion for a Preliminary Injunction, dated October 28, 2010; (e) Plaintiffs' original FOIA request; (f) Plaintiffs' Rapid Production List request; (g) the Court's December 17, 2010 Order regarding the production of Opt Out records; (h) the Plaintiffs' Final Production List requests; (i) publicly-available records published by certain of the Agencies; and (j) certain records produced by the Agencies to date, including certain records produced by the Agencies in response to the Plaintiffs' Opt Out, Rapid Production List, or Final Production List requests.

12.     Using the above framework to evaluate the quality of the Agencies' searches for the Opt-Out and Rapid Production List records as described in the Agencies' Declarations leads to the following conclusions:

    (a)     At various stages in processing the FOIA request, the Agencies did not meaningfully communicate with Plaintiffs about the unique challenges they confronted, which limited the parties' opportunities to develop effective and efficient solutions.

    (b)     The Agencies' reliance on individual custodians to not only identify relevant records, but also to electronically search for and collect relevant records, required a higher-level of instruction and supervision to ensure the adequacy of the search than the Agencies apparently employed.

(c)     The operating systems or software used by the Agencies on a day-to-day basis often do not allow for the use of key word searches, or otherwise limit the types of searches that can be conducted in those systems.

(d)     The Agencies' reliance on individual custodians to conduct the searches in place, *i.e.*, within the software used by the Agencies on a day-to-day basis, raises serious questions about the adequacy of the searches conducted and the adequacy of the instructions given for conducting those searches.

(e)     Where they are known, the search terms used by the Agencies often appear inadequate on their face, and there is no indication that those search terms were developed through a thoughtful process, tested or evaluated to verify that they were effective in identifying potentially relevant records.

(f)     In many instances, the Agencies' Declarations do not provide sufficient information to conclude that the Agencies' use of technology, people and process to locate relevant records was adequate to meet their obligations under FOIA.

## III.   <u>OVERVIEW OF DEFICIENCIES IN THE AGENCY DECLARATIONS</u>

13.     The Agencies' Declarations do not support their claim that the searches conducted were adequate under FOIA.  In particular:  (a) the quantity of documents produced by the Agencies in response to the Opt Out and Rapid Production List requests is relatively low in relation to what I would have expected given the size of the Agencies and the nature of the opt out issue in relation to the Secure Communities program; (b) the Agencies do not justify their claim that the information systems or technology used by the Agency or the individual custodians to conduct searches were adequate to locate relevant records; (c) the Agencies did not use IT personnel or a third party vendor with appropriate qualifications to conduct an effective electronic search;

(d) the Agencies provided insufficient instructions to the individual custodians tasked with searching for relevant records; and (e) the Agencies did not engage in any effort to test the search terms used to ensure they were effective in identifying potentially relevant records.

14.    First, it is my understanding that the FBI, DHS and ICE are significant government agencies that employ a large number of individuals.  According to the FBI website, on February 29, 2012, a total of 35,664 people worked for the FBI, including 13,778 special agents and 21,886 professional staff.  *See* Quick Facts, *available at* http://www.fbi.gov/about-us/quick-facts (last visited March 25, 2012).  According to DHS's website, DHS employs more than 240,000 employees in jobs that range from aviation and border security to emergency response, from cybersecurity analyst to chemical facility inspector.  *See* About, *available at* http://www.dhs.gov/xabout/ (last visited March 25, 2012).  And according to ICE's website, ICE now has more than 20,000 employees in offices in all 50 states and 47 foreign countries.  *See* Overview, available at http://www.ice.gov/about/overview/, last visited March 25, 2012.

15.    In addition, Secure Communities is a far-reaching program, impacting a large number of jurisdictions potentially affected by the opt out question.  DHS has expanded Secure Communities from fourteen jurisdictions in 2008 to more than 1,700 today.  DHS expects to expand this program to all law enforcement jurisdictions nationwide by 2013.  Through October 31, 2011, more than 110,000 immigrants convicted of crimes were removed from the United States after identification through Secure Communities.  *See* DHS' Progress in 2011: Smart and Effective Enforcement, available at http://www.dhs.gov/xabout/2011-dhs-accomplishments-smart-effective-enforcement.shtm, last visited March 25, 2012.

16.    Based on this information, the quantity of documents produced by the Agencies in response to the Rapid Production List and Opt Out requests is low relative to the size of the

Agencies and the number of potential custodians of relevant records.  For example, it is my understanding that: (a) the FBI produced approximately 16 records in response to the Rapid Production List, and approximately 5,400 records totaling 29,000 pages in response to the Opt Out request (*see* Seventh Declaration of David Hardy, dated March 2, 2012 ("Hardy Declaration" or "Hardy Decl.")); (b) DHS produced approximately 612 pages in total in response to the Rapid Production List and Opt Out request (*see* Declaration of David J. Palmer, dated March 2, 2012 ("Palmer Declaration" or "Palmer Decl.")); (c) ICE produced approximately 3,600 pages in response to the Rapid Production List, and approximately 12,300 pages in response to the Opt Out request (*see* Declaration of Ryan Law, dated March 2, 2012 ("Law Declaration" or "Law Decl.")); and (d) OLC produced approximately 12 documents in response to both the Rapid Production List and the Opt Out request (*see* Declaration of Paul Colborn, dated March 2, 2012 ("Colborn Declaration" or "Colborn Decl.")).

17.     Second, the Agencies fail to show that their in-place Operating Systems or software have the technical functionality necessary for individual custodians to perform the required searches, including the ability to search attachments to emails in addition to the text and body of the messages.

18.     Further, the Agencies' decision to forgo searching certain accessible data sources is not justified by their Declarations.  The Agencies do not provide any information supporting their conclusions that they did not need to search certain accessible sources because those accessible sources do not contain relevant and unique records, or why those sources would be unduly burdensome to search.

19.     Third, regardless of the functionality of the technology in place, an effective search presupposes that the individuals responsible for executing the searches either have the necessary

expertise to search and collect ESI or have been given proper instructions and know how to make use of the available technology. The Agencies in this case relied almost exclusively on individual agency custodians (and not IT professionals or third party vendors) to search for and collect ESI. Thus, the need for thoughtful instructions for the individual custodians responsible for locating relevant records, as well as some assurances that those individual custodians are appropriately implementing the instructions, is heightened.

20.     However, the instructions provided by the Agencies to the individual custodians conducting the searches were often inadequate on their face, or absent altogether.

21.     Fourth, when searching for ESI, the process by which the producing party selects, evaluates and refines search terms is critical. Yet there is little evidence in the Agencies' Declarations to indicate that the Agencies conducted adequate, if any, evaluation in developing or testing of search terms either before or after the Opt-Out and Rapid Production List searches began.

22.     In sum, based on my extensive experience with the identification and retrieval of electronic information, it is my opinion that certain aspects of the searches conducted by the Agencies were not reasonably calculated to uncover potentially unique, relevant electronic records, as required by FOIA. Set forth below in more detail are the particular deficiencies that I identified with each of the Agencies' searches, or an indication of the where the Agencies fail to support the sufficiency of their searches.

## IV.     FBI DECLARATION

23.     The Hardy Declaration submitted on behalf of Defendant FBI, fails to support the FBI's conclusion that the searches conducted were adequate.

