**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

NATIONAL DAY LABORER ORGANIZING
NETWORK, CENTER FOR CONSTITUTIONAL
RIGHTS, and IMMIGRATION JUSTICE
CLINIC OF THE BENJAMIN N. CARDOZO
SCHOOL OF LAW,

**ECF CASE**

10 CV 3488 (SAS)(KNF)

[Rel. 10-CV-2705]

*Plaintiffs*,

v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
FEDERAL BUREAU OF INVESTIGATION,
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, and OFFICE OF LEGAL COUNSEL

*Defendants*.

-------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

SONIA R. LIN
PETER L. MARKOWITZ
Kathryn O. Greenberg
Immigration Justice Clinic
Cardozo School of Law
55 Fifth Avenue
New York, New York 10003

*Attorneys for Immigration
Justice Clinic and National
Day Laborer Organizing
Network*

SUNITA PATEL
GHITA SCHWARZ
Center for Constitutional
Rights
666 Broadway, 7th Floor
New York, New York 10012

*Attorneys for Center for
Constitutional Rights
and National Day Laborer
Organizing Network*

ANTHONY J. DIANA
THERESE CRAPARO
JEREMY D. SCHILDCROUT
JARMAN D. RUSSELL
BRIDGET P. KESSLER

Mayer Brown LLP
1675 Broadway
New York, New York 10019

*Attorneys for National Day
Laborer Organizing Network*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND OF THE LITIGATION .............................................................. 2

I. FOIA Requests and Complaint ................................................................. 2

II. RPL Negotiations and Agreement ............................................................ 2

III. Preliminary Injunction Motion and Resulting Productions Complaint ............................ 3

IV. Search Guidance Provided by Plaintiffs ................................................... 3

V. The Adequacy of Search Challenge ........................................................... 4

ARGUMENT ............................................................................................. 5

I. Cooperation Among Parties is Critical in the Electronic FOIA Age ................................ 5

II. Legal Standard ....................................................................................... 6

    A. FOIA Adequacy of Search Standard ................................................... 6

    B. FOIA Adequacy of Search Standard as Applied to Electronic Searches ............. 9

        1. Agencies Must "Reasonably Describe" Electronic Information Systems and Technology ..................................................... 10

        2. Agencies Must Use An Adequate Electronic Search Process ............... 11

III. The Agencies' Searches ........................................................................ 12

    A. Deficiencies in FBI's Search ............................................................ 13

        1. FBI excluded crucial custodians and record locations from its search for Opt-Out Records and RPL Item VII .................................. 14

        2. FBI used limited search instructions and insufficient search terms for Opt- Out Records, and failed to follow up on obvious leads ............ 15

        3. Missing information regarding search instructions, capabilities, and methods .............................................................. 16

    B. Deficiencies in DHS's Search ........................................................... 17

        1. DHS excluded crucial custodians and offices in its search for Opt- Out Records and RPL Item VII ............................................ 17

        2. DHS' vague search instructions and generic search terms ............... 19

        3. Missing information on search terms, file structure and locations searched ....................................................................... 21

    C. Deficiencies in ICE's Search ............................................................ 21

        1. ICE's exclusion of crucial custodians and record locations from its Opt- Out Records search ................................................. 22

**TABLE OF CONTENTS**
(continued)

Page(s)

2.     ICE's vague instructions and generic search terms for Opt-Out
Records .................................................................................................. 23

3.     Missing information regarding connectors, search terms and scope
of  search ................................................................................................ 24

D.     Deficiencies in OLC Searches ........................................................................ 25

1.     OLC's exclusion of likely custodians from its search ........................... 25

2.     OLC's limited search terms .................................................................... 26

IV.     The Court Should Order Additional Searches and Supplemental Declarations ............. 27

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

*Amnesty Int'l USA v. CIA*,
   728 F. Supp. 2d 479 (S.D.N.Y. 2010).......................................................................................7

*Banks v. DOJ*,
   700 F. Supp. 2d 9 (D.D.C. 2010) ........................................................................................8, 9

*Campbell v. U.S. Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998)..................................................................................................8

*Carney v. Dep't of Justice*,
   19 F.3d 807 (2d Cir. 1994)......................................................................................................6

*Church of Scientology v. IRS*,
   792 F.2d 146 (D.C. Cir. 1986)................................................................................................7

*Defenders of Wildlife v. U.S. Dep't of Interior*,
   314 F. Supp.2d 1 (D.D.C. 2004).............................................................................................9

*Families for Freedom v. CBP*,
   No. 10 Civ. 2705 (SAS), 2011 U.S. Dist. LEXIS 148453 (S.D.N.Y. Dec. 27,
   2011) ...........................................................................................................................7, 9, 10, 11

*Founding Church of Scientology v. NSA*,
   610 F.2d 824 (D.C. Cir. 1979)................................................................................................8

*Fox News Network LLC v. U.S. Dep't of the Treasury*,
   678 F. Supp. 2d 162 (S.D.N.Y. 2009)...................................................................................11

*Grand Cent. P'ship, Inc. v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999)....................................................................................................6

*Hasbrouck v. U.S. Customs & Border Protection*,
   No. C 10-3793, 2012 U.S. Dist. LEXIS 7450 (N.D. Cal. Jan. 23, 2012) ..............................11

*Int'l Counsel Bureau v. United States DOD*,
   657 F. Supp. 2d 33 (D.C. Cir. 2009)..........................................................................7, 12, 27

*Katzman v. CIA*,
   903 F. Supp. 434 (E.D.N.Y. 1995) .........................................................................................7

*Krikorian v. Dep't of State*,
   984 F.2d 461 (D.C. Cir. 1993).................................................................................................9

iii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ................................................................6, 7, 11, 27

*Oglesby v. U.S. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) ...........................................................................8, 9, 10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   685 F. Supp. 2d 456 (S.D.N.Y 2010).....................................................................12

*Schoenman v. FBI*,
   763 F. Supp. 2d 173 (D.D.C. 2011) .........................................................................5

*SEC v. Collins & Aikman Corp.*,
   256 F.R.D. 403 (S.D.N.Y. 2009) .............................................................................6

*Valencia-Lucena v. U.S. Coast Guard*,
   180 F.3d 321 (D.C. Cir. 1999)...........................................................................8, 12

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
   250 F.R.D. 251 (D. Md. 2008)........................................................................10, 12

*Weisberg v. Dep't of Justice*,
   705 F.2d 1344 (D.C. Cir. 1983) ..........................................................................6, 8

STATUTES

5 U.S.C. § 552(a)(3)(c) ..............................................................................................11

5 U.S.C. § 552(a)(6)(B)(ii) (2009)...............................................................................5

5 U.S.C. § 552(g) ........................................................................................................10

OTHER AUTHORITIES

104 Cong. Rec. S10888-02 (1995) .............................................................................11

Electronic Discovery Deskbook (Thomas Y. Allman et al. eds., Practicing Law
   Institute 2011) ..........................................................................................................6

H. Rep. No. 104-795, H.R. 3802 (1996), 1996 U.S.C.C.A.N. 3448 ...........................5

PL 104-231 H.R. 3802 (1996) ......................................................................................5

S. Rep. No. 104-272 (1996) ........................................................................................10

Plaintiffs respectfully oppose the motion for partial summary judgment filed by Defendants Immigration and Customs Enforcement Agency ("ICE"), Federal Bureau of Investigation ("FBI"), Department of Homeland Security ("DHS") and Office of Legal Counsel ("OLC") (each a "Defendant" or "Agency" and, collectively, "Defendants" or "Agencies") and cross-move for partial summary judgment with respect to Opt-Out Records[1] and Rapid Production List ("RPL") Item VII (reports and memoranda to high level government officials regarding Secure Communities).[2]

## PRELIMINARY STATEMENT

Defendants have failed to meet their burden to demonstrate that they have conducted searches reasonably calculated to uncover all records relevant Plaintiffs' Request (as defined herein). Ironically, in attempting to comply with a statute designed to promote transparency, Defendants have refused to engage with Plaintiffs in any meaningful negotiations about the response to the Plaintiffs' Request, which has led to wasted time, effort and resources. In lieu of coordination with Plaintiffs, Defendants should have had: (1) a sound process for selecting search terms and data sources to be searched and for implementing those searches; (2) the technology available to be able to conduct an adequate search; and (3) the people in place who

---

[1] On December 17, 2010, the Court ordered Defendants to produce "Opt-Out Records," defined as records "relating to the ability of states or localities to decline or limit participation in Secure Communities, including documents, memoranda, manuals, and communications referencing the technological capacity of ICE and the FBI to honor requests to opt-out, opt-in or limit participation in Secure Communities." Dkt. # 25.

