**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL DAY LABORER ORGANIZING
NETWORK; CENTER FOR CONSTITUTIONAL
RIGHTS; and IMMIGRATION JUSTICE CLINIC OF
THE BENJAMIN N. CARDOZO SCHOOL OF LAW,

                    Plaintiffs,

      - against -

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT AGENCY; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW;
FEDERAL BUREAU OF INVESTIGATION; and
OFFICE OF LEGAL COUNSEL,

                    Defendants.

No. 10 Civ. 3488 (SAS)
ECF Case

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN**
**FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY**
**JUDGMENT ON ADEQUACY OF SEARCH FOR OPT-OUT AND RAPID**
**PRODUCTION LIST RECORDS**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761 / 2745 / 2737
Facsimile: (212) 637-2786 / 2686 / 2702
Email:  christopher.connolly@usdoj.gov
          joseph.cordaro@usdoj.gov
          ellen.london@usdoj.gov

CHRISTOPHER CONNOLLY
JOSEPH N. CORDARO
ELLEN LONDON
Assistant United States Attorneys
     - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ............................................................................................................................2

    A.    Adequacy of Search Standard in FOIA Cases ...............................................2

        1.    A Search Must Be Reasonable, Not Perfect .................................2

        2.    Declarations Must Be Relatively Detailed and Nonconclusory .................4

        3.    Because Agencies Are Entitled to Discretion in Crafting Searches, the Court Must Analyze Adequacy on a Case-by-Case Basis .........................5

        4.    Agencies Are Not Required to Take Extraordinary Measures to Find Responsive Records ..................................................................6

    B.    The Agencies Conducted Adequate Searches .........................................7

        1.    ICE's Search ...........................................................................8

        2.    FBI's Search ..........................................................................12

        3.    DHS's Search .........................................................................15

        4.    OLC's Search .........................................................................19

CONCLUSION .........................................................................................................................23

# TABLE OF AUTHORITIES

**CASES**                                                         **PAGE**

*Am. Fed'n of Gov't Emps. v. Broad. Bd. of Governors,*
    711 F. Supp. 2d 139 (D.D.C. 2010) ................................................................10

*Anderson v. U.S. Dep't of State,*
    661 F. Supp. 2d 6 (D.D.C. 2009) ...................................................................22

*Assassination Archives & Research Ctr. v. CIA,*
    720 F. Supp. 217, 219 (D.D.C. 1989) .......................................................... 6-7

*Carney v. DOJ,*
    19 F.3d 807 (2d Cir. 1994) ..............................................................................4

*Families for Freedom v. U.S. Customs & Border Prot.,*
    --- F. Supp. 2d --, 2011 WL 6780905 (S.D.N.Y. Dec. 27, 2011) ..................2, 4

*Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.,*
    639 F. Supp. 2d 384 (S.D.N.Y. 2009), *vacated on other grounds*, 601 F.3d 158
    (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1676 (Mar. 21, 2011) ...........................5

*Gallant v. NLRB,*
    26 F.3d 168 (D.C. Cir. 1994) ..........................................................................4

*Garcia v. DOJ, Office of Info. & Privacy,*
    181 F. Supp. 2d 356 (S.D.N.Y. 2002) .........................................................2, 7

*Grand Central P'ship v. Cuomo,*
    166 F.3d 473 (2d Cir. 1999) ..................................................................*Passim*

*Halpern v. FBI,*
    181 F.3d 279 (2d Cir. 1999) ........................................................................2, 7

*Iturralde v. Comptroller of the Currency,*
    315 F.3d 311 (D.C. Cir. 2003) .....................................................................3, 4

*Johnson v. Exec. Office for U.S. Attorneys,*
    310 F.3d 771 (D.C. Cir. 2002) ................................................................5-6, 10

*Judicial Watch, Inc. v. Export-Import Bank,*
    108 F. Supp. 2d 19 (D.D.C. 2000) ..............................................................2, 6

*Morley v. CIA,*
    508 F.3d 1108 (D.C. Cir. 2007) ......................................................................3

*Nation Magazine v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ...................................................................2, 11

*Oglesby v. U.S. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ...................................................................6

*Oleskey v. DOD*,
    658 F. Supp. 2d 288 (D. Mass. 2009) ........................................................2

*Perry v. Block*,
    684 F.2d 121 (D.C. Cir. 1982) ...............................................................2, 4

*Physicians for Human Rights v. DOD*,
    675 F. Supp. 2d 149 (D.D.C. 2009) ..........................................................6

*Prison Legal News v. Lappin*,
    603 F. Supp. 2d 124 (D.D.C. 2009) ..........................................................9

*Roberts v. DOJ*,
    No. 92-1707, 1995 WL 356320 (D.D.C. Jan. 28, 1993) ...............................15

*Schrecker v. DOJ*,
    349 F.3d 657 (D.C. Cir.2003) .................................................................5

*Weisberg v. DOJ*,
    745 F.2d 1476 (D.C. Cir. 1984) ...............................................................3

## PRELIMINARY STATEMENT

Defendants United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security ("DHS"), Federal Bureau of Investigation ("FBI"), Executive Office for Immigration Review ("EOIR"), and Office of Legal Counsel ("OLC") (collectively, "defendants" or the "agencies") respectfully submit this memorandum of law in opposition to plaintiffs' motion for partial summary judgment and in further support of their motion for partial summary judgment on the adequacy of their searches for "opt-out" records and records responsive to the "Rapid Production List" ("RPL"), two subcategories of records responsive to plaintiffs' Freedom of Information Act ("FOIA") request for information relating to the Secure Communities immigration enforcement strategy.

