**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

NATIONAL DAY LABORER ORGANIZING
NETWORK, CENTER FOR CONSTITUTIONAL
RIGHTS, and IMMIGRATION JUSTICE
CLINIC OF THE BENJAMIN N. CARDOZO
SCHOOL OF LAW,

                               *Plaintiffs,*

              v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
FEDERAL BUREAU OF INVESTIGATION,
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, and OFFICE OF LEGAL COUNSEL,

                            *Defendants.*

------------------------------------------------------------X

**ECF CASE**

10-CV-3488 (SAS)(KNF)

**STIPULATION AND ORDER**
**OF DISMISSAL**

WHEREAS, on April 27, 2010, National Day Laborer Organizing Network, Kathryn O.

Greenberg Immigration Justice Clinic of the Benjamin N. Cardozo School of Law, and Center

for Constitutional Rights (collectively "Plaintiffs") filed a complaint ("the Complaint"), seeking

the release of certain records by United States Immigration and Customs Enforcement ("ICE"),

the United States Department of Homeland Security ("DHS"), the Federal Bureau of

Investigation ("FBI"), the Office of Legal Counsel ("OLC"), and the Executive Office for

Immigration Review (collectively "Defendants"), pursuant to the Freedom of Information Act, 5

U.S.C. § 552 ("FOIA");

WHEREAS the allegations in the Complaint concern, *inter alia*, FOIA requests dated February 3, 2010 and sent by Plaintiffs to Defendants (the "FOIA Requests");

WHEREAS Plaintiffs and Defendants have engaged in litigation since the filing of the Complaint; and

WHEREAS, Plaintiffs and Defendants desire to resolve all outstanding issues concerning the FOIA Requests and this litigation on terms that are mutually agreeable;

IT IS HEREBY STIPULATED AND AGREED, by and between the parties as follows:

1.      This action is hereby dismissed with prejudice, except as specified below.

2.      Plaintiffs stipulate and agree to accept this Stipulation and Order of Dismissal (the "Stipulation") in full settlement and satisfaction of any and all claims related to the FOIA Requests and the instant litigation, except for attorneys' fees and costs as specified in paragraphs 15 and 16 below.

3.      In consideration for the release of Plaintiffs' claims related to the FOIA Requests and the instant litigation, Defendants agree to search for and produce to Plaintiffs the information described in paragraphs 4 through 6 and 12. Defendants shall produce the information on a rolling basis within 45 calendar days of the date the Stipulation is entered by the Court (the "Production Date").

4.      The FBI will search for and, by the Production Date, produce to Plaintiffs any non-exempt records responsive to the following:

      a.   Minutes from the FBI Advisory Policy Board ("APB") meeting held June 2009, at which the APB recommended automatic record-linking between the Automated Biometric Identification System ("IDENT") and the Integrated Automated Fingerprint Identification System ("IAFIS"). The June 2009 APB meeting is referenced in the following records produced by the FBI in the instant matter with

2

the Bates numbers FBI-SC-1311; FBI-SC-1333; FBI-SC-00603, attached hereto as Exhibit A.

b. Records reflecting the APB's recommendation to the FBI Director on automatic record-linking between IDENT and IAFIS and records relating to the reasoning for this recommendation.

c. Records reflecting the FBI Director's adoption of the APB's June 2009 recommendation on automatic record-linking between IDENT and IAFIS, and records relating to the reasoning for that adoption.

d. Records reflecting the November 2011 determination by the Department of Justice ("DOJ") relating to the FBI's legal obligation to share fingerprint data in IAFIS with DHS referenced in the March 25, 2012 Letter from R. Scott Trent attached hereto as Exhibit B, as well as records relating to the reasoning for that determination.

5.     DHS will search for and, by the Production Date, produce to Plaintiffs any non-exempt records containing communications from the DHS Office of the Secretary to Representative Robert Aderholt or his staff containing the terms: "Alabama," "Secure Communities," and "deploy," and reasonable variations of those terms, for the date range January 1, 2012 through February 29, 2012.

6.     DHS, ICE and the FBI will search for and, by the Production Date, produce to Plaintiffs any non-exempt records that contain policies and procedures relating to the ability of local law enforcement officials and FBI to use mobile fingerprint devices to access IDENT and the Immigration Violators File in the Repository for Individuals of Special Concern. Specifically, DHS, ICE, and the FBI will search for and produce any non-exempt records responsive to the following topics from the following time periods:

a.   Records reflecting US-VISIT's approval to expand FBI mobile searches of IDENT, in approximately December 2009.

b.   Records reflecting the time at which FBI users began receiving full identification responses from IDENT through the Quick Capture Platform, in approximately September 2010.

c.   Records reflecting the addition of the Immigration Violators File to the Repository for Individuals of Special Concern, in approximately April 2012.

7.   To identify the records described in paragraphs 4(b) and (c), 5, and 6, Defendants will:

a.   Identify the agency employees likely to have personal knowledge of the subject matter of each topic or record described and ask these employees to, in good faith, locate the records sought; or

b.   Identify the agency employees likely to have records responsive to each individual request and conduct electronic searches of the records of those employees with search terms that the agency believes in good faith are likely to locate the records sought; or

c.   Conduct the searches by some combination of the methods identified in paragraphs (7)(a) and (7)(b).

d.   With regard to paragraph 6, if Defendants conduct the searches in accordance with subsection (a), then they may do so by identifying no more than two custodians that they believe in good faith are most likely to have records responsive to that request.

e.   Defendants will notify Plaintiffs of the job titles of the custodians selected to search for records responsive to paragraphs 4(b) and (c), 5, and 6.

4

    f.   If Defendants choose to use search terms as provided for in sub-paragraphs (b) or (c) of this paragraph, Defendants will provide Plaintiffs with a list of the search terms they intend to use and provide Plaintiffs the opportunity to suggest a reasonable number of additional search terms.  Defendants will in good faith consider including Plaintiffs' additional search terms.

    g.   To the extent Defendants rely on individual custodians to conduct searches pursuant to paragraph (7)(a), Defendants will supervise the custodians' searches to ensure that the searches are adequate.  If Defendants choose to employ search terms in accordance with paragraph (7)(b), they will provide the custodians with instructions on conducting electronic searches, and will monitor those searches.

8.    In agreeing to conduct the foregoing searches, Defendants make no representation as to the existence of any non-exempt records responsive to paragraphs 4 through 6.  However, Defendants have no reason to believe that such records do not exist.

9.    Defendants shall produce the records identified in paragraphs 4 through 6 in accordance with the parties' June 17, 2011 Form and Format Stipulation (Docket # 97), attached hereto as Exhibit C.

10.    Defendants will undertake the searches described in paragraphs 4 through 6 in good faith and in accordance with the procedures outlined in paragraph 7.  Plaintiffs will not contest the adequacy of Defendants' searches for the records identified in paragraphs 4 through 6.

11.    Defendants will apply any exemptions to records produced pursuant to paragraphs 4 through 6 in good faith, and in accordance with the Court's July 11, 2011 Opinion and Order (Docket # 99) and October 24, 2011 Opinion and Order (Docket # 140).  Defendants will provide all non-exempt, reasonably segregable information.  Defendants will not provide, and Plaintiffs

do not seek, pre-decisional, deliberative information that was not adopted by the Defendant agencies. Plaintiffs will not contest any exemptions applied to the records produced pursuant to paragraphs 4 through 6.