### A.   Deficiencies in Technology: Use of Microsoft Outlook to Perform Searches

24.   Although the Hardy Declaration states that individual FBI custodians conducted the actual search and collection of relevant records within Microsoft Outlook itself, the declaration does not specify what version of Microsoft Outlook is used by the FBI.  *See, e.g.,* Hardy Decl. ¶¶ 16, 18.  And although that information is not needed when, for example, a party is collecting all email and email attachments for processing and review in a third party review tool (as is often the case in civil litigation), it is important when a party is "searching in place" within Outlook as the software's search function  varies depending on the version of Microsoft Outlook being used. Some versions, for example, do not have the functionality to search attachments using search terms.  Because the Hardy Declaration does not provide this information, the FBI does not show that the searches conducted by these individual custodians were adequate to identify relevant records.

### B.   Deficiencies in FBI's Search Process:  Insufficient Search Terms

25.   Here, according to the Hardy Declaration, the FBI used the following search terms at various points during the search process:  "Secure Communities", "opt out", and "opt-out". Hardy Decl. ¶¶ 14, 25.

26.   Using only these narrow search terms is a very limited approach to capturing relevant records.  In my experience, it is axiomatic that a party searching for relevant records will use a range of potentially synonymous search terms, drawn from the knowledge of the party, the pleadings or document requests, custodian interviews, available documents, or just plain common sense.  For example, many third party technologies allow the party to search using wildcards or "stem" search terms to account for different variations of the words.

27.     In this context, the FBI's reliance on only these three search terms—without adding at least some other variations, including alternate terms referencing the program that is the primary subject of the Plaintiffs' FOIA request, Secure Communities—was facially deficient and not reasonably calculated to uncover relevant and unique records.  Nor is there any indication that the FBI tested these limited search terms to verify their sufficiency in locating electronic records before (or even while) the searches were conducted.

28.     For example, there is no indication that the FBI undertook any analysis to determine whether there were other words that should have been included in their search, including, for example, a review of a sample set of the documents that did not contain the two search terms.

29.     Further, FBI personnel apparently recognized the deficiencies inherent in merely using the phrase "opt-out" to uncover relevant records.  Hardy Decl. ¶ 28.  As a result, four individuals within the IIU conducted an additional manual review of "records in his or her possession and on the IIU shared drives, including emails, for opt-out related documents[.]"  *Id.*

## C.     Deficiencies in Instructions:  FBI Provided Insufficient Instructions to Individual Custodians

30.     As indicated above, when using individual custodians to conduct a decentralized search for relevant records, the need for clarity regarding the objectives of the search and the strategy for meeting those objectives is paramount.  In apparent recognition of this general principle, "RIDS prepared an internal memorandum directed to the FBI divisions and office it reasonably expected to have potentially responsive records."  Hardy Decl. ¶ 16.

31.     The FBI did not attach this memorandum to the Hardy Declaration.  The search memorandum apparently provided examples of the types of records that may be relevant to Plaintiffs' requests, but "did not specify that archived records be searched."  *Id.*  Further, "[t]he search memorandum did not mandate the manner in which the search had to be conducted[.]"  *Id.*

32.     FBI apparently circulated the instructional memorandum to front office employees in eight divisions. *Id.* The instructional memorandum included no search terms. *Id.*

33.     The FBI's Criminal Justice Information Services Division ("CJIS") is the only division that responded to the instructional memorandum indicating that it might have relevant records. *Id.* ¶ 17.  According to the Hardy Declaration, "RIDS [FBI's Record/Information Dissemination Section ("RIDS")] has no record of receiving a response from the National Security Law Branch in the Office of the General Counsel or the Office of Public Affairs within the Directors Office." *Id.*

34.     In addition, because the December 17 Order required the Agencies to produce records that post-dated the cut-off date used for the FBI's initial search, RIDS circulated an additional search memorandum on December 15, 2010.  *See id.* ¶¶ 25-26.  This memorandum was not included with the Hardy Declaration.  As with the initial search memorandum, however, the second search memorandum apparently did not provide detailed instructions on how to conduct the searches for relevant records, though it purportedly "sought all opt-out related records."  *Id.* ¶ 26.

35.     In my experience, and as noted above, requiring individual custodians in multiple locations with access to different data sources to conduct searches for records, electronic or otherwise, without providing detailed instructions is a flawed process.  Individuals working in different offices are likely to possess different degrees of technical proficiency, and, further, may not have access to technology with equal functionality.  However, the limited details available, in addition to the fact that only one of eight divisions to receive the memorandum responded that it might have relevant records (while two others apparently did not respond at all), suggest that the individualized searches were far from thorough.

**D.    Deficiencies in the CJIS' Search Process:  Failure to Search Certain Data Sources**

36.    Even the limited information describing the searches conducted by the CJIS (the only FBI office that acknowledged that it had records potentially relevant to Plaintiffs' request) reveals significant deficiencies in the search process within the office.  According to the Hardy Declaration, most of the CJIS records were provided by the Interoperability Initiatives Unit ("IIU").  *Id.* ¶ 18.  But IIU elected not to search the reasonably accessible records of individual former employees, even those who had worked on Secure Communities.  *Id.* ¶ 20.

37.    According to the Hardy Declaration, it is the practice of the IIU for employees to save records on shared drives, which in the FBI's opinion obviated the need to search former employees' reasonably accessible individual records.  *Id.*  The Hardy Declaration does not, however, explain what types of records would be stored on the "shared drive" or what types of records would be stored in "individual records".  The FBI does not provide a sufficient basis, therefore, to support its conclusion that the former employees' "individual records" would be duplicative of the "shared drive" records and, therefore, did not need to be collected.  For example, if the former employees' "individual records" include email that is not stored on the "shared drive", then the FBI's search was not adequate.  There is no indication in the Hardy Declaration that the IIU undertook any evaluation to ensure that it was not prematurely eliminating a non-duplicative, reasonably accessible source of relevant and unique records.  *Id.*

38.    The Hardy Declaration states that "archived records" were not searched because information that would "typically" be archived is saved to the FBI shared drives.  *Id.* ¶¶ 16, 20.  The Hardy Declaration provides no explanation or description of the "archived records", including whether those "archived records" are stored on not reasonably accessible systems or media that cannot be searched without significant cost or burden, whether those "archived

records" may be easily searched using search terms or the like, or what the qualifier "typically" means.  The Hardy Declaration does not explain to what "archived records" refers, what type of system contains the "archived records", or when or how data is stored in "archived records". Based on other information provided in the Hardy Declaration, it appears that such records are reasonably accessible, could be easily searched by the FBI, and may contain unique, non-duplicative data.  Thus, I cannot conclude that the FBI's decision not to search these "archived records" was appropriate.

39.     Similarly, although the Hardy Declaration states that the FBI employed six individuals as "contractors" who may have been custodians with relevant data, there is no information in the declaration regarding how or where such contractors would have stored information or whether such contractors had restricted access to various FBI data sources.  Hardy Decl. ¶ 20 n. 7.  Thus, I cannot determine whether a search of the "shared drive" would have been adequate to identify relevant records for those six former employee contractors.