[2] *See* FBI-Ex. A, Dkt. # 180-1 (RPL). Plaintiffs do not concede that the searches for the remaining RPL Items I through VI and VIII were adequate or that Defendants have provided enough information in their declarations to meet their burden of proof to establish the adequacy of their searches. Nonetheless, for reasons of expediency, Plaintiffs only challenge the adequacy of Defendants' searches for records responsive to Item VII.

have an adequate understanding of how to conduct the searches, or proper instructions for the individuals conducting the search. Each Defendant largely has failed in this endeavor.

Far from meriting summary judgment, Defendants' refusal to cooperate led in some cases to fatally deficient searches. In other cases, the agency declarations lack sufficient detail to evaluate the effectiveness of the search. Therefore, Defendants' request for summary judgment should be denied and Plaintiffs' cross-motion for partial summary judgment should be granted.

## BACKGROUND OF THE LITIGATION

### I.     FOIA Requests and Complaint

On February 3, 2010, Plaintiffs submitted identical FOIA requests to the five defendant Agencies (the "Request"). *See* Compl. at ¶ 60, Dkt. # 1. The Request sought records related to the then little-known federal immigration enforcement program "Secure Communities". At the time, Secure Communities was in a pilot phase and had been activated only 145 jurisdictions. *Id.* at ¶ 4. However, ICE intended to expand the program nationwide by 2013. *Id.* Therefore, Plaintiffs sought documents to inform the public and government officials about the scope and impact of the program before widespread activation. *Id.* at ¶¶ 6, 18. Plaintiffs filed the instant lawsuit in the Southern District of New York in April 2010. *Id.* at ¶ 1.

### II.    RPL Negotiations and Agreement

Plaintiffs diligently attempted to negotiate with Agencies regarding the search for and processing of records relevant to the Request. As early as June 2010, Plaintiffs requested information from Agencies regarding (1) the status of search and processing and (2) information systems and search technology used by the Agencies. *See, e.g.*, Decl. of B. Kessler in Support of Pls.' Prelim. Inj. Mot. ("Kessler Reply Decl.") at ¶ 13, Dkt. # 22, Attach. 1, Ex. A (Addendum to Plaintiffs' June 9, 2010 Letter). Plaintiffs informed Agencies that the requested information

would help the parties narrow and prioritize the request based on Agencies' actual data retrieval systems. *Id.* Agencies declined to provide the majority of the requested information. *Id.*[3]

In spite of Agencies' lack of cooperation with Plaintiffs, in July 2010, the parties were able to agree to an initial schedule for production of the Rapid Production List ("RPL"), a limited list of key categories of easily identifiable records, by July 30, 2010. *Id.* at ¶ 4. Plaintiffs also agreed to one of Agencies' narrowing proposals. Decl. of B. Kessler, Oct. 28, 2010 ("Kessler Decl."), Dkt. # 12, Attach. # 1, Ex. H (Letter from C. Connolly to B. Kessler, Jul. 9, 2010). During the RPL negotiations, despite ample opportunity, no Agency proposed revising the RPL, objected that any RPL category was overbroad, or informed Plaintiffs of the volume of potentially relevant records. Decl. of S. Patel, Mar. 23, 2012 ("Patel Decl.") ¶ 10.

### III.    Preliminary Injunction Motion and Resulting Productions

During the summer of 2010, ICE and the FBI produced a small number of records relevant to the RPL. Plaintiffs repeatedly requested the missing categories of documents, particularly records relating to opt-out. Kessler Reply Decl. at ¶¶ 7-8. When Agencies essentially refused to comply with the parties' agreement, Plaintiffs moved for a preliminary injunction. *Id.* As a result, by an order dated December 17, 2010, this Court ordered Agencies to produce Opt-Out Records by January 17, 2011, and the remainder of the RPL by February 25, 2011. Dkt. # 25.

### IV.    Search Guidance Provided by Plaintiffs

Plaintiffs repeatedly provided solicited and unsolicited search guidance and clarification to aid the Agencies in processing the RPL and Opt Out Productions. For example, on June 9, 2010, August 31, 2010 and September 1, 2010, Plaintiffs provided guidance regarding the

---

[3] Plaintiffs made clear during the June 2010 discussions that records related to "opt out" were a priority and provided specific search guidance; for example, by explaining why a search limited to the term "opt-out" would be insufficient. *Id.* at 3.

meaning of the "opt-out" and likely locations of relevant records. Kessler Reply Decl. ¶¶ 3, 9, 8. At Agencies' request, Plaintiffs also provided a draft list of proposed search terms covering all the RPL topics, including opt out, to serve as a starting point for discussion. *Id.* at ¶ 12, Attach. 1, Ex. D (proposed search terms). Agencies, however, persisted in their refusal to provide even the most basic information about their information technology, their file structures, the status of processing and production, or to engage in meaningful negotiations with Plaintiffs.

## V.    The Adequacy of Search Challenge

Plaintiffs first raised the issue of adequacy of search with the Court *before* the RPL and Opt-Out Records productions, expressing concern that, given Agencies' refusal even to discuss search-related issues, the searches would be inadequate. *See* Jan. 12, 2011, Hr'g Tr. at 47-51. Plaintiffs raised the issue again by letter in August 2011, identifying potential deficiencies in their Opt-Out and RPL searches and requesting further information regarding Agencies' searches and information systems to facilitate negotiations and narrow the issues for litigation. *See* Ex. F (Letter from S. Patel to C. Connelly, Aug. 8, 2011).[4] Agencies again refused to provide further information about the searches, stating they would only provide further information in the context of motion practice. *See* Ex. E (Letter from C. Connelly to S. Patel, Sept. 23, 2011).

As a result, the parties forewent further negotiation and agreed upon a schedule for partial summary judgment briefing on the adequacy of the Opt-Out and RPL searches. *See* Stipulation and Order, Nov. 23, 2011, Dkt. # 159. The Agencies filed a partial motion for summary judgment on January 12, 2012, but agreed to withdraw the motion after Plaintiffs identified severe deficiencies in the declarations. Dkt. # 167; Feb. 2, 2012  Hr'g Tr. at 7. On March 2, 2012, Agencies submitted a revised motion and supporting declarations. Dkt. # 177.

---

[4] Unless otherwise noted, all exhibits cited herein are attached to the Patel Declaration.

## ARGUMENT

Agencies bear the burden of showing that the search conducted was reasonably calculated to uncover all relevant records.  As set forth below, Agencies have failed to do so.

## I.    Cooperation Among Parties is Critical in the Electronic FOIA Age

The volume of agency records created and retained in an electronic format has increased exponentially over time. In recognition of this expansion, Congress amended FOIA in 1996 to clarify the application of FOIA's disclosure obligations to electronic government records. *See* PL 104-231 H.R. 3802 ("EFOIA Amendments"). Notably, Congress specifically identified collaboration as one method by which FOIA requesters and agencies could ensure efficient processing of requests for electronic records. *See e.g.*, 5 U.S.C. § 552(a)(6)(B)(ii) (2009) (requiring agencies' FOIA Public Liaisons to aid in the negotiation and processing of FOIA requests under certain circumstances); *see also* H. Rep. No. 104-795, H.R. 3802 (1996), 1996 U.S.C.C.A.N. 3448, at 3466 (the "Committee believes that FOIA works best when requesters and agencies work together to define and fulfill reasonable requests.").