Plaintiffs spend the majority of their brief attempting to convince the Court to adopt a new standard for evaluating the adequacy of FOIA searches for electronic records, based in large part on the statements of plaintiffs' own expert. The drastic measures that plaintiffs seek to impose are not only unsupported by FOIA case law—including numerous cases decided in the era of electronic records, several within this Circuit—but they also run afoul of the basic principles underlying the adequacy-of-search standards under FOIA. Such drastic measures certainly are not justified here, where, at most, plaintiffs have identified a handful of discrete areas in which the agencies allegedly should have searched more thoroughly. And, perfect results are not required under FOIA. Moreover, in articulating their proposed new standard, plaintiffs lose sight of what is at issue in this case—the adequacy of defendants' searches for opt-out and RPL records. Plaintiffs fail to identify any deficiencies that, under the well-established FOIA standards governing searches for all types of records, would be sufficient to call into question the adequacy of defendants' searches.

**ARGUMENT**

## A.      Adequacy of Search Standard in FOIA Cases

As stated in defendants' opening brief, the FOIA standard is one of reasonableness, reflecting the principle that "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters." *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (citation and internal quotation marks omitted); *see also Oleskey v. DOD*, 658 F. Supp. 2d 288, 298 (D. Mass. 2009). Courts have set out certain legal requirements regarding the reasonableness of the search, which are set forth in further detail below.[1]

### 1.   A Search Must Be Reasonable, Not Perfect

As explained in defendants' opening brief, it is well established that an adequate search is one that is "*reasonably calculated* to discover the requested documents." *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (emphasis added); *see also Families for Freedom v. U.S. Customs & Border Prot.*, --- F. Supp. 2d ---, No. 10 Civ. 2705 (SAS), 2011 WL 6780905, at *3 (S.D.N.Y. Dec. 27, 2011). "[A]n agency need not conduct a search that plainly is unduly burdensome," *Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999), and "is not expected to take extraordinary measures to find the requested records," *Garcia v. DOJ, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002). Moreover, "there is no requirement that an agency produce *all* responsive documents." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995) (emphasis in original) (citing *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982)). Because "an agency's search need not be perfect," the adequacy of a search does not turn on "whether [the agency] actually uncovered every document extant." *Grand Cent. P'ship*,

---

[1] To the extent plaintiffs are asserting that there should be a requirement that the relevant agency meet and confer with the requesting party in every FOIA case, Pls.' Br. at 5-6, they have failed to cite any authority in support of such a broad rule, nor would such a rule be reasonable.

166 F.3d at 489; *see also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." (emphases in original).

Plaintiffs confuse this standard by continually emphasizing that an adequate search must be "'reasonably calculated to uncover *all* relevant documents.'" *See, e.g.,* Pls.' Br. at 6 (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)). In so doing, plaintiffs seek to focus the Court's inquiry on the outcome of defendants' searches rather than on the reasonableness of the methods that defendants employed in searching for responsive records. However, despite characterizing defendants' searches as "fatally deficient," Pls.' Br. at 2, plaintiffs' laundry list of criticisms amount to little more than conjecture concerning the possible location of additional responsive documents and a handful of examples of documents that plaintiffs contend were missed by the agencies during the searches, *see id.* at 13-29; *see also infra* Part B. Such arguments are insufficient to call into question the adequacy of defendants' searches. A FOIA plaintiff cannot show inadequacy of search "by purely speculative claims about the existence and discoverability of other documents." *Grand Cent. P'ship*, 166 F.3d at 489 (citation and internal quotation marks omitted). Moreover, as noted above, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search," because "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). Accordingly, while plaintiffs may (or may not) be capable of demonstrating that defendants did not uncover *all* responsive documents, they fail to show that defendants' searches were not reasonably calculated to do so.

3

### 2. Declarations Must Be Relatively Detailed and Nonconclusory

The standard applied in this Circuit for whether an agency's declaration is sufficient to show an adequate search is equally well established. Such declarations need only be "relatively detailed," and contain "nonconclusory facts." *Families for Freedom*, 2011 WL 6780905, at *1. As the Second Circuit has explained, "[a] district court in a FOIA case may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Grand Cent. P'ship*, 166 F.3d at 478 (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994) (emphasis in original). *See also Carney v. DOJ*, 19 F.3d 807, 813 (2d Cir. 1994) ("Suffice it to say, the declarations are reasonably detailed and reveal that each of the DOJ subdivisions undertook a diligent search for documents responsive to Carney's requests.").

Declarations need not "set forth with meticulous documentation the details of an epic search" in order to entitle agencies to summary judgment. *Perry*, 684 F.2d at 127. Plaintiffs do not acknowledge this standard, instead demanding a level of granular detail that is without precedent. They assert, relying solely on their declarants for support, that "a 'reasonable description' of an agency's information system should include, at minimum, the commercially available technology used, the operating system and software versions, reasonable descriptions of the federal government proprietary technology systems, and other relevant information, including email retention policies and practices." Pls.' Br. at 10. This list of requirements extends far beyond what courts have required. *See Iturralde*, 315 F.3d at 313-14 (holding that to describe a reasonable search, declarations should describe "the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials . . . were

searched") (citation and internal quotation marks omitted).  Fundamentally, Plaintiffs' list ignores the fact that the case law requires only "reasonable specificity of detail," which suffices as opposed to "merely conclusory statements."  *Grand Cent. P'ship*, 166 F.3d at 478.