12.     By the Production Date, ICE will provide Plaintiffs with data described in Exhibit D from fiscal year 2010 to February 14, 2013. This constitutes the data that ICE tracks electronically in the regular course of business that is responsive to the following topics requested by Plaintiffs: (a) the number of individuals apprehended by DHS/ICE pursuant to a detainer and served with a notice to appear ("NTA"); (b) the number of individuals apprehended by DHS/ICE pursuant to a detainer and never served with an NTA; (c) the number of individuals who had their detainers lifted within the 48-hour period and why; (d) the number of individuals who had their detainers lifted before the 48-hour period and why; and (e) the number of individuals issued a detainer but not apprehended by DHS/ICE because of a favorable exercise of discretion, a determination that there was no basis to arrest the individual, because the individual was transferred to another facility, or another reason. The data is to be produced by ICE as it exists in ICE's databases. ICE cannot warrant the accuracy or integrity of the underlying data in its databases. ICE represents only that it will truly and accurately produce to Plaintiffs the information contained in the data fields described in Exhibit D as that data is maintained in the agency's ordinary course of business. ICE will provide this data in a single native Excel spreadsheet.

13.     Neither Plaintiffs nor Defendants will seek, before the Production Date, to set aside this Stipulation on account of any dispute which arises over the implementation of the terms of this Stipulation.

14.     To the extent Defendants determine that a referral to a non-Defendant agency is necessary for any of the records described in paragraphs 4 through 6, Defendants will promptly

notify Plaintiffs of such a referral, and the referral by the Defendant agency will occur within a reasonable time of the determination.

15.     Defendants and Plaintiffs agree that the time for Plaintiffs to claim attorneys' fees and costs as set forth under Fed. R. Civ. P. 54(d)(2) shall be tolled for 60 days following the entry of this Stipulation to provide the parties with an opportunity to negotiate attorneys' fees and costs in good faith and avoid further litigation.

16.     Plaintiffs will provide Defendants with a demand for attorneys' fees and costs within 14 calendar days of executing this Stipulation. The parties agree to negotiate in good faith regarding the amount of attorneys' fees and costs due thereafter. The parties expressly reserve the right to litigate claims to attorneys' fees and costs for this case, including but not limited to claims for fees and costs incurred in filing or responding to past, pending, and future motions in this matter. The parties agree that nothing in this Stipulation has any bearing on Plaintiffs' position that they are entitled to attorneys' fees under FOIA, or on any defenses that Defendants may raise in opposing Plaintiffs' fee demand.

17.     Defendants agree not to seek fees from Plaintiffs for any productions made pursuant to this Stipulation and Order.

18.     Defendants and Plaintiffs agree that the United States District Court for the Southern District of New York shall retain jurisdiction over any controversy or claim arising out of or relating to this Stipulation.

19.     This Stipulation shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against any of the parties hereto.

20.     The persons signing this Stipulation warrant and represent that they possess full authority to bind the entities, agencies, and organizations on whose behalf they are signing the Stipulation.

7

21.    This Stipulation contains the entire agreement between the parties, and any

statements, representations, promises, agreements, or negotiations, oral or otherwise, between the

parties or their counsel that are not included herein shall not be of any force or effect.

Dated: New York, New York
       March ___, 2013


_____
SONIA LIN
LINDSAY NASH
PETER L. MARKOWITZ
Kathryn O. Greenberg Immigration Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, New York 10003
Tel: 212-790-0213
Fax: 212-790-0256
slin@yu.edu
lnash1@yu.edu
pmarkowi@yu.edu

*Attorneys for IJC and NDLON*


_____
SUNITA PATEL
GHITA SCHWARZ
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Tel: 212-614-6439
Fax: 212-614-6499
spatel@ccrjustice.org
gschwarz@ccrjustice.org

*Attorneys for CCR and NDLON*

8

ANTHONY J. DIANA
THERESE CRAPARO
BRIDGET P. KESSLER
Mayer Brown LLP
1675 Broadway
New York, New York 10019
Tel: 212-506-2500
Fax: 212-262-1910
adiana@mayerbrown.com
tcraparo@mayerbrown.com
bkessler@mayerbrown.com

*Attorneys for NDLON*


PREET BHARARA
United States Attorney for
Southern District of New York


*Attorney for Defendants*

By: _____   3/13/13
    CHRISTOPHER CONNOLLY
    ELLEN LONDON
    Assistant United States Attorneys
    86 Chambers Street, 3rd Floor
    New York, New York 10007
    Telephone: (212) 637-2761 / 2745
    Facsimile: (212) 637-2786 / 2686
    E-Mail: christopher.connolly@usdoj.gov
    ellen.london@usdoj.gov


SO ORDERED:


HON. SHIRA A. SCHEINDLIN   3/19/13
United States District Judge

9

# Exhibit A

## Email

**From:**
**Sent:**            Wednesday, October 14, 2009 8:32 PM
**To:**                                              (LEO);                  (LEO);
                     (LEO)
**Cc:**                       (LEO)            (LEO)          (LEO)           (LEO)
**Subject:**         RE: NDR field 2.098

As we've discussed, this language covers my concerns.

I'm not sure how well the "may be searched...to support FBI mission" will go over or if
that type of language is necessary in the PIA.  But I'll leave those questions to          and

W
C

From:                          @ic.fbi.gov]
Sent: Wednesday, October 14, 2009 2:23 PM
To:                       (LEO);                    (LEO);                  ;
(LEO)
Cc:                      (LEO);                  (LEO);              (LEO);              (LEO)
Subject: RE: NDR field 2.098

I think you are right about opting out of the response from IDENT (not the search itself).   b2
Good point.  I do think that the additional line covers the concept that additional          b6
searches are being done and is sufficient.   "Incoming submissions may be searched against  b7C
default repositories to support the FBI mission (e.g., ULF, RISC, IDENT)."

I also think it might be confusing to re-word the entire concept to focus on response
dissemination, but potentially a second line could be added to clarify that the users
designation of a repository to be searched would enable a response from the requested
repository.

What does everyone else think?

FBI/CJIS Management & Program Analyst
New Business and Rapid Prototyping Unit
Policy Initiation and Coordination Section

                          <mailto:                    >
                       <mailto:                    >
From:
Sent: Wednesday, October 14, 2009 12:55 PM
To:                       (LEO);                  (LEO);                  ;
(LEO)
Cc:                  (LEO);                  (LEO);              (LEO);              (LEO)
Subject: Re: NDR field 2.098

I was under the impression that all Interoperability incoming submissions would search
IDENT per the APBs recommendation and that the NDR field would be populated by the
submitting agency to indicate the desire for the IDENT response. At any rate, it seems we
need to show an IDENT response is optional and how the submitter should request the

1

FBI-SC-1311

response. Also, I did not think agencies could opt out of the search (they could only opt out of receiving the response) of IDENT due to the record linking paper.