40.     Early in the search process, RIDS performed a search of its Central Repository System ("CRS") using only the term "Secure Communities".  Hardy Decl. ¶ 14.  This search yielded no relevant records.   Apparently without testing any other search terms, the FBI concluded that the CRS contained no relevant records and concluded that it needed to conduct an "individualized inquiry outside of the [Central Repository System] in order to determine if the FBI had any documents relevant to plaintiffs' FOIA request."  Hardy Decl. ¶ 15.

41.     That there is no indication that RIDS tested other search terms before deciding to eliminate the CRS from further searches suggests that RIDS dismissed this system as a potential source of relevant records prematurely.

**E.    Evidence of Deficient Search:  Relevant Opt Out Records Produced in Response to the Final Production List**

42.    My concerns about the use of an extremely limited set of search terms—in this instance three: "Secure Communities", "opt out", and "opt-out"—and the absence of any evidence of a thoughtful process in selecting and testing search terms is confirmed by a cursory review of the documents produced by the FBI—specifically the FBI records produced in response to the Plaintiffs' Final Production List request (which was made to Plaintiffs long after the FBI was required to comply with this Court's December 17, 2010 Order requiring production of the Opt Out and Rapid Production List records).

43.    For example, it is my understanding that in response to the Final Production List request, the FBI produced the following records: FBI-SC-FPL-182 and SC-FBI-FPL-1160.  *See* FBI-SC-FPL-182 and SC-FBI-FPL-1160, *available at* http://uncoverthetruth.org/wp-content/uploads/FBI-SC-FPL-00182.pdf and http://uncoverthetruth.org/wp-content/uploads/SC-FBI-FPL-1160.pdf, respectively (last visited March 26, 2012).  Both of these records would appear to be responsive to the Opt Out request and fall within the relevant time period for the Opt Out request (*i.e.*, records prior to October 15, 2010).  Yet it is my understanding that Plaintiffs' review of the Opt Out and Rapid Production List productions and their electronic searches conducted on those productions indicate that these records were not identified or produced in response to the Opt Out request, despite the fact that these records actually contain one of the search terms used by the FBI, Secure Communities.  This highlights the significant risks associated with taking a casual and *de minimis* approach to developing and relying upon search terms.

*        *        *

44.     Based on all of the above, I cannot conclude that the FBI's searches for records relevant to the Opt Out and Rapid Production List requests were adequate.

## V.     DHS

45.     The Declaration of David J. Palmer ("Palmer Declaration" or "Palmer Decl.") raises significant questions regarding the sufficiency of the Department of Homeland Security's ("DHS") search for Opt-Out and Rapid Production List records.

### A.     Deficiencies in Instructions: DHS Delegates Search Responsibilities to Individual Custodians

46.     According to the Palmer Declaration, DHS delegates a significant degree of search and collection responsibilities to its individual custodians, and relies heavily on the proficiency and discretion of these individual custodians when conducting searches of electronic records.  Yet, the Palmer Declaration provides limited insight into both the instructions that DHS provided to those individual custodians required to search for electronic records and the quality control measures in place to ensure that the searches were conducted in a manner designed to capture relevant records.

47.     "DHS uses Microsoft Outlook as its electronic mail system."  Palmer Decl. ¶ 11.  Further, nearly all of DHS headquarter components "use Symantec Enterprise Vault to automatically store emails after three months."  *Id.*  According to the Palmer Declaration, DHS employees understand that they must use Microsoft Outlook and Enterprise Vault when searching for records relevant to FOIA requests.  *See id.* ¶ 12.

48.     While DHS might expect its individual custodians to be proficient when searching for and collecting electronic records, this proficiency does not necessarily obviate the need for the agency to provide adequate instructions on how to conduct effective searches for relevant records using the available technology.  Apparently, virtually no such instructions were provided

to the DHS individual custodians, and DHS's "instructions" consisted of a limited list of recommended search terms and the direction as to the potential data sources that needed to be searched.  *See id.* ¶ 13.

### B.    Deficiencies in DHS's Search Process: DHS Did Not Search for Information Contained in Email Attachments

49.    As noted above, a significant limitation in performing searches in place (*i.e.*, within the software itself) to locate relevant records using certain versions of Outlook and Enterprise Vault is that they do not search attachments.  As DHS acknowledges with respect to its own versions of Outlook and Enterprise Vault: "[n]either Outlook nor the Enterprise vault will search attachments[.]"  *Id.*  While DHS states that "the subject matter of attachments is typically explained in the body or subject of an email" (*see id.*), in my experience such a generalization rings hollow unless subjected to some form of empirical testing.  The Palmer Declaration provides no evidence that DHS conducted such an analysis when evaluating the efficacy of its search for Rapid Production List and Opt-Out records.

### C.    Deficiencies in DHS's Search Process:  Insufficient Search Terms

50.    Again, when relying on individual custodians to use key word terms to search in-place for relevant records, there is a greater need for careful evaluation and testing of the key words and search technology before the searches are conducted.  Here, in its search for Opt-Out records, DHS directed various offices, including the U.S. Visitor and Immigrant Status Indicatory Technology Program ("US-VISIT"), as well as the Executive Secretariat (on behalf of the Office of the Secretary of the DHS), to conduct electronic searches for records concerning the phrase "OPT-OUT".  DHS also provided a working definition of the phrase "opt-out", as well as a small group of additional optional search terms.  Palmer Decl. ¶¶ 18-19.

51.      Similar to the FBI's approach to selecting search terms, DHS failed to use a reasonable range of potentially synonymous search terms or conduct any type of testing of the search terms selected. *See supra ¶¶* 25-26.  DHS "recommended" that individual custodians use the following search terms to search for records responsive to the Opt Out request:  opt-out, mandatory, voluntary, participation, opting-out, choosing, mandate, and opt out.  *See* Palmer Decl. ¶¶ 19, 25, 32.  No terms were used that referenced the program that is the actual subject of the Plaintiffs' FOIA request—Secure Communities.  ICE did not even use its own terms that relate to Secure Communities, "Secure Communities" and "SC", terms that ICE itself uses in documents published on its own website.  *See* Immigration and Customs Enforcement (ICE) Secure Communities (SC) Standard Operating Procedures (SOP), available at http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf (last visited March 26, 2012).

52.      Other than the Officer of the Office of Civil Rights and Civil Liberties, it is unclear from the Palmer Declaration whether the various custodians actually used the recommended search terms to locate Opt-Out records.  The Palmer Declaration merely explains that "it is DHS' practice to advise custodians that they should not limit their searches to suggested search terms, but rather that they should use their knowledge of their particular record keeping systems and practices to conduct a search that they believed was likely to uncover any and all records[.]"  *Id.* at 19; *see also* ¶¶ 25, 32.  Regarding US-VISIT custodians, "the exact manner in which searches were conducted was left to the discretion of the individual custodians[.]"  *Id.* ¶ 25.  In my opinion, this type of in-place search, especially when relying upon individual custodians who may not fully understand the FOIA request, the limitations of search technology, or the

development and testing of key words (and whose searches generally cannot be audited), is not reasonably calculated to uncover relevant and unique records.