Understanding the benefits of cooperation, courts have advised parties in FOIA litigation to meet and confer to avoid unnecessary burdens and wasteful searches. *See e.g.*, *Schoenman v. FBI*, 763 F. Supp. 2d 173, 183 (D.D.C. 2011) ("[P]roactive, voluntary efforts on the part[s] of agencies," are encouraged and attempts to "undermine [the] process" of coming to an agreement are similarly discouraged). Indeed, a dialogue between agencies and requesters early on promotes transparency and the efficient use of government resources. *See* Declaration of Daniel L. Regard, Mar. 26, 2012 ("Regard Decl.") ¶ 8 (cooperation allows requesters to clarify the scope of the request before burdensome searches are conducted). In practice, the negotiation of search terms and the discussion of data storage locations is common during both the administrative FOIA process and litigation. Patel Decl. ¶ 5; Ex. C (Letter from K. Gallo, DHS

5

OIG, Apr. 29, 2010) (explaining how DHS OIG negotiated search terms with Plaintiffs prior to the instant litigation); Ex. E (Declaration of Anne Weismann ("Weismann Decl.") ¶¶ 4-7).

FOIA promotes an open dialogue between requesters and agencies to further transparency and accountability in government, without needless litigation.  Likewise, this Court, among others, has required civil litigants, including the government, to cooperate in the retrieval and production of ESI to avoid wasting time, effort and resources of the parties and the courts. *See SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 415 (S.D.N.Y. 2009); *see also* Electronic Discovery Deskbook § 5:1-5:2 n.2 (Thomas Y. Allman et al. eds., Practicing Law Institute 2011) (collecting cases wherein courts have "warned parties of the need to cooperate to resolve their [electronic discovery] disputes rather than burdening the courts with them.").  Ignoring the benefits of practical steps, proven effective in facilitating the efficient retrieval of ESI, needlessly wastes resources and impedes the timely resolution of FOIA requests.

Where, as here, Agencies refuse to cooperate with requesters  to develop reasonable sESI searches, they bear the burden of establishing that searches conducted were reasonably calculated to uncover all relevant using the people, technologies and process available. *See supra*, II.A; *see also* Regard Decl. ¶¶ 8-10. Defendants have failed to meet this burden.

## II.    Legal Standard

### A.    FOIA Adequacy of Search Standard

Agencies seeking summary judgment in a FOIA action have the burden to demonstrate the adequacy of their search for records relevant to a request. *Carney v. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir. 1994). To prevail, each defendant agency "must show beyond material doubt that it has conducted a search reasonably calculated to uncover *all* relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007), quoting *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (emphasis added); Defs. Br. at 4 (citing *Grand Cent. P'ship., Inc. v.*

*Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). This "'reasonableness test' should be "consistent with congressional intent tilting the scale in favor of disclosure" *Id.*

Although agency declarations submitted to meet this standard are accorded a presumption of good faith "requester[s] may[ ] produce countervailing evidence [of inadequate search], and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Morley*, 508 F.3d at 1116 (internal citations omitted). Thus, contrary to Defendants' erroneous contention, Plaintiffs need not show bad faith to defeat a summary judgment motion. *Families for Freedom v. CBP*, No. 10 Civ. 2705 (SAS), 2011 U.S. Dist. LEXIS 148453, at *11 (S.D.N.Y. Dec. 27, 2011) ("where an agency has not satisfied its burden, a showing of bad faith is not necessary").

To demonstrate that a search was reasonably calculated to uncover relevant records, an agency must make several showings. *First*, each agency must provide reasonably detailed information that "'identif[ies] the searched files and describe[s] at least generally the structure of the agency's file system' which renders any further search unlikely to disclose additional relevant information." *Katzman v. CIA*, 903 F. Supp. 434, 438 (E.D.N.Y. 1995) (quoting *Church of Scientology v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986)). *Second*, an agency must show that it did not adopt an overly narrow interpretation of the request. *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 498-99 (S.D.N.Y. 2010) (noting that an agency must "construe FOIA requests liberally" and finding a search inadequate when the defendant was on notice of the types of documents requested but narrowly interpreted the terms in the request) (internal quotations omitted).

*Third*, the agency must show that it did not unreasonably limit the offices or custodians searched. *See*, *e.g.*, *Int'l Counsel Bureau v. United States DOD*, 657 F. Supp. 2d 33, 38-39 (D.C.

Cir. 2009) (granting plaintiffs summary judgment where an agency improperly limited its search to particular custodians and topics). Searching only those offices or custodians "most likely" to have responsive records is inadequate. *See Banks v. DOJ*, 700 F. Supp. 2d 9, 15 (D.D.C. 2010) (finding a search insufficient where defendants failed to explain why they included some custodians and excluded others); *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (finding search inadequate where agency affidavit merely stated that agency searched only the record system "most likely to contain" the requested information and did not "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents").

*Fourth*, agencies must show that they "follow[ed] through on obvious leads to discover requested documents." *See Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (finding a search inadequate where, *inter alia*, an agency failed to search an office identified as potentially containing responsive records and an individual with a close nexus to the record requested). This "includ[es] leads that emerge during [an agency's] inquiry." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) (holding that the district court erred in finding FBI's search adequate when FBI failed to search for potentially responsive records alluded to in other records the FBI produced). Accordingly, "the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell*, 164 F.3d at 28.

Finally, "[e]vidence that relevant records have not been released may shed light on whether the agency's search was indeed adequate." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *Founding Church of Scientology v. NSA*, 610 F.2d 824, 835-38 (D.C. Cir. 1979) (finding a search inadequate where there were "well-defined requests and

positive indications of overlooked materials"). For example, the discovery of responsive documents found after an agency conducts its search provides evidence of inadequacy. *See Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp.2d 1, 8 (D.D.C. 2004); *Krikorian v. Dep't of State*, 984 F.2d 461, 468-69 (D.C. Cir. 1993) (remanding for the district court to consider whether an agency's search was adequate when the plaintiff found relevant agency documents that the agency failed to produce).

B.     FOIA Adequacy of Search Standard as Applied to Electronic Searches

Defendants agree that the requirement to provide "reasonably detailed declarations" and conduct a search "reasonably calculated" to uncover *all* relevant records applies equally to all searches, including electronic, under FOIA. *See* Defs. Br. 7 (noting that the standard for electronic searches FOIA is "identical" to the general standard). In adequacy of search cases involving ESI, courts have suggested certain minimum requirements. *See*, *e.g.*, *Families for Freedom v. U.S. Customs and Border Protection*, No. 10 Civ. 2705 (SAS), 2011 U.S. Dist. LEXIS 148453, at *12 (S.D.N.Y. Dec. 27, 2011) (ruling on adequacy of search for electronic documents); *see also Banks v. DOJ*, 700 F. Supp. 2d 9, 15 (D.D.C. 2010); *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). While these courts have made determinations of the adequacy of particular aspects of electronic searches, no court has comprehensively analyzed the factors to consider when determining whether searches involving ESI are adequate under FOIA. Nevertheless, baseline standards have emerged in FOIA jurisprudence about information technology best practices and, with reference to the field of electronic discovery, these standards suggest a basic framework for courts to assess the adequacy of EFOIA searches.

1.   *Agencies Must "Reasonably Describe" Electronic Information Systems and Technology*

A "reasonable description" of information systems in the EFOIA context must be detailed enough to allow FOIA requesters and courts to assess whether the choice of particular search locations or technology was appropriate under the circumstances. *See Families for Freedom*,2011 U.S. Dist. LEXIS 148453, at *12  (finding a declaration insufficient that failed to "explain exactly which files and storage systems are being searched and exactly how that search is being performed").[5] *See also* Regard Decl. ¶¶ 13-22 (appropriate electronic searches are circumstance specific). Congress recognizes that FOIA requesters need to understand an agency's information systems in order to formulate an appropriate FOIA request and that transparency about information systems is an integral part of an agency's commitment to overall transparency and compliance with FOIA. *See* 5 U.S.C. § 552(g) (requiring agency heads to make public an index of major information systems, and description of major information and record locator systems ). In the context of EFOIA, a "reasonable description" of an agency's information system should include, at minimum, the commercially available technology used, the operating system and software versions, reasonable descriptions of the federal government proprietary technology systems and other relevant information, including email retention policies and practices. *See* Regard Decl. ¶¶ 13-22; Weismann Decl. ¶ 8.[6]

In the EFOIA context, an agency should aver that it reasonably utilized all available technology and electronic data sources to ensure that the search was reasonably calculated to identify *all* responsive records. *See Oglesby*, 920 F.2d at 68 (requiring agencies to "aver that all

---

[5]  *Cf. Victor Stanley, Inc. v. Creative Pipe, Inc.,* 250 F.R.D. 251, 260 n.10 (D. Md. 2008) (encouraging litigants to be aware of the strength and weaknesses of various ESI retrieval methodologies, in order to select the most appropriate method under the circumstances).