Here, defendants' declarations provide extensive detail about the wide-ranging and comprehensive searches they conducted.  Defendants' declarations explain, among other things, which agency components and custodians conducted searches or were searched, why those custodians were chosen to conduct searches, the types of records that were searched, the record systems in which the potentially responsive records were stored, how the searches were conducted, and how each agency monitored the searches and tracked their results.  Nothing more is required, and plaintiffs' characterization of the declarations as "lack[ing] sufficient detail" falls flat.  *See* Pls.' Br. at 2.

### 3. Because Agencies Are Entitled to Discretion in Crafting Searches, the Court Must Analyze Adequacy on a Case-by-Case Basis

It is well established that there is no one-size-fits-all standard for an adequate search, and that courts are required to assess adequacy on a case-by-case basis.  *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 639 F. Supp. 2d 384, 397 (S.D.N.Y. 2009) (The "'adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case.'") (quoting *Schrecker v. DOJ*, 349 F.3d 657, 663 (D.C. Cir.2003)), *vacated on other grounds*, 601 F.3d 158 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1676 (Mar. 21, 2011).  A case-by-case analysis is necessary, given that an agency is entitled to discretion in crafting a search in light of its knowledge of its own work product and other records.  As the D.C. Circuit has explained, "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch."  *Johnson v. Exec. Office*

*for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002). Accordingly, plaintiffs' request that the Court require agencies to adhere to Mr. Regard's guidelines with regard to every single FOIA request, *see* Pls.' Br. at 11-12, is contrary to the governing law.

Moreover, because agencies have discretion in conducting FOIA searches, plaintiffs' insistence that they are entitled to summary judgment because defendants failed to use certain of plaintiffs' preferred search terms or search in certain locations is without support. As an initial matter, an agency is not required to "search every record system," *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); accordingly, the agency must determine which record systems are "likely to produce responsive documents." *Id.* Agencies also have discretion in determining which search terms to use, and by whom the searches will be conducted. *See Physicians for Human Rights v. DOD*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("Additionally, as evidenced in their affidavits, Defendants properly exercised their discretion in crafting lists of search terms that they believed to be reasonably tailored to uncover documents responsive to the FOIA request . . . [I]n responding to a FOIA request, an agency is only held to a standard of reasonableness; as long as this standard is met, a court need not quibble over every perceived inadequacy in an agency's response, however slight.").

### 4. Agencies Are Not Required to Take Extraordinary Measures to Find Responsive Records

Plaintiffs' suggestion that the agencies "should make reasonable efforts to fill [technological] gaps" in their existing technology is contrary to law and reason. Pls.' Br. at 11. This Court should not order the defendants to upgrade their technological capabilities because that would, of course, require increasing the federal budget, but also because "'agencies are not required to perform searches which are not compatible with their own document retrieval systems.'" *Judicial Watch*, 108 F. Supp. 2d at 27 (quoting *Assassination Archives & Research*

*Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989)).  Moreover, as a general matter, an "agency is not expected to take extraordinary measures to find the requested records."  *Garcia v. DOJ, Office of Info. & Privacy*, 181 F. Supp. at 368; *see also Halpern*, 181 F.3d at 288 ("[A]n agency need not conduct a search that plainly is unduly burdensome.").

While plaintiffs assert that defendants made "choices" regarding "the technology and data sources used," that is not the case, as the agencies could only use the resources they had at their disposal.  Pls.' Br. at 11.  Plaintiffs also imply that the agencies should not allow individuals to run searches of their own records, and Mr. Regard faults the agencies for failing to "use IT personnel or a third party vendor with appropriate qualifications to conduct an effective search."  Regard Decl. ¶ 13.  The fact that plaintiffs seek to impose the expense and burden of hiring additional IT personnel or outside vendors to oversee FOIA searches further demonstrates that plaintiffs misunderstand the reasonableness standard that governs this inquiry.[2]

## B.     The Agencies Conducted Adequate Searches

A review of plaintiffs' list of perceived inadequacies in the agencies' searches reveals that plaintiffs are demanding a perfect search, as opposed to a reasonable one; that they are asking this Court to micromanage the production; that they want the Court to impose an across-the-board standard for searches in complete disregard of the agencies' discretion and knowledge of their own records; and, in some cases, that plaintiffs simply misread (or misconstrued) the agencies' declarations.[3]

---

[2] While defendants believe that the burden that they would face if they were to implement the technology and staffing changes that plaintiffs suggest is self-evident, the agencies can provide declarations to this effect if that would be useful to the Court.

[3] Plaintiffs do not dispute that the Executive Office for Immigration Review ("EOIR") conducted an adequate search.  Accordingly, the Court should grant summary judgment as to the adequacy of EOIR's searches.