Management and Program Analyst
FBI, CJIS Division
_____ (w)
_____ (c)

--sent from blackberry--

From: _____
To: _____ (LEO); _____ (LEO); _____@leo.gov _____; _____
(LEO)
Cc: _____ (LEO); _____ (LEO); _____ (LEO); _____ (LEO)
Sent: Wed Oct 14 11:44:36 2009
Subject: NDR field 2.098

A concern was raised with the description within the EBTS for the NDR field 2.098 during preparation for a WIN meeting this week (Oct 15th & 16th). Specifically, the description in the current 8.1 and the proposed 9.0 do not clarify that there are instances in which the FBI will search a repository not specifically requested by the end-user, to support an FBI business process. Today, both RISC and IDENT may be searched EVEN IF THE END-USER DOES NOT DESIGNATE THEM. I believe that we also reverse search 10 prints against the ULF.

b2
b6
b7C

To prevent any possible user confusion, we need to add a blurb to the existing EBTS language. I suggest a sentence after the NDR 2.098 table within the EBTS that states: "Incoming submissions may be searched against default repositories to support the FBI mission (e.g., ULF, RISC, IDENT)."

I have not added anything about users who wants to 'opt-out'. I believe that business rules established based on MOUs should allow for users to broadly opt-out of the IDENT and Latent searches and not require additional fields. I believe, but would want clarification from the SDO, that the SRD sufficiently supports 'opt-out'. I don't believe that option exists for RISC. Not sure if the users will insist that an 'opt-out' sentence be added here or not.

_____  Do you agree with the proposed language, and agree that it be addressed during IIETF discussions next week? Any discussion with IIETF/WIN on this topic yet?

_____: How do you suggest following up on the "opt-out"? Once we hear back from the others we should know how to proceed with IIETF next week. Thanks for your help.


BACKGROUND

    1.
I do not believe that we asked the APB to vote on a default search of RISC. However, it is clearly described as early as the Spring 2007 IS Subcommittee. As an internal note, there was much CJIS discussion in March 2007 on whether IAFIS must perform default searches or whether a true 'hub' capability existed. I believe the final decision was left to MPI, as OGC/AIU responded that there would be no legal liability for not performing the default search, but the best practice would be determined based on FBI mission needs.
        *
RISC default searches
IS Subcommittee Spring 2007
IS Issue #1 Next Generation Identification (NGI) Program Update
AFIT RISC Rapid Search Discussion

"In addition, the IAFIS will provide a non-rapid identification search of the RISC for all ten-print identification search requests."
    2.
The APB clarified the default search for IDENT in June 2009.
        *

FBI-SC-1312

2

IDENT default searches
*
June 2009 APB Recommendation #15
*
APB Item #9  Chairman's Report on the IS Subcommittee

IS Issue #4        Clarification on Record Linking

APB Recommendation:  The APB passed a motion to accept Option #1 with amended verbiage as shown in bold:  For record linking/maintenance purposes, a search/record update will be sent to the Department of Homeland Security's (DHS) Automated Biometric Identification System (IDENT) regardless of the CJIS Division stakeholder's request for an IDENT search. The state can opt out of receiving the response.  The approved motion included a friendly amendment to continue the use of the Transaction Control Number/FBI number conversion.

3.
ULF searches are probably best described under the IAFIS enhancements list, since we have recently implemented reverse searches for non-retained criminals and retained civils.  The APB first addressed the expansion in June 2007.
*
Latent reverse searches

IS Subcommittee Fall 2008
IS Issue #2 Integrated Automated Fingerprint Identification System (IAFIS) Enhancement Status
Enhancement #40
[TABLE]
IAFIS ULF Cascade Capabilities to Support Automated Searches for Retain and Non-retain Criminal and Civil Tenprint Transactions. Approved by APB 6/07.  Completed June 2008
Criminal and Humanitarian (non-retain/non-ident).  January 2009 Civil Retain/non-ident

June 2007 APB
APB Item #9  Chairman's Report on the IS Subcommittee
IS Issue #6       Proposal to Enhance IAFIS Unsolved Latent File (ULF) Cascade Capabilities to Support Automated Search for Retain and Non-retain Criminal and Civil Ten-Print Transactions

APB Action:  The APB voted to approve the topic as information only and request the FBI to look into doing a partial opt-in based on  statue with the implementation of NGI.

EBTS Version 9.0 DRAFT
NDR 2.098 — Name of Designated Repository. (Future Capability) This field contains the

numerical designation of the repository(ies) to be searched. Repository numbers are assigned by

the CJIS Division. Multiple entries in this field will indicate a desire to search more than one

repository, including Canada's RTID and authorized DHS records. Multiple entries will be

separated by the RS separator. The following values are acceptable for NDR.

[TABLE]

NDR Value File Name

1 Criminal Master File Records

2 Civil Records

3 Unsolved Latent File

FBI-SC-1313

4 Major Case File Records

5 Latent Image File Records

6 Repository for Individuals of Special Concern
(RISC)

7 Canada Real Time Identification (RTID)

8 DoD Automated Biometric Identification System
(ABIS)

9 DHS IDENT/US-VISIT

10 International Terrorist File (ITF) Participants

11 RISC Wants and Warrants (W&W)

12 RISC Sexual Offender Registry (SOR)

13 RISC Known and Suspected Terrorist (KST)

14 RISC International Terrorist File (ITF)

15 RISC Persons of Special Interest (Other)

16 - 100 Reserved for Future Use

101-125 FBI Special Population Cognizant Files

126-135 Other Federal Organization Special Population
Cognizant Files

FBI/CJIS Management & Program Analyst
New Business and Rapid Prototyping Unit
Policy Initiation and Coordination Section

<mailto:

<mailto:

b2
b6
b7C

FBI-SC-1314

4

## CJIS ADVISORY POLICY BOARD
### June 4-5, 2009

### STAFF PAPER

## WORKING GROUP TOPIC #4

Clarification on Record Linking

## PURPOSE

The purpose of this paper is threefold:

- provide full transparency into the Record Linking concept as it applies to Shared Services functionality for Interoperability
- provide the data managements necessary to support Record Linking and solicit user input on an alternative implementation option

## POINTS OF CONTACT

[          ] Federal Bureau of Investigation/Criminal Justice Information Services Division (FBI/CJIS)/Biometric Services Section [          ]

[          ] DHS/National Protection & Programs Directorate/United States - Vistor and Immigrant Status Indicator Technology (US-VISIT),[          ]

b2
b6
b7C

## REQUEST OF THE WORKING GROUPS

The Working Groups are requested to review the information detailing the record linking concept for the Next Generation Identification (NGI) and IDENT/IAFIS Interoperability, consider the alternative implementation option presented in this paper and provide a recommendation.

## BACKGROUND

The Federal Bureau of Investigation (FBI) Criminal Justice Information Services (CJIS) Division and the Department of Homeland Security (DHS) United States Visitor and Immigration Status Indicator Technology (US-VISIT) Program have been working together to achieve Interoperability between the FBI's Integrated Automated Fingerprint Identification System (IAFIS) and the DHS Automated Biometric Identification System (IDENT).  Interoperability is planned through incremental deployment with full interoperability to be achieved through the NGI. Since this paper discusses functionality

FBI-SC-1333

-1-

that will be accomplished through full interoperability, all references to what is currently known as IAFIS are reflected as NGI.