> **D.     Deficiencies in Search Process:  The Searches Conducted by the Office of the Secretary Were Inadequate**

53.     The searches conducted by the Office of the Secretary suffer from deficiencies similar to the rest of DHS.  As with nearly all of DHS, the Executive Secretariat apparently used general search terms to search the computer files, including emails, of the Secretary's Chief of Staff and Deputy Chief of Staff, as well as the Counselor to the Secretary.  *Id.*  As with the rest of DHS, the search terms used were: "opt-out", "mandatory", "participation", "opting-out", "choosing", "mandate", and "opt-out".  The Office of the Secretary apparently did not use any terms that referenced the actual program that is the primary subject of the FOIA request, namely, Secure Communities.

54.     Further, there is no indication that the search terms were tested either before or while the searches were underway.  Much like other offices and divisions within DHS, the Office of the Secretary encouraged custodians to exercise their discretion in attempting to uncover relevant records.  In so doing, "the use of search terms was not monitored."  *Id.* The lack of monitoring and documentation of the use of search terms when conducted by individual custodians indicates a deficient search process.  Combined with a lack of testing, a lack of post-search confirmation testing, and meager production, this leads to the conclusion that the search process was fatally flawed.

55.     The Hardy Declaration states that "[t]he Secretary does not have an email account, so there could be no search for email sent to the secretary."  *Id.*  ¶ 33.  It further states that "all documents sent to or from the Office of the Secretary, including the Secretary herself, are maintained by the Executive Secretariat in electronic and paper format."  *Id.* ¶ 30.  From this

description, it is not clear whether the Secretary's personal hard copy files, hard drive, shared drives to which she had access, or home drive were searched.  Thus, I cannot evaluate whether the search of relevant records for the Secretary was adequate.

      **E.**    **Deficiencies in DHS's Search Process: The Search for Rapid Production List Records**

56.     According to the Palmer Declaration, the searches for Rapid Production List records "were done in the exact same manner as the search for opt-out documents[.]" *See* Palmer Decl. ¶ 33.  Thus, the deficiencies noted with respect to the Opt-Out records apply to DHS's search for Rapid Production List records.

      **F.**    **Evidence of Deficient Search:  Relevant Opt Out Records Produced in Response to the Final Production List**

57.     Again, my concerns about the use of an extremely limited set of search terms—in this instance eight: "opt-out", "mandatory", "participation", "opting-out", "choosing", "mandate", "opt-out" and "Secure Communities"—and the absence of any evidence of a thoughtful process in selecting and testing search terms are confirmed by a cursory review of the documents produced by the FBI and DHS, specifically the FBI records produced in response to the Court's December 17, 2010 Order requiring the production of Opt Out and Rapid Production List records.

58.     For example, it is my understanding that in response to the Opt Out request, the FBI produced the following record: FBI-SC-1871.  *See* FBI-SC-1871, *available at* http://uncoverthetruth.org/wp-content/uploads/FBI-SC-1871.pdf (last visited March 26, 2012). This record would appear to be responsive to the Opt Out request, falls within the relevant time period for the Opt Out request (*i.e.*, prior to October 15, 2010), and involves a meeting between DHS, the FBI, and ICE (among others) in which Secure Communities was discussed.  Yet it is

my understanding that Plaintiffs' review of the Opt Out and Rapid Production List productions and their electronic searches conducted on those productions indicate that these records were not identified or produced by DHS in response to the December 17, 2010 Order, despite the fact that the document actually contains some of the search terms "recommended" by DHS. Once again, this highlights the significant risks associated with taking a casual and *de minimis* approach to developing and relying upon search terms.

*      *      *

59.     Based on all of the above, I cannot conclude that DHS's searches for records relevant to the Opt Out and Rapid Production List requests were adequate.

## VI.     ICE DECLARATION

60.     The declaration provided by Deputy FOIA Officer of the United States Immigration and Customs Enforcement Freedom of Information Act Office Ryan Law ("Law Declaration" or "Law Decl.") is facially deficient in its description of ICE's search efforts.

### A.     Deficiencies in Technology:  ICE Provides an Insufficient Description of its Technological Resources

61.     In describing its information technology system, ICE indicates that prior to December 2008, it had a "disaster recovery system" "intended to allow the agency to restore its email and file servers in the event of catastrophic loss of data." Law Decl. ¶ 9. "Beginning in December 2008, ICE implemented a new server-based disaster recovery system for email servers." *Id.* ¶ 9. Though the post-December 2008 recovery system "retains the complete email archive for every ICE employee . . . ICE does not leverage the disaster recovery server for conducting routine FOIA searches." *Id.* ¶ 11.

62.     ICE does not provide any detail regarding the type of "email archive" or "disaster recovery system" used.  The alternating and apparently arbitrary use of the descriptive term-of-

art words "archive" and "disaster recovery" confuses two diametrically opposed uses of technology – one to provide a long-term off-line storage specifically for migrating information away from active-systems while establishing a system of record intended for future retrieval (archive), and the other to provide a short-term off-line storage specifically to replicate and protect information that is otherwise fully available and retrievable on-line (disaster recovery) – and appear to me as an attempt to use an artificial label to justify the inclusion or exclusion of a data source, rather than the actual configuration, usage and content of that data source.  Thus, ICE has not demonstrated that this "archive" is a not reasonably accessible data source (such as an offline tape collection) that would be unduly burdensome to search such that the decision not to search that "archive" was justified.

63.     To the extent that the system to which ICE is referring is technically and reasonably accessible, ICE does not support its decision to forgo searching this data source.  That is, ICE does not show that the archive contains information duplicative of other email sources that were searched, or whether the email archive contains unique emails.  To support its decision not to search a potentially reasonably accessible email archive, ICE could provide some explanation regarding how emails from other data sources are kept, *e.g.*, whether there is an automatic delete function in place.

### B.     Deficiencies in Instructions:  The Guidance Provided to Individual Custodians Tasked with Locating Relevant Records Was Inadequate

64.     ICE states that it, like the other Agencies, relies on individual offices and custodians to implement searches.  Law Decl. ¶ 19.  As noted above, when tasking a multitude of individual custodians with searching and collecting records relevant to a variety of topics, it is critical that the instructions provided to these individuals be clear and thorough.

65.     The Law Declaration indicates that "[i]ndividual archives of emails are searched by the individual custodians where those custodians have identified individual archives as containing potentially responsive documents." *Id.* at 14.  Further, ICE purportedly expects "agency employees to be familiar with computer functions, including the search capabilities of agency operating systems such as Windows[,]" *Id.* at ¶ 21.  However, the Law Declaration provides little indication of how the Agency ensures that this basic competency exists among ICE personnel.  Further, and as detailed more thoroughly below, the instructions provided to the individual ICE custodians tasked with searching for Opt-Out records were far from thorough.

### C.     Deficiencies in ICE's Search Process:  The Process by Which ICE Searched for Item VII of the Rapid Production List Records Was Inadequate

66.     The Law Declaration states that in conducting searches for records responsive to the Rapid Production List, "ICE often was able to pinpoint the specific offices or divisions likely to possess such records and task those offices and divisions with searching for records responsive to specific Rapid Production List categories[.]" *Id.* at 29.   For example, "Item VII of the RPL sought all reports and memoranda reporting on Secure Communities to DHS, the Assistant Secretary of Homeland Security in Charge of ICE, or the White House." *Id.* at 29(g).  ICE determined that records relevant to this request, to the extent they existed, would be located in the SharePoint system.  *See id.*  Further, because a Management Program Analysis had conducted a "prior, broader search of SharePoint[,]" which involved "a manual search of each folder within SharePoint and reviewed each document therein for responsive material[,]" ICE determined that an additional search was unnecessary.  *Id.*

67.     Missing from this summary, however, is a description of what this "broader search" entailed and how that search relates to the records relevant to Item VII of the Rapid Production

List.  The Law Declaration provides no detail relating to the instructions the Program Analyst

received prior to searching for relevant records.