[6] *See also* S. Rep. No. 104-272, at 31 (1996) (noting that computer software should be treated as a "record" under FOIA subject to release).

files likely to contain responsive materials were searched."). *See also* Regard Decl. ¶ 9

(describing the components of a thoughtful search and collection process). An agency must

explicitly justify the failure to search an available information system containing potentially

relevant records by showing that the effort required to search that particular information system

would be unreasonable because it "would significantly interfere with the operation of the

agency's automated information system." 5 U.S.C. § 552(a)(3)(c). When a given technology in

use has flaws, agencies should make reasonable efforts to fill those gaps. *Id.* A poorly

constructed or maintained database does not justify a lack transparency or accountability.[7] To the

contrary, the agency must still comply with its obligation to conduct a reasonable search.

### 2. *Agencies Must Use An Adequate Electronic Search Process*

Most importantly, agencies must ensure that, taken together, the choices they make in

constructing an electronic search result in searches that are reasonably calculated to uncover *all*

relevant records. *See Morley*, 508 F.3d at 1114. These choices include: (1) the technology and

data sources used; (2) the selection, testing and application of search terms, including whether

Boolean connecters are used; (3) whether to have individual custodians conduct searches; and (4)

the provision of instructions to those individual custodians. Regard Decl. ¶¶ 12-19. Agencies

must ensure that, given the technology utilized, the process of formulating and testing search

terms results in terms reasonably calculated to uncover all relevant documents. *See*, *e.g.*,

*Families for Freedom*, 2011 U.S. Dist. LEXIS 148453, at *12 (noting that the search terms used,

and "the method in which they are combined and deployed is central to the inquiry" of adequacy

of search); *Fox News Network LLC v. U.S. Dep't of the Treasury,* 678 F. Supp. 2d 162, 166

---

[7] *See* 104 Cong. Rec. S10888-02, (1995) (Statement of Sen. Leahy) (noting that "this bill would require all Federal agencies to use technology to make Government more accessible and accountable to its citizens by requiring an assessment of those new computer systems will enhance agency FOIA operations to avoid erecting barriers that impede public access.").

(S.D.N.Y. 2009) (finding failure to use obvious acronyms inadequate); *Hasbrouck v. U.S. Customs & Border Protection,* No. C 10-3793, 2012 U.S. Dist. LEXIS 7450, at \*12 (N.D. Cal. Jan. 23, 2012) (finding failure to use spelling variants inadequate). *See also* Weismann Decl. ¶ 5 (describing how database search capabilities dictated choice of search terms). As Defendants concede, courts will find inadequacy where search terms used are narrow or incomplete. Defs. Br. at 9-10.

In addition, while it may be reasonable for an agency to rely on individual custodians to assist with the identification of relevant documents, individuals have differing levels of competency with technology. Regard Decl. ¶ at 19; Weismann Decl. ¶ 8.[8] Therefore, agencies must be able to explain how they ensured the competency of individual custodians, for example through training, search instructions, or oversight by an attorney or an information technology professional. *See* Regard Decl. ¶¶ at 19-20 (noting that satisfactory electronic searches by individual custodians generally involve instructions).[9]

## III.    The Agencies' Searches

As discussed below, based on the declarations provided, Agencies' choices with respect to: (1) certain custodians and data locations searched; (2) the search terms and methods employed; and (3) the use of available technology, were either patently inadequate or remain opaque to both Plaintiffs and the Court. As a result, Defendants are not entitled to summary judgment and Plaintiffs should be granted partial summary judgment. *See, e.g.*, *Valencia-Lucena*, 180 F.3d at 325; *Int'l Counsel Bureau*, 657 F. Supp. 2d at 38-39.

---

[8] *Cf. Victor Stanley Inc.*, 250 F.R.D. at 262 (requiring producing party in civil discovery to specify qualifications of the individuals selecting search terms).
[9] *Cf. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 473 (S.D.N.Y 2010) (noting the benefit of attorney oversight when employees with limited expertise are tasked with searches for ESI).

12

A.     Deficiencies in FBI's Search

Because of the large role the FBI played in the opt out controversy, the agency's records are particularly important to ensure transparency in the federal government's decision-making to shift Secure Communities from a voluntary to a mandatory program. *See, e.g.*, Ex. B, Docs. ## 1, 4, 5, 14-16.[10] The FBI manages the Integrated Automated Fingerprint Identification System ("IAFIS"), the world's largest biometric database. *See* Declaration of David M. Hardy, Nov. 12, 2010 ("First Hardy Decl.") ¶ 16. Since 2005, the FBI has worked with DHS to achieve "biometric interoperability" between IAFIS and DHS's immigration database, the Automated Biometric Identification System ("IDENT"). *Id. ¶* 17. Under Secure Communities, fingerprints sent by state and local law enforcement to IAFIS are forwarded to IDENT, through interoperability, for an immigration check.[11]

The FBI's decisions to make IAFIS and IDENT fully interoperable has driven the determination by DHS, ICE and FBI to make Secure Communities mandatory. One key decision occurred in June 2009. The FBI Criminal Justice Information Services ("CJIS") division's Advisory Policy Board ("APB") voted to recommend that *all* criminal submissions to IAFIS be forwarded to IDENT for immigration checks, regardless of the submitting agency's preference. *See* Ex. B, Docs. # 1, 2, 4, 13, 22, 25. This recommendation was adopted by the FBI Director and forms the technological basis for mandatory participation in Secure Communities. *Id.*

---

[10]  For the Court's convenience, Plaintiffs have listed all relevant supporting evidence in a Document Index. *See* Patel Decl. *¶* Ex. B, Document Index. The documents are cited herein as Docs. ## 1-77. Note that documents 1-37 are included as attachments to the index. Documents 38-77 are publicly available and URLs are provided in the index.

[11]  *See* ICE Secure Communities Standard Operating Procedures (2009) at 3, available at http://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf.

13

1.   *FBI excluded crucial custodians and record locations from its search for Opt-Out Records and RPL Item VII.*

Despite the involvement of high-level FBI officials in Secure Communities and the opt-out controversy in 2010 and 2011, the FBI failed to search the following offices and custodians for Opt-Out Records and RPL Item VII records:

a)   *FBI Director, Deputy Director, and Associate Deputy Director*: The FBI did not search these three custodians for relevant records. Seventh Declaration of David M. Hardy ("Hardy Decl.") ¶¶ 17, 26. Yet the FBI Director discussed and/or approved high-level policy decisions about the voluntary or mandatory nature of Secure Communities both before and after the October 15, 2010 cut-off date for Opt-Out Records. *See* Ex. B, Docs. ## 5, 17, 19, 27, 30, 32, 39, 64. The Deputy Director and Associate Deputy Director were also involved in discussions about opt-out and IDENT/IAFIS interoperability. Ex. B, Docs. ## 12, 28-30, 62.

b)   Chief of Staff and Senior Counsel to the Director: Tasked with advising the Director, and managing his day to day operations, this custodian was involved in discussions related to Secure Communities and opt *out*. *See* Ex. B, Docs. ## 28, 29, 32. The FBI did not search this custodian's records. Hardy Decl. ¶¶16, 26.

c)   Office of General Counsel ("OGC"): The FBI searched only the National Security Law Branch of OGC and one attorney in the Access Integrity Unit ("AIU"). See id. ¶¶ 16, 21.[12] However, OGC has been involved in discussions about biometric interoperability with DHS since August 2009, including privacy reviews relevant to RPL Item VII. See Ex. B, Docs. ## 10. The OGC, including the General Counsel and Deputy General Counsel, was also involved in discussions related to Secure Communities and opt-out. Id. Docs. ## 18, 20-21, 28-30, 44.

d)   Science and Technology Branch ("STB"), Executive Assistant Director ("EAD") for STB: The FBI did not search these custodians despite the EAD's involvement in Secure Communities and opt out discussions. *See* Ex. B, Docs. ## 20, 28-30. The STB also houses CJIS, which manages the IAFIS database. Hardy Decl. ¶¶ 6, 17-18.

e)   Office of Law Enforcement Coordination ("OLEC" or "LEC"): OLEC was not searched, even though it is the FBI's primary liaison with state and local law enforcement. Questions from these partners about Secure Communities' voluntary or mandatory nature fall squarely within OLEC's mandate. This custodian was

---

[12]  The FBI had previously represented that OGC was searched and "reported having no documents."  *See* First Hardy Decl. ¶¶ 22-23. The FBI now admits the limited scope of its OGC search and further acknowledges that the National Security Law Branch in fact never responded to the FBI's search memorandum. Hardy Decl. ¶¶ 17, 21.

also involved in Secure Communities and opt-out discussions. See Ex. B, Docs. ## 28, 63, 65. However, OLEC was not searched for Opt-Out Records.