## 1. ICE's Search

Plaintiffs' arguments that ICE's search was inadequate fail for several reasons. First, they are incorrect that certain custodians were not searched. Second, they mistakenly state that permitting custodians to use discretion in crafting their individual searches is improper, without pointing to more than a couple of documents (out of over 100,000 identified) as examples of the allegedly inadequate search. Finally, the examples provided by plaintiffs do not even support their assertions. As demonstrated in the Declaration of Ryan Law dated March 2, 2012 ("Law Declaration"), ICE's search was not only adequate, but involved "thousands of man hours" and was the "most costly effort ever undertaken by the agency in response to a FOIA request." *Id.* ¶ 57.

Most of the custodians listed by plaintiffs were in fact included by ICE in its search efforts.[4] Pls.' Br. at 22. Plaintiffs first claim that Homeland Security Investigations ("HSI") "unilaterally determined that the office would not be likely to have relevant records based on a test search using only the words 'secure' and 'communities.'" Pls.' Br. at 22. However, that is not what the Law Declaration says regarding HSI; as Law explains, HSI determined that it likely would not have any responsive records beyond its "records on individuals identified through interoperability," in light of the role it plays. Law Decl. ¶ 24 n.3. As to the contractors listed by plaintiffs, plaintiffs incorrectly assume that discussions of staff included only agency-employed staff and not outside contractors. *See, e.g., id.* ¶ 37 ("every staff member"). Plaintiffs further criticize ICE's search because "only two custodians" from the Office of State, Local, and Tribal Coordination ("OSLTC") searched for opt-out records, yet they fail to explain why these two custodians would not have been the most likely OSLTC custodians to have responsive records in

---

[4] Law did not address the Deputy Director (Al Pena) in his declaration. ICE already has initiated a search of Mr. Pena's emails and will produce any responsive documents accordingly.

light of Law's description of these custodians as individuals who likely would have dealt with the opt-out issue. Pls.' Br. at 22; Law Decl. ¶ 49.

Finally, plaintiffs assert that ICE's search was inadequate because it did not include the ICE Privacy Office, which, as stated in the Law Declaration, confirmed that it "would not likely have any records that would be responsive to the Plaintiffs' FOIA request or RPLS." Pls.' Br. at 22-23; Law Decl. ¶ 55. Plaintiffs' only evidence purportedly demonstrating why the Privacy Office should have been searched is a single document showing that a representative of the Privacy Office attended a single meeting regarding Secure Communities. Pls.' Br. at 23. However, one person attending one meeting does not mean that the office would have records responsive to plaintiffs' requests, and there is no reason to disbelieve Law's testimony.

Plaintiffs also criticize ICE for providing "vague instructions and generic search terms." Pls.' Br. at 23. As Law explained, the ICE FOIA Office provided the various program offices with instructions "to conduct a comprehensive search of paper and electronic files for records that would be potentially responsive." Law Decl. ¶ 36. In those instructions, the ICE FOIA Office provided a list of suggested search terms for electronic records but directed the individual program offices not to limit their searches and "to use their knowledge of their particular record keeping systems and practices" in running their searches. *Id.* Nonetheless, plaintiffs speculate that the relevant custodians did not follow these instructions. They say, for example, that because ICE did not include instructions about archived records, email attachments or paper records, "those data sources were not searched." Pls.' Br. at 23. With regard to archived records, the ICE FOIA Office instructed the custodians to comprehensively search all files, paper and electronic, and that is all that FOIA requires. *See Prison Legal News v. Lappin*, 603 F. Supp. 2d 124, 127-28 (D.D.C. 2009) (addressing the issue of searching archived records and stating,

"[t]he Court agrees with the Bureau that it does not have to turn over documents not contained in its files").

Moreover, it is unclear why plaintiffs would assume that when allowing custodians the discretion to search their own records (with the instruction to conduct a "comprehensive search"), those custodians would not know to open possibly relevant attachments or would not understand how to search paper records manually. It is also unclear why custodians could not be trusted to run effective searches of their own files, a skill that most office workers employ on a daily basis. Plaintiffs' effort to second-guess some of the search terms that were used likewise is unpersuasive. Pls.' Br. at 24; *see also Am. Fed'n of Gov't Emps. v. Broad. Bd. of Governors,* 711 F. Supp. 2d 139, 151 n.11 (D.D.C. 2010) (holding that "Plaintiffs' argument that the search was inadequate because different officials used different terms when searching their own files is also unpersuasive" because "declarants play different roles within the agency" and the agency properly exercised its discretion in creating a list of search terms). Ultimately, plaintiffs are asking the Court to micromanage the searches, which, as the D.C. Circuit has explained, is not proper in FOIA cases, "requiring as [they do] both systemic and case-specific exercises of discretion and administrative judgment and expertise." *Johnson*, 310 F.3d at 776.

Plaintiffs provide four examples of documents that ICE purportedly missed in its searches, claiming that these examples demonstrate that ICE's searches were inadequate. Pls.' Br. at 24. These documents simply do not lead to that conclusion. The first document is an email exchange between someone from ICE and someone from the FBI making arrangements for a meeting. Ex. B, Doc. 9. While this document was produced by the FBI, it is possible, given its administrative content, that ICE determined that it was not responsive to the requests. The third example is a DHS weekly report, and it is not clear why this document would be responsive to plaintiffs'

requests. Ex. B, Doc. 39.  Finally, the fourth document is a letter dated October 7, 2010 that was produced by ICE as part of the FPL production, Ex. B, Doc. 40; given how close the date of this letter is to the October 15, 2010 cut-off date, it is most likely that this letter had not been received and processed in time to be included in the earlier productions.  The fact that it was subsequently produced demonstrates that ICE's searches were thorough and effective.  Thus, the only document that plaintiffs have identified that might have been overlooked is the second document listed, which was produced by DHS.  Ex. B, Doc. 36.  "Of course, the failure to turn up [a] document does not alone render [a] search inadequate." *Nation Magazine*, 71 F.3d at 892 n.7.