One benefit of full interoperability between NGI and IDENT is providing authorized users the ability to submit a single biometric transaction via a single interface to transparently and efficiently retrieve information from both systems. Another feature is users can be notified, via this single interface, whenever relevant data is updated in either system. A key component towards achieving this functionality is using a unique, "person centric" identifier from each system to link fingerprint records common to both NGI and IDENT, hereafter referred to as Record Linking.

Record Linking also has the potential to provide the following benefits:

- **Minimize the number of identification searches:** Where policy permits, when the user of one system hits against a linked record, information from the other system can be obtained without having to search the entire other system, which also decreases system processing. Furthermore, authorized criminal justice IDENT users, such as Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) for authorized criminal justice purposes, may retrieve the full criminal history record information from the Interstate Identification Index (III).
- **Faster response times:** Using the link identifier to retrieve information from the other system, as opposed to having to re-perform biometric searches results in faster response times. This also results in faster notifications to the shared identity owner in the other system.
- **Reduced operations cost:** Reductions in the number of cases requiring both systems to be exhaustively searched will reduce matcher and associated hardware costs and also reduce human verification costs.

The benefits of full Interoperability also present concerns with regard to protection of the data. To address these concerns, nine Data Protection Strategies have been incorporated into Interoperability. The primary objective of these strategies is to ensure that data shared between the systems is accurate, timely, relevant and complete. These Data Protections Strategies were introduced at the Fall 2006 Working Group meetings and endorsed by the Advisory Policy Board (APB) in December 2006.

Specifically, Data Protection Strategy #2 (Inventory of Data Shared), included the initial plan to do a comparison between data residing in NGI and IDENT prior to deployment of Interoperability to ensure each system reflected data that is current, accurate and appropriate. This initial strategy implementation would have also immediately identified commonly held subjects within NGI and IDENT to begin Record Linking.

FBI-SC-1334

In June 2008, an Informational Topic Paper discussed an implementation change to Data Protection Strategy #2. As opposed to a technically challenging "initial sync" of both systems, the agencies intend to incrementally establish record links as transactions are directed to the alternate agency.

Policies and agreements for data management have been established to ensure that each system continues to reflect data that is current, accurate and appropriate. For example, if a link has been established and subsequently all information on a subject is removed from NGI, a delete will be sent to IDENT and the link will be removed. Likewise, when DHS removes a record, a delete request will be sent to NGI and the link will be removed. Additionally, audits will be conducted periodically on both systems to ensure that proper maintenance actions are being performed.

With progress being made towards Interoperability, the intention of this paper is not to cover every aspect of Record Linking, but to provide significant points on how Record Linking is established in the Shared Services environment and an alternative implementation option.

## DISCUSSION AND ANALYSIS

As stated previously, a record link is established for those fingerprint records both common to NGI and IDENT. However, a condition that must be met with regards to the fingerprint records held in both systems before a link can be established is both systems must have fingerprints for the same person as a result of an independent encounter. The only exception to this is where the FBI and DHS missions overlap. For example, an individual encountered by DHS's Customs and Border Protection for a criminal justice purpose could be maintained in both IDENT and NGI. In this instance, a record link could be established.

Furthermore, for Record Linking to be fully accomplished, the process of a new enrollment in IDENT or establishment of a criminal history record within NGI should initiate an identification search request to the other system to determine if the person has a common identity. This is consistent with the goal of the interoperability effort defined in the DHS/US-VISIT and DOJ/FBI Interoperability Concept of Operations to provide full information sharing between the two biometric repositories. For example, CJIS stakeholders will have the option to request a search of IDENT when submitting to NGI. However, a criminal submission to CJIS that does not designate IDENT as an external system to search will still be sent to IDENT for record linking purposes only. In this shared services environment, IDENT will not retain any biometric or biographic information unless IDENT already maintained the subject in their system as a result of an independent encounter. Exceptions to this rule will be determined through data owners and

FBI-SC-1335

-3-

all agencies party to this effort.

This functionality was an area of concern to the IAFIS Interface Evaluation Task Force. The other option is to only send a search to IDENT when the stakeholder requests, thereby minimizing the Record Linking functionality. This option could also result in ICE and CBP to miss state and local law enforcement interactions with Lawful Permanent Residents and visitors that may impact admissibility into the United States or present a national security threat to the United States.

The next process in link establishment is determining if the subject is a commonly held subject through biometric comparison and storing a "person centric" link identifier. From the CJIS stakeholder perspective, if a Tenprint Identification search sent to IDENT is determined to be a match, IDENT will store the "NGI link identifier" and return a response that includes the "IDENT link identifier" and biographic data. The "IDENT link identifier" is then stored with the subject's NGI record. From the DHS stakeholder perspective, if a Tenprint Identification Search sent to NGI is positively identified, NGI will store the "IDENT link identifier" and return the subject's Record of Arrest and Prosecution sheet (RAP sheet), which includes the "NGI link identifier" and biographic data. The "NGI link identifier" is then stored with the subject's IDENT identity. In this instance, both systems perform a biometric comparison, however only one system biometrically verifies the fingerprints in both systems belong to the same individual.

The establishment of record links in NGI and IDENT will enable the retrieval of information using the link identifier as opposed to having to re-perform a biometric comparison. Authorized CJIS stakeholders may subsequently request additional information on linked records, such as photos. Authorized criminal justice IDENT users, for an authorized criminal justice purpose may retrieve the full criminal history record information from III based on an established record link. Authorized non-criminal justice IDENT users will receive notification of activity on linked records, but full criminal history information disclosure will still be dependent on provisions of the National Crime Prevention and Privacy Compact.

## RECOMMENDATIONS

**Option One:** For record linking/maintenance purposes, a search/record update will be sent to IDENT regardless of the CJIS stakeholder's request for an IDENT search.

**Option Two:** A search request will only be sent to IDENT when the CJIS stakeholder requests a search of IDENT.

FBI-SC-1336

## Re: Hot One: Need APB Meeting Minutes

@ic.fbi.gov]

**Sent:** Wednesday, March 09, 2011 7:32 AM

**To:** ____@dhs.gov ____@dhs.gov; ____@dhs.gov

**Cc:** ____@dhs.gov; ____@dhs.gov; ____@leo.gov

Yes this is the recommendation that the APB endorsed for the action paper that was taken through the APB process for Clarification on Record Linking.

Thanks!

- Sent from blackberry -

**From:** ____@dhs.gov>
**To** ____@dhs.gov>; ____
____@dhs.gov>
**Cc:** Greenberg, Randi L ____@dhs.gov>; ____@dhs.gov>; ____;
____@leo.gov ____@leo.gov>
**Sent:** Wed Mar 09 07:27:59 2011
**Subject:** RE: Hot One: Need APB Meeting Minutes

Hi ____

Is the language you are referring to below from the June 2009 APB meeting minutes that every transaction will be sent to IDENT regardless of the type of transaction?  Just want to make sure we have the right part of the meeting minutes.