68.	Distilling the Law Declaration's description of the search for records relevant to Item VII

of the Rapid Production List reveals the following deficiencies of the search process:

    (a)	The universe of records searched was dictated by the results of a prior search;

    (b)	The objectives and/or target of the prior search, and the instructions provided to personnel tasked with meeting those objectives, are unknown;

    (c)	After reviewing the results of the prior search, ICE counsel determined that there were no records responsive to Item VII of the Rapid Production List; and

    (d)	ICE conducted no additional searches for records responsive to Item VII of the Rapid Production List.

In short, the information detailing the search process for records responsive to Item VII does not

support the proposition that the search was adequate.

    **D.	Deficiencies in Instructions:  ICE Provided Insufficient Guidance to Individual Custodians Tasked with Conducting the Search for Opt-Out Records.**

69.	To guide custodians in their searches for opt-out records, the ICE FOIA office provided

the ICE Program Offices with a copy of the Rapid Production List, as well as a document

entitled "How to Search for Opt-Out Records."  *Id.* ¶ 36.  Among other things, this search guide

provided individual custodians with instructions on how to search for records within Microsoft

Outlook ("Outlook") using search terms.

70.	As indicated above, when using many different individuals and offices to implement a

search in-place for records located in multiple data sources, the quality of the instructions

provided to the individuals is critical.  However, the instructions provided to the individual ICE

custodians responsible for conducting the Opt-Out searches were far from comprehensive.  For

example, the instructions listed eight search terms.  *See* Law Decl., Ex. B.  The search terms

listed were:  "opt-out", "voluntary", "opting-out", "mandate", "mandatory", "participation", "choosing" and "opt out".    This list of search terms has the same fundamental flaws evident in the other Agencies' searches.  *See supra* ¶¶ 25-27, 50-52.  Further, as the Law Declaration states, "[t]he instructions did not address the issue of combining any of the search terms or using any connectives."  Law Decl. ¶ 36.  And while the instructions encouraged personnel to use their own knowledge and experience to develop and employ additional search terms, the only additional search term referenced in the Law Declaration was "Secure Communities".  *See id.* ¶¶ 45, 57.  Yet in documents published by ICE on its own website, ICE itself defines Secure Communities as "SC" and "SC/CIRCA".  *See* Secure Communities: Quarterly Report, Fiscal Year 2009 Report to Congress, available at http://uncoverthetruth.org/wp-content/uploads/SC-Quarterly-Report-FY-2009.pdf (last visited March 26, 2012).

71.    The Law Declaration does not describe with particularity which version of Outlook the individual custodians used when conducting the searches (again, an important piece of information when performing searches in place on the software itself).  ICE refers to both the 2003 and the 2007 versions of Outlook in the Law Declaration, but does not specify which offices had access to the different versions, which hinders my ability to assess the functionality of the software – including whether the version used by the individual custodians was able to search attachments in addition to an email's text.  Thus, the Law Declaration does not provide sufficient information to determine whether, in fact, email attachments were searched.

72.    Though Exhibit B to the Law Declaration lists the search terms that were provided to certain offices within ICE, the Law Declaration also indicates that various custodians, including those in ICE OPLA HSILD and ICE OSLTC, elected to use a narrower set of terms.  *See id.*

¶¶ 44, 49.  In other instances, there is no indication that certain custodians used any of the search terms that had been provided to them.  *See id.* ¶¶ 36, 39.

73.     Further, it is worth noting that information relating to search terms included in the Law Declaration appears to contradict information that had previously been submitted in a prior declaration in this action.  For example, the January Law Declaration states:

> [A] search of the email files of the ICE director, ICE Assistant Deputy Director, the ICE Chief of Staff, the ICE Executive Associate Director for Management and Administration . . . was conducted.  Key-word searches of all e-mails sent or received by these individuals between October 2008 and October 15, 2010 was conducted using the terms "opt-out" and ["]opt-out".

Jan. Law Decl. ¶ 54.  The most recent Law Declaration, however, indicates that each of the individuals noted above searched for emails using "the search terms provided in the 'How to Search for Opt-Out Records' guidance documents[,]" (Law Decl. ¶ 53) which, as noted above, includes eight search terms, rather than the two noted in the January 12 Declaration.  This inconsistency further complicates any analysis of the quality of ICE's searches.

74.     Finally, there is no indication that the individual custodians noted in the preceding paragraph searched for records other than emails, including, but not limited to, individual electronic and hard copy files.

### E.     Evidence of Deficient Search:  Relevant Opt Out Records Produced in Response to the Final Production List

75.     My concerns about the use of an extremely limited set of search terms—in this instance nine: "opt-out", "voluntary", "opting-out", "mandate", "mandatory", "participation", "choosing", "opt out" and "Secure Communities"—and the absence of any evidence of a thoughtful process in selecting and testing search terms is confirmed by a cursory review of the documents produced by ICE—specifically ICE's records produced in response to the Plaintiffs' Final

Production List request (which was made to Plaintiffs long after ICE was required to comply with this Court's December 17, 2010 Order requiring the production of Opt Out and Rapid Production List records).

76.     For example, it is my understanding that in response to the Final Production List request, ICE produced the following record: ICE 2010FOIA2674.018031.  *See* ICE 2010FOIA2674.018031, *available at* http://uncoverthetruth.org/wp-content/uploads/ICE-2010FOIA2674.018031.pdf (last visited March 26, 2012).  This record would appear to be responsive to the Opt Out request and falls within the relevant time period for the Opt Out request (i.e., records prior to October 15, 2010).  Yet it is my understanding that Plaintiffs' review of the Opt Out and Rapid Production List productions and their electronic searches conducted on those productions indicate that this record was not identified or produce in response to the Opt Out request, despite the fact that it does contain some of the terms that ICE identified in its search instructions.  This, again, underscores the significant risks associated with taking a casual and *de minimis* approach to developing and relying upon search terms.

*        *        *

77.     Based on all of the above, I cannot conclude that ICE's searches for records relevant to the Opt Out and Rapid Production List requests were adequate.

## VII.    OLC DECLARATION

78.     As with ICE, FBI and DHS, the Office of Legal Counsel ("OLC") conducted its search for records relevant to Plaintiffs' FOIA request independently.  As the Declaration of Paul Colborn ("Colborn Declaration" or "Colborn Decl.") illustrates, the process through which the OLC executed its search raises significant concerns.

### A.     Deficiencies in Process:  Identifying Custodians

79.     OLC attempted to determine the identities of custodians likely to have relevant records

by questioning two veteran OLC staff attorneys "who are generally aware of assignments . . . at

OLC."  Colborn Decl. ¶ 9.  These attorneys indicated that they were "unfamiliar with Secure

Communities and had no recollections of OLC's working on any issues relating to the program."