Further, FBI failed to search archived records for both current and former employees and failed to search seven former employees' records, including emails, paper files and home drives, despite those employees' work on Secure Communities issues. Hardy Decl. ¶ 20, ¶ 20 n.7. Regard Decl. ¶¶ 36-38. Documents demonstrate that extensive discussions between the Department of Justice and DHS took place and therefore the FBI should have conducted a more extensive search for RPL Item VII. Ex. B, Docs. ## 3, 29, 39, 53.

Finally, several FBI searches excluded Opt-Out Records from February 4 through October 15, 2010. The lone attorney from the AIU of the OGC who searched his records, and the Advisory Groups Management Unit ("AGMU") do not appear to have searched for these records. Hardy Decl. ¶¶ 17, 21, 25-28 (indicating only personnel in the Interoperability Initiatives Unit within CJIS searched for later Opt-Out Records).

2.   *FBI used limited search instructions and insufficient search terms for Opt-Out Records, and failed to follow up on obvious leads*

Unlike the other Agencies, the FBI did not attach its search memoranda or describe their contents in detail. The limited description of search instructions provided in the Hardy Declaration indicates that neither memorandum: (a) instructed custodians to search archived records; (b) suggested or specified any search terms to be used; or (c) provided guidance for how the search should be conducted. Hardy Decl. ¶ 16, 26. The failure to provide this information to personnel conducting the searches is inadequate. *See* Regard Decl. ¶ 30-35. [13]

---

[13]  The FBI's search of its Central Records System ("CRS") also appears to have been inadequate, both because the system itself cannot be effectively searched and because the search terms used were inadequate search terms. The FBI only used the term "Secure Communities" to search the CRS. *Id.* ¶ 14; Regard Decl. ¶¶ 40-41.

In addition, the actual search terms used to identify Opt-Out Records were inadequate. Regard Decl. ¶¶ 25-29.  To identify Opt-Out Records created before March 2, 2010, the FBI used only "opt-out" and "opt out" to search email and PowerPoint files of previously gathered records. Hardy Decl. ¶ 25. For opt-out records created from March 2, 2010 to October 15, 2010, the agency used only the term "opt-out" within the "Unclassified and Secret systems." *Id.* ¶ 27. The use of these limited search terms to uncover relevant records was "facially deficient" and not reasonably calculated to uncover relevant records. Regard Decl. ¶¶ 25-29. The FBI itself acknowledges that parties "would not always use the term 'opt-out' in discussions." Hardy Decl. ¶ 28. Indeed, records related to opt-out dating before March 2, 2010, and containing obvious terms such as "mandatory" and "IDENT/IAFIS Interoperability" were not produced until well after the opt-out production date in January 2011. *See e.g.*, Ex. B, Docs. ## 14-16; Regard Decl. ¶¶42-43.

The FBI also did not follow up on obvious leads indicating that APB documents were missing. The FBI has not produced any records or minutes of the key APB 2009 vote, the questions, comments, or discussion preceding that vote, the FBI Director's decision to adopt the APB recommendation, or the FBI's communication of the APB decision to DHS or ICE.[14] *See* Ex. B, #14; Ex. B, Docs. ## 1, 2, 4, 5, 13, 22, 25, 27.

3. *Missing information regarding search instructions, capabilities, and methods*

In addition to deficiencies with the FBI's search, the FBI's declarations fail to provide sufficient detail for the Court or Plaintiffs to assess the adequacy of its search. First, it is unclear whether FBI searched for CJIS APB records, which are key to understanding the inter-agency

---

[14]  FBI-SC-FPL603, at 604 confirms that meeting minutes from the June 2009 APB vote exist; however, Plaintiffs did not receive them from the FBI. *See* Ex. B, Doc. # 22.  These records may be located in the AGMU. *Id.* at 7, 25.

16

process of denying limitations of Secure Communities information-sharing. *See* Hardy Decl. n.6; *infra* 13. Second, FBI provided insufficient information on the search capacity and process for the one attorney within the AIU attorney who searched for responsive records; nor is there any justification for limiting the search to one person. *See* Hardy Decl. ¶ 21.

Furthermore, there is insufficient information about the contents and distribution of search memoranda and the technology used by the FBI. *See* Regard Decl. ¶ 24, 30-35; Hardy Decl. ¶¶ 16-19, 26.  Nor does the FBI provide sufficient information to justify its decision not to search the individual files of its former employees or contractors.  Hardy Decl. ¶ 19 n.7; Regard Decl. ¶¶ 36-39.

B.    Deficiencies in DHS's Search

Although DHS is the primary agency behind the creation and development of Secure Communities, it provided only 612 pages in response to the Court's December 17, 2010 order. Palmer Decl. ¶ 41. This sparse production is the result of a search process that utilized limited custodians and faulty search terms.  Regard Decl. ¶¶ 46-58.  DHS' declaration also lacks sufficient information to assess the adequacy of certain aspects of its search.

1.    *DHS excluded crucial custodians and offices in its search for Opt-Out Records and RPL Item VII*

DHS unreasonably determined that only a few offices or individuals within the entire agency—OGC, CRCL, US-VISIT, and Office of Secretary—would have Opt-Out or RPL Records. Palmer Decl. ¶ 17. DHS failed to search numerous offices and custodians likely to possess relevant records, including the following:

a)  *Homeland Security Advisory Council (HSAC)*: Tasked with "provid[ing] advice and recommendations to the Secretary," HSAC discussed Secure Communities as early as September 2009. *See* Ex. B, Docs. ## 60-70 for the Secure Communities program. *See id* Doc. # 69. Yet HSAC was not searched. *See* Palmer Decl. ¶17.

17

b) *Secretary Napolitano*: Secretary Napolitano has been central to decision-making and messaging on opt-out, as illustrated by the internal communication related to her September 7, 2010 letter to Congresswoman Lofgren confirming the ability of localities to opt out, and her public reversal of this position on October 6, 2010. *See* Ex. B, Docs. ## 3, 29, 36, 39, 40 43, 45, 49. Yet, even though DHS concedes that the Secretary's records should have been searched for records relevant to Plaintiffs' FOIA request, it is not clear that DHS searched Secretary Napolitano's records at all. Palmer Decl. ¶ 30; Regard Decl. ¶ 47.

c) *Office of General Counsel (General Counsel, Principal Deputy General Counsel, multiple Deputy General Counsels)*:[15] These custodians within OGC were not searched. *See* Palmer Decl. ¶ 24. Yet the General Counsel, Principal Deputy General Counsel and Deputy General Counsels were included in high-level emails and meetings specifically discussing opt-out and Secure Communities. Ex. B, Docs. ## 23, 31, 45, 61, 73. This correspondence specifically references the ICE legal memorandum regarding the decision to make Secure Communities mandatory. *Id. See also* October 24, 2012 Opinion and Order, Dkt. # 140, at 2-5.

d) *US-VISIT (Chief Information Officer Assistant Director Information Technology Management Division (CIO/AD-ITM))*: This position is part of the Executive Steering Committee for Interoperability, which has a direct role in shaping the information sharing aspect of Secure Communities. Ex. B, Doc. # 26. According to DHS, the CIO/AD-ITM was not searched due to the custodian's focus on "macro-level program issues, such as the overall architectures of the IDENT and ADIS databases." Palmer Decl. ¶¶ 23. This is precisely the type of information that should have been located, *i.e.* records related to the technical capacity of DHS (*i.e.* the architecture of its databases) to limit information sharing with the FBI. *See* Dkt. # 25. ITM is one branch tasked with providing information regarding interoperability at high level meetings. Ex. B, Doc. # 41.

e) *US-VISIT (Deputy Director)*: This position is part of the Executive Steering Committee for Interoperability. Ex. B, Doc. # 26. The US-VISIT Deputy Director is also included in emails discussing Illinois' ability to opt out of Secure Communities. *Id.* Doc. # 42.