Finally, plaintiffs claim that ICE's declaration is missing information.  Pls.' Br. at 24.  As to the question of whether ICE had to list the version of Microsoft Outlook used by its custodians, there is no support in the law for the proposition that this level of granular detail is required in order for an agency's search to be deemed reasonable.  *Id.*  Plaintiffs also assert that ICE was required to provide more information as to every search term used by every office; however, ICE described in detail the instructions provided, making it clear that individuals were encouraged to use their discretion in crafting searches that would be best suited for identifying records in light of their knowledge of their work, their organizational system, and their files.  *Id.*; Law Decl. ¶ 36.  Plaintiffs focus myopically on these minor alleged inadequacies while failing to acknowledge the vast and, in ICE's case, unprecedented agency-wide effort that was made to locate responsive records.  The standard is whether the agency conducted a reasonable search, and plaintiffs persist in demanding a perfect search.  That is something to which they are not entitled.  *See Grand Cent. P'ship*, 166 F.3d at 489 (holding that "an agency's search need not be

perfect," and the adequacy of a search does not turn on "whether [the agency] actually uncovered every document extant").

### 2. FBI's Search

The FBI undertook a comprehensive search for opt-out and RPL records based on (1) an electronic search of its Central Records System; and (2) an extensive manual review of hard copy and electronic records in those divisions and offices identified as likely to possess responsive records. *See* Seventh Declaration of David M. Hardy dated March 2, 2012 ("Seventh Hardy Decl.") ¶¶ 7, 19. The FBI's declaration described this search in more than sufficient detail to establish its adequacy. By contrast, plaintiffs' challenges to the FBI's search are unavailing.

Plaintiffs' arguments concerning the offices and divisions that the FBI did not search are flawed insofar as they rely predominantly on records that post-date the search cut-off dates for the opt-out and RPL productions. *See* Pls.' Br. at 14-15. As explained in the FBI's supplemental declaration, during the time periods covered by the opt-out and RPL searches at issue in the instant motion, the FBI had no reason to believe that, for example, the Director's Office would possess responsive records. *See* Declaration of Dennis J. Argall dated April 9, 2012 ("Argall Decl.") ¶ 6.[5] It was only later, when the opt-out issue became more prominent, that the Director's Office became involved in that issue. *See id.* This explains why the FBI's "Final Production List" ("FPL") productions, which cover a later time frame, contain records from places like the Director's Office—but that does not indicate a need to have searched such offices during earlier productions.

---

[5] The FBI did, however, circulate a search memorandum regarding plaintiffs' initial FOIA request to the Office of Public Affairs ("OPA") within the Director's Office, and sent a search memorandum for opt-out records to both OPA and the Office of Congressional Affairs. Seventh Hardy Decl. ¶¶ 16, 26. This belies any claim that the FBI failed to consider the possibility that responsive records would be located within the Director's Office.

Of the eight documents that plaintiffs cite purporting to demonstrate that the Director should have searched for opt-out records, four post-date the search cut-off date for opt-out records and were produced pursuant to the FPL.  *See* Patel Decl. Ex. B, Docs. 17, 19, 30, 32.  The remaining four documents provide an insufficient basis for claiming that the FBI's search was unreasonable.  One of the documents merely notes a meeting between the FBI Director and DHS Secretary to discuss "interoperability," *id.* Ex. B, Doc. 39; one of the documents contains a single remark by someone in the Interoperability Initiatives Unit ("IIU") about the Director's ability to answer questions, *id.* Ex. B, Doc. 5; and another is Congressional testimony from the Director in 2006, when Secure Communities was in its pilot phase, *see id.* Ex. B, No. 64.  Finally, one of the documents that plaintiffs rely on discusses "theoretical" approval by the Director as to a hypothetical future event.  *See id.* Ex. B, No. 27.  These documents at best allow for speculation that other responsive documents *might* exist within the Director's Office—but speculation is insufficient to demonstrate the inadequacy of an agency's search and, in any event, an adequate search need not uncover all responsive records.  *See supra* at pp. 2-3.

Similarly, the FBI had no reasonable basis to believe that custodians within the Office of General Counsel ("OGC")—save for the OGC representative from the Access Integrity Unit ("AIU") who conducted a search, *see* Seventh Hardy Decl. ¶ 21—would have had responsive records during the time period relevant to the opt-out and RPL searches, *see* Argall Decl. ¶ 6.  And indeed, most of the documents that plaintiffs cite as evidence of OGC's relationship to Secure Communities issues post-date the opt-out and RPL searches.  *See* Patel Decl. ¶¶ 18, 20, 21, 30.  The remaining documents—which can hardly be considered evidence of OGC's "involvement" with Secure Communities, *see* Pls.' Br. at 14—consist of two copies of the same e-mail, which circulated a draft letter that originated within DHS and specified that the letter

"[DID] NOT REQUIRE ANY FBI ACTION," *see* Patel Decl. Ex. B, Docs. 8, 29, and an e-mail chain produced by ICE indicating that OGC employees might have attended a single meeting on the opt-out issue, *see id.* Ex. B, Doc. 44. Again, this is a purely speculative and tenuous basis for ordering the FBI to conduct further searches.