**APB ITEM #9 Chairman's Report on the Identification Services (IS) Subcommittee**

Mr. ____ Deputy Superintendent, Boston Police Department, and Chairman of the IS Subcommittee, provided the Chairman's Report. (See Appendix O or the PowerPoint presentation.)

During the Chairman's report and discussion, the APB passed the following motions:

IS Issue #4 Clarification on Record Linking

APB Recommendation: The APB passed a motion to accept Option #1 with amended verbiage as shown in bold: For record linking/maintenance purposes, a search/record update will be sent to the Department of Homeland Security's (DHS) Automated Biometric Identification System (IDENT) regardless of the CJIS Division stakeholder's request for an IDENT search. **The state can opt out of receiving response.**

Thanks,

**Secure Communities**
Department of Homeland Security
U.S. Immigration and Customs Enforcement
____@dhs.gov ____(w) - ____(c)

**From:** ____ [mailto: ____@ic.fbi.gov]
**Sent:** Tuesday, March 08, 2011 5:01 PM
**To:** ____
**Cc:** Greenberg, Randi L; ____@leo.gov

b6
b7C

FBI-SC-FPL-603

7/28/2011

**Subject:** RE: Hot One: Need APB Meeting Minutes

If that's the information that they are looking for, that APB endorsement is in the June 2009 meeting minutes. Word of caution though...this recommendation was made for Record Linking purposes, no mention of Secure Communities functionality.

Supervisory Management and Program Analyst
FBI CJIS Division / Global Operations Section
Interoperability Initiatives Unit (IIU)
       (office)
       (mobile)

*This e-mail may contain Personally Identifiable Information (PII) which must be protected in accordance with applicable privacy and security policies. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited.*

**From:**               @dhs.gov]
**Sent:** Tuesday, March 08, 2011 4:55 PM
**To:**
**Cc:**        Greenberg, Randi L;               @leo.gov
**Subject:** Re: Hot One: Need APB Meeting Minutes

What they are looking for is the APB vote that all criminal submissions beginning with NGI will go to Ident, no exception. This was the apb optout issue

Sent using BlackBerry

b6
b7C
b7E

**From:**               @ic.fbi.gov>
**To:**               @dhs.gov>;              @dhs.gov>
**Cc:**              @dhs.gov>; Greenberg, Randi L        @dhs.gov>;
           @dhs.gov>;            @ic.fbi.gov>;
           @leo.gov>
**Sent:** Tue Mar 08 16:49:13 2011
**Subject:** RE: Hot One: Need APB Meeting Minutes

Sorry...one more point.  The discussion regarding what types of transactions search against IDENT data really goes back to the discussions for iDSM and is probably covered in our Concept of Operations.  So that decision predates the Secure Communities program.  Though I wasn't part of the discussions, I imagine since Secure Communities was going to bring a search of the full IDENT repository the TOTs were examined and redefined.

I hope this helps.

**From:**
**Sent:** Tuesday, March 08, 2011 4:43 PM
**To:**
**Cc:**        Greenberg, Randi L;       FBI-SC-FPL-604
**Subject:** RE: Hot One: Need APB Meeting Minutes

7/28/2011

The APB did not endorse or recommend the types of transactions that were sent to IDENT under the Secure Communities program, as they were not asked.

The decision as to which types of transactions were sent to IDENT under the Secure Communities Initiative was determined through discussions between the Secure Communities Program Office and the CJIS Division.  We initially started with the notion of all criminal transactions.  There were some concerns with the CNA transactions to the point that it was determined we would (at that time) not send CNAs.  (side-note: We are still not sending the CNAs though I believe it's a topic for discussion at the touchbase meetings.)

There was also a lot of discussion between ICE, US-Visit and CJIS around the CPI and CAR non-retains, though ultimately the decision was made to send them.

I'm confident between the two agencies these discussions are captured in meeting minutes, but they won't be captured in any minutes from the APB process.

I hope this helps, but if not please don't hesitate to reply or give me a call.

Supervisory Management and Program Analyst
FBI CJIS Division / Global Operations Section
Interoperability Initiatives Unit (IIU)

(office)
(mobile)

*This e-mail may contain Personally Identifiable Information (PII) which must be protected in accordance with applicable privacy and security policies. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited.*

b6
b7C
b7E

**From:**                          @dhs.gov]
**Sent:** Tuesday, March 08, 2011 3:58 PM
**To:**
**Cc:**                                    Greenberg, Randi L;
**Subject:** Re: Hot One: Need APB Meeting Minutes

We are looking for the minutes where they approved the foreign born or unknown place of birth functionality.

Management Program Analyst
U.S. Immigration & Customs Enforcement
Enforcement & Removal Operations
Secure Communities IT Modernization
500 12th Street S.W. (2177B)
Washington D.C. 20004

Office
Mobile
@dhs.gov Email

**From:**                          @ic.fbi.gov>   FBI-SC-FPL-605
**To:**                             @dhs.gov>

7/28/2011

**Cc:** [          ]@dhs.gov>; [                    ]@dhs.gov>; Greenberg, Randi L [              ]@dhs.gov>; [                    ]@dhs.gov>
**Sent:** Tue Mar 08 15:49:25 2011
**Subject:** RE: Hot One: Need APB Meeting Minutes

[      ] is out of the office and I'm actually at APB Working Groups in Louisville right now. I need a clarification of specifically what you are looking for. The topic paper you attached is referencing the functionality of Foreign and Unknown Place of Birth notifications, as opposed to making the determination as to what types of transactions are sent to IDENT.

Are you looking for where it was determined or who determined what transactions are sent to IDENT for Secure Communities?

Supervisory Management and Program Analyst
FBI CJIS Division / Global Operations Section
Interoperability Initiatives Unit (IIU)
[          ] (office)
[          ] (mobile)

*This e-mail may contain Personally Identifiable Information (PII) which must be protected in accordance with applicable privacy and security policies. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited.*

---

**From:** [                    ]@dhs.gov]
**Sent:** Tuesday, March 08, 2011 2:51 PM
**To:** [                    ]leo.gov
**Cc:** [                    ]Greenberg, Randi L; [                    ]
**Subject:** Hot One: Need APB Meeting Minutes

Hi [                ]

We are looking for the meeting minutes in which the APB approved Secure Communities to receive CAR transactions. In the APB Archive on LEO both the Orlando, FL and Litte Rock, Arkansas meeting minutes for issue #14 just states that Jim made a presentation on SC transactions through Interoperability, but does not state anyone approved SC transactions in the meeting minutes.

Is there any easy way to find the minutes that approved all CAR transactions to go through SC?

Under Subcommitted Meetings Archive for Idenfication services Subcommitted in Aug 2008 Issue #4 states the following below. Could you confirm if that is what we are looking for above? I think it is because the minutes below stated the motion carried, but not sure CAR transactions were approved anywhere else with the APB governance structure as we are looking for official documentation that approves SC to receive IAQ on CAR transactions.