*Id.* ¶ 9.

80.     OLC personnel sent a query to all OLC attorneys in January 2011, which ultimately

yielded relevant records related to immigration litigation in the state of Arizona that discussed

Secure Communities.  *Id.* ¶¶ 9-10.  But there is no indication in the Colborn Declaration that the

two career OLC staff attorneys were presented with these findings, which might have refreshed

their recollections as to whether there were additional staff members who had worked on

assignments that were related to Secure Communities.

81.     Though the January 2011 inquiry to all OLC attorneys ultimately yielded two relevant

records, "most attorneys did not respond" to the inquiry.  *Id.* ¶ 9.  OLC did not attempt to follow-

up with the non-responsive attorneys.  In light of the fact that the Colborn Declaration presents

the OLC as a small office where "it is generally a straightforward matter  . . . to determine, in

response to a FOIA request, whether the office has worked on a particular matter[,]" (*see id.* ¶ 3),

it would have been reasonable to follow up with the non-responding attorneys to ensure that they

had received and properly considered the query.

> **B.     Deficiencies in Search Process:  Inadequate Development and Inconsistent Application of Search Terms**

82.     According to the Colborn Declaration, OLC used several different search terms to search

OLC's central storage system, "which consists of documents in their original file format . . . on a

shared network drive on the Department of Justice electronic file server."  *Id.* ¶ 5.  However,

certain search terms that were included in email searches for former employees (such as "opt

out" and "interoperability") were not included in the search of the central storage system. There is no explanation in the Colborn Declaration for these omissions. In addition, while the search engine that OLC uses to search its central storage system ("ISYS") is capable of capturing variations of search terms "without the need for wildcards and expanders[,]" (*see id.* at 6), it is unclear whether the search engine would also capture unspecified acronyms of abbreviations of the search terms selected. Though OLC appears to have used certain acronyms and abbreviations in certain instances (such as "CAR" for "Criminal Alien Records" (*see id.* Ex. A)), it apparently elected not to use other potentially relevant apparent abbreviations or acronyms, such as references to Secure Communities.

83.    The searches of the central storage system were conducted in May and November of 2010 and yielded no relevant records. *Id.* ¶ 6.

84.    OLC did search the accessible email files of former employees in December 2010. *Id.* ¶ 8. However, the emails of the former employees were only searched using "secure communities" and "interoperability". *See id.* These searches yielded no relevant records. *Id.* There is no indication in the Colborn Declaration as why the OLC limited its searches to these terms only. Further, there is no indication that OLC conducted any testing to evaluate the effectiveness of these searches.

*      *      *

85.    Based on all of the above, I cannot conclude that OLC's searches for records relevant to the Opt Out and Rapid Production List requests were adequate.

## VIII.   CONCLUSION

In light of the foregoing, I am unable to conclude that the Agencies' searches for Rapid Production List and Opt-Out records were reasonably calculated to identify relevant and unique records in response to Plaintiffs' FOIA request.

\*        \*        \*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:        New York, New York
              March 26, 2012

                                           _____
                                           DANIEL L. REGARD II

701409844

# EXHIBIT A



## Daniel L. Regard, BS, JD, MBA, Managing Director

direct:  +1.202.249.7877
email:   dregard@idiscoverysolutions.com

**SUMMARY**

Daniel L. Regard is a nationally recognized electronic evidence and case management expert with 20 years experience in consulting to legal and corporate entities. A programmer and an attorney by training, Mr. Regard has conducted system investigations, created data collections, and managed discovery on some of the highest profile financial investigations of the last decade. He is responsible for the development and implementation of case and matter strategies that leverage technology to clients' best advantage in both litigations and investigations. Mr. Regard has both national and international experience advising on such issues as electronic discovery, computer forensics, database development, application software, data analysis, and repository services. He has worked as a testifying expert and as a court appointed neutral on issues of electronic discovery.

Prior to founding Intelligent Discovery Solutions, Inc. in December 2007, Mr. Regard was the national director of e-Discovery for LECG. He was also the national director of Electronic Evidence & Consulting for FTI Consulting, and was a national leader of Analytical Dispute Services at Deloitte & Touche, where he managed multi-national, multi-jurisdictional, and multi-counsel litigation support projects. He began his career as the founder of a nationwide litigation-support practice.

Mr. Regard is the founder of b-Discovery, a monthly e-discovery networking group that meets throughout the United States. He is a director of the Institute of Computer Forensic Professionals and a long time associate of the Certified Fraud Examiners. He is a member of the Sedona Conference WG1: Electronic Document Retention and Production, and WG6: International Electronic Information Management, Discovery and Disclosure. He is a board member of Georgetown Advanced Institute for e-Discovery. He is an editorial advisory board member of Law Technology News. He is a founding member of the Master's Cabinet for electronic discovery and records management. He is an advisory board member of Surety, an information security technology firm.

**SELECT CONSULTING EXPERIENCE**

• In the broker-dealer industry, effectively reduced the re-occurring cost of e-discovery by 80% through the implementation of cost-savings and litigation scoping best practices.

• In the pharmaceutical industry, advised client on international safe harbor, discovery and disclosure.

• In the pharmaceutical industry, advised client on document retention, discovery readiness, enterprise application decommissioning and other aspects of document and information management.

• In the tobacco industry, led a team of 45 team members to assess and advise client on legacy media and physical media inventories through collections, evaluations, remediation and re-introduction into the normal document life cycle.



- In the gold mining industry, assessed and testified as to client's document retention and production processes and procedures prior to, and during, litigation.

- In the construction industry, led an e-discovery team on an international SEC-driven FCPA investigation. Information was gathered from 5 countries, teams were staged in the US and the EU. Data was handled in a manner consistent with the EU data protection directives. On-site native file review was set up for legal teams in both locations.

- In the casino gaming industry, consulted as a software code expert comparing various data cube technologies within allegations of theft of intellectual property and copyright violation. (Venture Catalyst Incorporated v. Tech Results, Inc. et al).

- In the call center industry, led a computer forensics and software code seek-and-comparison effort under court neutral status to determine the presence and extent of unlicensed intellectual property. (Protocol Services, Inc. v. Evolve Tele-Services).

- In a civil spoliation trial within a wage-and-labor class action certification, testified as to e-discovery best practices, the interpretation of wage and labor data and the interpretation of software code. (Lerma v. Wal-Mart Stores, Inc.)

- In the anti-virus industry, led a team to analyze the behavior of ad-ware and determine whether or not certain spy-ware products exhibited viral characteristics.

- In the insurance industry, led multinational computer forensics investigations to secure and preserve data in foreign office locations.

- In the insurance industry, led multinational computer forensics investigation to evaluate allegations of bid-rigging and undisclosed commission structures. Led the team that acquired and examined over 100 employee systems and multiple backup collections in a variety of domestic and international locations.

- In an insurance defense case, led the data analysis team for business interruption claims stemming from the World Trade Center bombing. Conceived and spearheaded model to analyze empirical lost profits on an individual customer basis as contrasted to a store-level trend basis. Resulted in a significantly reduced estimation of recoverable losses.