---

[15] OGC's Immigration Division searched only one custodian, the Associate General Counsel, for RPL records, despite earlier averments in opposition to Plaintiffs' motion for preliminary injunction that attorneys from the Immigration Division within OGC searched and retrieved "too many" records. Palmer Decl. ¶¶ 11, 17. *See also* Ex. B, Doc. # 23 (providing OGC record directly related to Secure Communities).

[15] The Executive Steering Committee for Interoperability was created at least as early as Sept. 17, 2009. It is made up of individuals from DHS, DOJ, DOS and DOD to "identify and determine high-level policy, business, and data requirements, as well as guide the design, development, and implementation of the information sharing solution." Ex. B, Doc. Index # 26.

In addition to failing to search the above-enumerated custodians, the offices that were searched did not conduct adequate searches. The three individuals within the Office of the Executive Secretariat ("ExecSec") who searched for Opt-Out Records on behalf of the Office of the Secretary "focused primarily upon" email systems.  Palmer Decl. ¶ 33.  While there is no indication of what non-email sources were searched, if any, that office did not release any records located in hard drives or shared drives, concluding that "*all* of the relevant documents were either emails or documents attached to emails."Palmer Decl. ¶ 33 (emphasis added). Paradoxically, DHS claims that its searches of emails would have uncovered correspondences to and from Secretary Napolitano, who has no email account. *Id.* ¶ 30. Despite the Secretary's central involvement in Secure Communities Opt-Out policy, *see supra ¶*(B)(ii), it appears that DHS did not search the Secretary's own paper files, hard drive or home drive records for potentially relevant records*. See* Palmer Decl. ¶¶ 30, 33. Nor did they search the Secretary's records for RPL Item VII, which requests reports and memoranda to the Secretary. *See supra* n.1.

Of the 600 pages produced, DHS produced none relevant to RPL Item VII. Plaintiffs requested reports and memoranda sent to the Secretary of DHS, the White House and ICE Assistant Secretary. Records publically available and produced in the FPL indicate that such records must exist. *See* Ex. B, Docs. ## 53, 3, 36, 37, 45. For example, at least one former DHS Assistant Secretary testified about Secure Communities before Congress in 2009 and 2010. *See id* Doc. # 66, 77. However, DHS provides no insight into its search for Item VII records. Palmer Decl. ¶¶ 37-39.

> 2. *DHS' vague search instructions and generic search terms*

DHS provided insufficient search instructions and search terms. Regard Decl. ¶¶ 46-48, 50-54.  For example, custodians were not instructed to search shared drives or hard drives.

Palmer Decl. ¶¶ 20, 32. The instructions provided to DHS custodians presumed that all relevant documents were contained in emails. It focused searches on the Vault and Outlook, which default to searches of text within emails. *Id.* at ¶¶ 33, 13; Regard Decl. ¶49. Although DHS contends emails generally summarize the contents of attachments, no one supervising the search process confirmed or tested whether this was actually true. *Id.* Moreover, the agency never monitored the search terms used, or provided instructions on using connectors. Palmer Decl. at ¶ 13; Regard Decl. ¶¶46-48, 50-52. For the RPL searches, no search instructions or search terms were provided. *Id.* at ¶ 37; Regard Decl. ¶56.

Moreover, the search terms recommended and "used" were inadequate. Regard Decl. DHS provided the actual search terms used for a sole custodian: the Officer of CRCL, whose search included only the term "Secure Communities." *See* Palmer Decl. ¶ 28. For others, DHS provided only the search terms recommended, not those used. The recommendations omitted obvious terms that would uncover records related to information sharing between the FBI and DHS, such as "Integrated Automated Fingerprint Identification System," "IAFIS" or "interoperability" and its abbreviation "IO." *Id.* at ¶ 7 (describing Secure Communities using these terms). The list similarly excluded any terms calculated to uncover the records falling within the Court's Dec. 17, 2010 order to produce records relevant to "technological capacity of ICE and the FBI to honor requests to opt-out, opt-in or limit participation in Secure Communities." Dkt. # 25; Palmer Decl. ¶ 18; *see supra* III.C.2. Although DHS advised custodians to use other terms if they would uncover Opt-Out or RPL records, nothing indicates that any custodian developed different or better terms. Palmer Decl. at ¶ 19.

Notably, a list of search terms  negotiated during the Final Production List negotiations led to the production of DHS records that should have been produced in response to Court's

December 17, 2010 order. Regard Decl. ¶¶57-58.  This fact highlights the deficiencies of the

search term recommended and "used" here. *Id.*; Ex. B, Doc. Index # 3, 39, 40.

3.     *Missing information on search terms, file structure and locations searched*

In addition to the obvious deficiencies of DHS' search, there is little detail regarding

DHS' general file structures and systems, including email filing systems and archives. *See*

Palmer Decl. ¶¶ 40-42. For the Opt-Out Records search, DHS did not provide the actual search

terms used or file locations searched, including whether attachments to emails were reviewed for

responsiveness. *See infra*, II.C.3 (deficiencies in opt out search terms); Regard Decl. ¶¶ 46-49.

DHS' explanation of the RPL search likewise omits information regarding actual

searches conducted. Explaining searches for several categories of records, DHS states that only

two DHS offices—US-VISIT and the Office of the Secretary—were given a copy of the RPL

with instructions to review the RPL, determine whether they had relevant documents and locate

them based on their knowledge of their filing systems.[16] Palmer Decl. ¶¶ 19, 34, 37. While

certain custodians may locate and search for records without using search terms because

custodians understood where to find relevant records, without more information it is difficult to

determine whether those custodians conducted an adequate search. *See* Regard Decl. ¶¶46-48.

C.     Deficiencies in ICE's Search

ICE failed to search several crucial custodians for relevant Opt-Out Records. In addition,

ICE's search process used generic search terms and vague and ambiguous search instructions

that made its search inadequate. Regard Decl. ¶¶69-74.  Finally, the ICE's declaration does not

---

[16] It appears OGC did not search for records responsive to the RPL beyond Opt-Out. While the Palmer Declaration states that the same custodians searched for RPL records as for opt-out records, there is no further information regarding the office's search for RPL records. Palmer Decl. at ¶¶ 34-39. CRCL relied upon its original faulty search of records based on a single search term of one custodian. *Id.* ¶ 35.

provide certain details that would permit the Court or Plaintiffs to evaluate the search. Regard

Decl. ¶¶61-63, 66-68, 71.

1.    *ICE's exclusion of crucial custodians and record locations from its Opt-Out Records search*

ICE excluded the following custodians likely to possess relevant Opt-Out Records:

a)   *Deputy Director*: As ICE's "chief operating officer," the Deputy Director has participated in high level discussions, hearings, and outreach to states and localities on Secure Communities and opt out issues. *See* Ex. B, Docs. ## 33-35, 43 (Deputy Director Kumar Kibble). Yet, the Deputy Director did not search for Opt-Out Records. *See* Law Decl. ¶¶ 29(g), 52.

b)   *Homeland Security Investigations (HSI)*: HSI has participated in hearings, responses to media, and discussions with states and localities relating to Secure Communities and opt-out. *See* Ex. B, Docs. ## 11, 24, 38, 57, 60. However, HSI did not search for any records relevant to the Request even though it had been tasked with doing so, because it unilaterally determined that the office would not be likely to have relevant records based on a test search using only the words "secure" and "communities." Law Decl. ¶ 24 n.3, ¶¶ 25-26.