Finally, plaintiffs' claims (Pls.' Br. at 14-15) that the Executive Assistant Director ("EAD") of the Science and Technology Branch ("STB") and the Office of Law Enforcement Coordination ("OLEC") should have been searched are meritless. *See* Argall Decl. ¶ 7. Two documents purporting to show STB's involvement with Secure Communities post-date the instant searches, *see* Patel Decl. Ex. B, Docs. 20, 30, while the other two are the same two copies of the same e-mail cited with respect to OGC, *see id.* Ex. B, Docs. 28, 29. As for OLEC, it was not searched because it does not work with CJIS on matters pertaining to Secure Communities— CJIS works directly with state and local law enforcement agencies. Argall Decl. ¶ 7. Indeed, the FBI, through counsel, informed plaintiffs of this fact in September 2011. *See* Patel Decl. Ex. G. The documents (two of which are websites discussing OLEC generally) do not support plaintiffs' argument to the contrary. *See* Patel Decl. Ex. B, Docs. 28, 63, 65.

Furthermore, contrary to plaintiffs' arguments, the FBI did not miss "obvious leads" that certain Advisory Policy Board ("APB") documents were missing from its production. Pls.' Br. at 16. As explained in the Seventh Hardy Declaration, both the Advisory Groups Management Unit ("AGMU") and the Designated Federal Officer who serves as the CJIS liaison with the APB searched their files for records potentially responsive to plaintiffs' original FOIA request. Seventh Hardy Decl. ¶ 17. These searches failed to turn up the records that plaintiffs believe exist, but that alone is insufficient to call into question the adequacy of the FBI's search. Argall

Decl. ¶ 8; *see also Roberts v. DOJ*, No. 92-1707, 1995 WL 356320, at *2 (D.D.C. Jan. 28, 1993) ("Nothing in the law requires the agency to document the fate of documents it cannot find.").

As for plaintiffs' complaints about the FBI's use of search terms, they miss the fundamental characteristic of the FBI's search: most of it was conducted manually by sifting through and reviewing tens of thousands of pages of records related in any way to Secure Communities. *See* Seventh Hardy Decl. ¶¶ 18-23, 27-28. In other words, the FBI largely did not rely on search terms, but instead relied on the knowledge of its custodians who have involvement in Secure Communities to identify those records responsive to the particular sub-sets of plaintiffs' request. As explained in the Seventh Hardy Declaration, this process is both compatible with the FBI's technological limitations and designed to capture the broadest possible universe of responsive records. *See id.* ¶¶ 15, 18-23. Indeed, to adopt plaintiffs' preferred one-size-fits-all standard for conducting electronic searches—which would extend well beyond the reasonableness standard that lies at the heart of FOIA—would likely have the unintended effect of making agency searches like the FBI's less effective by relying on the mechanized results of an electronic search rather than the informed results that come from broad review of records by custodians who possess relevant institutional knowledge. Moreover, as described above, plaintiffs have failed to identify concrete evidence that the FBI's search failed to locate potentially responsive records. Adoption of a heightened standard for FOIA electronic searches is thus particularly inappropriate and unnecessary here.

### 3. DHS's Search

DHS's searches for opt-out and RPL records were also adequate. DHS's declaration provided a detailed, nonconclusory account of its searches, including complete explanations of why certain offices and custodians were searched while others were not. *See* Declaration of

David J. Palmer dated Mar. 2, 2012 ("Palmer Decl.") ¶¶ 6-9, 21-24, 27-28, 30.  In light of this detailed declaration, plaintiffs' assertion that DHS "unreasonably determined" which offices and custodians to search is unavailing.  Pls.' Br. at 17.  Equally meritless is plaintiffs' attempt to call into question the adequacy of DHS's search by characterizing the agency's productions as "sparse."  Pls.' Br. at 17.  Again, plaintiffs ignore the settled rule that the adequacy of an agency's search is evaluated not by its results but by the reasonableness of its methods.  *Grand Cent. P'ship*, 166 F.3d at 489.

DHS properly identified those offices and custodians likely to possess responsive records.  Plaintiffs' assertions to the contrary are misleading and, in some cases, demonstrably incorrect.  Pls.' Br. at 17.  For example, plaintiffs claim that "it is not clear that DHS searched Secretary Napolitano's records at all."  *Id.* at 18.  In fact, DHS's declaration states plainly that the Office of the Secretary's search "included any documents sent to or from the Secretary."  Palmer Decl. ¶ 30.  Moreover, the Office of the Secretary conducted searches not only for opt-out records, but also for RPL records—and those searches encompassed both paper and electronic records.  *See id.* ¶¶ 34, 39.

In other instances, plaintiffs advance little more than speculation about other offices and custodians that they believe should have been searched.  First, plaintiffs cite to a meeting transcript as evidence that the Homeland Security Advisory Council ("HSAC") "discussed Secure Communities as early as September 2009."  Pls.' Br. at 17.  But that meeting transcript contains only a single passing reference to funding for Secure Communities, and, as such, is hardly evidence that a reasonable search for opt-out and RPL records should have included HSAC.  *See* Patel Decl. Ex. B, No. 40.