Thanks for your help,

[          ]

**CJIS ADVISORY POLICY BOARD (APB)**
**IDENTIFICATION SERVICES (IS) SUBCOMMITTEE**

7/28/2011

**CLARKSBURG, WV**
**OCTOBER 22, 2008**
**STAFF PAPER**

**IS ISSUE #4**
Foreign and Unknown Place of Birth (POB) Notifications to U.S. Immigration and Customs
Enforcement (ICE) Law Enforcement Support Center (LESC)

**PURPOSE**
The U.S. Department of Homeland Security (DHS), ICE in conjunction with the Federal Bureau of
Investigation (FBI) Criminal Justice Information Services (CJIS) Division is proposing to improve
community safety by transforming the way the federal government cooperates with state and local law
enforcement agencies to identify, detain, and remove criminal aliens.
The purpose of this paper is to present a proposal for the FBI/CJIS to provide notification to the DHS
ICE LESC of Foreign or Unknown POB to identify and process criminal aliens amenable for removal.

**POINT OF CONTACT**:
James Buckley, (202) 514-3206

**REQUEST OF THE SUBCOMMITTEE**
The Subcommittee is requested to review the information provided in this paper and provide appropriate
comments, suggestions, and recommendations to the APB.

**BACKGROUND**
The FBI /CJIS Division and the DHS United States Visitor and Immigration Status Indicator
Technology (US-VISIT) Program have been working together to achieve Interoperability between the
FBI's Integrated Automated Fingerprint Identification System (IAFIS) and the DHS Automated
Biometric Identification System (IDENT). Interoperability is planned through incremental deployment,
with additional functionality planned for October 2008 and full interoperability to be achieved through
the Next Generation Identification (NGI).
The DHS ICE LESC began leveraging interoperability with the deployment of the iDSM in September
2006. When a subject is searched against the FBI/CJIS and DHS/US-VISIT datasets and a fingerprint
match is found in the iDSM, the FBI/CJIS generates an Immigration Alien Query (IAQ) message to the
DHS ICE LESC to request immigration status. If the subject is of interest to DHS, ICE LESC
immediately responds by issuing a detainer on the subject to prevent being released on bond.
As an additional enhancement, the FBI/CJIS implemented changes in April 2008 to provide ICE LESC
an electronic notification of identifications to IAFIS records when subjects are also enrolled in the
Immigration Violator File (IVF). Enrollment in the IVF signifies subjects that are a high enforcement
priority for ICE — criminal aliens who have been deported for drug trafficking, firearms trafficking, or
serious violent crimes and on foreign-born individuals who have violated some section of the
Immigration and Nationality Act. This adds an additional and effective avenue for ICE to identify
criminal aliens who are amenable for removal.
One of the key components of the ICE comprehensive plan to Identify and Remove Criminal Aliens is
the distribution of integration technology that will link local law enforcement agencies to both DHS and
FBI biometric databases. As part of the current routine booking process, local officers run a subject's
fingerprints through FBI's IAFIS to access that individuals' criminal history. As part of the
interoperability effort, those fingerprints will also automatically be searched against DHS databases to
access immigration history information. This functionality will be deployed by the FBI/CJIS Division
and DHS/US-VISIT in October 2008 with the Single Search Capability/IDENT Data Response pilot.

**DISCUSSION AND ANALYSIS**
Although ICE has made considerable progress over the past several years in identifying and removing
criminal aliens through its Criminal Alien Program, a fundamental change in ICE's current approach is
required to reach the goal of identifying and removing all removable aliens convicted of a crime. The
implementation of a comprehensive plan to Identify and Remove Criminal Aliens (Secure Communities)
will leverage emerging technology that shares law enforcement data between federal, state, and local
law enforcement agencies. By using this technology, ICE is now able to expand coverage nationwide in

FBI-SC4-PL-607

7/28/2011                    b7E

a more effective manner. Interoperability between the FBI's IAFIS and DHS's IDENT will help ICE and local law enforcement officers positively identify criminal aliens.

ICE has been directed by Congress to improve and modernize efforts to identify aliens convicted of a crime, sentenced to imprisonment, and who may be deportable, and remove them from the U.S. once they are judged deportable and to work to establish a process in conjunction with DOJ that will make every reasonable effort to remove, upon their release from custody, all criminal aliens judged deportable. ICE has the Secure Communities Initiative that applies risk-based methodologies (e.g., an IAQ) to focus resources on assisting all local communities in identifying high-risk criminal aliens amenable for removal while in custody.

In support of the Secure Communities Initiative, the FBI/CJIS Division was requested by ICE to provide an IAQ to the LESC for all IAFIS ten-print Criminal submissions based on a Foreign or Unknown POB and all IAFIS tenprint criminal submissions that match against an existing IAFIS record with a Foreign or Unknown POB.

If the Subcommittee recommends that an IAQ be sent to the DHS ICE LESC for both types of submissions, the following details the processes for each enhancement.

An authorized contributor sends a Criminal tenprint submission to IAFIS for a search of the Criminal Master File (CMF) and the subject's POB is Foreign or Unknown, FBI/CJIS will initiate an IAQ to the LESC on behalf of the requestor, regardless of a positive or negative hit in IDENT. If the search of IAFIS results in a positive match, the FBI number returned from the search will be included in the IAQ. If the searches result in "No match", the outcome will be a biographic-based IAQ and may indicate a first encounter of a potential illegal alien. The LESC will then perform a more extensive search of immigration records to determine the alien status of the subject. Once the alien status has been determined, the LESC will transmit an Immigration Alien Response (IAR) directly to the requestor and may also alert the local ICE office to take additional action.

An authorized contributor sends a Criminal tenprint submission for a search of the CMF with the POB field marked as U.S. If the submission biometrically matches a subject in the CMF with the POB Foreign or Unknown, FBI/CJIS will initiate an IAQ to the LESC. The LESC will then perform a more extensive search of immigration records to determine the alien status of the subject. Once the alien status has been determined, the LESC will transmit an IAR directly to the requestor and may also alert the local ICE office to take additional action.

If the Subcommittee approves the concept as outlined in this paper the enhancements will be implemented through the NGI contract.

**RECOMMENDATION**

The Subcommittee is requested to review the information in this paper and make recommendations on the following:

1. Approve the concept as outlined in this paper.
2. Approve with recommended changes.

**Fall 2008 Working Group Actions:**

**North Central Working Group Action:**
**Motion:** Mr. [                    ] made a motion to accept the proposal for FBI/CJIS to provide notification to the DHS/ICE/LESC of Foreign or Unknown POB to identify and process criminal aliens amenable for removal as outlined with the enhancements to be implemented through the NGI contracts.

**Second:** Mr. [                ]

**Action:** Motion carried

**Northeastern Working Group Action:**
**Motion:** Mr [                    ] made a motion to approve the concept as outlined in the paper:

In support of the Secure Communities Initiative, the FBI/CJIS Division was requested by ICE to provide an IAQ to the LESC for all IAFIS ten-print Criminal submissions based on a Foreign or Unknown POB and all IAFIS tenprint criminal submissions that match against an existing IAFIS record with a Foreign or Unknown POB.