- In an insurance agency investigation, led the data analysis and acquisition team in a dispute between the broker and the underwriter (my client). Hard drives, backup tapes and portfolio financial records were captured, analyzed and presented. The case led to criminal charges against the broker.
- In the telecommunications industry, conducted workflow analysis and recommended changes for precious metal recovery.

- Managed a Fortune 50 food services SEC investigation involving collection and review of over two terabytes of e-mail and user file data, as well as the collection and review of millions of records of transactional financial data.

- In the US, South America and Europe, oversaw the design and implementation of an asset and equity modeling system for an $80 million fraud investigation into international security trading between the U.S., Switzerland and Columbia.



- Designed and implemented a bank-transaction analysis and tracing database for fraud investigation into a $100 million bankruptcy of a private investment brokerage. • In the U. S. and Caribbean, managed a computer forensic analysis of personal computers to detect and identify offshore banking and trading activity.

- In defense of an SEC investigation, audit restatement and class action lawsuit for a U. S. grocery supplier, performed detailed vendor allowances analysis, revenue recognition analysis, computer forensic analysis of over 120 computers and over 15 enterprise systems, and retrieval and analysis of two terabytes of e-mail and user data. Oversaw the support of over one million pages for review, and the development of document retention notice and policy in response to litigation.

- Led team of 30 analysts to provide technological support of the largest financial restatement in U. S. history. Using a combination of mainframe and local client-server systems, built a data system from 2,000 backup tapes hosting 450 tables, five fiscal years of information, 3.8 billion records and delivered over 8,000 separate data sets for further analysis.

- In Japan, created e-mail forensic system to trace the distribution of information across 2,000 employees, four continents and two million e-mails.

## EDUCATION

- BS in Computer Science, University of Southwestern Louisiana
- JD, Tulane University
- Certificate in International Comparative Law, Tulane University
- MBA, Tulane University

## PUBLICATIONS

- "The Discovery of Structured Data", D. Regard, D. Kessler, American Bar Association, a chapter within "Managing E-Discovery and ESI", Hon. Mag. Paul Grimm et al.
- "The Sedona Principles for the Mitigation of Conflicts Between EU Data Protection Laws and US Preservation and Discovery Obligations", Sedona Conference Working Group VI, contributing editor, October 2011 (pending)
- "The Sedona Database Principles: Best Practices, Recommendations, and Principles for Addressing the Preservation and Production of Databases and Other Structured Data in Civil Litigation", Sedona Conference Working Group I, contributing editor, 2011 (pending).
- "Web 2.0 Collides with E-Discovery", Law Technology News, May 2008
- "Beyond Privacy", Law Technology News, January 2008
- "Data about Data", National Audio Broadcast, Pike & Fischer, November 2005
- "Application Databases: E-Discovery's 'New E-mail'", Digital Discovery and e-Evidence Newsletter, Pike & Fischer, November 2004
- "Assessing Your Case from a Data Standpoint – Key Considerations and Questions," Digital Discovery & e-Evidence Newsletter, Pike & Fischer, August, 2004
- "The E-Mail Imperative", Corporate Legal Times, February 2001
- "When Electronic Discovery Involves E-mail", Law Technology News, Spring 2001
- "When Electronic Discovery Involves E-mail", Deloitte & Touche Hearsay Publication, December 2000
- "The Use of Internet Repositories for Litigation Support", Corporate Legal Times, October 2000



**TESTIFYING EXPERIENCE**

- Electronic Discovery Expert, Computer Science Expert, _Laura Kenyon v. Deere & Company_, El Paso County, State of Colorado, September 2011 (Affidavit).
- Electronic Discovery Expert, Computer Forensics Expert, Computer Science Expert, _Gentex v. Armor Holdings et al._, Middle District of Pennsylvania, June 2011 (Deposition).
- Electronic Discovery Expert, Computer Forensics Expert, _Gaalla v. Citizens Med. Ctr._, Southern District of Texas, May 2011 (Affidavit).
- Electronic Discovery Expert, Computer Forensics Expert, Computer Science Expert, _Gentex v. Armor Holdings et al._, Middle District of Pennsylvania, April 2011 (Declaration).
- Electronic Discovery Expert, _Mantech International Corporation v. Barry Greenberg_, Circuit Court of Fairfax County, Virginia, March 2011 (Deposition).
- Electronic Discovery Expert, Computer Science Expert, _Gentex v. Armor Holdings et al._, Middle District of Pennsylvania, December 2010 (Declaration).
- Electronic Discovery Expert, _O'Shea v. Cordis,_ 15th Circuit, Palm Beach, FL, February 2010 (Affidavit).
- Electronic Discovery Expert, _Telenor East Invest AS v. Altimo Holdings & Investments Ltd, et al_, US District. Court, Southern District of New York, May 2009 (Declaration).
- COBOL and Software Systems Expert, _Hoffman et al v. American Express Travel Related Services Co._, California State Superior Court, Almeda County, January 2009 (Trial Testimony)
- COBOL and Software Systems Expert, _Hoffman et al v. American Express Travel Related Services Co._, California State Superior Court, Almeda County, October 2008 (Deposition).
- 30(b)(6) witness, _In Re: Avandia Marketing Sales Practices and Products Security Litigation_, US District Court, Eastern District of Pennsylvania, October 2008 (Deposition).
- 30(b)(6) witness on issues of document retention and production, _Wagner et al v. Barrick Gold Corp., et al_, US District Court, Southern District of New York, August 2008 (Deposition).
- Database Discovery Expert, _Moldowan et al v. Sears, Roebuck & Co.,_ Superior Court, State of California, County of Sonoma, March 2008 (Affidavit).
- Electronic Discovery Expert, _O'Shea v. Cordis,_ 15th Circuit, Palm Beach, FL, February 2008 (Affidavit).
- Electronic Discovery Expert, _Amnesty International v. Central Intelligence Agency et al,_ US District Court, Southern District of New York, February 2008 (Affidavit).
- Database Discovery Expert, _In Re Vivendi Universal,_ US District Court, Southern District of New York, May 2006 (Trial Testimony).
- Software Code Expert, _Playesed v. PCA_, US District Court, Southern District of Florida, February, 2006 (Expert Report, Deposition).
- Software Code Expert, _Venture Catalyst Incorporated v. Tech Results, Inc. et al_, US District Court, Southern District of California, November, 2005 (Testimony).
- Public Hearing On Proposed Amendments To the Federal Rules of Civil Procedure, Dallas, Texas, January 28, 2005 (Testimony).
- Electronic Discovery Expert, _Exel North American Logistics v. Pegasus Logistics Group et al._, Texas State Court, 134th Judicial Circuit, Cause No. 03-11468-G, May 2004 (Testimony).
- Electronic Discovery Expert, _Lerma v. Wal-Mart Stores, Inc._, Oklahoma State Court, CJ-2001-1395, April, 2004 (Trial Testimony).
- Electronic Discovery Expert, _Douglas Realty Advisors, Inc. v Albertson's Inc._, Indiana State Court, 49D05-0009-CP-0013789, October, 2003 (Deposition).
- Litigation Database Expert, _Stephen Russell v. UNUM Life Insurance Company of America, et al._, Maricopa County, Phoenix, Arizona, CV 95-12521, July, 2000 (Deposition).