c)   *Contractors*: Private contractors, including from Omega Secure Solutions, BoozAllen, BAI Systems, and Fleishman-Hillard have played a direct role in Secure Communities, discussions and decision-making on the opt out issue, and the overall opt out controversy. *See* Ex. B, Doc. ## 8[17]; Dkt. # 95 (letter from one former ICE contractor explaining his key role in developing and implementing opt out policy). However, from ICE's declaration, it is unclear whether or how contractors were searched. *See* Law Decl. ¶ 24, 36.

d)   *Office of State, Local, and Tribal Coordination (OSLTC)*: Responsible for "build[ing] awareness and understanding of" Secure Communities, senior OSLTC officials – such as the Assistant Director, Senior Public Engagement officer, regional points of contact and Chief of Staff – were directly involved in discussions and outreach with state and local officials relating to Secure Communities and the opt out issue. *See* Ex. B, Docs. ## 37, 50, 53, 60, 72. However, only two custodians searched for Opt-Out Records. *See* Law Decl. ¶¶ 36, 29(i).

e)   *Privacy Office*: The Privacy Office of ICE was not asked to search for documents responsive to the RPL (including opt out) because the agency did not believe it would have records. *See* Law Decl. ¶ 55. The office further confirmed it would

---

[17] *See also* May 9, 2011 Letter from Dan Cadman to Congresswoman Lofgren and April 12, 2011 Letter from Dan Cadman to Marc Rapp, at http://uncoverthetruth.org/wp-content/uploads/Letter-to-DHS-OIG-re-SComm-Investigation-Follow-Up-5-17-111.pdf (letter from former ICE contractor explaining his key role in developing and implementing opt-out policy).

not have responsive records. *Id.* However, the office and the Privacy Officer for ICE attended at least one bi-monthly meeting of the Secure Communities Executive Steering Committee. *See* Ex. B, Doc. # 48.

2.   *ICE's vague instructions and generic search terms for Opt-Out Records*

ICE began its search for Opt-Out Records in November 2010. *See* Law Decl. ¶ 36. The "How to Search for Opt-Out Records" document was circulated to a list of individual custodians..[18] It did not provide instructions to search archived records, email attachments or guidance for manual reviews of paper records or files, and thus those data sources were not searched. Law Decl. ¶ 36, Ex. B; Regard Decl. ¶¶ 61-65. Further, many individual custodians did not conduct manual searches of paper records. *See* Law Decl. ¶¶ 39-40, 42, 43, 47, 49, 50, 52. Relying upon earlier searches conducted mostly prior to the RPL agreement, the "How to Search" instructions limited the search from April 30, 2010 through October 15, 2010. *Id.* ¶ 36, Ex. B. In so doing, ICE assumed that custodians would have appropriately searched for Opt-Out Records created prior to April 30, 2010 in the context of their earlier searches for records responsive to the entire FOIA request. *See* Law Decl. ¶¶ 24, 28, 29(b), 39, Ex. B; 11/12/19 Pavlik-Keenan Decl. ¶ 26 (stating the agency applied a search cut-off date of April 30, 2010). But those earlier searches were conducted without search terms or guidance related to "Opt Out."

Moreover, the instructions suggested only five generic terms with some variants and provided no guidance on combining terms or using connectors or Boolean searches. *See* Law Dec. ¶ 36, Ex. B; Regard Decl. ¶¶70-72 . The list omitted "Secure Communities" or common

---

[18] It is noteworthy that this list contains the same offices that previously provided responsive records to the general FOIA request. Law Decl. ¶¶ 24, 26. The only exception is the addition of the Office of the Director, which was not asked to search for records responsive to the FOIA request prior to the Opt-Out Records search. Law Decl. ¶ 26. It is unclear whether OAS searched for responsive opt out records, as ICE declared in the January 12, 2010 Law Declaration ¶ 35, rather than the Office of the Director. Law Decl. ¶¶ 26, 52. In addition Senior OPLA leadership were not disclosed as custodians searching for responsive records prior to this declaration. *Compare* Law Decl. ¶¶ 46, *with* 1/12/12 Law. Decl. ¶ 49.

abbreviations (*i.e.* "SC"). In some cases the search terms *actually* applied were plainly

inadequate. *See* Law Decl. ¶¶ 44, 49 (OPLA HSILD used only "opt out" and "opt-out", and

OSLTC used only "opt-out," "voluntary" and "mandatory");[19]  Regard Decl. ¶¶70-72, 75-76.

These inadequacies in search terms, data sources and instructions are not merely

academic. The FBI and DHS produced records as part of their Opt-Out Records productions,

which identify records that should have been produced by ICE. *See* Ex. B, Docs. ## 9, 36;

Regard Decl. ¶¶75-76.  Further, the results of the FPL included documents dated before

October 15, 2010 which should have been produced as Opt-Out Records. *See e.g., id.* Docs. ##

39, 40. These records discuss requests by states and localities, prior to October 15, 2010, to limit

their participation or opt out of Secure Communities. *See supra*, 8-9 (discussing probative value

of documents released later or unreleased records to inadequacy determination).

3.  *Missing information regarding connectors, search terms and scope of search*

ICE's declaration fails to provide any explanation of its reasons for excluding crucial

custodians and offices from its search.  In addition, ICE does not specify the version of Microsoft

Outlook (whether 2003 or 2007) used by different offices or custodians. Law Decl. ¶ 7; Regard

Decl. ¶71. It is unclear whether connectors were used for any of the searches or how they were

combined. *See* Law Decl. ¶¶ 21, 36. Further, in some cases the search terms are unknown. Law

Decl. ¶ 42 (ERO custodians were searched but no information provided); ¶ 37 (ERO Secure

Communities searched but no search terms provided); ¶ 50 (OCR searched but no search terms

provided); ¶ 53 (ExecSec searched but no search terms provided). It remains unclear, based on

the "How to Search" document and the Law Declaration's description of custodians' searches,

whether any custodians searched emails located in folders within Microsoft Outlook or

---

[19] *See* 1/12/12 Law. Decl. ¶ 49 (Office of Director custodians only searched using "opt out" and "opt-out").

attachments to emails. *Compare* Law Decl. Ex. B(specifically instructing custodians to search sent and received messages), *with* Law Decl. ¶ 7 (each employee uses a different method of storing Microsoft Outlook email files). *See also* Regard Decl. ¶¶71-72.

Moreover, the description of the search employed for ICE ERO and ICE ERO Secure Communities lacks specific information regarding the scope of the search.  For example, ICE provides no details about how the search of "all staff" in the Secure Communities Deployment Unit was conducted. Law Decl. ¶¶ 29(c), 38. It is thus impossible to evaluate the quality of the search or even to determine whether the Branch Chief of that unit, who was directly involved in discussions with states and localities about opt out, searched for responsive records. *See* Ex. B, Docs. ## 9, 54, 58, 61 (providing documents describing involvement of Branch Chief in opt-out issues though not originating from him or her).

D.    Deficiencies in OLC Searches

OLC represented that it had responded to the entirety of the Request in its search for documents produced pursuant to the Court's order of December 17, 2010 (Dkt. No. 25).[20] Yet OLC's searches yielded only the drafts of two declarations. Both of these declarations discuss the Secure Communities program as well as biometric information-sharing. Patel Decl. Ex. D; Palmatier Declaration ¶ 7; Ragsdale Declaration, Ex. B, Doc. # 99, .

1.    *OLC's exclusion of likely custodians from its search*

To determine likely custodians of records, in November of 2010 OLC queried "two long-term career OLC attorneys . . . who are generally aware of assignments of work at OLC." Colborn Decl. ¶ 8. There is no indication that either of these attorneys searched their records, but

---

[20] Plaintiffs dispute Defendants' contention that a ruling here in OLC's favor would constitute summary judgment for the entirety of OLC's response to the Request.  This Motion addresses only Opt Out and RPL records.  Plaintiffs respectfully reserve the right to challenge OLC's response to the remainder of the Request.

both reported that they were "unfamiliar" with Secure Communities and had "no recollection" of OLC's work on issues related to the program. *Id.* Nonetheless, a "general query to all OLC attorneys" two months later elicited a response from two Attorney-Advisors whose manual searches of a non-specified "set of documents" determined that drafts of the two declarations were responsive to the FOIA request. Colburn Decl. ¶ 9. This discovery should have alerted Defendants that the recollection of the career OLC attorneys queried in November 2010 was faulty. But there is no indication that Defendants followed up with those two employees, much less required any other OLC attorneys to search their electronic or paper records. Regard Decl. ¶¶79-81.