Next, plaintiffs purport to provide evidence demonstrating that certain custodians within DHS's Office of the General Counsel ("OGC")—the General Counsel, Principal Deputy General Counsel, and "multiple Deputy General Counsels"—should have conducted searches. Pls.' Br. at 18.[6] Yet their support for this claim is thin at best. The five records plaintiffs cite contain a single e-mail written by the Principal Deputy General Counsel. *See* Patel Decl. Ex. B, Doc. 23. Two of the remaining records are merely informational, *see id.* Ex. B, Nos. 61 (OGC organizational chart), 73 (Principal Deputy General Counsel's University of Virginia faculty website), while a third addresses an issue entirely unrelated to either Secure Communities, the opt-out issue, or the topics included on the RPL, *see id.* Ex. B, No. 31 (memorandum discussing the Ninth Circuit decision in the Arizona immigration litigation). The final document, an e-mail thread, appears to contain messages that mention two OGC custodians in passing, but these custodians did not author any of the e-mails in the thread. *See id.* Ex. B, No. 45. Moreover, this e-mail thread post-dates the October 15, 2010 cut-off for the opt-out productions and therefore, as discussed above, does not demonstrate that these custodians should have been searched for earlier records.

Finally, plaintiffs claim that DHS should have searched two custodians at US-VISIT—the Chief Information Officer/Assistant Director for the Information Technology Management Division ("CIO/AD-ITM") and the Deputy Director. Pls.' Br. at 18. In its declaration, DHS explained that the CIO/AD-ITM was not searched because he focused on "macro-level program issues" rather than the program-specific issues raised by opt-out and the RPLS. Palmer Decl. ¶ 23. The document to which plaintiffs cite merely reinforces that point—it broadly describes the

---

[6] As explained in DHS's declaration, appropriate custodians within OGC—including a Deputy General Counsel—did conduct searches. *See* Palmer Decl. ¶ 24. Those custodians were identified as having worked on matters relating specifically to Secure Communities or to immigration matters generally. *See id.*

composition of a committee tasked with overseeing all information-sharing between DOJ and DHS. *See* Patel Decl. Ex. B, Doc. 26. As for the Deputy Director, plaintiffs can only muster one e-mail in support of their claim that this custodian should have been searched—an e-mail again post-dating the cutoff date for opt-out and RPL records, on which the Deputy Director is the recipient of a forwarded media article discussing the opt-out issue. *See id.* Ex. B, Doc. 42. Simply put, plaintiffs proffer no compelling evidence that a reasonable search would have included any of the custodians they identify; instead, they merely conjecture that these custodians might possess responsive records. Such conjecture does not establish the insufficiency of DHS's searches.

Plaintiffs also misapply the FOIA standards and misread DHS's declaration in arguing that DHS's search instructions and search terms were "insufficient." Pls.' Br. at 19-21. For example, plaintiffs incorrectly claim that DHS's instructions "presumed that all relevant documents were contained in e-mails." Pls. Br. at 20. To the contrary, as indicated in its declaration, DHS repeatedly instructed its custodians to search all types of files, including hard copy files and other types of electronic files, and such searches were ultimately performed. *See* Palmer Decl. ¶¶ 10, 14, 20, 29, 30, 34. Plaintiffs also state that "[f]or the RPL searches, no search instructions or search terms were provided." Pls.' Br. at 20. In fact, all offices and custodians were provided with copies of the RPL, and they carried out their searches in the same manner as their searches for the opt-out records. Palmer Decl. ¶ 34. Furthermore, search terms were unnecessary for many of the RPL categories, because those categories described specific documents that could be identified and located without the use of search terms. *See id.* ¶¶ 38-39.

Indeed, as discussed *supra*, plaintiffs' focus on the perceived "inadequacy" of DHS's search terms represents an attempt to circumvent the well-established FOIA standards in favor of a new,

one-size-fits-all standard for FOIA searches for electronic records.  While search terms may in some instances be useful for uncovering responsive records, the primary way in which such records are identified is through the knowledge and familiarity of the custodians themselves.  As DHS explained in its declaration, its standard practice is to provide guideline search terms, but also "to advise custodians that they should not limit their searches to suggested search terms, but rather that they should use their knowledge of their particular record keeping systems and practices to conduct a search that they believe[] [is] likely to uncover any and all records . . . ." Palmer Decl. ¶ 19.  Plaintiffs themselves concede that "certain custodians may locate and search for records without using search terms because custodians understood where to find relevant records . . . ."  Pls.' Br. at 21.  And because plaintiffs have pointed to no concrete evidence that DHS's searches failed to uncover responsive records, their emphasis on the perceived need to use more detailed search terms is unpersuasive.

### 4. OLC's Search

OLC's declaration plainly shows that the searches it performed were adequate, particularly given the type of work performed at OLC and its small size.  Plaintiffs' main complaint about OLC's searches—that "[it] yielded only the drafts of two declarations"—does not support a determination that OLC failed to conduct an adequate search.  Pls.' Br. at 25.  The underlying premise of plaintiffs' argument is that OLC should have uncovered more documents, which is purely speculative.  While plaintiffs state that the drafts of the two declarations that were found "discuss the Secure Communities program as well as biometric information-sharing," nothing about these drafts (which are marginally relevant at best) demonstrates that "the recollection of the career OLC attorneys queried in November 2010 was faulty."  Pls.' Br. at 26; *see* Declaration of David C. Palmatier at ¶ 2, 14 (mentioning Secure Communities in one paragraph as further

support of the argument that Arizona's immigration law (SB 1070) would have a negative impact on ICE's ability to handle requests from its law-enforcement partners). Plaintiffs assume that the approximately 20 attorneys at OLC either are not capable of remembering their own work product or deliberately disregarded requests that they turn over any responsive records; however, they offer no basis for such an assumption. While plaintiffs may be dissatisfied that OLC uncovered no relevant documents from the specified time period, such dissatisfaction is not a proper basis for a finding of inadequacy.