The following details the processes for each enhancement. FBI-SC-FPL-608

b6
b7C
b7E

7/28/2011

An authorized contributor sends a Criminal tenprint submission to IAFIS for a search of the Criminal Master File (CMF) and the subject's POB is Foreign or Unknown, FBI/CJIS will initiate an IAQ to the LESC on behalf of the requestor, regardless of a positive or negative hit in IDENT. If the search of IAFIS results in a positive match, the FBI number returned from the search will be included in the IAQ. If the searches result in "No match", the outcome will be a biographic-based IAQ and may indicate a first encounter of a potential illegal alien. The LESC will then perform a more extensive search of immigration records to determine the alien status of the subject. Once the alien status has been determined, the LESC will transmit an Immigration Alien Response (IAR) directly to the requestor and may also alert the local ICE office to take additional action.

An authorized contributor sends a Criminal tenprint submission for a search of the CMF with the POB field marked as U.S. If the submission biometrically matches a subject in the CMF with the POB Foreign or Unknown, FBI/CJIS will initiate an IAQ to the LESC. The LESC will then perform a more extensive search of immigration records to determine the alien status of the subject. Once the alien status has been determined, the LESC will transmit an IAR directly to the requestor and may also alert the local ICE office to take additional action.

**Second:** Lieutenant
**Action:** Motion carried.

**Federal Working Group Action:**
**Motion:** Mr            moved that the FBI/CJIS Division provide an IAQ to the LESC for all IAFIS tenprint criminal submissions based on a foreign or unknown POB and all IAFIS tenprint criminal submissions that match against an existing IAFIS record with a foreign or unknown POB. The motion further moved to approve the concept as outlined in the paper.
**Second:** Mr
**Action:** Motion carried.

**Southern Working Group Action:**
**Motion:** Mr            made a motion to approve the concept as outlined, an authorized contributor sends a Criminal tenprint submission to IAFIS for a search of the Criminal Master File (CMF) and the subject's POB is Foreign or Unknown, FBI/CJIS will initiate an IAQ to the LESC on behalf of the requestor, regardless of a positive or negative hit in IDENT. If the search of IAFIS results in a positive match, the FBI number returned from the search will be included in the IAQ. If the searches result in "No match", the outcome will be a biographic-based IAQ and may indicate a first encounter of a potential illegal alien. The LESC will then perform a more extensive search of immigration records to determine the alien status of the subject. Once the alien status has been determined, the LESC will transmit an Immigration Alien Response (IAR) directly to the requestor and may also alert the local ICE office to take additional action.
**Second:** Ms.
**Action:** Motion carried

**Western Working Group Action:**
**Motion:** Mr.            moved to approve the concept as outlined in the topic paper. Concept: To provide an Immigration Alien Query to the LESC for all IAFIS ten-print criminal submissions based on a Foreign or Unknown POB and all IAFIS tenprint criminal submissions that match against and existing Integration Automated Fingerprint Identification System record with a Foreign or Unknown POB.
**Second:** Ms.
**Action:** Motion Carried.

b6
b7C
b7E

**Secure Communities**
Department of Homeland Security
U.S. Immigration and Customs Enforcement
                    @dhs.gov              (w)            (c)

FBI-SC-FPL-609

# Exhibit B

 # Criminal Justice Information Services

## Advisory Policy Board

March 26, 2012

Ms. Jessica Karp
National Day Laborer
  Organizing Network
1419 V Street, NW, Suite 400
Washington, DC  20009

Dear Ms. Karp:

I am writing in response to your e-mail dated March 8, 2012, which included your topic suggestion to the Federal Bureau of Investigation's (FBI) Advisory Policy Board (APB). The APB, chartered under the provisions of the Federal Advisory Committee Act of 1972, serves to review appropriate policy, technical, and operational issues related to the services maintained by the FBI's Criminal Justice Information Services (CJIS) Division, and makes recommendations resulting from those reviews to the Director of the FBI for approval.

Your communication to the APB appears to be on behalf of numerous civil and immigrant rights organizations requesting the APB re-examine a previous recommendation related to Interoperability between the FBI and Department of Homeland Security (DHS) biometric databases.

In November 2011, the Department of Justice determined that federal law, Title 18, United States Code, Section 1722, requires the FBI to share fingerprint data in the FBI's Integrated Automated Fingerprint Identification System with the DHS as that data is relevant to admissibility or deportability determinations made by the DHS.  Therefore, this topic is not a matter within the purview of the APB.

On behalf of the CJIS Division, and the APB to which I serve as principal liaison, I thank you for your interest as demonstrated by your submission.

Sincerely yours,


R. Scott Trent
Designated Federal Officer
Criminal Justice Information
  Services Division

319Y-HQ-A1487723            1 – AIU, Mod. C-3
1 – Mr. Cuthbertson, Mod. C-3    1 – Mr. Trent, Mod. C-3
RST:slb (5)

**Representing the interests of the local, state, federal, and tribal criminal justice community.**

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

NATIONAL DAY LABORER
ORGANIZING NETWORK, CENTER FOR
CONSTITUTIONAL RIGHTS, and
IMMIGRATION JUSTICE CLINIC OF THE
BENJAMIN N. CARDOZO SCHOOL OF
LAW,

        *Plaintiffs,*

        vs.

UNITED STATES IMMIGRATION AND
CUSTOMER ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, FEDERAL
BUREAU OF INVESTIGATION,
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, and OFFICE OF LEGAL
COUNSEL,

        *Defendants.*

-------------------------------------------------- X

**ECF CASE**

**10 CV 3488 (SAS)**

## STIPULATION AND ORDER

WHEREAS, on April 27, 2010, National Day Laborer Organizing Network, Kathryn O.

Greenberg Immigration Justice Clinic of the Benjamin N. Cardozo School of Law, and Center

for Constitutional Rights (collectively "Plaintiffs") filed a complaint ("the Complaint"), seeking

the release of certain documents by United States Immigration and Customs Enforcement

("ICE"), the United States Department of Homeland Security ("DHS"), the Federal Bureau of

Investigation ("FBI"), the Executive Office for Immigration Review ("EOIR"), and the Office of

Legal Counsel ("OLC") (collectively "Defendants"), pursuant to the Freedom of Information

Act, 5 U.S.C. § 552 ("FOIA");

WHEREAS, the allegations in the Complaint concern, *inter alia*, Plaintiffs' FOIA requests dated February 3, 2010 (collectively, the "FOIA Request");

WHEREAS, on February 7, 2011, and February 14, 2011, the United States District Court for the Southern District of New York (the "Court") issued orders (the "Orders") regarding the form and format in which records responsive to the FOIA Request must be produced (Docket ## 41, 50);

WHEREAS, on February 21, 2011, Defendants filed a Notice of Appeal of the Orders to the United States Court of Appeals for the Second Circuit (Docket # 63) (the "Appeal");

WHEREAS, the parties have conferred and resolved their dispute regarding the form and format of future productions of records responsive to the FOIA Request;

WHEREAS, in light of the parties' resolution of their dispute regarding form and format of production, the Court has indicated that, upon dismissal of the Appeal, it intends to issue an order withdrawing the Orders (the "Order of Withdrawal"), and to enter this Stipulation and Order; and

WHEREAS, the parties have agreed to a dismiss the Appeal pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure to permit the Court to enter the Order of Withdrawal and this Stipulation and Order, without prejudice to re-instatement of the Appeal if the Court does not enter the Order of Withdrawal and this Stipulation and Order;

IT IS HEREBY STIPULATED AND AGREED, by and between the parties, that records responsive to the FOIA Request henceforth shall be produced as follows:

1.      Any responsive, non-exempt records shall be produced in Portable Document Format ("PDF") files. Prior to production, Defendants shall apply Optical Character Recognition ("OCR") software to each PDF file in order to render them searchable.