**SELECT SPEAKING ENGAGEMENTS**

- Georgetown Law School, guest lecturer, "The role of the expert witness in e-discovery", October, 2011
- ARMA International, "Mock Meet-and-Confer for e-Discovery Issues", October 2011.
- The Master's Conference, "The Discovery of Databases", Washington DC, October 2011.
- The Master's Conference, "The Consumerization of IT", Washington DC, October 2011.
- Pennsylvania Law School, guest lecturer, "Cloud Computing and IT Architecture", October 11.
- ILTA, "Controlling Litigation Support Costs", Nashville TN, August 2011.
- The Master's Conference, "International E-Discovery Panel", New York, July 2011.
- Georgetown Center for Law, "How Attorneys Use Computers", June 2011.
- The Master's Conference, "International E-Discovery Panel", Chicago, June 2011.
- Georgetown University, McDonough School of Business, "The Use of Digital Forensics Within Financial Investigations", May 2011.
- American University Washington College of Law, E-Discovery Joint Panel, April 2011.
- Webinar, "What E-Discovery Means to Your Agency", Washington DC, February 2011
- Temple Law School, guest lecturer, Cloud Computing and IT Architecture, February 2011
- 6th Annual Meeting of the American College of Business Court Judges, Electronically Stored Information, December 2010.
- Georgetown Advanced E-Discovery Institute, Advanced Technology, November 2010
- The Masters Conference, Master of Ceremonies, October 2010
- Georgetown Law School, guest lecturer, "Introduction to E-Discovery", February 2010
- Georgetown Advanced E-Discovery Institute, "Backup Technology", November 2009
- The Master's Conference, Master of Ceremonies and Lecturer, "Structured Data", October 2009
- Wave University, Audio Lecturer, "The Discovery of Structured Data", September 2009
- ITLA Statewide Meeting, Lecturer, "Getting the most out of relationships with agencies, attorneys, clients and vendors", September 2009
- Stratford Publications CLE Series, Audio Lecturer, "FCPA Investications and Privacy Protection: Safeguarding Data and Avoiding Violations of Privacy Laws", August 2009.
- George Washington University, "What New Attorneys Should Know About the Procedures of e-Discovery," Washington, DC, January 2009
- Wave University, Webex, "Cutting the High Cost of e-Discovery Through Reliable Processes, People and Tools," National Broadcast, January 2009
- CA World, The eDiscovery Case Law Update, multiple sessions, Las Vegas, November 2008
- The Master's Conference, Master of Ceremonies, Washington, DC, October, 2008
- R4 Conference: The Human Asset and Liability Conference of 2008, The Risk Technology Gap, Miami, September 2008.
- Georgetown Advanced Institute for e-Discovery, Panel Speaker, November, 2007
- The Master's Conference, Keynote Speaker, Washington, DC, October, 2007
- London Legal Technology Seminar, "How the rules put the "Y" back into e-Discovery", August 2007
- The Master's Conference, "Planning, Holding and Improving e-Discovery", Washington, DC, September, 2006
- Epstein Becker, CLE Course, "Current Cases in e-Discovery", July 2006
- Marcus Evans Legal & Strategic Guide to e-Discovery, "Your e-Discovery Anthology: The Most Relevant Cases and Updates for Corporate Counsel", New York, New York, June 2006
- IQPC e-Discovery Conference, "Post Zubulake Legal Climate: Lessons Learned", Miami, Florida, February 2006



- Georgetown Law School, "Fundamentals of Computer Forensics", Guest lecturer, Washington DC, February 2006
- DC Bar Association, "E-mail and the Securities Regulators: The View from All Sides", Washington DC, February 2006
- Law Seminars, "Trade Secrets and Corporate Governance Issues: The Sarbanes-Oxley Act", Chicago, Illinois, November, 2005
- Pike & Fischer, "Beyond "Data about Data": Taking a Hard Look at Metadata", National Audio Broadcast, November, 2005
- Pike & Fischer, "Rules Alert: The Latest on the Amendments to the New Federal Rules of Civil Procedure Addressing e-Discovery", National Audio Broadcast, September, 2005
- Maine State Bar Association, Electronic Discovery Seminar, Several Topics, Augusta, Maine, May 2005
- Chief Litigation Counsel Association Roundtable Discussion, Managing Electronic Discovery, Atlanta, Georgia, April 2005
- Marcus Evans Legal & Strategic Guide to eDiscovery West Conference, "Custodial Centric Intensity Matrix: Applying the "Key Players" concept of Zubulake, Palo Alto, California, April 2005
- 12th Annual Symposium on Alcohol Beverage Law, NABCA, "Drowning in Data: Electronic Discovery in Alcohol Beverage Litigation", Arlington, Virginia, March 2005
- National Organization of Bar Council, "Electronic Discovery: Volumes, Complexity and the Federal Rules of Civil Procedure", Salt Lake City, February 2005
- Bernstein, Shur, Sawyer & Nelson, CLE Course "Current Issues in Electronic Discovery", Portland, ME, January 2005
- Marcus Evans' Legal & Strategic Guide to E-Discovery conference, Speaker, "Custodial Centric Approach to e-Discovery", New York, November, 2004
- Jones Day, CLE Course "Introduction to Computer Forensics", Houston, April 2003.
- Holland & Knight, CLE Course, "Electronic Discovery Duties and Best Practices", New York, March 2003
- 2003 CyberCrime Conference, Speaker, "Electronic Discovery – Corporate Litigation", Connecticut, February 2003
- Windels Marx Lane & Mittendorf, CLE Course "Successful Strategies for Electronic Discovery", New York, January 2003
- Wilmer Cutler, CLE Course "Successful Strategies for Electronic Discovery", Washington, DC, December 2002
- Sidley Austin, CLE Course, "Successful Strategies for Electronic Discovery", New York, November, 2002
- Kirkland Ellis, CLE Course, "Successful Strategies for Electronic Discovery", Washington DC, October 2002
- Sedona Working Group on Best Practices for Electronic Discovery and Production, Focal Group Member: Collecting Electronic Evidence, Distributed Data Systems, Scottsdale, AZ, October 2002
- CLE Defense Symposium: Pitfalls, Conflicts and Hidden Liability in Major Litigation and Investigations, DuPont Primary Law Firm and Service Provider Network, "Electronic Evidence and Case Management", Los Angeles, CA, October 2002
- Association of Healthcare Internal Auditors, Annual Convention, "Electronic Discovery Procedure and Technique: What to expect, Why to expect it", San Antonio, TX, September 2002
- Miller Chevalier, CLE Course, "Successful Strategies for Electronic Discovery", Washington DC, September 2002
- Morrison Foerster, CLE Course, "Successful Strategies for Electronic Discovery", September 2002



**PROFESSIONAL AFFILIATIONS**

- Louisiana Bar Association

- DC Bar Association

- American Bar Association

- Association of Certified Fraud Examiners

- High Tech Crime Investigation Association

- Sedona Conference Working Group 1 on Electronic Discovery

- Sedona Conference Working Group 6 on eDisclosure, eDiscovery and Data Privacy

- Masters Conference, Educational Cabinet

- E-Discovery Institute, Director

- Institute of Computer Forensics Professionals, Board Member

- Law Technology News, Editorial Advisory Board Member

- Georgetown Advanced Institute for e-Discovery, Director