In fact, while "[a] few attorneys in the office affirmatively stated" that they had not worked on Secure Communities issues, "most attorneys did not respond" to the November 2010 request. Colburn Decl. ¶ 9. Yet nothing in the Colburn Declaration indicates any effort to follow up with attorneys who did not respond or to check the recollections of those who did. No attorney was required—or even instructed—to search his or her records. Regard Decl. ¶¶79-81.

Instead, OLC searched only the emails of those 25 OLC attorneys, referred to as "departed users," employed between June 1, 2007 and October 15, 2010 but no longer on staff. Colburn Decl. ¶ 8. As shown below, those searches used only two search terms and were plainly inadequate. But even if the two search terms had satisfied legal standards, OLC's decision to limit its search of emails to those of "departed users" was unjustifiably narrow, and OLC provides no legitimate explanation for its decision not to search the email records of current staff.

2.  *OLC's limited search terms*

Alone among the agencies submitting declarations, OLC provided the search terms actually used to search its central storage database and the emails of departed users. Colburn Decl. ¶¶ 6-7; Colburn Decl. Ex. A. The list of terms used to search the central storage database

26

excludes such crucial phrases and terms as "opt-out" and "interoperability." *Id. ¶* 6; Colborn

Decl. Exhibit A. These exclusions are astonishing given that Opt-Out Records were the subject

of the Court's December 17, 2010 order and specified in Item II of the RPL. Regard Decl. ¶¶82-

84.  Further, OLC must have understood the relevance of the term "interoperability," because it

was one of only two terms used in searches of departed users' emails. Colborn Decl. ¶ 8. In

addition, while the search engine that OLC uses to search its central storage system ("lsys") is

capable of capturing variations of terms, it is not clear that it can capture unspecified acronyms

or abbreviations. Regard Decl. ¶¶82-84. While OLC used abbreviations for some phrases (*e.g.*

"CAR" for "Criminal Alien Records"), it did not make use of far more obvious abbreviations

such as "SC" or "S-Comm" for "Secure Communities." *Id.;* Regard Decl. ¶¶82-84.

OLC's search of departed users' emails was even more limited. OLC used only two

terms— "secure communities" and "interoperability" — providing no explanation for its failure

to use even the truncated list of terms identified in Exhibit A. Colborn Decl. ¶ 8. Nor does OLC

explain why it also failed to use such obvious phrases as "opt out" or "opt-out" or such common

abbreviations as "SC" or "S-Comm. Regard Decl. ¶¶82-84.

**IV.   The Court Should Order Additional Searches and Supplemental Declarations**

A district court may order agencies to conduct additional searches when their searches

were inadequate. *See*, *e.g.*, *Morley*, 508 F.3d at 1119-20 (ordering defendant agency to search

particular records it had failed to search); *Int'l Counsel Bureau*, 657 F. Supp. 2d at 40 (ordering

an agency to re-conduct its search because its original search was inappropriately limited in

scope). In addition, a court may order defendants to provide supplemental declarations where

defendants have provided insufficient information or explanations, or there remains a factual

dispute regarding aspects of their search. *See Morley*, 508 F.3d at 1121 (ordering supplemental

explanation). Accordingly, Plaintiffs respectfully request that this Court order Agencies to conduct additional searches and provide additional information as follows.[21]

Plaintiffs request that the Court order the FBI to do the following:

- Search the offices, custodians or data sources identified in Part (A)(1)(a)-(e) *supra* for Opt-Out Records and Records relevant to Item VII of the RPL using a list of search terms agreed upon by the parties.

- Search the archived records for both current and former employees and contractors, and the individual files and emails of former employees and contractors using, where appropriate, a list of search terms agreed upon by the parties;

- Search the AIU and AGMU for Opt-Out Records for the date range February 4-October 15, 2010 using, where appropriate, a list of search terms agreed upon by the parties;

- Search the AGMU or other offices for records related to the APB 2009 vote to make interoperability, and thereby Secure Communities, mandatory, including, but not limited to, the questions, comments, and discussion preceding that vote, the FBI Director's decision to adopt the APB recommendation, and the FBI's communication of the APB decision to DHS or ICE;

- Search CJIS IIU for Opt-Out Records using a list of search terms agreed upon by the parties;

- Provide additional information regarding: (a) the version of Microsoft Outlook used to conduct searches and whether it searched, or can presently search, attachments; and, (b) how searches of electronic records were conducted by individual custodians and what search terms were used.

Plaintiffs request that the Court order DHS to do the following:

- Search the offices and custodians identified in Part (B)(1)(a)-(e) *supra* for Opt-Out Records and Records relevant to Item VII of the RPL, using, where appropriate, a list of search terms agreed upon by the parties;

- Search the office of the Executive Secretariat, Office of the Secretary (including Secretary Napolitano's individual data sources), including all potentially relevant ESI contained in data sources including, but not limited to hard-drives, home drives, shared

---

[21] Plaintiffs have limited our requested relief to key custodians and offices. Plaintiffs do not concede that the Defendants' other searches were sufficient, but given the staleness of these documents, over one year after they were originally produced, Plaintiffs limit the requested relief to only the most essential categories of records;

drives, and email attachments, using, where appropriate, a list of search terms agreed upon by the parties;

- Search Microsoft Outlook and Enterprise Vault for Opt Out records in a manner that encompasses attachments using a list of search terms agreed upon by the parties.

Plaintiffs request that the Court order ICE to do the following:

- Search the offices and custodians identified in Part (C)(1)(a)-(e) *supra* for Opt-Out Records, using, where appropriate, a list of search terms agreed upon by the parties;

- Search for Opt-Out Records, including records created prior to April 30, 2010, using a list of search terms and data sources agreed upon by the parties, in Office of the Director, ICE ExecSec and ICE ERO Field Office Directors;

- Provide additional information regarding: (a)archive or disaster recovery systems for email servers, including whether that source is "inaccessible" (and if so, the costs and burdens of accessing), and whether it is likely to contain unique email; (b) the instructions provided to the Program Analyst tasked with searching for SharePoint for relevant records; (c) the version of Microsoft Outlook used to conduct searches and whether it searched, or can presently search, attachments;(d) and whether individual custodians searched data sources other than Microsoft Outlook.

Plaintiffs request that the Court order OLC to do the following:

- Search the central storage system using, where appropriate, a list of search terms agreed upon by the parties;

- Search the email accounts of departed users and current employees on any email system (including any email archive), and any other accessible data source where emails may be stored, for Opt-Out Records using, where appropriate, a list of search terms agreed upon by the parties and by making additional inquiries of the relevant individual custodians.

Plaintiffs reserve the right to seek discovery if any additional searches or information are inadequate.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion for Partial Summary Judgment and grant Plaintiffs' Cross-Motion for Partial Summary

Judgment.

Dated: March 26, 2012
      New York, New York

                                Respectfully submitted,


                                  /s/
                              SUNITA PATEL
                              GHITA SCHWARZ
                              Center for Constitutional Rights
                              666 Broadway, 7th Floor
                              New York, New York 10012
                              Tel: 212-614-6439
                              Fax: 212-614-6499
                              spatel@ccrjustice.org
                              gschwarz@ccrjustice.org

                              *Attorneys for CCR and NDLON*


                                  /s/
                              ANTHONY J. DIANA
                              THERESE CRAPARO
                              JEREMY D. SCHILDCROUT
                              JARMAN D. RUSSELL
                              BRIDGET P. KESSLER
                              Mayer Brown LLP
                              1675 Broadway
                              New York, New York 10019
                              Tel: 212-506-2500
                              Fax: 212-262-1910
                              adiana@mayerbrown.com
                              tcraparo@mayerbrown.com
                              jschildcrout@mayerbrown.com
                              jrussell@mayerbrown.com
                              bkessler@mayerbrown.com


                              *Attorneys for NDLON*

/s/
_____

SONIA LIN
PETER MARKOWITZ
Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, New York 10003
Tel: 212-790-0213
Fax: 212-790-0256
slin@yu.edu
pmarkowi@yu.edu

*Attorneys for IJC and NDLON*