In spite of the fact that OLC did not locate anything beyond the drafts of two declarations, it nonetheless undertook multiple additional steps to ensure that nothing was missed; these additional steps highlight the thorough nature of OLC's search. As explained in the Declaration of Paul Colborn dated March 2, 2012 ("Colborn Decl."), OLC began its process by electronically searching its shared central storage system, which contains all of the office's final work product; the paralegal tasked with running the extensive list of search terms did not locate a single responsive document. Colborn Decl. ¶¶ 5, 6. Colborn explained that "if OLC has provided any written advice or has memorialized any oral advice in writing, that advice should be accessible through this system." *Id.* ¶ 5. While plaintiffs assert that it is "astonishing" that the list of search terms did not include the phrases "opt-out" and "interoperability," Pls.' Br. at 27, or abbreviations for "Secure Communities," *id.*, a search using a list that included such broad terms as "ICE" and the unabbreviated "Secure Communities," among others, is certainly a sensible way to identify whether OLC had generated any work product on these issues. Colborn Decl., Ex. A.

Given the lack of any documents responsive to the broad search that was conducted in OLC's central storage system, OLC already had a clear indication that its attorneys had not

rendered any advice on the relevant topics during the specified time periods.  However, OLC still took additional steps to confirm this, including discussing the requests with two knowledgeable attorneys in the office; searching the emails of departed users with broad search terms; and sending a general inquiry to all OLC attorneys.  Colborn Decl. ¶¶ 7-9.  Plaintiffs' assertions concerning the inadequacy of OLC's search do not take into account either the fact that OLC's small size makes it likely that the office would be aware of whether any advice had been given or the fact that any final work product would have been in its central database.  For example, plaintiffs assert that the two long-time career OLC attorneys who were first approached should have searched their records.  Pls.' Br. at 25-26.  Plaintiffs fail to explain, however, why they needed to do so if these two attorneys were familiar with OLC's work and had no recollection of any relevant work having been done.  Colborn Decl. ¶ 7.  Nor did the discovery of the drafts of the two declarations discussed above, which were found in a set of documents regarding litigation over Arizona's immigration statute, *id.* ¶ 9, undermine these attorneys' recollections that, at that point, OLC had not worked on these issues.  Pls.' Br. at 26.

Plaintiffs also insist that the search was inadequate because OLC did not check with each of its attorneys personally, rather than trusting that these attorneys would respond with anything relevant.  *Id.*  Plaintiffs seem to be implying that OLC's attorneys might have disregarded the request, without any basis for such assumption.  Moreover, the fact that two attorneys found the obscure reference to Secure Communities in the declarations contradicts plaintiffs' criticisms and shows that OLC's personnel acted in good faith in responding to the requests.

Finally, plaintiffs' broad-brush contention that the use of two search terms for the search of the departed users' e-mails was "plainly inadequate" lacks any support.  *Id.*  Plaintiffs offer no argument as to why the broad terms "secure communities" and "interoperability" would not have

identified a single responsive document, whereas using narrower terms would have yielded responsive documents. *See Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12 (D.D.C. 2009) ("A search is not inadequate merely because its terms are limited."). The already broad search of the departed users' e-mails was all the more reasonable given that when that search was conducted in December 2010, Colborn Decl. ¶ 8, OLC already had a high degree of confidence that the Office had not worked on issues relating to Secure Communities. *Id.* ¶¶ 6-7 (searches of central storage system performed in May and November 2010, and senior lawyers queried in November 2010).

\* \* \*

As demonstrated above, plaintiffs offer only isolated examples of alleged inadequacies in defendants' searches, and even these examples do not support plaintiffs' position. Plaintiffs do not even try to argue that the overall searches were unreasonable, nor could they, given the actual searches conducted by the agencies, much less the amount of resources that the agencies expended in searching for records responsive to plaintiffs' requests. Because a perfect search is not required, summary judgment should be granted in favor of defendants. Moreover, even if the Court were to disagree and deny defendants summary judgment, it should be on narrow grounds, requiring only discrete searches to fill in the purported gaps identified by plaintiffs.

**CONCLUSION**

For the reasons stated above, the Court should grant summary judgment to the agencies

and hold that they conducted adequate searches for opt out and Rapid Production List records.

Dated:    New York, New York
          April 9, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        *Attorney for Defendants*

                           By:    s/ Ellen London
                                        CHRISTOPHER CONNOLLY
                                        JOSEPH N. CORDARO
                                        ELLEN LONDON
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2761 / 2745 / 2737
                                        Facsimile:  (212) 637-2786 / 2686 / 2702
                                        E-mail:  christopher.connolly@usdoj.gov
                                                 joseph.cordaro@usdoj.gov
                                                 ellen.london@usdoj.gov