2. All pages within each PDF file shall be consecutively Bates numbered.

3. All PDF files shall be named using the beginning Bates number of the document.

4. A .txt ("Text") file for each PDF file shall be produced, and each Text file shall be named using the beginning Bates number of the document. Text files shall be created using Adobe Acrobat or equivalent OCR software.

5. Defendants shall exercise best efforts to maintain existing parent-child relationships – for example, a "parent" email and accessible "child" attachments to that e-mail – and produce those documents such that the parent and its corresponding children appear as consecutive PDF files within a Bates range (for example: parent, child, child). No affirmative steps shall be taken to separate a parent from its corresponding children during processing of documents or release of documents.

6. Excel spreadsheets shall be produced in accordance with the foregoing paragraphs. Hidden rows and columns within an Excel spreadsheet must be exposed prior to converting the native (.xls) file to a PDF document. The parties agree to continue to negotiate in good faith concerning the production of a sample of Excel spreadsheets in native format, in instances where Plaintiffs identify individual spreadsheets warranting further review, and such spreadsheets contain no information exempt from production under FOIA.

7. E-mail records shall be produced in accordance with the foregoing paragraphs. Defendants need not conduct a search of each individual e-mail solely to ascertain whether that e-mail contains a blind carbon copy ("BCC"); however, upon discovery that an e-mail contains a visible BCC field, Defendants shall not take any affirmative steps to conceal that BCC field, except to redact that BCC field as exempt from production under FOIA. Any such redactions shall be clearly visible on the face of the produced PDF file.

-3-

8.     Defendants agree to provide Plaintiffs with information concerning the organization of documents within each production.  FBI and ICE shall use best efforts to organize documents by topical areas, subject to further good faith discussions between the parties concerning the most efficient organization of productions.

9.     To the extent that electronic documents have been collected or are collected on a going-forward basis in an electronic format in connection with the Plaintiffs' FOIA Request, such documents shall continue to be preserved in an electronic format.

10.     The parties agree that the Court shall retain jurisdiction over any controversy or claim arising out of or relating to this Stipulation and Order.

11.     This stipulation is for settlement purposes only and applies solely to future productions in the above-captioned case.  The stipulation not precedential with respect to any FOIA request or FOIA litigation.  Entry by Defendants into this Stipulation shall not be construed as an admission or concession that the form and format of production specified herein is "readily reproducible," pursuant to 5 U.S.C. § 552(a)(3)(B), with respect to Plaintiffs' FOIA Request, or any other FOIA Request.

12.     This Stipulation contains the entire agreement between the parties, and any statements, representations, promises, agreements, or negotiations, oral or otherwise, between the parties or their counsel that are not included herein shall be of no force or effect.

13.     This stipulation may be executed in counterparts.  Facsimile signatures shall constitute originals.

-4-

Dated: June 15, 2011
     New York, New York

BRIDGET P. KESSLER
PETER L. MARKOWITZ
Kathryn O. Greenberg Immigration
Justice Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, NY 10003
Tel: (212) 290-0213
Fax: (212) 790-0256

*Attorneys for NDLON and IJC*

SUNITA PATEL
GITANJALI GUTIERREZ
Center for Constitutional Rights ("CCR")
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

*Attorneys for CCR and NDLON*

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:
JOSEPH N. CORDARO
CHRISTOPHER CONNOLLY
CHRISTOPHER B. HARWOOD
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Tel: (212) 637-2761 / 2745 / 2728
Fax: (212) 637-2786

-5-

ANTHONY J. DIANA
THERESE CRAPARO
LISA R. PLUSH
JEREMY D. SCHILDCROUT
Mayer Brown LLP
1675 Broadway
New York, NY 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

*Attorneys for NDLON*

SO ORDERED:

Dated: New York, New York
       June 17, 2011

HON. SHIRA A. SCHEINDLIN, U.S.D.J.

-6-

# Exhibit D

**EXHIBIT D – DETAINER DATA FIELDS**

Pursuant to paragraph 12 of the foregoing Stipulation and Order of Dismissal, ICE will provide Plaintiffs with the following data, which it tracks electronically in the ordinary course of business:

(a)     Date that detainer was prepared and issued to local law enforcement.

(b)     Area of responsibility/region of the officer that issued the detainer.

(c)     Site location, meaning facility (ICE or local) where the individual will be detained in immigration custody.

(d)     Docket Control Office, meaning the ICE office where dockets are maintained. This could be a field office or it could be some other type of office.

(e)     Detention location name, meaning the location where the individual was detained in state custody noted on the Form I-247.

(f)     ICE program through which the detainer subject was identified by ICE. This refers to the text entry on the detainer form, including 287(g), CAP or Secure Communities.

(g)     Active investigation? Yes or No based on entry in check box on Form I-247.

(h)     Arrest warrant served? Yes or No based on entry in check box on Form I-247.

(i)     Deportation ordered? Yes or No based on entry in check box on Form I-247.

(j)     Notify release request? Yes or No based on entry in check box on Form I-247.

(k)     Country of birth or citizenship.

(l)     Was the individual arrested by ICE? Yes or No.

(m)     Date individual was arrested by ICE, if applicable.

(n)     Whether detainer is active/inactive. Yes or no. "Inactive" detainers include those that are lifted or have become inactive for other reasons.

(o)     Reason that the detainer was lifted, if applicable, designated by the following codes:

(i)     B- Booked into ICE detention facility.

(ii)     C- Case closed. "Case closed" means that the immigration case has been closed. An officer might use this code rather than "not subject to deportation" where the case has been closed for administrative reasons rather than based on a substantive finding that the individual is not removable.

(iii)   D- Died.

(iv)   F- Lifted/Lack of funds. "Lack of funds" means that the field office does not have funding available to effectuate the individual's detention (even though there might be sufficient bed space)

(v)   L- Lifted. "Lifted" would cover a number of reasons for a detainer being lifted, including the "lack of funds" and "lack of space" categories.

(vi)   N- Not Subject to Deportation.

(vii)   S- Lifted/Lack of Space. "Lack of space" means that there is a lack of bed space to detain the individual.

(viii)   T- Transferred. "Transferred" refers to an individual being transferred between two state or local jurisdictions, *e.g.* from one county's detention facility to another county's facility. The ICE detainer is not lifted as a result of this transfer, but this code allows ICE to note that the individual has been moved from one jurisdiction to other since the detainer was issued.

(ix)   U-U.S. Citizen Interviewed.

(x)   Z- Early Release. "Early release" means that the individual was released from criminal custody before the 48-hour period tolled or began to run.

(p)   Most serious criminal conviction on file.

(q)   Notice to Appear issued by DHS/ICE? Yes or No.

(r)   Date on which Notice to Appear was issued by DHS/ICE.

(s)   Date on which Notice to Appear was served on detainer subject/filed in court.

2